Konrad K. Gatien (Bar No. 221770)
E-Mail:  kgatien@stubbsalderton.com
Anthony M. Keats (Bar No. 123672)
E-Mail:  akeats@stubbsalderton.com
Barak J. Kamelgard (Bar No. 298822)
Email:  bkamelgard@stubbsalderton.com
STUBBS ALDERTON & MARKILES LLP
1453 3rd Street Promenade, Suite 300
Santa Monica, CA 90401
Telephone:   (310) 746-9800
Facsimile:    (310) 746-9820

Attorneys for Plaintiff
AOP VENTURES, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## EASTERN DIVISION - RIVERSIDE

| | |
|---|---|
| AOP VENTURES, INC., a Delaware corporation,<br><br>                    Plaintiff,<br><br>          v.<br><br>STEAM DISTRIBUTION, LLC, a California limited liability company; ONE HIT WONDER, INC., a California corporation; HAVZ, LLC DBA STEAM WHOLESALE, a California limited liability company; ANTHONY TELLEZ III, an individual; and DOES 1-10,<br><br>                    Defendants.<br><br>―――――――――――――――<br>ONE HIT WONDER, INC., a California corporation; and ANTHONY TELLEZ III, an individual,<br><br>                    Counterclaimants,<br>          v.<br><br>AOP VENTURES, INC., a Delaware corporation,<br><br>                    Counterdefendant. | **CASE NO. 5:15-CV-01586 VAP (KKx)**<br><br>**[PROPOSED] STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |

Plaintiff AOP Ventures, Inc. ("AOP"), by and through its attorneys, submits this Statement of Uncontroverted Facts and Conclusions of Law in support of AOP's Motion for Summary Judgment, or, in the Alternative, Partial Summary Judgment, as required by Rule 56 of the Federal Rules of Civil Procedure and L.R. 56-1.

## UNCONTROVERTED FACTS

| FACT | EVIDENTIARY SUPPORT |
|---|---|
| 1.  In June 2014, Barbara Villegas, AOP's predecessor-in-interest, developed THE MILKMAN e-liquid. | Villegas Decl. ¶ 1; Ex. 58 at 39:7-9 |
| 2.  Ms. Villegas conducts an e-liquid business under the name The Vaping Rabbit. | Villegas Decl. ¶ 10; Ex. 58 at 12:24-13:5 |
| 3.  Ms. Villegas chose the brand name, THE MILKMAN, for her new e-liquid, because she believed in the potential of the brand name and flavor profile of milk, ice cream, and fruit tarts. | Villegas Decl. ¶ 2; Ex. 58 at 39:10-40:1, 72:6-9 |
| 4.  In July 2014, Ms. Villegas proceeded with plans to manufacture and distribute THE MILKMAN e-liquid. | Villegas Decl. ¶ 4; Ex. 58 at 41:16-42:20 |
| 5.  In July 2014, Ms. Villegas contacted packaging manufacturers to produce packaging for THE MILKMAN e-liquid. | Villegas Decl. ¶ 6; Ex. 4 |

| | |
|---|---|
| 6. In July 2014, Ms. Villegas established Instagram and Google social media accounts under THE MILKMAN name. | Villegas Decl. ¶ 5; Ex. 3 |
| 7. Ms. Villegas established the Instagram account on July 7, 2014, under the social media handle @themilkmaneliquid. | Villegas Decl. ¶ 5; Ex. 3 |
| 8. Ms. Villegas established the Gmail account on July 7, 2014, under the email address themilkmaneliquid@gmail.com. | Villegas Decl. ¶ 5; Ex. 3 |
| 9. By November 2014, Ms. Villegas had purchased a large order of packaging, labels, and promotional materials bearing THE MILKMAN mark. | Villegas Decl. ¶¶ 7-8; Ex. 5; Ex. 6 |
| 10. Ms. Villegas was so excited about the potential for the brand that she announced it to the vaping community in a series of posts on Instagram on December 3 and 4, 2014. | Villegas Decl. ¶¶ 11-13 |
| 11. On December 3, 2014, Ms. Villegas placed two posts on Instagram directing viewers to a "sneak peek" video for THE MILKMAN, which she had uploaded to thevapingrabbit.com. | Villegas Decl. ¶ 12; Ex. 8; Ex. 9 |

| | |
|---|---|
| 12.    Ms. Villegas included the hashtag "#themilkman" in the comments for the posts. | Villegas Decl. ¶ 12; Ex. 8; Ex. 9 |
| 13.    The December 4, 2014, post announced the imminent launch of the brand, and included promotional postcards featuring THE MILKMAN name and the milk carton Ms. Villegas had manufactured in November. | Villegas Decl. ¶ 13; Ex. 10 |
| 14.    The buzz from the posts was so significant that Ms. Villegas met with AOP (her distributor) in December 2014 to discuss the possibility of AOP becoming the exclusive distributor for THE MILKMAN. | Villegas Decl. ¶ 14-16; Ex. 58 at 58:2-13; Zhang Decl. ¶¶ 3-4; Ex. 57 at 27:25-28:8 |
| 15.    AOP immediately saw the potential in the brand. | Zhang Decl. ¶ 5; Ex. 57 at 115:9-116:2 |
| 16.    On January 1, 2015, AOP agreed to become the exclusive distributor for THE MILKMAN e-liquid. | Villegas Decl. ¶ 17; Zhang Decl. ¶ 6 |
| 17.    On January 5, 2015, AOP and Ms. Villegas entered into an Exclusive Distribution Agreement. | Villegas Decl. ¶ 18; Zhang Decl. ¶ 7; Ex. 11 |
| 18.    On January 5, 2015, AOP placed its first order of THE MILKMAN e-liquid for 20,000 bottles. | Villegas Decl. ¶ 19; Zhang Decl. ¶ 8; Ex. 12 |

-3-   [PROPOSED] STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW IN SUPPORT OF PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 19.   This order of 20,000 bottles was the largest order Ms. Villegas had for a single flavor, compared to her typical 5,000 bottle orders. | Villegas Decl. ¶ 19 |
| 20.   On January 22, 2015, AOP placed an order for another approximately 18,000 bottles of THE MILKMAN e-liquid. | Zhang Decl. ¶ 10; Ex. 13 |
| 21.   Between January 2015 and April 2015, AOP sold over ███ bottles of THE MILKMAN e-liquid nationwide. | Zhang Decl. ¶ 13; Ex. 16 |
| 22.   By May 1, 2015, AOP had sold its THE MILKMAN e-liquid into all 50 states. | Zhang Decl. ¶ 14; Ex. 16 |
| 23.   During the period between January 5, 2015, and May 1, 2015, AOP's sales were growing nationwide. | Zhang Decl. ¶ 14; Ex. 16 |
| 24.   Many of the states in which AOP sold the least in terms of volume had more sales per capita than the states with the most sales volume. | Kamelgard Decl. ¶ 5; Request for Judicial Notice, Ex. C |
| 25.   This popularity and success was due in large part to AOP's Internet advertising. | Zhang Decl. ¶ 15 |

[PROPOSED] STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW IN SUPPORT OF PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 26. AOP's Internet advertising included email blasts and active social media accounts. | Zhang Decl. ¶ 15; Ex. 57 at 96:13-97:2 |
| 27. The vaping community, the customers of the parties' e-liquid, is very active and reputation can be spread quickly online and through word-of-mouth. | Villegas Decl. ¶ 14; Ex. 58 at 53:11-19; Ex. 51 at 45:3-4 ("the way it works in this industry, again everything is word of mouth") |
| 28. AOP's online viewership and customer base also grew during the period between January 5, 2015, and May 1, 2015. | Zhang Decl. ¶ 16; Ex. 17; Ex. 18 |
| 29. Between January 2015 and May 2015, new visitors to AOP's website grew at a consistent pace in every state. | Zhang Decl. ¶ 16; Ex. 17; Ex. 18 |
| 30. As with AOP's sales volume, many of the states in which AOP had the least number of visitors to its website had more visitors per capita than the states with the most visitors. | Kamelgard Decl. ¶ 6; Request for Judicial Notice, Ex. C |
| 31. AOP acquired a national reputation for its e-liquid before Defendants' MILK MAN e-liquid was sold to the general public in May 2015. | Zhang Decl. ¶ 17 |

[PROPOSED] STATEMENT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW IN SUPPORT OF
PLF'S MOTION FOR SUMMARY JUDGMENT

| 32.    As early as April 30, 2015, before Defendants began selling their MILK MAN e-liquid, in the comments of One Hit Wonder's Instagram posts about the MILK MAN, customers asked about AOP's rights to the mark. | Zhang Decl. ¶ 26; Ex. 19; Ex. 38 |
|---|---|
| 33.    By the time Defendants sold their MILK MAN e-liquid, William Hackett, who was responsible for Defendants' social media, knew of THE MILKMAN e-liquid. | Ex. 48 at 72:18-73:2 (William Hackett is responsible for social media), 132:8-25 ("Yeah, it's definitely safe to say that they knew that there was another brand in existence."); Ex. 38 |
| 34.    William Hackett is the younger brother of Robb Hackett, who is the Principle of Defendants Steam Distribution, LLC, One Hit Wonder, Inc., and HAVZ, LLC Dba Steam Wholesale. | Ex. 48 at 30:30-31:3; Ex. 53 at 17:6-8, 89:5-7 |
| 35.    William Hackett testified that he did not tell Robb Hackett, about The Milkman, Vaping Rabbit, or the milk carton because he "assumed they'd already know. You know, Rob's way more on this industry that I am…" I figure he's the one who's working with all the brands and stuff." | Ex. 53 at 219:18-220:13 |

[PROPOSED] STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW IN SUPPORT OF PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 36.    Given the early success of THE MILKMAN brand, on March 26, 2015, AOP acquired all right, title and interest in and to THE MILKMAN mark from Ms. Villegas. | Villegas Decl. ¶ 20; Zhang Decl. ¶ 12; Ex. 15 |
| 37.    During this time period, AOP decided to protect its brand by filing a federal trademark application for its THE MILKMAN mark with the United States Patent and Trademark Office ("USPTO"). | Zhang Decl. ¶ 18 |
| 38.    AOP's counsel did a brief clearance check of the USPTO online records, only to discover that Defendant Tellez had filed a trademark application for the mark MILK MAN for e-liquid. | Zhang Decl. ¶¶ 19-20; Ex. 57 at 67:3-23, 68:4-6 |
| 39.    Tellez filed the trademark application for MILK MAN in his own name on March 4, 2015. | Ex. 25 ¶ 10; Ex. 31 |
| 40.    Tellez's trademark application was assigned the serial number 86553215. | Ex. 25 ¶ 10; Ex. 31 |
| 41.    At the time Defendant Tellez filed the trademark application for the MILK MAN mark, he was employed as a warehouse worker for Defendants. | Ex. 50 at 48:3-7, 68:2-10 |

[PROPOSED] STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW IN SUPPORT OF PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 42.   Tellez did not perform any trademark availability searches before filing his trademark application for the MILK MAN mark. | Ex. 50 at 94:14-25 |
| 43.   In his trademark application for MILK MAN, Tellez alleged a date of first use of November 1, 2014. | Ex. 31 |
| 44.   The specimen of use Tellez filed with the USPTO for his MILK MAN trademark application consisted of a roll of labels. | Ex. 31 |
| 45.   Defendants admitted these labels were not used until May 2015. | Ex. 48 at 96:5-12 (labels used before the current MILK MAN labels were the plain labels Tellez used); Exs. 34-37 (current MILK MAN bottles not sold until May 2015) |
| 46.   The earliest "sale" of MILK MAN e-liquid Defendants can prove was November 14, not November 1, 2014 (the date claimed in Tellez's trademark application for the MILK MAN mark). | Ex. 29, No. 13; Ex. 33 |
| 47.   Tellez stated in his testimony that he did not know why his trademark application for MILK MAN claimed a first use date of November 1, 2014. | Ex. 50 at 107:17-20 |

[PROPOSED] STATEMENT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW IN SUPPORT OF
PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 48.   AOP researched the alleged "use" by Tellez and found no public evidence of any sales of MILK MAN e-liquid by Tellez. | Zhang Decl. ¶ 22 |
| 49.   AOP's research confirmed that Tellez also filed a federal trademark application for ONE HIT WONDER E-LIQUID (Ser. No. 86553281) on March 4, 2014. | Zhang Decl. ¶ 21 |
| 50.   AOP's research identified the Facebook social media page and website for www.onehitwondereliquid.com, which were associated with Defendant One Hit Wonder. | Zhang Decl. ¶ 21 |
| 51.   As of April 28, 2015, One Hit Wonder's Facebook social media page did not mention MILK MAN e-liquid. | Ex. 19 (first social media post for MILK MAN e-liquid dated April 29, 2015) |
| 52.   As of April 28, 2015, One Hit Wonder's website, www.onehitwondereliquid.com, did not mention MILK MAN e-liquid. | Ex. 19 (first social media post for MILK MAN e-liquid dated April 29, 2015, states the product will be listed on the website after the official announcement) |

| | |
|---|---|
| 53.    In April 2015, when AOP's agents called One Hit Wonder to purchase MILK MAN e-liquid they were told the product was not available for sale, and would not be released until May 2015. | Zhang Decl. ¶ 22 |
| 54.    Based on the foregoing, AOP believed that the sales claimed in Tellez's federal trademark application for MILK MAN had been fabricated and that the application was fraudulent. | Zhang Decl. ¶ 23 |
| 55.    On May 4, 2015, AOP filed its trademark applications for THE MILKMAN (Ser. No. 86618735) in standard word format and THE MILKMAN (Ser. No. 86618769) in stylized form. | Zhang Decl. ¶ 24 |
| 56.    In May 2015, Defendants One Hit Wonder, Steam Distribution, and Steam Wholesale, starting selling e-liquid under the mark MILK MAN. | Exs. 34-37 |
| 57.    Defendants did not perform any trademark availability searches before beginning to sell their MILK MAN e-liquid. | Ex. 50 at 94:14-25 |

[PROPOSED] STATEMENT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW IN SUPPORT OF
PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 58.    At that point, AOP was able to confirm actual sales in commerce by One Hit Wonder of e-liquid under the MILK MAN mark. | Zhang Decl. ¶ 25; Ex. 57 at 70:4-9 |
| 59.    On June 24, 2015, AOP sent a letter to Defendants demanding that they cease all use of the MILK MAN mark. | Gatien Decl. ¶ 18; Ex. 41 |
| 60.    Defendants did not respond to AOP's June 24, 2015 letter. | Gatien Decl. ¶ 19 |
| 61.    AOP sent a follow-up letter on July 8, 2015. | Gatien Decl. ¶ 20; Ex. 42 |
| 62.    On July 17, Defendants' counsel finally replied, stating that he was "investigating the facts." | Gatien Decl. ¶ 21; Ex. 43 |
| 63.    In his July 17 letter, Defendants' counsel did not make any claims alleging Defendants' priority of use. | Ex. 43 |
| 64.    In his July 17 letter, Defendants' counsel did not make any claims of superior ownership rights to the name MILK MAN on behalf of Defendants. | Ex. 43 |

| | |
|---|---|
| 65.    In his July 17 letter, Defendants' counsel did not make any claims against AOP for infringement of Defendants' MILK MAN mark. | Ex. 43 |
| 66.    Instead, Defendants' counsel requested in his July 17 letter that AOP "provide us with the details of your investigation that led you to conclude that my client did not sell any e-liquid under the mark prior to an up to the January 5, 2015?" | Ex. 43 |
| 67.    On July 24, 2015, AOP's counsel sent a letter to Defendants' counsel maintaining AOP's claims of infringement, demanding a response by July 31, 2015, or AOP would file the instant lawsuit to protect its rights by August 5, 2015. | Gatien Decl. ¶ 22; Ex. 44 |
| 68.    Defendants did not respond to AOP's July 24, 2015, letter. | Gatien Decl. ¶ 23 |
| 69.    On August 5, 2015, AOP filed this lawsuit. | Gatien Decl. ¶ 24 |
| 70.    On August 11, 2015, AOP requested, and was granted, a 90-day extension of time to file a notice of opposition to Tellez's MILK MAN trademark application. | Gatien Decl. ¶ 25 |

| | |
|---|---|
| 71.    Defendants did not assert any prior rights or make any claims against AOP for infringement of their MILK MAN mark until filing their Counterclaim in this Action, on August 27, 2015. | Ex. 30, No. 197 |
| 72.    In March 2016, over six months after One Hit Wonder filed its Counterclaim, One Hit Wonder testified that it did not think AOP or AOP's use of THE MILKMAN mark was harming Defendants' business or Defendants' mark. | Ex. 48 at 155:3-17; 156:5-10, 160:6-15 |
| 73.    In March 2016, One Hit Wonder testified that it had not conducted an analysis of harm before asserting its Counterclaim. | Ex. 48 at 167:7-17 |
| 74.    In March 2016, One Hit Wonder testified that it could not say it had a basis for its Counterclaim. | Ex. 48 at 160:16-22 |
| 75.    In March 2016, One Hit Wonder testified that no one on behalf of One Hit Wonder told its attorneys that it believed AOP's use of AOP's THE MILKMAN mark was damaging Defendants' business. | Ex. 48 at 160:23-161:4 |

| | |
|---|---|
| 76.    On or about September 30, 2015, after the commencement of this action and during the 90-day extension given to AOP to oppose Tellez's federal trademark application, Defendant One Hit Wonder filed a California state trademark application for MILK MAN for e-liquid, the same goods identified in the federal MILK MAN application. | Gatien Decl. ¶ 26; Ex. 45 |
| 77.    There is no opposition window for third parties to oppose a California trademark application. | Request for Judicial Notice ¶ 4 |
| 78.    There is no public database for a third party to search which trademark applications have been filed in California without formally requesting information. | Request for Judicial Notice ¶ 4 |
| 79.    Defendants did not inform AOP of their California trademark application until January 5, 2016. | Gatien Decl. ¶ 29, Ex. 47 |
| 80.    One Hit Wonder's California MILK MAN mark matured to registration on October 21, 2015 (Cal. Reg. No. 120457). | Gatien Decl. ¶ 27; Ex. 46 |

[PROPOSED] STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW IN SUPPORT OF PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 81.    On October 26, 2015, five days *after* the California MILK MAN mark registered in the name of One Hit Wonder, Tellez claims to have assigned all right, title and interest in and to the MILK MAN mark to One Hit Wonder. | Ex. 25 ¶ 11 |
| 82.    California is the largest source of e-liquid sales for AOP and Defendants. | Ex. 16; Exs. 34-37 |
| 83.    The majority of e-liquid brands are from Southern California. | Ex. 48 at 144:12-24 |
| 84.    On November 13, 2015, AOP opposed the federal trademark application for the MILK MAN mark before the Trademark Trial and Appeal Board. | Gatien Decl. ¶ 28 |
| 85.    At that point, AOP was unaware that Defendants had applied for or registered the California trademark registration for MILK MAN. | Gatien Decl. ¶ 29 |
| 86.    On January 5, 2016, Defendants informed AOP of One Hit Wonder's California trademark registration. | Gatien Decl. ¶ 29; Ex. 47 |

| | |
|---|---|
| 87. On January 5, 2016, Defendants told AOP that One Hit Wonder obtained the California trademark registration for MILK MAN, and, therefore, intended to amend Defendants' counterclaim to add a California statutory cause of action for infringement of the registered state trademark. | Ex. 47 |
| 88. Prior to May 2015, the only "sales" of MILK MAN e-liquid were by Tellez. | Ex. 29, No. 13; Ex. 26, No. 5; Exs. 32-33 |
| 89. Despite claiming a date of first use of November 1, 2014, in his trademark application for the MILK MAN mark, Tellez has no documentary evidence of any "sales" of MILK MAN e-liquid prior to November 14, 2014. | Ex. 29, No. 13; Ex. 26, No. 5; Exs. 32-33 |
| 90. The November 14, 2014, "sale" of MILK MAN e-liquid to LA Vapor Works consisted of only 2 bottles. | Exs. 32 |
| 91. The November 21, 2014, "sale" of MILK MAN e-liquid to Whittier Vapes consisted of only 6 bottles. | Exs. 33 |

[PROPOSED] STATEMENT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW IN SUPPORT OF
PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 92.    LA Vapor Works and Whittier Vapes were close to Tellez's residence in Whittier, California. | Ex. 49 at 152:18-19, 153:5-13; Request for Judicial Notice ¶¶ 6-7 |
| 93.    On November 14, 2014, Tellez claims to have sold 2 bottles of "Milkman" e-liquid to Berj Aliksanian, the owner of LA Vapor Works, for a total of $40. | Ex. 32 |
| 94.    Tellez chose Aliksanian because of their friendship and because Aliksanian would be an "easy one for helping [Tellez] out." | Ex. 50 at 186:4-23; *see also* Ex. 50 at 180:23-25 (testifying that he met Aliksanian before 2012); Ex. 50 at 185:7-9 (calling Aliksanian a friend in November 2014) |
| 95.    Aliksanian characterized the transaction as Tellez giving him samples and then offering to pay Tellez because Aliksanian "thought [Tellez] could probably use the money." | Ex. 51 at 52:9-17 |
| 96.    Aliksanian admitted that he is "not a really good businessman" in that he "tend[s] to overpay for things" and only paid for the bottles because Tellez "needed money." | Ex. 51 at 64:21-65:5 |

[PROPOSED] STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW IN SUPPORT OF PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 97.   According to Aliksanian, if Tellez had approached another purchaser, the purchaser would have said "No, just give me these for free. They don't have, you know, right labeling. I can't really sell it." | Ex. 51 at 65:6-9 |
| 98.   According to Aliksanian, if Tellez "came with that label now, most shops would tell him, you know, 'Just go away. We're not even going to try that.'" | Ex. 51 at 25:24-26:6 |
| 99.   Aliksanian testified that, in November 2014, his minimum order would normally have been at least ten bottles. | Ex. 51 at 49:19-22 |
| 100.  Aliksanian testified in his deposition that the invoice for the November 14 "sale" was written on November 14, 2014. | Ex. 51 at 57:14-18 |
| 101.  Aliksanian testified in his deposition that the invoice for the November 14 "sale" was signed on November 14, 2014. | Ex. 51 at 57:19-20 |

| | |
|---|---|
| 102.   Aliksanian testified in his deposition that, on November 14, 2014, the signatures were written on the invoice as a memento for Tellez, then the invoice was scanned, and then the phone numbers were written on the invoice because Tellez wanted the invoice. | Ex. 51 at 57:25-58:23 |
| 103.   Tellez testified that he was "sure" the phone number was written at the same time as the rest of the invoice, on November 14, 2014. | Ex. 50 at 192:11-15, 193:12-14 |
| 104.   Aliksanian testified that he did not change anything on the document before giving it to Tellez that day. | Ex. 51 at 90:7-9 |
| 105.   Neither Tellez nor Aliksanian made any changes to their deposition transcripts within 30 days of the transcripts becoming available. | Gatien Decl. ¶ 39 |
| 106.   In August 2016, Tellez "clarified," that he created the signature portion of the hand-written invoice dated November 14, 2014, in July 2015. | Ex. 62 |

[PROPOSED] STATEMENT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW IN SUPPORT OF
PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 107. The metadata of the scanned invoice, prior to the addition of the phone number, shows that the invoice was scanned on July 22, 2015. | Ex. 63 |
| 108. Aliksanian testified that Tellez mentioned one of AOP's June-July 2015 cease and desist letters when they spoke in July 2015. | Ex. 51 at 94:16-18 |
| 109. Tellez also claims to have sold 6 bottles of MILK MAN e-liquid to Nabil Iskander, the owner of Whittier Vapes, on November 21, 2014, for a total of $120. | Ex. 33 |
| 110. Whittier Vapes is in Whittier, California, where Tellez lives. | Ex. 50 40:8-9; Ex. 52 at 14:4-17 |
| 111. Iskander considers Tellez to be "like a little brother." | Ex. 52 at 58:9-10 |
| 112. Tellez went to Iskander because Iskander was a friend who could do Tellez a favor. | Ex. 50 at 208:2-13, 208:25-209:21 |
| 113. Iskander testified that the transaction was "done on consignment just as a favor to Tony." | Ex. 52 at 52:3-7 |

[PROPOSED] STATEMENT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW IN SUPPORT OF
PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 114.  Iskander testified that the transaction "wasn't normal business practice" and "was more like a friends thing," which is why Tellez "just left" the e-liquid for Iskander to "try it out." | Ex. 52 at 20:10-20 |
| 115.  Iskander testified that he was "just trying to help [Tellez] out." | Ex. 52 at 78:4-18 |
| 116.  Iskander testified that he did not "think it's going anywhere." | Ex. 52 at 48:20-25 |
| 117.  Tellez testified that the invoice dated November 21, 2014, "should have been created" on that day and that his best recollection and belief were that it was created on that day. | Ex. 50 at 202:22-203-24, 234:24-235:1 |
| 118.  Iskander also testified that the invoice dated November 21, 2014, was created on or about that date. | Ex. 52 at 43:23-24 |
| 119.  Tellez testified that he left the original of the November 21 invoice with Iskander. | Ex. 50 at 204:2-14 |
| 120.  Tellez testified that he picked up the original invoice in December 2014, when Whittier Vapes paid the amount of the invoice as a consignment. | Ex. 50 at 204:2-14 |

| | |
|---|---|
| 121.  Tellez testified that he had to show Robb Hackett a copy of the invoice to prove he got paid. | Ex. 50 at 205:18-206:1 |
| 122.  Tellez testified that he showed Hackett the copy of the invoice. | Ex. 50 at 206:6-12 |
| 123.  Hackett testified that he never saw the invoice. | Ex. 49 at 152:13-17 ("How did he confirm it? Actually he didn't. He just told me that he made sales.") |
| 124.  Messrs. Tellez, Aliksanian, and Hackett did not make any changes to their deposition transcripts within 30 days of the transcripts becoming available. | Gatien Decl. ¶ 39 |
| 125.  In August 2016, Tellez "clarified" that the invoice that he previously asserted was created on November 21, 2014, was actually created in July 2015. | Ex. 62; Ex. 29, Nos. 15-16 |
| 126.  Based on an impression left on the purported November 14 invoice, AOP's forensic expert confirmed that the purported November 21 invoice was written directly on top of the November 14 invoice, which means that it was written after July 22, 2015. | Ex. 61 |

| | |
|---|---|
| 127.  Tellez did not "clarify" his testimony until after AOP's forensic expert's report was produced to Defendants. | Ex. 61; Ex. 62 |
| 128.  Tellez stated that the November 2014 sales were made by him individually. | Ex. 50 at 85:22-86:2 |
| 129.  Defendants have no documentary evidence of any sales of MILK MAN e-liquid by Tellez other than the claimed November 14 and 21, 2014, sales. | Ex. 29, No. 13; Ex. 26, No. 5 |
| 130.  Defendants allege that Tellez otherwise only gave samples to friends and family. | Ex. 28, No. 10 |
| 131.  Defendants have a pattern of claiming first use dates for their trademarks based on the distribution of samples, as opposed to actual sales in commerce. | Ex. 56 at 114:1-14. *But see* Ex. 54 at 172:6-10, 183:3-20, 186:5-13 (stating that some of the trademarks that were applied for as use-based applications were never used or released); Ex. 55 at 127:19-130:18, 176:19-178:18 (same) |
| 132.  Tellez stated that he hand-delivered the bottles. | Ex. 50 at 186:24-187:3 |

| | |
|---|---|
| 133.  Defendants have no pictures of what the MILK MAN bottles looked like when they were "sold" to Messrs. Aliksanian and Iskander on November 14 and 21, 2014. | Ex. 50 at 65:17-24 |
| 134.  Defendants, and Mr. Aliksanian have testified that each of the bottles were 60 ml bottles. | Ex. 49 at 145:18-146:9; Ex. 50 at 64:11-66:11; Ex. 51 at 55:15, 75:2-4 |
| 135.  Each bottle of MILK MAN e-liquid "sold" by Tellez was marked only with a plain white Avery label printed with only the batch number, nicotine level, and the name "milk man." | Ex. 49 at 145:18-146:9; Ex. 50 at 64:11-66:11; Ex. 51 at 54:3-7, 55:10; Ex. 52 at 41:15-42 |
| 136.  Iskander testified that packaging was not professional. | Ex. 52 at 41:15-17 |
| 137.  Aliksanian testified that the bottles looked like tester bottles. | Ex. 51 at 50:10-16 |
| 138.  Aliksanian testified that he "knew [Tellez] wasn't going to sell [his e-liquid with packaging] like that." | Ex. 51 at 55:7-11 |
| 139.  Each of the bottles Tellez used for his November 2014 "sales" looked the same. | Ex. 50 at 66:13-18 |
| 140.  Tellez testified that the bottles were "for sampling." | Ex. 50 at 64:10 |

| 141. Tellez mixed the e-liquid used for his MILK MAN bottles during non-business hours. | Ex. 56 at 201:22-202:3, 203:16-24 |
|---|---|
| 142. Tellez typically mixed the e-liquid used for his MILK MAN bottles at his home or Robb Hackett's home. | Ex. 56 at 201:22-202:3, 203:16-24 |
| 143. Tellez did not "mix" the e-liquid used for his MILK MAN bottles as part of his job responsibilities for Steam. | Ex. 56 at 201:22-202:3, 203:16-24 |
| 144. Tellez did not have his own inventory of bottles to use. | Ex. 50 at 100:25-101:2, 177:10-15 |
| 145. The bottles did not have any markings indicating the source of origin of the e-liquid. | Ex. 50 at 65:9-13, 85:8-21 |
| 146. Neither Tellez's name, nor the name "One Hit Wonder" were used on any of bottles of MILK MAN e-liquid "sold" by Tellez. | Ex. 50 at 65:9-13, 85:8-21 |
| 147. The bottles of MILK MAN e-liquid "sold" by Tellez did not have a Proposition 65 warning. | Ex. 51 at 67:19-68:1 |
| 148. California has recognized that e-liquid contains as many as ten ingredients on the Prop 65 list of chemicals. | Request for Judicial Notice, Ex. A at 1, Ex. B at 9. |

[PROPOSED] STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW IN SUPPORT OF PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 149.  Prop 65 warnings are required on e-liquid labels. | Request for Judicial Notice, Ex. A at 1, Ex. B at 9; Ex. 57 at 87:9-14; *see also* Ex. 50 at 225:24-226:14 (testifying that a label could not be final because it did not have a warning) |
| 150.  Tellez never advertised his MILK MAN e-liquid. | Ex. 50 at 227:4-228:1; Ex. 26, No. 3 |
| 151.  Tellez did not claim any of the November 2014 "sales" of MILK MAN e-liquid as income in his 2014 tax return. | Ex. 29, Nos. 1-2; Ex. 27, No. 25 |
| 152.  Tellez did not claim any income from the sale of any e-liquids in his 2014 tax return. | Ex. 29, Nos. 1-2; Ex. 27, No. 25 |
| 153.  Defendants One Hit Wonder, Steam Distribution, and Steam Wholesale, starting selling MILK MAN e-liquid on May 1, 2015. | Exs. 34-37 |
| 154.  Defendants claim to have sold over ▮▮▮ bottles of MILK MAN e-liquid in their first month, May 2015, for over $▮▮▮. | Exs. 34-37; Ex. 60 |
| 155.  Defendants claim to have enjoyed continued significant sales averaging over $▮▮▮. | Exs. 34-37; Ex. 60 |

| | |
|---|---|
| 156.  Immediately upon the announcement of the launch of Defendants' MILK MAN e-liquid in April 2015, on Defendants' social media pages and in customer service communications, customers began asking questions and making comments about Defendants' affiliation with AOP and AOP's THE MILKMAN e-liquid. | Zhang Decl. ¶ 26; Ex. 19 |
| 157.  Beginning in April 2015, before Defendants sold any MILK MAN e-liquid, there were instances of actual customer confusion between AOP's THE MILKMAN e-liquid and Defendants' MILK MAN e-liquid. | Ex. 19; Ex. 38 |
| 158.  On several occasions, customers mistakenly contacted Defendants when they intended to contact AOP. | Ex. 19; Ex. 38 |
| 159.  On several occasions, Defendants responded to customers' questions, comments, and mistaken contacts with incorrect factual and legal assertions. | Ex. 19; Ex. 38 |
| 160.  Defendants have claimed to be the "sole owner" of all rights to the mark MILK MAN. | Ex. 19; Ex. 38 |

[PROPOSED] STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW IN SUPPORT OF PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 161.  Defendants falsely claimed to own a trademark registration for the mark MILK MAN before AOP starting selling its e-liquid, when Defendants still do not. | Ex. 19; Ex. 38 |
| 162.  On several occasions, Defendants responded to customers' questions, comments, and mistaken contacts by soliciting them to buy Defendants' e-liquid instead of AOP's e-liquid. | Ex. 19; Ex. 38 |
| 163.  Defendants' factually and legally incorrect statements, and solicitations influenced those customers' buying behavior. | Ex. 19; Ex. 38 (customer responding that it was a "good sales tactic"; Defendants telling a customer to "please let everyone know that [an alleged injury] was caused by MilkMan by Vaping Rabbit" and offering free samples of its MILK MAN e-liquid, both of which the customer accepts) |
| 164.  Customers continue to be confused between Defendants and their MILK MAN mark and e-liquid, and AOP and its THE MILKMAN mark and e-liquid. | Ex. 57 at 56:17-25; Ex. 25 ¶ 34 |

| | |
|---|---|
| 165.  Defendants admit that there is a likelihood of confusion between AOP's THE MILKMAN mark and Defendants' MILK MAN mark. | Ex. 25 ¶ 19 |
| 166.  Defendants have repeatedly used the phrase "the Milk Man" to refer to their e-liquid in advertisements for their MILK MAN e-liquid. | Ex. 19; Ex. 39 |
| 167.  Defendants have repeatedly used the phrase "The Milk Man" to refer to their e-liquid in advertisements for their MILK MAN e-liquid. | Ex. 19; Ex. 39 |
| 168.  Defendants have used the phrase "the Milk Man" on the product packaging for their MILK MAN e-liquid. | Ex. 19; Ex. 39 |
| 169.  Defendants have used the phrase "The Milk Man" on the product packaging for their MILK MAN e-liquid. | Ex. 19; Ex. 39 |
| 170.  As of March 2016, the One Hit Wonder Website and packaging still used the term "the Milk Man." | Ex. 48 at 116:5-117:12 |
| 171.  As of March 2016, the One Hit Wonder Website and packaging still used the term "The Milk Man." | Ex. 48 at 116:5-117:12 |

[PROPOSED] STATEMENT OF UNCONTROVERTED FACTS & CONCLUSIONS OF LAW IN SUPPORT OF PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 172.  Tellez testified in his deposition that he thought such uses were mistakes. | Ex. 50 at 167:1-175:4 |
| 173.  Tellez also testified in his deposition that he thought it was confusing to refer to one product as "THE MILKMAN" and another as "MILK MAN." | Ex. 50 at 176:5-8; *see also* Ex. 50 at 15:10-16, 117:23-24, 128:3-5 (clarifying whether the question is about MILK MAN or THE MILKMAN) |
| 174.  The goods sold under AOP's THE MILKMAN mark and Defendants' MILK MAN mark are identical in kind and directly compete with one another. | Ex. 29, No. 95; Ex. 25 ¶ 18 |
| 175.  AOP's THE MILKMAN mark is inherently distinctive. | Request for Judicial Notice ¶ 5 (approving the legally identical mark MILK MAN without a showing of secondary meaning) |
| 176.  The marketing channels for the products sold under AOP's THE MILKMAN mark and Defendants' MILK MAN mark are the same. | Ex. 29, No. 99; Exs. 34-37 |
| 177.  AOP's and Defendants' e-liquids are sold in some of the same retail and online stores. | Ex. 16; Ex. 29, No. 99; Exs. 34-37 |

[PROPOSED] STATEMENT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW IN SUPPORT OF
PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 178.  To avoid any doubt as to its nationwide priority, on June 10, 2016, AOP acquired by assignment all right, title and interest in and to the mark MILKMAN for e-liquid that were previously held by Deus Juice LLC. | Zhang Decl. ¶ 27; Ex. 20 |
| 179.  Deus Juice LLC is based in Michigan, where it has a retail store. | Zhang Decl. ¶ 28 |
| 180.  Deus Juice's first use of MILKMAN for e-liquid is at least as early as October 9, 2014. | Ex. 21; Ex. 22 |
| 181.  Prior to Tellez's first "sale," Deus Juice sold ███ bottles of MILKMAN e-liquid for a total of $███ | Ex. 21; Ex. 22 |
| 182.  Deus Juice has sold and continues to sell its MILKMAN e-liquid to customers from several states through its online website and its retail storefront. | Zhang Decl. ¶ 28 |
| 183.  On June 29, 2016, AOP informed Defendants that it had acquired the rights to Deus Juice's MILKMAN mark. | Gatien Decl. ¶ 42; Ex. 59 |

[PROPOSED] STATEMENT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW IN SUPPORT OF
PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 184.  Even after being informed of AOP's acquisition of MILKMAN from Deus Juice, and AOP's confirmation of senior sales by Deus Juice, Defendants have continued to sell their MILK MAN e-liquid. | Gatien Decl. ¶ 43 |
| 185.  In addition to its rights to THE MILKMAN mark, AOP owns the mark DRIP CLUB (Reg. No. 4618948) for use in connection with, *inter alia*, e-liquids and online retail store services featuring e-liquids. | Zhang Decl. ¶ 29; Ex. 23 |
| 186.  Defendants used AOP's DRIP CLUB Mark as a hashtag on social media posts for their products, including Defendants' MILK MAN e-liquid. | Ex. 40 |
| 187.  Using the hashtag "dripclub" allows viewers to sort through advertisements that use that hashtag. | Ex. 57 at 37:20-39-2 |
| 188.  Multiple hashtags may be used on a post to widen the potential audience for that particular post and make and association between that post and a brand. | Ex. 57 at 39:11-21 |

[PROPOSED] STATEMENT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW IN SUPPORT OF
PLF'S MOTION FOR SUMMARY JUDGMENT

| | |
|---|---|
| 189.  There is a quantifiable market benefit from using hashtags to draw viewers. | Ex. 57 at 42:11-43:6 |
| 190.  About one week before the first depositions of Defendants in this case, in March 2016, Defendants deleted their main social media account, the Instagram account @steamdistribution. | Ex. 49 at 20:13-21:6 |
| 191.  William Hackett testified that he tracks the One Hit Wonder sales every day. | Ex. 53 at 320:17-19 |
| 192.  In May 2016, William Hackett testified that the sales for each product had remained steady and, if anything, were increasing. | Ex. 53 at 323:1-9 |
| 193.  William Hackett testified that the sales of MILK MAN e-liquid were following the same trajectory. | Ex. 53 at 324:1-4 |
| 194.  Despite William Hackett's testimony, Defendants maintain that beginning in March 2016 (the first month *after* the initial production of sales documents ███    ▬▬▬ | Exs. 34-37; Ex. 60 |
| 195.  Defendants testified that the sales documents produced in March 2016 were complete and accurate. | Ex. 54 at 216:1-21 |

| | |
|---|---|
| 196.  The sales documents produced in August 2016 reveal that between May 2015 and March 3, 2016 (the last day reported in the sales documents for Steam Wholesale ██ | Kamelgard Decl. ¶ 7; Ex. 64 |
| 197.  The August sales documents also show ██ | Kamelgard Decl. ¶ 8; Ex. 65 |
| 198.  ██ | Kamelgard Decl. ¶¶ 9-10; Exs. 66-67 |
| 199.  AOP believes that Defendants have intentionally under-reported their sales | Kamelgard Decl. ¶¶ 7-11; Exs. 64-67 |
| 200.  Defendants claim that their sales of MILK MAN e-liquid from May 2015 through ██ | Exs. 34-37; Ex. 60 |

## CONCLUSIONS OF LAW

201.   AOP is the owner of THE MILKMAN mark based on its nationwide priority of use. *Hana Fin., Inc. v. Hana Bank*, --- U.S. ---, 135 S. Ct. 907, 909, 190 L. Ed. 2d 800 (2015); (AOP's Memorandum, Point IV.A.).

202.   Tellez's "sales" in November 2014 were illegal because the bottles used did not contain a Prop 65 warning, and, therefore, could not give rise to trademark priority. *CreAgri, Inc. v. USANA Health Scis., Inc.*, 474 F.3d 626, 630 (9th Cir. 2007); (AOP's Memorandum, Point IV.A.1.).

203.   Tellez's "sales" in November 2014 were not bona fide sales in commerce because they were not sufficiently public that the marked goods are identified or distinguished in an appropriate segment of the public mind as those of the adopter of

1   the mark. *Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha*, 290 F. Supp. 2d

2   1083, 1088 (C.D. Cal. 2003); (AOP's Memorandum, Point IV.A.2.).

3   204.   If Tellez's "sales" in November 2014 were bona fide sales, they were

4   nonetheless *de minimis*, and insufficient to confer ownership in a mark. *Dogloo, Inc.*

5   *v. Doskocil Mfg. Co*., 893 F. Supp. 911, 921 (C.D. Cal. 1995); (AOP's Memorandum,

6   Point IV.A.3.).

7   205.   The trademarks THE MILKMAN and MILK MAN are legally identical

8   and likely to cause confusion. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.

9   1979), *abrogated on others grounds by Mattel, Inc. v. Walking Mountain Prods.*, 353

10   F.3d 792 (9th Cir. 2003); (AOP's Memorandum, Point IV.B.).

11   206.   Based on the foregoing, AOP prevails on its claims for federal and state

12   trademark infringement, false designation of origin under federal law, California

13   unfair competition, and cancellation of [Defendants'] Mark for Defendants'

14   infringement of AOP's THE MILKMAN mark. *Brookfield Commc'ns, Inc. v. W.*

15   *Coast Entm't Corp*., 174 F.3d 1036, 1046 (9th Cir. 1999) (AOP's Memorandum,

16   Points IV.A.-B.).

17   207.   OHW's California MILK MAN application was filed in bad faith, is

18   defective, and OHW did not own the mark at the time the application was filed, and

19   the Court should issue an order to cancel the resulting state registration. Cal. Bus. &

20   Prof. Code § 14230(c); (AOP's Memorandum, Point IV.C.).

21   208.   AOP prevails on its claim for intentional interference with prospective

22   economic advantage because Defendants directly soliciting AOP's customers to buy

23   Defendants' MILK MAN e-liquid instead of AOP's THE MILKMAN e-liquid after

24   those customers mistakenly contacted Defendants as a result of their trademark

25   infringement. (AOP's Memorandum, Point IV.D.).

26   209.   AOP prevails on its claim for trademark infringement of its DRIP CLUB

27   mark because the mark's federal registration gives rise to a heavy presumption as to

28

its validity and of AOP's exclusive right to use it in commerce, and Defendants' used the mark as a hashtag on their social media posts to attract online consumers. (AOP's Memorandum, Point IV.E.).

210.   All sales by Defendants of their MILK MAN e-liquid are infringing sales for which AOP is entitled to the profits. 15 U.S.C. § 1117; (AOP's Memorandum, Point IV.F.).

211.   AOP is entitled to treble damages and its attorneys' fees based on defendants' malicious, fraudulent, deliberate, or willful conduct. 15 U.S.C. § 1117; (AOP's Memorandum, Point IV.G.).

212.   Defendants' counterclaims fail for the same reasons that AOP prevails on its claims against Defendants. (AOP's Memorandum, Point IV.H.).


Dated: September 2, 2016          By: _____
                                       Konrad K. Gatien, Esq.
                                       STUBBS ALDERTON & MARKILES, LLP
                                       Attorneys for Plaintiff
                                       AOP Ventures, Inc.

[PROPOSED] STATEMENT OF UNCONTROVERTED
FACTS & CONCLUSIONS OF LAW IN SUPPORT OF
PLF'S MOTION FOR SUMMARY JUDGMENT