

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

AOP Ventures, Inc.,

                Plaintiff,

       v.

Steam Distribution, LLC et al.,

              Defendants.

EDCV 15-1586-VAP (KKx)

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

On September 2, 2016, Plaintiff AOP Ventures, Inc., filed a motion for summary judgment seeking judgment against Defendants Steam Distribution, LLC; One Hit Wonder, Inc.; HAVZ, LLC; and Anthony Tellez III. (Doc. No. 56.) On September 12, 2016, Defendants filed their Opposition. (Doc. No 75.) On September 20, 2016, Plaintiff filed its Reply. (Doc. No. 91.) After reviewing and considering all papers filed in support of, and in opposition to, the Motion, the Court GRANTS the Motion in part and DENIES it in part.

## I.  BACKGROUND

Plaintiff, an electronic cigarette liquid ("e-liquid") distributor, initiated the present action against Defendants on August 5, 2015. (Doc. No. 1.) Plaintiff alleges Defendants infringed Plaintiff's unregistered THE MILKMAN mark and registered DRIP CLUB mark. (Doc. No. 55.) The operative complaint, filed on August 16, 2016, asserts the following claims: (1) Trademark Infringement under 15 U.S.C. § 1114; (2) False Designation of Origin under 15 U.S.C. § 1125(a); (3) Intentional

Interference with Prospective Economic Advantage; (4) Unfair Competition under Cal. Bus. & Prof. Code § 17200; (5) Trademark Infringement under California common law; (6) Cancellation of California Trademark Registration under Cal. Bus. & Prof. Code § 14230(c); and (7) Unfair Competition under California common law. (Doc. No. 55.)

Defendants contend their use has priority over the MILK MAN trademark and filed counterclaims against Plaintiff asserting the following causes of action: (1) False Designation of Origin under 15 U.S.C. § 1125(a); (2) Unfair Competition under Cal. Bus. & Prof. Code § 17200; (3) Trademark Infringement under California common law; and (4) Unfair Competition under California common law.  (Doc. No. 44.)

## II.   EVIDENTIARY RULINGS

Before setting forth the uncontroverted facts, the Court examines the admissibility of the evidence offered by both sides in support of, and opposition to, the Motion for Summary Judgment.  "A trial court can only consider admissible evidence in ruling on a motion for summary judgment." Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002).  At this stage, however, a district court should "focus on the admissibility of the [evidence's] contents," "not . . . on the admissibility of [its] form." See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003); Block v. City of Los Angeles, 253 F.3d 410, 418-19 (9th Cir. 2001).

Plaintiff submitted several evidentiary objections to Defendants' Opposition; Exhibits C, D, and E submitted in support of the Opposition; the Tellez Declaration; the Hackett Declaration; the Nuttall Declaration; and Defendants'

United States District Court
Central District of California

Separate Statement of Genuine Issues of Material Fact. "[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant." Burch v. Regents of Univ. of Cal., 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also Anderson, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted."). The Court does not consider any objections on the grounds that evidence lacks foundation, is speculative, or is irrelevant. "On this basis alone, the Court will not scrutinize each objection and give a full analysis of identical objections raised as to each fact." Stonefire Grill, Inc. v. FGF Brands, Inc., 987 F. Supp. 2d 1023, 1033 (C.D. Cal. 2013). The Court thus OVERRULES Opposition Objections 2-5; Separate Statement Objections 1-2; and Objections to the Tellez and Hackett Declarations on the ground that the declarations are conclusory, self-serving, and lacking detailed facts and supporting evidence. With respect to Opposition Objections 1, 8, 9; Separate Statement Objections 4, 6-8; objections to hearsay in the Tellez and Hackett Declarations; and references to trademark assignment in the Tellez Declaration, the Court does not rely on the objected-to statements. To the extent the Court does not rely on the statements, Plaintiff's objections are OVERRULED as moot.

The Court addresses Plaintiff's remaining objections—Opposition Objections 6 and 7, Separate Statement Objections 3 and 5, and Objections to the Hackett Declaration on the ground of Hackett's lack of expertise—as they become relevant below.

3

### III.  LEGAL STANDARD

A motion for summary judgment or summary adjudication shall be granted when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson, 477 U.S. at 250.

Generally, the burden is on the moving party to demonstrate it is entitled to summary judgment.  Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998); Retail Clerks Union Local 648 v. Hub Pharmacy, Inc., 707 F.2d 1030, 1033 (9th Cir. 1983). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party carries its burden of production, however, the burden then shifts to the non-moving party to show there is a genuine issue of material fact that must be resolved at trial.  See Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 256; Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc., 210 F.3d 1099, 1103 (9th Cir. 2000).  The non-moving party must make an affirmative showing on all matters in issue by the motion as to which it has the burden of proof at trial.  Celotex, 477 U.S. at 322; Anderson, 477 U.S. at 252.  See also William W. Schwarzer, A. Wallace Tashima & James M. Wagstaffe, FEDERAL CIVIL PROCEDURE BEFORE TRIAL, § 14:144.  "This burden is not a light one.  The non-moving party must show more than the mere existence of a scintilla of

4

evidence." In re Oracle Corp. Secs. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Anderson, 477 U.S. at 252).

A genuine issue of material fact will exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, a court construes the evidence in the light most favorable to the non-moving party.  Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991); T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987).

## IV.   FACTS

To the extent certain facts or conclusions are not mentioned in this Order, the Court has not relied on them in reaching its decision.  In addition to considering the evidentiary objections raised by the parties, the Court has considered independently the admissibility of the evidence that both parties submitted and has not considered irrelevant or inadmissible evidence.

### A.  Uncontroverted Facts

The following material facts are supported adequately by admissible evidence and are uncontroverted.  They are "admitted to exist without controversy" for the purposes of this Motion.  See L.R. 56-3.

In January 2015, Plaintiff entered into an exclusive distribution agreement with Barbara Villegas to distribute Villegas' e-liquid under the mark THE MILKMAN.  (Defendants' Separate Statement of Genuine Issues of Material Fact ("SS") ¶¶ 16-17.)  Between January 2015 and April 2015, Plaintiff sold over 70,000

bottles of their product nationwide, including sales in every state. (Ex. 16.)[1] During the same time period, Plaintiff's online viewership and customer base increased. (SS ¶ 28; Ex. 17; Ex. 18.)[2] On March 26, 2015, Plaintiff acquired all rights, title, and interest in and to THE MILKMAN mark from Villegas. (SS ¶ 36.)

Shortly thereafter, Plaintiff's counsel performed a clearance check on THE MILKMAN mark through the United States Patent and Trademark Office's online records. (SS ¶ 38.) At that point, Plaintiff's counsel discovered Defendant Anthony Tellez had filed an application for the mark "MILK MAN" on March 4, 2015. (SS ¶ 38.) At the time Tellez had filed his trademark application, he was a warehouse worker for Defendant Steam Distribution and did not create e-liquid flavors as part of his job responsibilities. (SS ¶¶ 41, 143.) In April 2015, Plaintiff's agents attempted to purchase MILK MAN e-liquid from Defendants over the telephone, but they were told the product was not available for sale and would not be released until May 2015. (SS ¶ 53.)

---

[1] Plaintiff alleges it sold over 100,000 bottles from January 2015 to April 2015, but the record shows only the sale of 71,321 bottles during that time. (See SS ¶ 21; Ex. 16.)

[2] Defendants dispute Plaintiff's sales, online viewership, and customer base increased from January 2015 to May 2015 on the ground that Exhibits 16, 17, and 18 were not produced before the close of discovery. Defendants have not, however, supported their assertion with a citation to or copy of the relevant discovery requests. Moreover, Defendants fail to raise any evidence that controverts the accuracy of Exhibits 16, 17, and 18.

United States District Court
Central District of California

United States District Court
Central District of California

Defendants allege they have priority over the MILK MAN mark because Tellez sold eight bottles of e-liquid under the mark in November 2014.[3]  Specifically, they allege that on November 14, 2014, Tellez sold two bottles of his MILK MAN e-liquid to Berj Aliksanian, the owner of LA Vapor Works, for a total of $40.00.  (SS ¶ 93.)  Tellez chose to try to sell his e-liquid to Aliksanian because he had a pre-existing friendship with Aliksanian and he could be "an easy one for helping me out."  (SS ¶ 94.)

Defendants further allege that on November 21, 2014, Tellez sold six bottles of his MILK MAN e-liquid to Nabil Iskander, the owner of Whittier Vapes, for a total of $120.00.  (SS ¶ 109.)  Iskander testified the transaction was "done on consignment just as a favor to [Tellez]."  (SS ¶ 113.)  Iskander also testified the transaction "wasn't normal business practice," "was more like a friends thing," and he was "just trying to help [Tellez] out."  (SS ¶¶ 114-15.)[4]

---

[3] Plaintiff disputes Defendants' claims that Tellez created his MILK MAN e-liquid and mark in October 2014, sold bottles of his e-liquid under the MILK MAN mark in November 2014, and entered into a distribution agreed with Defendant Steam Distribution shortly thereafter.  Although Plaintiff has produced some evidence that calls into question the veracity of Defendants' claims, this Court must construe the evidence in the light most favorable to Defendants, the non-moving party.  Barlow, 943 F.2d at 1135.  The Court, therefore, assumes at summary judgment the above facts to be true.

[4] Defendants dispute, but do not succeed in controverting, some of this testimony.  Defendants point out that Iskander testified there was an expectation that he would try to sell the bottles.  (SS ¶ 114.)  That testimony does nothing to controvert his testimony that the transaction "wasn't normal business practice," "was more like a friends thing," and he was "just trying to help [Tellez] out."

United States District Court
Central District of California

At no point surrounding the November 2014 sales did Tellez advertise his MILK MAN e-liquid.  (SS ¶ 150.)  For both the November 14 and 21 sales, Tellez's MILK MAN bottles were marked only with a plain white labels that stated the batch number, the nicotine level, and the name "MILK MAN."  (SS ¶ 135.)  Iskander testified the packaging was not professional.  (SS ¶ 136.)  Aliksanian testified the packaging "looked like crap," as if it was "just [a] tester."  (Doc. No. 80-8 at 55:2-9.)  None of the bottles had any markings identifying the source of origin of the e-liquid and the bottles did not list Tellez's or One Hit Wonder's name.  (SS ¶¶ 145, 146.)

On May 1, 2015, Defendants One Hit Wonder and Steam Distribution began to sell e-liquid under the mark MILK MAN.  (SS ¶¶ 56, 153.)  On June 24, 2015, Plaintiff sent Defendants a letter demanding they cease all use of the MILK MAN mark.  (SS ¶ 59.)  After Defendants continued to the use the MILK MAN mark, Plaintiff filed its Complaint on August 5, 2015.  (Doc. No. 1.)  On November 13, 2015, Plaintiff opposed Tellez's federal trademark application for the MILK MAN mark.  (SS ¶ 84.)

On or about September 30, 2015, Defendant One Hit Wonder filed a California state trademark application for MILK MAN for e-liquid.  (SS ¶ 76.)  Defendant One Hit Wonder's California MILK MAN mark matured to registration on October 21, 2015.  (SS ¶ 80.)  Defendants did not inform Plaintiff of the California trademark registration for MILK MAN until January 5, 2016.[5]  (SS ¶ 86.)

---

[5] The parties do not dispute that there is no public database enabling third parties to search which trademark applications have been filed in California. (SS ¶ 78.)

8

No later than October 26, 2015, Tellez assigned all right, title and interest in and to the MILK MAN mark to Defendant One Hit Wonder.  (SS ¶ 81.)

At some point before Plaintiff's present Motion, Defendants used the hashtag "#DRIPCLUB" on at least five social media posts for their products, including advertisements for Defendants' MILK MAN e-liquid.  (SS ¶ 186; Doc. No. 57-16.)

## V.   DISCUSSION

### A.  Trademark Infringement, False Designation, and Unfair Competition Related to Defendants' Use of MILK MAN Mark

Claims of "federal and state trademark infringement, false designation of origin under federal law, [and] California unfair competition" share the same essential elements.  Stonefire Grill, Inc. v. FGF Brands, Inc., 987 F. Supp. 2d. 1023, 1046 (C.D. Cal. 2013); see also Phillip Morris USA Inc. v. Shalabi, 352 F. Supp. 2d 1067, 1072 (C.D. Cal. 2013).  To prevail on each of those claims, Plaintiff must establish: "(1) it owns a valid and protectable interest [in the mark]; (2) Defendants subsequently and without authorization used a similar mark likely to cause consumer confusion, deception or mistake."  Phillip Morris, 352 F. Supp. 2d at 1072.

### 1.  Valid and Protectable Interest

"Rights in a trademark are determined by the date of the mark's first use in commerce" and "[t]he party who first uses a mark in commerce is said to have priority over other users."  Hana Fin., Inc. v. Hana Bank, 135 S. Ct. 907, 909 (2015).  "The first to use a mark is deemed the 'senior' user and has the right to enjoin

United States District Court
Central District of California

'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion." <u>Brookfield Communications, Inc. v. West Coast Entertainment Corp.</u>, 174 F.3d 1036, 1046 (9th Cir. 1999).

Defendants contend their use has priority over Plaintiff because Tellez's November 2014 sales preceded Plaintiff's January 2015 launch of its THE MILKMAN e-liquid.  This argument fails.

To determine whether a party's first use of a mark establishes proprietary trademark rights, the Ninth Circuit instructs courts to consider the "totality of the circumstances" to see if the party demonstrates "use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." <u>Brookfield</u>, 174 F.3d at 1052.

"The use necessary to acquire protectable rights is more than token or *de minimus* use." <u>Matrix Motor Co. v. Toyota Jidosha Kabushiki Kaisha</u>, 290 F. Supp. 2d 1083, 1088 (C.D. Cal. 2003) (citing <u>Chance v. Pac–Tel Teletrac Inc.</u>, 242 F.3d 1151, 1157 (9th Cir. 2001)).  "The use of the mark must be 'sufficiently public' that the marked goods are 'identified or distinguish[ed] . . . in an appropriate segment of the public mind as those [of the adopter of the mark].'" <u>Id.</u> (citing <u>Glow Indus., Inc. v. Lopez</u>, 252 F. Supp. 2d 962, 981 (C.D. Cal. 2002); <u>see also</u> <u>Dogloo, Inc. v. Doskocil Mfg. Co.</u>, 893 F. Supp. 911, 921 (C.D. Cal. 1995) (noting sales that are so "small, sporadic, and inconsequential" are "considered de minimis for priority purposes") (citing <u>Sweetarts v. Sunline, Inc.</u>, 380 F.2d 923, 929 (8th Cir. 1967); <u>Chandon Champagne Corp. v. San Marino Wine Corp.</u>, 335 F.2d 531 (2nd Cir. 1964)).

United States District Court
Central District of California

Tellez's November 2014 sales were token, de minimis, and insufficiently public.  Tellez sold a total of eight bottles in November 2014.  (SS ¶¶ 90, 91.)  Two of those bottles were purchased by Aliksanian, whom Tellez testified was a friend and would be "an easy one for helping [him] out."  (SS ¶ 94.)  The other six bottles were purchased by Iskander, who testified the transaction was "done on consignment just as a favor to [Tellez]."  (SS ¶ 113.)  Iskander further testified the transaction "wasn't normal business practice," "was more like a friends thing," and he was "just trying to help [Tellez] out."  (SS ¶¶ 114-15.).

At no point surrounding the November 2014 sales did Tellez advertise his MILK MAN e-liquid.  (SS ¶ 150.)  For all of Tellez's November 2014 sales, the bottles were marked only with a plain white labels listing the batch number, the nicotine level, and the name "MILK MAN."  (SS ¶ 135.)  Iskander testified the packaging was not professional.  (SS ¶ 136.)  Aliksanian testified the packaging "looked like crap," as if it was "just [a] tester."  (Doc. No. 80-8 at 55:2-9.)  Notably, none of the bottles had any markings identifying the source of product and did not list Tellez's or One Hit Wonder's name.  (SS ¶¶ 145, 146.)

Under those circumstances, the Court holds that, even taking the evidence in the light most favorable to Defendants, Tellez's sales were too "small, sporadic, and inconsequential" to establish priority of the MILK MAN mark.  Dogloo, Inc., 893 F. Supp. at 921; see also Zazu Designs v. L'Oreal, S.A., 979 F.2d 499, 502-05 (7th Cir. 1992) (holding a hair salon's sales and mailings of "a few" unlabeled bottles of hair products with the salon's business card attached "were insufficient as a matter of law to establish national trademark rights" because the sales and shipments neither

linked the salon's trademark with the salon's "product in the minds of consumers nor put other producers on notice" of the trademark); Momentum Luggage & Leisure Bags v. Jansport, Inc., No. 00 Civ. 7909, 2001 WL 830667, at *4 (S.D.N.Y. July 23, 2001) (holding a company's "de minimis" sale activities—advertising once and selling six tote bags and two briefcases for $760—was insufficient to establish trademark rights), aff'd Momentum Luggage & Leisure Bags v. Jansport, Inc., 45 Fed. Appx. 42 (2d Cir. 2002) (summary order).

Plaintiff, however, has presented undisputed evidence that by May 2015 it had sold bottles in every state and more than 70,000 bottles nationally.  Such sales took place after Tellez's initial November 2014 sales, but before Defendants engaged in any sales of their e-liquid that were not token, de minimis, and insufficiently public. The Court, therefore, holds Plaintiff established priority for its THE MILKMAN mark when it began to distribute its e-liquid nationally between January 2015 and April 2015.

Even if Tellez's sales had not been token, de minimis, and insufficiently public, this Court would still be inclined to hold that the sales do not establish priority due to the bottles' labelling defects.  "[O]nly *lawful* use in commerce can give rise to trademark priority."  CreAgri, Inc. v. USANA Health Scis., Inc., 474 F.3d 626, 630 (9th Cir. 2007) (emphasis in original).  None of the bottles Tellez sold displayed a warning in compliance with the California Safe Drinking Water and Toxic Enforcement Act ("Proposition 65").  Proposition 65 requires "businesses to provide a public warning if they 'knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity.'" California Chamber of Commerce v. Brown, 196 Cal. App. 4th 233, 239 (2011).

There is no dispute that the eight bottles of e-liquid that Tellez sold contained nicotine, a substance that the State of California has listed as triggering Proposition 65 warnings since 1990. <u>Dowhal v. SmithKline Beecham Consumer Healthcare</u>, 32 Cal. 4th 910, 918 (2004). "Consequently, *to conform to Proposition 65,* [D]efendants' products must carry a warning that 'this product contains nicotine, a chemical known to the state of California to cause reproductive harm,' or words to that effect." <u>Id.</u> (emphasis in original). Tellez's bottles, however, contained no such warning. The sales were thus unlawful and cannot give rise to trademark priority. <u>See</u> <u>CreAgri, Inc.</u>, 474 F.3d at 633 (holding that a labelling defect that "existed as to *every* bottle . . . sold prior to the competing registrant's priority date . . . was [a] material" defect and, therefore, the sales of defectively labelled bottles could not establish trademark priority) (emphasis in original).[6]

### 2. Likelihood of Confusion

Infringement of federally registered trademarks is governed by the test of whether Defendants' use is "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). In determining whether confusion is likely, the following factors are relevant:

1. strength of the mark;

2. proximity of the goods;

---

[6] As this Court has determined that Plaintiff established priority of its THE MILKMAN mark because Tellez's sales were (1) token, de minimis, and insufficiently public, and (2) unlawful, the Court does not reach Plaintiff's alternative argument that Tellez's sales could not create trademark rights because Plaintiff obtained priority over Defendants through its acquisition of Deus Juice's MILKMAN mark.

3. similarity of the marks;

4. evidence of actual confusion;

5. marketing channels used;

6. type of goods and the degree of care likely to be exercised by the purchaser;

7. defendant's intent in selecting the mark; and

8. likelihood of expansion of the product lines.

AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979).  The Court considers each of the Sleekcraft factors in turn below.

### a. Strength of the Mark

Marks are grouped into classifications, with each classification receiving a different level of protection.  "A strong mark is inherently distinctive, for example, an arbitrary or fanciful mark; it will be afforded the widest ambit of protection from infringing uses."  Sleekcraft, 599 F.2d at 349.  "A descriptive mark tells something about the product; it will be protected only when secondary meaning is shown."  Id.  "In between lie suggestive marks which subtly connote something about the products.  Although less distinctive than an arbitrary or fanciful mark and therefore a comparatively weak mark, a suggestive mark will be protected without proof of secondary meaning."  Id.

Defendants do not dispute Plaintiff's claim that the THE MILKMAN mark is inherently distinctive.  The Court, however, holds the mark is suggestive because, by Plaintiff's own admission, the mark was chosen to connote the e-liquid's "flavor profile of milk, ice cream, and fruit tarts."  (SS ¶ 3.)  As a suggestive mark, it is entitled to protection without proof of secondary meaning, but "only if the marks

are quite similar, and the goods closely related, will infringement be found." Sleekcraft, 599 F.2d at 350.

### b. Proximity of the Goods

"For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists.  The more likely the public is to make such an association, the less similarity in the marks is requisite to a finding of likelihood of confusion." Sleekcraft, 599 F.2d at 350 (internal citations omitted).

The parties do not dispute the goods sold under Plaintiff's THE MILKMAN mark and Defendants' MILK MAN mark are identical in kind and directly compete with one another.  (SS ¶ 174.)  This factor, therefore, weighs heavily in favor of a determination that Defendants' use of the MILK MAN mark is likely to cause consumer confusion.

### c. Similarity of the Marks

The Ninth Circuit has "developed three axioms that apply to the 'similarity' analysis:  1) Marks should be considered in their entirety and as they appear in the marketplace; 2) Similarity is best adjudged by appearance, sound, and meaning; and, 3) Similarities weigh more heavily than differences."  Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1144 (9th Cir. 2002).

Defendants contend the marks are not likely to cause confusion because of their product's distinctive packaging.  Indeed, the products are packaged differently. Plaintiff's THE MILKMAN e-liquid is sold in a container shaped to resemble a milk

United States District Court
Central District of California

carton, whereas Defendant's MILK MAN e-liquid is sold in a clear cylindrical tube. Plaintiff's THE MILKMAN mark appears in a large script font across the container, whereas Defendants MILKMAN mark appears in large bold lettering next to the logo of a milkman. The packaging for Plaintiff's THE MILKMAN notes the e-liquid is "from the creators of the Vaping Rabbit," whereas Defendant's MILK MAN packaging identifies the product as part of Defendant's ONE HIT WONDER brand. (Ex. A and B.) Lastly, Plaintiff's THE MILKMAN e-liquid is typically sold only in a 30mL glass bottle, whereas Defendants' is in a 180mL plastic bottle.

 

(Ex. A and B.)

Those differences, however, are not enough to outweigh the similarities between the marks. Most significantly, the marks are comprised of the same words and letters: "MILK" and "MAN." That Defendants' mark includes a definite

article—"THE"—and a space or line break between "MILK" and "MAN" is insignificant.  See In Re Narwood Prods., Inc., 223 U.S.P.Q. 1034, at *1 (T.T.A.B. 1984) (holding the marks "MUSICMAKERS" and "THE MUSIC MAKERS" were "virtually identical" and "likely to result in purchaser confusion").  Additionally, the MILK MAN and THE MILKMAN marks are the prominent feature of their respective packagings, as they are both displayed at least twice in large black font at the center of each container.

Moreover, "[l]ooks aren't everything," and we must compare the marks' sound and meaning.  Pom Wonderful LLC v. Hubbard, 775 F.3d 1118, 1129 (9th Cir. 2014).  As both marks are comprised of the same words, they are aurally identical. As for the meaning, both marks mean precisely the same thing—a man who delivers milk—and serve as allusions to the products' milk-like flavor.  MERRIAM-WEBSTER, Definition of MILKMAN, http://www.merriam-webster.com/dictionary/milkman. (Doc. No. 57-24 at 39:10-24; Doc. No. 80-7 at 58:16-18.)  Both products similarly highlight the allusion to milk flavor in their packaging, as Plaintiff's THE MILKMAN is sold in a container resembling a milk carton and Defendants' MILKMAN features a cartoon.  The similarities in meaning are "particularly noteworthy because '[c]loseness in meaning can itself substantiate a claim of similarity of trademarks.'"  Pom Wonderful, 775 F.3d at 1129.

Therefore, balancing the marks' visual similarities, aural similarity, semantic and figurative similarity "more heavily than the marks' visual dissimilarities—as we must—the similarity factor weighs heavily in [Plaintiff's] favor."  Pom Wonderful, 775 F.3d at 1129 (footnote omitted); see id. (holding the similarity-of-marks factor weighed in favor of consumer confusion between the marks "P♥M" and "pŏm"

despite distinct differences in each products' packaging); <u>Sleekcraft</u>, 599 F.2d at 351-52 (holding the presence of a housemark was insufficient to reduce the likelihood of confusion because the housemark was "down-played in the brochures and advertisements" and "smaller and skewed to one side" on the products).

### d.  Evidence of Actual Confusion

"Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." <u>Sleekcraft</u>, 599 F.2d at 352.

There is evidence in the record of actual consumer confusion between the two products.  (Ex. 19; Ex. 38.)  That evidence includes: a customer complaining on social media that he or she purchased one product when intending to purchase the other (Ex. 19); a retailer attempting to order over e-mail one of Defendants' e-liquids ("MUFFIN MAN") from Plaintiff (Ex. 19); a potential customer stating on social media he or she was "confused" why Defendants chose the same name as Plaintiff (Ex. 38); a potential customer inquiring on social media if Defendants' MILK MAN tastes like Plaintiff's THE MILKMAN (Ex. 38); and five instances of customers posting photographs on social media with Defendants' MILK MAN, but identifying it as Plaintiff's THE MILKMAN, or vice versa (Ex. 38).

Defendants argue the above instances of consumer confusion are de minimis given that both Plaintiff and Defendants "have sold hundreds of thousands of bottles of e-liquid bearing their respective marks."  That argument is unpersuasive. "[A]ctual confusion is hard to prove; difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy."  <u>Brookfield Communications</u>,

174 F.3d at 1050.  That Plaintiff presented several examples of consumer confusion weighs decidedly in its favor.

### e.  Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion," because it means "the general class of [consumers] exposed to the products overlap." Sleekcraft, 599 F.2d at 353.

The Parties do not dispute the marketing channels are identical, with retail and online stores selling both Parties' products.  (SS ¶ 176-77.)

### f.  Types of Goods and the Degree of Care Likely to be Exercised by the Purchaser

"In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution.  Although the wholly indifferent may be excluded, the standard includes the ignorant and the credulous. When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely.  Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely." Sleekcraft, 599 F.2d at 353 (internal citations omitted).

Defendants assert this factor should weigh in their favor because "vaping customers tend to research the products they buy . . . and thus tend to be better informed about products than typical consumers." (Opposition at 7.)  Defendants failed to support that assertion with a citation to evidence in the record.  The Court,

United States District Court
Central District of California

therefore, does not consider it.  See Sullivan v. Dollar Tree Stores, Inc., 623 F.3d 770, 780 (9th Cir. 2010) (holding the district court properly disregarded a party's "unsupported and unexplained assertion").

Rather, due to the relatively low cost of Plaintiff's ($18.00 for 30mL) and Defendants' ($60.00 for 180mL) products (Opposition at 5-6), as well as Defendants concession that their product is sold at "value pricing" (Opposition at 2), "customers are likely to exercise less case, thus making confusion more likely." Brookfield Communications, 174 F.3d at 1060.

### g.  Defendants' Intent in Selecting the Mark and Likelihood of Expansion of the Product Lines

"[E]vidence of the defendant's intent to confuse customers or of product expansion is not required for a finding of likelihood of confusion."  Pom Wonderful, 775 F.3d at 1131; see also GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199, 1208 (9th Cir. 2000) (characterizing the intent factor as minimally important and explaining intent to confuse consumers is not necessary to demonstrate a likelihood of confusion); Lahoti v. Vericheck, Inc., 636 F.3d 501, 509 (9th Cir. 2011) (characterizing the product expansion factor as "neutral" because neither party presented evidence regarding the likelihood of expansion).

Therefore, "[t]he absence of any proof regarding . . . the defendant's intent[] and product expansion does not affect our likelihood-of-confusion analysis."  Pom Wonderful, 775 F.3d at 1131.

United States District Court
Central District of California

### h. Totality of the Facts

This Court's review of the <u>Sleekcraft</u> factors reveals six factors weigh in favor of a likelihood of consumer confusion and the remaining two factors are neutral. The totality of the facts, therefore, establishes consumer confusion between the marks is likely.[7]

The Court thus holds Plaintiff has satisfied its burden under its federal and state trademark infringement, false designation of origin under federal law, and California unfair competition claims.  Defendants, their officers, agents, servants, employees, attorneys, parents, subsidiaries and related companies, and all persons acting for, with, by, through or under them having notice of this Order by personal service, electronic mail, or otherwise, and each of them, shall be immediately and permanently enjoined and restrained from marketing, advertising, distributing, offering to sell, or selling any product, packaging, or any other item that was named or labeled with the marks MILK MAN, MILKMAN, THE MILK MAN, or THE MILKMAN, or otherwise using said marks in commerce.  <u>See</u> <u>GoTo.com v. Walt</u>

---

[7] Even if the <u>Sleekcraft</u> factors did not establish a likelihood of consumer confusion, the Court may still have been inclined to hold in favor of Plaintiff given that Defendants alleged in their pleading that the two marks created such a likelihood. (Doc. No. 44 ¶ 19; Doc. No. 94 Opposition Objection 7.)  <u>Block v. City of L.A.</u>, 253 F.3d 410, 419 n.2 (9th Cir. 2001) ("A party cannot create a genuine issue of material fact to survive summary judgment by contradicting his earlier version of the facts."); <u>Cline v. Indus. Maint. Eng'g & Contracting Co.</u>, 200 F.3d 1223, 1232 (9th Cir. 2000) ("Both judges correctly held that Appellants could not contradict their earlier allegations in an effort to survive summary judgment.").  But as the Court has determined the <u>Sleekcraft</u> factors establish a likelihood of consumer confusion and has not considered Defendants' assertions regarding the October 2015 trademark assignment, the Court OVERRULES Opposition Objection 7 as moot.

Disney Co., 202 F.3d 1199, 1211 (9th Cir. 2000) ("When the infringing use is for a similar service, a broad injunction is especially appropriate.") (internal citation omitted).

Defendants' counterclaims for trademark infringement, false designation of origin, and unfair competition are dismissed with prejudice.  See Omar v. Sea-Land Serv., Inc., 813 F.2d 986, 991 (9th Cir. 1987) ("A trial court may dismiss a claim sua sponte under Fed. R. Civ. P. 12(b)(6).  Such a dismissal may be made without notice where the claimant cannot possibly win relief.") (internal citation omitted).

### 3.  Additional Remedies

#### a.  Trademark Cancellation

Plaintiff requests this Court order the cancellation of Defendants' California trademark.  See Cal. Bus. & Prof. Code § 14230(c) ("The secretary shall cancel from the register . . . [a]ny registration concerning a mark with regard to which a court of competent jurisdiction finds . . . [t]he registrant is not the owner of the mark."); see also Brawn of California v. Jojoba Products Co., Inc., No. 79-1776, 1980 WL 30313 at *5 (S.D. Cal. Sept. 11, 1980) ("Having further determined that the national market for 'HOBA' Jojoba oil-based cosmetics should not be divided between the parties but instead should be controlled exclusively by the 'first user' of that mark, the Court may properly order the cancellation of defendant's California trademark registration to ensure the exclusivity of the mark and avoid public confusion.").

United States District Court
Central District of California

As Defendants did not have priority as to the MILK MAN mark when they filed a California trademark application on or about September 30, 2015, this Court orders Defendants' California trademark for MILK MAN cancelled.[8]

### b. Damages

Under the Lanham Act, a plaintiff "shall be entitled, ... subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a).  Under § 1117(a), a plaintiff may recover an infringing defendant's profits in two situations: (1) as a measure of the plaintiff's own damages; or (2) on a theory of disgorgement of the defendant's unjustly obtained profits.  See Lindy Pen Co. v. Bic Pen Corp., 982 F.2d 1400, 1407 (9th Cir. 1993).  The Act "apparently confers a wide scope of discretion upon the district judge in the fashioning of a remedy for a violation of the Act," Maier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117, 121 (9th Cir. 1968), with the goal of "mak[ing] acts of trade-mark infringement, or at the very least acts of deliberate trade-mark piracy, unprofitable," id. at 122-23.  "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  15 U.S.C. § 1117(a).  Any award "shall constitute compensation and not a penalty."  Id.

"Damages are typically measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement," and "are guided by tort law principles."  Lindy Pen, 982 F.2d at 1407.

---

[8] The Court does not reach Plaintiff's remaining arguments as to the defectiveness of Defendants' California trademark.

Any award of lost profits must be supported by "reasonable certainty," which does not require "absolute exactness," but does require a "reasonable basis for computation," to ensure an award is not "remote and speculative." Id. at 1407–08. "To establish damages under the lost profits method, a plaintiff must make a 'prima facie showing of reasonably forecast profits.'" Id. at 1407. When the defendant's profits are the measure of the plaintiff's losses, "[t]he plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty," which are presumed to be the result of the infringing activity. Id. at 1408.

The burden then shifts to the defendant to show "which, if any, of its total sales are not attributable to the infringing activity, and, additionally, any permissible deductions for overhead." Id.; see also Nintendo of Am., Inc. v. Dragon Pac. Int'l, 40 F.3d 1007, 1012 (9th Cir. 1994) ("[T]he burden is upon [defendant] to prove that sales were demonstrably not attributable to the infringing mark.") (alterations in original; quotation marks omitted); Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 206 (1942) (stating the infringer bears the burden to show the "infringement had no relation to profits made by the defendant" because the trademark owner is "not entitled to profits demonstrably not attributable to the unlawful use of [the] mark."). In the end, any "uncertainty in the amount of damages should be borne by the wrongdoer." Adray v. Adry–Mart, Inc., 76 F.3d 984, 989 (9th Cir. 1995).

The Parties do not dispute that, through June 2016, Defendants' sales of its MILK MAN e-liquid generated revenues of $6,487,861.00. (SS ¶ 200.) The burden now shifts to Defendants to show "which, if any, of its total sales are not attributable

United States District Court
Central District of California

United States District Court
Central District of California

to the infringing activity, and . . . any permissible deductions for overhead." <u>Lindy Pen</u>, 982 F.2d at 1408.  Defendants contend they have satisfied their burden by submitting an expert report (Ex. 60) that controverts Plaintiff's expert report and, therefore, "raises a genuine issue of material fact upon which determination of damages depends."  (Opposition at 17.)

Plaintiff objects to the admissibility of Defendants' expert report because the report was unsworn and was submitted without an attached affidavit by the expert stating the factual basis for the opinion.  (Doc. No. 94 Opposition Objection 6, Separate Statement Objection 5.)  "Courts in the Ninth Circuit have routinely held that unsworn expert reports are inadmissible." <u>Ridgel v. United States</u>, No. 12–0071, 2013 WL 2237884, at *2 (C.D. Cal. May 21, 2013); <u>see also</u> <u>King Tuna, Inc. v. Anova Food, Inc.</u>, No. 07–7451, 2009 WL 650732, at *1 (C.D. Cal. Mar. 10, 2009) (stating "[i]t is well-settled that under Fed. R. Civ. P. 56(e), unsworn expert reports are not admissible to support or oppose summary judgment" and "to be competent summary judgment evidence, an expert report must be sworn to or otherwise verified, usually by a deposition or affidavit").  Accordingly, the Court SUSTAINS Plaintiff's objections and finds Defendants' expert report inadmissible.

The only remaining evidence in the record that Defendants present is a statement in Robert Hackett's declaration asserting consumer demand for Defendants' e-liquids is driven by the products' 180ml bottle size and value pricing.[9]

---

[9] Defendants also argue that consumer demand is driven by consumer experience with other ONE HIT WONDER e-liquids, but cite to no evidence in support of that claim.  The Court, therefore, does not consider it.

(Opposition at 18.)  Plaintiff objects to the admission of this statement on the ground that Hackett has not demonstrated any expertise that qualifies him to make such an assessment.  (Doc. No. 94 at 6, 8.)  The Court OVERULES Plaintiff's objections as moot.  Even taking Hackett's statement into consideration, the statement alone— without any citation or reference to other credible evidence—is not enough to meet Defendants' burden to show which of its total sales are not attributable to the infringing activity and what costs are permissible deductions for overhead.  Cf. Binder v. Disability Group, Inc., 772 F. Supp. 1172, 1184-85 (C.D. Cal. 2011) (rejecting the defendants' argument that, despite their willful attempts to profit from the plaintiffs' mark, their attempts were unsuccessful due to the purported intervention of a third party because the argument was "insufficiently supported by credible evidence").

Accordingly, as Defendants have not proffered any admissible evidence to show which, if any, of its total sales are not attributable to the infringing activity or are permissible deductions, the Court awards Plaintiff damages in the amount of $6,487,861.00.

### c. Attorney's Fees and Treble Damages

"An award of reasonable attorneys' fees and costs is expressly provided for in 'exceptional cases' of trademark infringement."  Derek Andrew, Inc. v. Poof Apparel Corp., 528 F.3d 696, 702 (9th Cir.2008) (citing 15 U.S.C. § 1117(a)).  "While the term 'exceptional' is not defined in the statute, attorneys' fees are available in infringement cases where the acts of infringement can be characterized as malicious, fraudulent, deliberate, or willful."  Id. (citation and internal quotation marks omitted).  Additionally, "[i]f the violation is found to be willful, the trial court

United States District Court
Central District of California

should award treble damages unless it finds 'extenuating circumstances." <u>A & M Records, Inc. v. Abdallah</u>, 948 F. Supp. 1449, 1458 (C.D. Cal. 1996).

   Plaintiff alleges Defendants' conduct was "malicious, fraudulent, deliberate, or willful" because Defendants' "knew that Tellez's claims of 'sales' were unsupported by any evidence." (Motion at 24.) In the alternative, Plaintiff argues that, even if Defendants thought Tellez's sales provided them with some form of trademark priority, "Defendants *knew* they had no rights [outside of Whittier, California]." (Mot. at 24.) Defendants contend their conduct was not "malicious, fraudulent, deliberate, or willful" and point to the differences in product packaging as evidence of their lack of intent to deceive consumers.

   Viewing the evidence in the light most favorable to Defendants as the non-moving party, the Court holds a reasonable juror could find Defendants' adoption of the MILK MAN mark was under a good faith belief that they had priority to the mark, albeit misguided. The Court, therefore, declines to hold Plaintiff is entitled to Attorneys' Fees or treble damages at summary judgment. <u>See</u> <u>Mendocino Envtl. Ctr. v. Mendocino Cty.</u>, 192 F.3d 1283, 1302 (9th Cir. 1999) ("[Q]uestions involving a person's state of mind . . . are generally factual issues inappropriate for resolution by summary judgment.").

B. **Intentional Interference with Prospective Economic Advantage**

Plaintiff asserts Defendants are liable under California law for intentional interference with a prospective economic advantage.  To prevail on such a claim, Plaintiff must establish:

> 1) The plaintiff and a third party were in an economic relationship that probably would have resulted in an economic benefit to the plaintiff;

> 2) The defendant knew of the relationship;

> 3) The defendant intended to disrupt the relationship;

> 4) The defendant engaged in wrongful conduct;

> 5) The relationship was disrupted;

> 6) The plaintiff was harmed; and

> 7) The defendant's wrongful conduct was a substantial factor in causing the plaintiff's harm.

Rock River Commc'ns, Inc. v. Universal Music Crp., Inc., 745 F.3d 343, 349 (9th Cir. 2014).

Plaintiff proposes trademark infringement can qualify as "wrongful conduct" under California law.  Even if the Court were to accept that premise, Plaintiff has failed to establish several other elements of its claim, including:  an economic relationship with a third party that probably would have resulted in an economic benefit to Plaintiff; Defendants intended to disrupt that relationship; the relationship was disrupted; and the disruption was harmful.  The Court, therefore, declines to grant summary judgment in Plaintiff's favor on this claim.  See, e.g., Panavision Intern., L.P. v. Toeppen, 945 F. Supp. 1296, 1305 (C.D. Cal. 1996) (holding a defendant was guilty of diluting the plaintiff's trademark, but granting summary

United States District Court
Central District of California

United States District Court
Central District of California

judgment on an intentional interference claim in favor of the defendant because the plaintiff failed to present any evidence establishing a specific economic relationship containing the probability of future economic benefit).

## C. Infringement of DRIP CLUB Trademark

Plaintiff alleges Defendants infringed its federally registered DRIP CLUB trademark by using the hashtag "#DRIPCLUB" in at least five online social media posts, including some posts for Defendants' MILK MAN e-liquid.[10]  (SS ¶ 186.)

This Court, however, has held previously that "hashtags are merely descriptive devices, not trademarks." Eksouzian v. Albanese, NO. CV 13–00728, 2015 WL 4720478, at *8 (C.D. Cal. Aug. 7, 2015); see id. ("Plaintiffs' use of the hashtag . . . is merely a functional tool to direct the location of Plaintiffs' promotion so that it is viewed by a group of consumers, not an actual trademark.").

_____

[10] "A 'hashtag' is a form of metadata comprised of a word or phrase prefixed with the symbol '# ' (e.g., # chicago, # sewing, and # supremecourtdecisions)." Eksouzian v. Albanese, 116 U.S.P.Q. 2d 1972, 2015 WL 4720478, at *8 (C.D. Cal. Aug. 7, 2015) (citing Trademark Manual of Examining Procedure, ¶ 1202.18 (Wolters Kluwer eds., 2014), 2014 WL 5799282).  Clicking on a hashtag allows users of social media to sort through posts that use the same word or phrase as a hashtag. (SS ¶ 187.)  See, generally, Twitter, Inc. v. Skootle Corp., No. C 12-1721, 2012 WL 2375486 (N.D. Cal. June 22, 2012) (describing hashtag use on Twitter).

Plaintiff has offered no evidence Defendants used the mark DRIP CLUB on its advertisements or products, as opposed to using it as a hashtag.  Nor has Plaintiff adequately presented the Court with any reason why it should depart from its precedent.  Accordingly, the Court declines to hold Defendants' use of the hashtag "#DRIPCLUB" entitles Plaintiff to summary judgment on a trademark infringement claim.

## VI.   CONCLUSION

For the reasons stated above, the Court GRANTS IN PART Plaintiff's motion for summary judgment as to Plaintiff's claims for trademark infringement, false designation of origin, and unfair competition relating to Defendant's use of the MILK MAN mark.

The Court enjoins Defendants, their officers, agents, servants, employees, attorneys, parents, subsidiaries and related companies, and all persons acting for, with, by, through or under them having notice of this Order by personal service, electronic mail, or otherwise, and each of them, from marketing, advertising, distributing, offering to sell, or selling any product, packaging, or any other item that was named or labeled with the marks MILK MAN, MILKMAN, THE MILK MAN, or THE MILKMAN, or otherwise using said marks in commerce.  The Court orders Defendant's California MILK MAN trademark cancelled and awards Plaintiff damages in the amount of $6,487,861.00.

The Court DENIES IN PART Plaintiff's motion for summary judgment as to Plaintiff's claims for intentional interference with a prospective economic advantage relating to Defendant's use of the MILK MAN mark and trademark infringement

relating to Defendant's use of the DRIP CLUB mark.  The Court DENIES Plaintiff's request for attorney's fees and treble damages at summary judgment.

**IT IS SO ORDERED.**

Dated:    10/11/16

Virginia A. Phillips
Chief United States District Judge