UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

- - - - -

THE HONORABLE WILLIAM D. KELLER, SENIOR DISTRICT JUDGE

PRESIDING

| | | |
|---|---|---|
| AOP VENTURS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No.  EDCV 15-01586-WDK |
| | ) | |
| | ) | |
| STEAM DISTRIBUTION, LLC, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

MONDAY, MAY 10, 2017

**VOLUME I OF II**

**PAGES 1 - 218**

_____

DEBORAH K. GACKLE, CSR, RPR
United States Courthouse
350 W. First Street, 4th Floor
Los Angeles, California 90012
(213) 893-8913

**APPEARANCES OF COUNSEL:**


**For the Plaintiff:**


        Michael L Cohen
        Michael Cohen APLC
        1910 West Sunset Boulevard Suite 440
        Los Angeles, CA 90026
        213-413-6400
        Fax: 213-403-6405
        Email: cohen@mlcplclaw.com


        Barak Kamelgard
        Stubbs Adlderton and Markiles LLP
        1453 3rd Street Promenade, Suite 300
        Santa Monica, CA 90401
        310-746-9800
        Fax: 310-746-9820
        Email: bkamelgard@stubbsalderton.com


        Anthony M Keats
        Konrad Karl Gatien
        Keats Gatien LLP
        120 South El Camino Drive Suite 207
        Beverly Hills, CA 90212
        424-302-0717
        Email: kg@keatsgatien.com


        ///

        ///

1    **For the Defendants:**

2

3         Matthew K Wegner
          Brown Wegner LLP
4         2603 Main Street Suite 1050
          Irvine, CA 92614
5         949-705-0080
          Email: mwegner@bwmllp.com
6

7         William J Brown, Jr
          Brown Wegner LLP
8         2603 Main Street Suite 1050
          Irvine, CA 92614
9         949-705-0080
          Email: bill@bwmllp.com
10

11        Yuanjun Lily Li
          Brown Wegner LLP
12        2603 Main Street Suite 1050
          Irvine, CA 92614
13        949-705-0080
          Email: lli@bwmllp.com
14

15        Glen Nuttall
          Brown Wegner LLP
16        2603 Main Street Suite 1050
          Irvine, CA 92614
17        949-705-0080
          Email: gnuttall@bwmllp.com
18

19

20                         - - - - -

21

22

23

24

25

1

**I N D E X**

2

3 **COURT'S WITNESSES:**                                    **EXAMINATION**

4

5    MARTIN, DARYL    BY THE COURT              58
                      BY MR. COHEN              65
6                     BY MR. WEGNER            125
                      BY MR. COHEN             132
7                     BY MR. WEGNER            147
                      BY MR. COHEN             151
8                     BY MR. WEGNER            158
                      BY MR. COHEN             160
9                     BY MR. WEGNER            160

10

11    ANSON, WESTON    BY THE COURT             79

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1       LOS ANGELES, CALIFORNIA; MONDAY, MAY 10, 2017; 9:10 A.M.

 2                          - - - - -

 3

 4             THE CLERK:  Item 1, ED CV 15-01586-WDK, AOP Ventures,

 5   Inc. v. Steam Distribution LLC, et al.

 6             Counsel, please state your appearances.

 7             MR. COHEN:  Good morning, Your Honor.  Michael Cohen

 8   for the plaintiff AOP Ventures.

 9             THE COURT:  Good morning.

10             MR. KEATS:  Good morning.  Anthony Keats --

11             THE COURT:  Excuse me.  Your name?  Your Name?

12             MR. KEAT:  Anthony Keats --

13             THE COURT:  Anthony Keats.  I didn't have you on my

14   program, Mr. Keats.  Bear with me a moment, please.  I need my

15   glasses.

16             Yes.

17             MR. GATIEN:  Konrad Gatien for plaintiff, AOP

18   Ventures, Your Honor.

19             THE COURT:  Good morning, Mr. Gatien.

20             MR. GATIEN:  Good morning.

21             MR. KAMELGARD:  Barak Kamelgard for plaintiff AOP

22   Ventures, Your Honor.

23             THE COURT:  Mr. Kamelgard, good morning.

24             MR. KAMELGARD:  Good morning.

25             MR. WEGNER:  Good morning, Your Honor.  Mat Wegner
```

```
 1   for defendants.

 2            THE COURT:  Good morning, Mr. Wegner.

 3            Who's with you, Mr. Wegner?

 4            MR. WEGNER:  With me today I have Lili Li, Bill Brown

 5   from my office, and Glen Nuttall.

 6            THE COURT:  Good morning to each of you.

 7            MR. BROWN:  Good morning, Your Honor.

 8            THE COURT:  Okay.

 9            Let me say that the law clerk has done yeoman service

10   in this case; she's put a lot of time in this, and she has also

11   given me the benefit of her thoughts in a written memorandum

12   and sitting down.

13            There appears to be a lot of unnecessary

14   disagreement, but I may be wrong.  I want to resolve it the

15   best I can for you.  I think we can reach some conclusions here

16   today.  I will say -- when I talked with the law clerk and my

17   secretary, I said, You know, when I took this case from Judge

18   Fischer, or we did, what was the case estimate and trial

19   estimate, and she came back after a bit of searching and said,

20   You know, the trial estimate in this case is three to five

21   days, three to five days, and I said, Well, that's an

22   interesting estimate given what I've seen so far.  We'll keep

23   that, and we can have that if we're only doing damages, and I

24   say that only half in jest.

25            You know, I've been through the damage aspect in this
```

```
 1  case, not the liability -- although I certainly have some
 2  acquaintanceship with the liability aspect -- but I've been
 3  through the damage aspect of the case, and, you know,
 4  figuratively, and perhaps literally, I scratch my head, and you
 5  think you're going to really be able to educate six people on
 6  the economic theories here?  I don't know if you, individually
 7  or collectively, are aware of the word bushwa?  Bushwa, okay?
 8  Spelled b-u-s-h-w-a, and it means, nicely, baloney, okay?
 9          In my experience as an attorney -- and I'm not
10  beating my aged-old chest -- but I tell you what, I've tried a
11  lot of cases personally -- okay? -- both criminal and civil.
12  In my experience, there's always one side that wants to dumb
13  down the jury.  Always the guy who's got the weaker case, dumb
14  it down, get the worse you can, get the least educated you can,
15  especially in the dismal sciences, as economics is sometimes
16  referred to.  And that will happen here -- I almost guarantee
17  you.  I don't know who is going to do it, but somebody is going
18  to do it here, and even if you don't do it -- and I'm not
19  denigrating the jurors.  I'm saying they're not equipped to do
20  this.  It's enough to keep their bank balance -- okay? -- not
21  mucking around with something like this.
22          So you bring in -- it's your prerogative.  Don't get
23  me wrong; I understand that.  I understand this is -- you may
24  get some inkling of what I say -- think of the system in
25  certain areas of practice, but it is a monumental challenge to
```

1    get these jurors who will be sitting there to figure out what

2    in the Sam Hill -- H-i-l-l -- make sure you get that word

3    correctly, Reporter -- what in the Sam Hill is going on here,

4    okay?

5            It isn't like today, back and forth, we'll swear both

6    of the experts, and we go back and forth.  I can ask questions,

7    and expert might be asking questions of the other expert

8    conceivably.  It isn't that kind of proceeding when you are in

9    there with a jury, and it is stilted to a fare-thee-well, i.e.,

10   you have the rules of evidence, and you have some hot shot on

11   the other side saying, Well, I know the rules of evidence.  I'm

12   making an objection -- shouldn't be making them, but he is

13   making them, and now you've got to rule on it, and everything

14   gets interfered with, and it's just not the same.

15           So you're trying to explain it not to a judge here in

16   a motion practice, as we're talking about now, you're trying to

17   explain to the jury.  I'm telling you a daunting task would be

18   an understatement, okay?

19           Now, I want to be nice, I want to help you, and I'm

20   giving you my insight, such as it may be, born of 50 years, all

21   right?  And I'll be immodest enough to say it:  I have taught

22   trial practice in many venues:  State and attorney generals and

23   actually Harvard Law school, okay?  I have taught in these

24   programs, and I do have some acquaintanship with trial work.

25   Obviously, I've been around the bench a long time.  So what I'm

1    saying is I'm quite confident I'm right.

2          Now, we'll work this out as best we can this morning,

3    and when we're through, hopefully you will see the light.  I am

4    getting ahead of myself, but let me get ahead as long as I've

5    started ahead.

6          You have the theory here -- the theory related to how

7    the experts are going to arrive at what I call -- I think it's

8    in your papers -- call net profits, and then you start minusing

9    it, taking things away, and then the dog fight, legal dog

10   fight, starts with, Well, what are you going to take away?

11   What can you take away?  What can you not take away?  Is he

12   guessing?  Is he not guessing?  Does he meet *Daubert*?  Does he

13   meed 702?  Go back and forth, back and forth, okay?

14         And a lot of this is born by the approach that you

15   have taken as regards how you're going to determine the

16   damages, the figure from which you are minusing, taking away:

17   Operating expenses, all of these that I'll call intangibles,

18   qualitative factors, okay?  You're taking away, taking away,

19   taking away, and here comes the dog fight.  In contrast, you

20   have a very clear way that a jury might be able to understand,

21   and it is a much more crisp analysis, and that is all you got

22   to do is take a step back and say, Hey, look it, what's the

23   alternative?  And given that lead in -- which is escaping me

24   for the moment.  What's that alternative approach that they

25   were doing in the motion for summary judgment?  What do you

1    call it?  Royalty in the license fee approach.  I have

2    refreshed my own recollection; that's is quite a feat.  You

3    have the royalty and license approach, and that's fairly

4    direct.  You're going to get in a fight about, you know, are

5    you using the right benchmarks from which to determine the

6    royalty.  That's a matter of cross-examination in all

7    likelihood.  That's a matter of argumentation, but that's

8    fairly crisp compared to what you're doing here; and, I might

9    add, that particular approach was advanced, as I understand it,

10   in the summary judgment motion by, of all things, the

11   plaintiff, wasn't it?  Yeah.  Plaintiff advances that, okay?

12   Now they seem to be walking away from it, but they're

13   advancing, and now we have the defense advancing this other

14   approach.

15          So there is a way here to modestly or maybe

16   meaningfully simplify this for the purposes of the trier of

17   fact.  I will say also to you that if you look at the *Lanham*

18   *Act* and you say, Well, what role is the judge at?  I'm just

19   giving you a preview.  I'm not exactly sure, as I looked at the

20   statute yesterday, what role the judge has under -- what is it,

21   1202 -- what is it?  What is that section?  She doesn't know

22   where I'm going because I'm off script, okay?  I'm not using

23   that bench memo.

24          If we go -- if we keep going all the way, you're

25   going to get a nice order saying I want this issue addressed.

```
 1   It is nothing like 1202.  It's 15 U.S.C. 1117(a), small (a),

 2   and among other things, it says, "In assessing damages, the

 3   court may enter a judgment according to the circumstances of

 4   the case for any sum above the" -- I said -- "above the amount

 5   of actual damages," or you can -- I think you can reduce it.

 6           So what I'm really pointing out to you is, you know,

 7   I got a role here, too -- okay? -- and I'm very mindful of it.

 8   So you're dealing with the jury, and you're dealing with me,

 9   and be aware of it, and you're dealing with me fairly, and I'm

10   looking at you carefully, okay?  So with that, let me see if I

11   can get back to the way we're going to order this.  I'm just

12   giving you the initial thoughts.

13           I do have another thought that I talked about with

14   the law clerk yesterday.  She identified the three corporate

15   defendants and the individual defendants, and I said to her --

16   I believe that Mr. T-e-l-l-e-z, uses the -- what I would call

17   Spanish pronunciation "Tellez" rather than "Tellez."

18           Is it "Tellez" or "Tellez?

19           MR. WEGNER:  I believe it is "Tellez," Your Honor.

20           THE COURT:  "Tellez."  I okay.

21           I did tell you about *Daubert* -- didn't I -- the

22   *Daubert* story?

23           MR. WEGNER:  Yes, Your Honor.  *"Daubert"* versus

24   *"Daubert"*?

25           THE COURT:  Yes.
```

```
 1              MR. WEGNER:  Yes, Your Honor.

 2              THE COURT:  Well, this is "Tellez" versus Tellez."

 3   Okay.

 4              So now we've got Daubert worked out.  It's not

 5   "Daubert" -- even if Daubert said that, as we know -- and now

 6   we've got worked out Mr. Tellez, okay?  After all, you are in

 7   Southern California.

 8              Now, is there a potential conflict of interest?  I

 9   may have asked that question.  I halfway, Mr. Wegner think I

10   did, but I don't know.  Give me the -- and do me a favor.  I

11   don't care if you -- the last time I said you could and are

12   invited to sit there at counsel table, but when you're at the

13   counsel table, I don't want you talking to the microphone like

14   that; I want it like that.  I want to be able to hear you.  It

15   may just be my advancing years, but I tell you what.  You have

16   to speak up in this courtroom.  I don't know that the acoustics

17   are all that great.

18              So any conflict of interest here for Tellez?

19              Mr. Wegner, take that microphone, and it's a part of

20   you, okay?

21              MR. WEGNER:  I understand, Your Honor.

22              In any multi-defendant case, I suppose there is a

23   chance of a conflict.  I'm not sure how much I can say about

24   that without running afoul of privilege, but it is something

25   that's been considered and worked with.  I'm kind of at a loss
```

```
 1    to convey that without delving --

 2              THE COURT:  Bottom line, Judge, I don't think there's

 3    a conflict.

 4              MR. WEGNER:  At this point, I do not, Your Honor.

 5              THE COURT:  Let me get an amicus over here from the

 6    plaintiff's side.

 7              A conflict in your view or potential for conflict?

 8              MR. COHEN:  Your Honor, of course there is a --

 9              THE COURT:  Use the microphone.

10              MR. COHEN:  Of course, Your Honor, there's a

11    potential for conflict, yes, but --

12              THE COURT:  Is there a conflict?

13              Is Mr. Tellez here?

14              MR. WEGNER:  Mr. Tellez is here.

15              THE COURT:  Will you raise your hand, Mr. Tellez.

16              Thank you.  You can lower it.

17              THE REPORTER:  State your name again, please.

18              THE COURT:  You want his name?

19              THE REPORTER:  I do.

20              THE COURT:  You know, you're not exactly a household

21    name.  Maybe in time to come, Mr. Cohen.

22              MR. COHEN:  My name is Michael Cohen.

23              Thank you, Your Honor.

24              THE COURT:  You've got to say it so she gets --

25    she's -- she needs help is what I'm saying, as perhaps I do.
```

1      Go ahead.  Mr. Cohen.

2           MR. COHEN:  Michael Cohen for AOP, the plaintiff.

3           THE COURT:  Keep the microphone up.

4           MR. COHEN:  The answer to your question is yes, there

5      could be because at the phase of the proceedings --

6           THE COURT:  At the what?

7           MR. COHEN:  When the court begins to consider the

8      existence of exceptional circumstances, then depending on

9      liability or what the facts are, then, yes, Mr. Tellez could be

10     held responsible for the misconduct of the corporate defendants

11     and vice versa.

12          THE COURT:  When you look at the exceptional

13     circumstances, doesn't he have an argument that whereas there

14     may be exceptional -- I'm not saying it's the case -- I'm just

15     saying wouldn't he have an argument provisionally that whereas

16     the corporate entity may have acted in such a manner as to

17     warrant acceptable circumstances, under no circumstances did I.

18          MR. COHEN:  In understand.

19          THE COURT:  Well, somebody's got to argue that for

20     him.

21          MR. COHEN:  That's right, and I don't know whether

22     it's a -- the question has been answered in the law whether

23     liability for exceptional circumstances or enhancement of

24     damages or shifting of attorney's fees is joint and several or

25     just several; we don't know the answer to that.

```
 1              THE COURT:  We can at the time of the conclusion of

 2    the -- I'm going to do what I asked you to do that I wasn't

 3    doing, and I'm speaking in the microphone, and that's this:  At

 4    the conclusion of the hearing, we'll put a minute order out,

 5    and there are going to be certain things that we're going to

 6    want.  For instance, there's an 1117 analysis of what the

 7    court's role is -- but -- vis-a-vis damages, but also probably

 8    another thing -- I'm looking toward the law clerk -- another

 9    thing we're going to do is say, given the issue raised by the

10    court, is there potential and/or has the potential been

11    explained to Mr. Tellez and has he waived it.  So you've got a

12    couple things going on there.  It's segmented, serial, okay?

13              Okay.  Now, that being the case, here's where we are:

14    I want to move to -- what for -- perhaps it's the appropriate

15    time.  I'm going to move to what you have been talking about --

16    what we've been talking about internally as the fundamental

17    damages analysis which implicates these experts, and given what

18    I said here this morning, is that really the way to go when you

19    have a jury?  Is that the most -- I mean, it reduces the

20    plaintiff's damages in all likelihood, which means, well, look

21    it, it may be the way to go for simplicity, but it's not the

22    way to go for purposes of dollar multiplicity.  Are you with

23    me?  Do you understand what I am saying?

24              MR. COHEN:  Yes.

25              THE COURT:  Is that what's going on here?
```

```
 1            MR. COHEN:  I can't speak for what defendants are

 2   doing, but I want to address the questions, but I --

 3            THE COURT:  Move that microphone.  It's malleable.

 4   You know the word "malleable"?

 5            MR. COHEN:  Yes, Your Honor, I do.

 6            THE COURT:  I don't mean to offend you, but you don't

 7   seem to recognize malleability because you're not moving the

 8   microphone.

 9            MR. COHEN:  Your Honor, I'm afraid if I move it any

10   closer, I am going to be swallowing it.

11            THE COURT:  Right down your gullet.

12            MR. COHEN:  Can you hear me --

13            THE COURT:  I haven't used the word "gullet" in a

14   long time.

15                 (Discussion held off the record)

16            THE REPORTER:  I can.

17            THE COURT:  Okay.  Go ahead, please.

18            MR. COHEN:  At the beginning of the court's brief

19   comments this morning, you said that the plaintiff had advanced

20   or advocated a theory of a royalty right.  That's mistaken.

21            THE COURT:  That's what?

22            MR. COHEN:  That's mistaken.

23            THE COURT:  Are you accusing the court of making a

24   mistake, Mr. Cohen?

25            MR. COHEN:  Yes, Your Honor, I am.
```

```
 1              THE COURT:  Such temerity I haven't seen in a long

 2    time.

 3              Go ahead.

 4              MR. COHEN:  It's not even 9:45.

 5              THE COURT:  What was my mistake?

 6              MR. COHEN:  AOP has been advocated in this for the

 7    proxy damages theory of recovery in its summary judgment

 8    papers, and, in fact, the original summary judgment decision,

 9    the decision granting summary judgment in its entirety of both

10    liability and damages awarded proxy damages that were all the,

11    I believe, gross profits or gross revenues from the defendants

12    for the sales because at least as an initial matter, the

13    defendants have failed to submit admissible summary judgment

14    evidence of any of the deductions for cost of goods sold or for

15    overhead.

16              So in its original decision -- in the court's

17    original decision, Judge Phillips awarded proxy damages of

18    $6.2 million to AOP.  Now later, after a motion for

19    reconsideration filed by the defendants, Judge Phillips

20    affirmed her decision on liability but set aside the decision

21    on damages, which is why we're here, but it's always been a

22    proxy theory.

23              While the court was making its comments earlier, we

24    did a word search on both our -- AOP's motion for summary

25    judgment and its reply, and we couldn't find the word "royalty"
```

```
 1    anywhere.

 2            THE COURT:  Or "license"?

 3            MR. COHEN:  I didn't look for the word "license."  I

 4    just looked for the word "royalty."

 5            THE COURT:  They are treated interchangeably.

 6            MR. COHEN:  I understand, but AOP has been advocating

 7    for the proxy theory of damages.

 8            THE COURT:  Okay.

 9            I'll accept your representation, and you're still

10    advocating the proxy theory, which we referred to a moment ago

11    as what I said is the fundamental damages issue, but the proxy

12    damages theory is what really is before the court this morning;

13    I understand that.

14            MR. COHEN:  Correct and --

15            THE COURT:  I want you to go away from it if you can,

16    and you say I don't want to go away from it.

17            MR. COHEN:  No, we don't want to go away.  That's

18    their election is for proxy damages absent a court order saying

19    we cannot recover --

20            THE COURT:  I'm not saying that.

21            MR. COHEN:  Understood.

22            THE COURT:  I'm only saying for purposes of jury

23    communication.

24            MR. COHEN:  I get it.  But we are trying to simplify

25    things.
```

```
 1          THE COURT:  That's your prerogative, but I don't want
 2   you saying, Well, this judge is trying to force feed me.  I'm
 3   not forcing you to do anything.  I'm just telling you
 4   realistically that you've got to be a veritable giant to be
 5   able to make the jury understand what in the world you're
 6   talking about, okay?  It's very, very -- I could stretch the
 7   veries down five floors -- hard to do.  Okay.
 8          Taking on the task, fine, go ahead.  Now, with the
 9   damages theory, then I can move into it right now.
10          MR. COHEN:  Okay.
11          And we are mindful of the challenge that AOP faces on
12   damages.  So, for example, as we've discussed in our papers
13   that we filed with the court and have said in open court here,
14   we are -- we will not dispute the gross revenue figure for the
15   defendant's sales of Milkman.  So there's no dispute there.
16          THE COURT:  We're going to get -- that's one of the
17   first things I want to know here:  Can we get some agreement
18   for the basics, and you got a 15,000-page backed out here that
19   you've referred to in your papers also, I believe, and you
20   said, Look it, I don't want a master coming in here; we'll be
21   bound by it.  So that's another issue.
22          So what I have here -- some notes that we made
23   yesterday -- and basically what I'd like to do is go through
24   it -- you know, there is a flow of sorts to this whole thing.
25   Facially, it's basic, okay?  You start off with the gross
```

```
 1    profits, you get the net profits, and then where are the
 2    backouts, okay?  That's what you're talking about.  But
 3    embedded in the backouts is a lot of argumentation.  That's
 4    what the hearing is about, okay?  And who can explain the basis
 5    of the proposed backouts?  That's what's all going on here.
 6            You know, what you always want to do is reduce it
 7    fundamentally -- okay? -- not all this gibberish economic
 8    terms, everything.  Bango, what is it you're talking about.  I
 9    believe what I characterized just now is what you're talking
10    about, right?
11            MR. COHEN:  Yes, that's what we were trying to do.
12            THE COURT:  So far so good -- right -- other than my
13    one mistake?
14            MR. COHEN:  Yeah, other than that, Your Honor.
15            THE COURT:  You'll see more, Mr. Cohen.  That is my
16    first.  Hopefully not a lot, but you're going to get a couple.
17    It's going to become abundantly clear I don't have all the
18    answers as time moves on here this morning, but I have some
19    answers, I can assure you.
20            MR. COHEN:  Well, we, in the attempt to make things
21    easier and simpler both for the court and for the parties and
22    for the jury, in addition to the fact we are not going to
23    dispute the gross revenue figure, we're not disputing the cost
24    of goods sold, that number either; and we offered a
25    stipulation.  We sent a proposed stipulation to opposing
```

1   counsel back on April 20 saying, "We'll stipulate to the gross

2   revenue figure and to the cost of goods sold."  We haven't

3   heard boo.

4            THE COURT:  You're going to hear "boo" in a moment.

5            MR. COHEN:  Well --

6            THE COURT:  I'm going to evoke "boo."  I'm going to

7   figure out what is going on here okay.

8            MR. COHEN:  Okay.

9            THE COURT:  You can get a little control starting

10  right now, I'm telling you, nice control, okay?  Otherwise, I'm

11  Gulliver with you people just piling over me with all this, I

12  got this.  Oh, no you don't.  We're going to get right on it,

13  man.  I say "man"; I mean it in the general sense, street talk

14  admittedly, but that's what we're getting to, okay?

15         So what we want to do, I think, Mr. Cohen, is just

16  take it through the way it's analyzed, and you start off with

17  the gross profits.  What are the income ones?  What has to be

18  the plus?  What's the minus?  And do we have agreement?  And if

19  we don't have agreement, why don't we have agreement?  That's

20  what's going to happen here to start with, and then we're going

21  to get into operational costs.  Do we have agreement?  No way

22  in the world you've got agreement on that, and I want to know

23  why you don't have agreement, and I'm going to want to know

24  here, here's a list of operational costs, okay.

25         Now, what's the difference of opinion?  And I want a

```
1    crisp answer, as much as possible, and I will try to try to

2    give you a crisp response, and then we can -- you people can

3    move on with the development of your lawsuit and in turn the

4    presentation of your lawsuit, okay?

5            Now, with that in mind, if you start off under this

6    proxy damages theory, and the first question -- you've already

7    averted to it -- is this issue of gross profits.  You said

8    you're prepared to agree to the gross profits made on the sale

9    of The Milkman.

10           MR. COHEN:  You're correct, Your Honor, and I want to

11   be very clear because terminology matters here, and this is my

12   understanding:  Gross revenues is the number of bottles they

13   sold times however much they cost.  That's gross revenues,

14   which we've offered to stipulate to, and we're not going to

15   dispute even if they won't stipulate.  We're not going to

16   dispute that figure.  That's the top number; that's our burden;

17   we're not disputing.  We don't have agreement yet, maybe we

18   will today.

19           THE COURT:  You know what?  That should be easy.

20   That's not where the fight is.  Let's get to the fight.  Let's

21   not muck around with, well, what is the revenue.  Come on.

22           MR. COHEN:  Your Honor, I'm not fighting --

23           THE COURT:  You play golf, Mr. Cohen?

24           MR. COHEN:  No.

25           THE COURT:  Do you watch golf on television?
```

```
 1              MR. COHEN:  Not even.

 2              THE COURT:  Well, you poor man, but the fact of the

 3   matter is -- the fact of the matter is -- this may explain some

 4   things, Mr. Cohen -- but the fact of the matter is there's

 5   something called "gimme," and what you're talking about here

 6   is -- revenue is "gimme."  Cost of goods sold.  You know,

 7   should be a little fight there but not much.

 8              MR. COHEN:  We've offered to stipulate; there's

 9   fight.  That's two things.

10              THE COURT:  So no fight on cost of goods sold.

11              What's the difference between, as you understand it,

12   between your view of what you're willing to stipulate to

13   revenue wise and their position?

14              MR. COHEN:  They've never gotten back to us.  I

15   offered to stipulate.  So where is the fight?  I don't know.

16              THE COURT:  I don't want to be any more impolite than

17   I appear -- okay? -- but what I'm trying to do is I hear you

18   did, and I want to get into it before I forget it.  What I want

19   to know is what do you say the revenue experienced or received

20   by the plaintiff was on the sale of The Milkman product?

21   What's the figure you have?

22              MR. COHEN:  Their expert's figure, I think, is

23   $9.8 million.  It's a change --

24              THE COURT:  Nine-point -- you're willing to agree

25   with that?
```

```
 1              MR. COHEN:  Yes.

 2              THE COURT:  Okay.  Mr. Wegner, you're willing to

 3    stipulate?

 4              MR. WEGNER:  Yes.

 5              I have quite a few comments to make in response to

 6    Mr. Cohen's comments because I think I need to be heard on a

 7    couple of substantive comments.

 8              THE COURT:  His comments about what, Mr. Wegner?

 9              MR. WEGNER:  Where the damages case is and where it's

10    headed.

11              Thank you.

12              Your Honor is absolutely correct.

13              THE COURT:  Do me a favor and yourself.  I think the

14    microphone is adjustable.  You should be able to adjust it so

15    you can use it, and I can hear you.

16              MR. WEGNER:  How is this, Your Honor?

17              THE COURT:  Good.  What happens is as you talk, you

18    tend -- Mr. Cohen and I do it too -- to start moving away.  Try

19    to -- when I go like this -- go ahead.  Please.

20              MR. WEGNER:  Thank you, Your Honor.

21              You're absolutely correct that a reasonable royalty

22    analysis is a crisp way of valuing intellectual property.  That

23    is a very well-established, longstanding method, and it's one

24    that, despite Mr. Cohen's comments, was raised --

25              THE COURT:  Was what?
```

```
 1          MR. WEGNER:  By the plaintiffs in their expert
 2   report, okay?  I have not gone back to look at the MSJ papers
 3   as we're discussing this today, but I do know that their
 4   expert, Mr. Anson, advanced a reasonable royalty analysis as
 5   part of his damages report.  Our expert responded to that, and
 6   they are now trying to keep Mr. Martin's analysis out under
 7   this idea that they just get to choose the proxy theory of
 8   damages, and that's the be all, end all for everybody.  It's
 9   not.  Okay.
10          Proxy damages are allowed when they're a reasonable
11   approximation of the profits that the plaintiff would have
12   garnered but for the infringement, and that we just cross a
13   hurdle to get there.
14          In this case, The Milkman flavor sold by the
15   plaintiffs underperformed by a factor of, I think, two to three
16   the sales by defendants.  So there's a threshold issue there
17   that, you know, he keeps trying to avoid, and we keep trying to
18   advance, that it's not just a fait accompli that they get to
19   seek proxy damages, and that's it.  There are alternative
20   measures, and we ought to be entitled to advance alternative
21   measures, particularly when one of them was a response to a
22   royalty analysis performed by their expert; and so that's where
23   we are with our expert report.
24          Our expert report, as the court is well aware by now,
25   has essentially two components, both responsive to Mr. Anson's
```

 1    report.  The first component is a reasonable royalty rate

 2    analysis where Mr. Martin corrects various assumptions and

 3    analyses performed by Mr. Anson in his report.  That report, by

 4    the way, exists today.  The supplemental report still includes

 5    that.

 6            Secondly is the other lobe of the expert report which

 7    is the response to Mr. Anson's calculation of what I'll call

 8    profits attributed to infringement.  Our response includes the

 9    apportionment analysis that Mr. Anson didn't even touch upon,

10    didn't even knowledge in his report.

11            And so that's why we end up where we are today.  I

12    would agree with you -- and I think my expert, Mr. Martin,

13    would agree -- a reasonable royalty is a crisp way of

14    presenting this, and it's well established; it's beyond repute.

15            That's background on what our position is and where

16    the damages case is and has been --

17            THE COURT:  Yeah, but here's the thing.  Here's the

18    thing, Mr. Wegner:  You and I may agree, and you, from a -- I

19    think it's favorable to you that approach because the damages

20    are going to be less, considerably less, I think, under that

21    theory.  But be that as it may, it's nevertheless the

22    plaintiff's prerogative to chose what way he is going to go,

23    and although I try to sell, in quotes, the approach that you

24    just described, namely, the license of profits theory, which is

25    relatively crisp and certainly has been enforced forever as an

```
 1    approach toward this type of thing, you don't want to do it.
 2    And the answer is -- you know, he doesn't have to give an
 3    answer.  I think I know why you're doing it.  It's the amount
 4    of damages.
 5            MR. WEGNER:  Clearly.
 6            THE COURT:  I'm not critical of him.  He wants to
 7    maximize it, okay?
 8            You want to maximize it, and you think you can take
 9    on what is the difficult task of explaining this?  Go ahead and
10    do it.  What I'm saying is since we can't -- since the -- if
11    he -- I'll try to phrase this.  What we're going to have to do
12    is have him -- he is, having taken that approach, which is
13    appropriate, now we have to grade his papers.  Can he do this?
14    And what can he prove?  And that's how you are going to have to
15    go through these various subject matters in the -- working to a
16    final amount of damages, and that's why you got to start with
17    the gross profits, net profits, and then into the other issues
18    that have been identified by Mr. Martin.
19            And what is it -- given that, that's the way they're
20    entitled to go, that's the way they want to go -- what is it
21    you want to input me now?
22            MR. WEGNER:  Your Honor, under no circumstances are
23    they entitled to a windfall; that's not law.  The reasonable
24    royalty rate analysis is a way of back-ending the damages
25    analysis and securing it to show that it's -- they can't get a
```

```
 1   windfall.  It's an alternative way of measuring intellectual

 2   property, and, again, it's advanced by their expert in the

 3   first place.

 4             THE COURT:  Okay.  I understand what you're saying,

 5   and the answer is, as I said a moment ago, he chose it; he is

 6   entitled to it; we're going to work with it and see if he can

 7   produce the requisite evidence.  And since he is entitled to it

 8   and since he wants to proceed that way under the proxy theory,

 9   then we've got to go through an analysis of the various

10   increments of the proxy theory, and we start with revenues.

11   That's as simple as that.  This isn't that difficult, okay?

12             So I don't want to get into, Well, what I said and

13   what you're endorsing, you ought to go clear, historically

14   accepted way, and the answer is there are other ways, and he

15   wants to go another way in pursuing his damages, another

16   theory.  He's entitled to do it, and under that you have to go

17   through the various -- you have to cross the various analytical

18   hurdles, okay?  And that's -- I want to do it.  I don't want to

19   spend all day -- because you got a lot of issues here -- I

20   don't want to spend all day on whether this is the appropriate

21   way.  We're going -- we're going the -- along the road that the

22   plaintiff is entitled to pursue, and that is the proxy theory;

23   and I want to know, want to know, do you agree with his

24   proposed stipulation as to the revenues, "yes" or "no"?

25             MR. WEGNER:  Yes, and that would be the revenue
```

1    advanced by our expert.

2              THE COURT:  Got it.

3              So what's the figure for the record?

4              Mr. Cohen, I'm proposing a revenue stipulation.  Now

5    what is it?

6              MR. COHEN:  It's 9.8 million, Your Honor.  Let me get

7    the exact number from their expert's report.  One second.

8              MR. WEGNER:  It's 9,883,420.

9              THE COURT:  So stipulated, Mr. Wegner?

10             MR. WEGNER:  Yes, Your Honor, with the caveats again

11   that I'm not stipulating that the proxy measure is appropriate

12   in the case, but, yes, that is our gross revenue figure.

13             THE COURT:  All right.  So let me make it clear for

14   you:  That is, look it, I'm not agreeing they can pursue this

15   theory, but if you do pursue this theory, I will stipulate to

16   the revenue amount.  Fair statement?

17             MR. WEGNER:  Fair statement, Your Honor.  I don't

18   agree with his theory, but if we go with that theory, then,

19   yes, that would be our revenue number.

20             THE COURT:  Okay.  There's the figure.

21             Now, the next issue is if you take away the cost of

22   goods sold and -- are you prepared to stipulate to that?

23   Again, you don't have to repeat "I object to the approach."

24   Your objection is noted as a continuing objection, okay?  Now,

25   back to the question.  The question is do you agree with this

```
 1   cost of goods sold theory that has been proposed by Mr. Cohen?

 2   I want to be able to go through this bang, bang, bang, bang,

 3   and then when we get to a difficulty, What do you say?  What do

 4   you say?  What does Anson say?  What's Martin say?  What does

 5   the judge say?  We got to do that.  You don't have a choice.

 6   Let's go.

 7            MR. WEGNER:  Understood, Your Honor.

 8            Subject to the same objection, we can stipulate to

 9   the cost of goods sold.

10            THE COURT:  What is it for purposes of stipulation?

11            MR. WEGNER:  $3,831,196.  It's reflected in Exhibit 1

12   of Mr. Martin's report, the supplemental report, dated

13   March 3rd, 2017.

14            THE COURT:  Okay.  Thank you.

15            Now, you take the revenue, you take away the cost of

16   goods sold, and you gross it out or call gross profits.

17            What are the gross profits, just doing the math?

18            MR. COHEN:  $6,052,232.

19            THE COURT:  Okay.  Next step:  How do we get to the

20   net profits, right?

21            MR. COHEN:  That figure is a net profit figure, and

22   then my understanding -- excuse me -- that's a gross profit

23   figure.

24            THE COURT:  That's what I said.

25            MR. COHEN:  I apologize.  My fault.
```

 1          THE COURT:  You're saying -- I want to, for the

 2   record, you made a mistake.

 3          MR. COHEN:  I did.  I did.  I apologize.

 4          THE COURT:  Okay.  Go ahead.  Let the record reflect

 5   I'm smiling.  Sometimes the record says this nasty old judge

 6   said you made a mistake.  I'm smiling when I say that, record,

 7   okay?

 8          MR. COHEN:  Okay.

 9          THE COURT:  Now, we're moving to the net profits, and

10   now you got gross profits.  We've arrived at that.  Now you

11   take away the operating expenses.  Now -- now, what I said to

12   you is under this theory, operating expenses that are

13   related --

14          Now, where is that cite -- I'm talking to the law

15   clerk, very attentive alert law clerk for the record -- we have

16   a cite to the very issue that I'm addressing right now, okay?

17   And where is that cite?

18          Here's the thing:  I have the *Frank Music* case, and

19   it's a Ninth Circuit case, and what is the cite on that?

20          886 F.2d 1545, Ninth Circuit 1989.  Is there is a

21   quote there?  And in that case -- I'm sorry.  I don't have the

22   exact verbiage -- okay? -- but I can tell you the gist of it

23   because it's quoted in a case called *Winterland* -- one word --

24   *Concessions v. Fenton*, F-e-n-t-o-n, 835 F.Supp. 529, 533, and

25   they quoted the *Frank* case; and that case says in part that,

1  Defendants may deduct overhead expenses if they can demonstrate

2  that the expenses were of, quote, actual assistance in the

3  production, distribution, or sale of the infringing product,

4  and I underscore for you infringing product.  So this is where

5  the -- close quotes -- this is where the disagreement comes in

6  here.

7          You do have operating expenses; there isn't doubt

8  about that, okay?  So the way to do this, if you're not going

9  to agree -- do you want to agree?  Have you tried to agree?

10          MR. COHEN:  We can't, Your Honor, because -- and

11  here's why.  The very next sentence in the *Winterland*

12  *Concessions* case, right after the sentence that the court just

13  read, is important and central to what's going on here.

14          "Where more precise methods of allocating costs are

15  not available, defendants may allocate costs based on the

16  infringing products share of gross revenues so long as there

17  is, in addition, evidence to support a finding that each item

18  included in fixed costs actually contributed to the infringing

19  product."

20          The reason we cannot agree to their figure is because

21  Mr. Martin made no effort, none, to determine whether the --

22  any particular fixed cost actually contributed to the

23  infringing product.  He didn't even make the effort -- even in

24  instances where he might have been able to --

25          THE COURT:  If that's the case, then he can't reduce

```
 1   it then.

 2           MR. COHEN:  That's what we think; that's why we're

 3   here fighting.

 4           THE COURT:  I said "if."  I don't know the answer.

 5           What's your response, Mr. Wegner?

 6           MR. WEGNER:  He did, Your Honor.  He reviewed the

 7   data; he talked with the CFO at length about the expenses, and

 8   there's going to be evidence to back up his opinion at the

 9   trial.  We'll have evidence from the people that work at the

10   defendant's that discusses, you know, what the overhead is and

11   how it actually connects to the products; but I'll have to

12   grant it's not as if the books say and -- books and records

13   themselves that this part of the rent that we paid on the

14   warehouse went to the production of this The Milkman flavor

15   only.

16           And so the analysis that he did was to confirm that

17   those overhead expenses were used to advance the brand, which

18   is One Hit Wonder and then apportion as the law allows -- I

19   shouldn't say the word "apportion" because that is later, I

20   guess -- allocated as a percentage of sales from that Umbrella

21   brand, the expenses that are -- would go along with the

22   percentage of sales from the umbrella brand that were

23   attributable to The Milkman flavor.  But it's not as if he took

24   a shot in the dark; he got the overhead expenses and spoke with

25   management about --
```

```
 1            THE COURT:  Okay.  Here's the thing I'm going to tell
 2    you.  It would help -- it seems to me -- if you incrementalized
 3    the constituents of overhead expenses -- okay? -- and that in
 4    and of itself, the macro overhead expenses -- if you'll excuse
 5    the fractured English, "ain't that tough," okay?  Here are the
 6    overhead expenses.  Okay.
 7            Now, having established the overhead expenses in a
 8    general sense, then the question is having in mind that only
 9    overhead expenses that ultimately relate to the infringing
10    product can be deducted, you, defendant, have to present what
11    you think can be deducted, and the plaintiff can object; but
12    I'm not here to resolve the actual amount right now.  You're
13    entitled to your respective theories.  You want to bring it to
14    the attention of the jury, go ahead.  I am saying to you that,
15    nicely, there are limits here, and if you're not going to
16    discipline yourself, what you force the court into is a
17    disciplinary mode of sorts; and I'm not hesitant to do that,
18    believe me.  I don't want to do it, but I don't, by the same
19    token -- by the same token, I'm referred to Gulliver.  I'm not
20    sitting here like Gulliver with a bunch of little pollutions
21    all over me, okay?  No, sir.  You're going to have to -- you're
22    going to have to discipline yourself as much as possible.
23            Now, you know, commonsense -- this offending product,
24    there were absolutely operating expenses associated with it.
25    Come on.  That's for sure.  Question is quantify it, and that's
```

1    where the difference is.  I don't think today's hearing is

2    about quantification.  I just tell you -- I give you a preview:

3    You get in front of a jury, and I guarantee you -- you know, I

4    remember years ago, a very delightful young assistant United

5    States attorney, who has since become the public defender in a

6    major state back east, and I ran into him in the hall, and he

7    was trying a criminal case that involved economics, revenues,

8    damage, fraud.  And I said to him -- we'll call him Joe -- I

9    said, Joe, how is your case going?"  And this fellow had a lot

10   of -- kind of shaking and jive moves, this attorney did; he

11   kind of moved on it, physically.  He looks at me, and he kind

12   of moves like this -- court moving back and forth for the

13   record -- he moves back and forth, and he says "Judge, if I

14   were selling NoDoz, I could make a million dollars."

15             This is NoDoz case, okay?  I don't mean to be

16   offensive, but anybody taking a look at this case would tell

17   you it's a NoDoz case, and what you're trying to do is

18   minimize -- I think you're trying to do -- at least I'm trying

19   to do.  I'm trying to minimize the NoDoz part of this, fighting

20   over how do you allocate.  This is an allocation issue, and how

21   do you two propose to allocate the overhead as regards the --

22   what has been found to be the offending product?

23             Have you talked with each other about this?

24             MR. WEGNER:  Yes, Your Honor.

25             THE COURT:  You choked that, out for the record.

```
 1           MR. WEGNER:  We've filed multiple briefs against each

 2    other.  We've talked in that sense, you know.  We have met and

 3    conferred about what we can agree on, on that topic, and I

 4    would say I would agree with Mr. Cohen that we haven't.

 5           THE COURT:  What do you suggest?  Look it, I'm trying

 6    to help you.  It may not appear that way, but I am.  I'll try

 7    to help you.  How do you take this and try to get some

 8    agreement?  You're not getting -- look it, can you get -- this

 9    isn't an X-acto.  Do you remember what the old X-acto knife is?

10           MR. WEGNER:  Yes.

11           THE COURT:  You don't have to use an X-acto as an

12    example.  This isn't something that you can -- one plus one

13    equals two.  This isn't that kind of thing.  This is mushy,

14    okay?  And just like the next issue here is going to be mushy:

15    The eight factors.  This is mushy.  It isn't as mushy as the

16    eight factors, but it's mushy, and it lends itself to some type

17    of agreement.  This isn't an Israel-Palestine deal, all

18    right? -- where you can't resolve it.  You can resolve it.

19           And I'm not going to sit down with you, but the fact

20    of the matter is stop gladiating for a moment -- if there's

21    such a verb -- and think how can we assist the trier of fact.

22    How can you do it?  I'm asking you.  How can you -- first I

23    want you to identify the various characters.  Look it, if I'm

24    looking to this jury and I'm saying I'm pursuing the proxy

25    theory, okay?  And we start off, and then the defendant is
```

```
 1    going to have to -- Mr. Wegner is going to have to start
 2    backing these things out if he can.  And Wegner looks at the
 3    jury and says, We're under a proxy theory, and the proxy theory
 4    is pretty simple.  This is the way, in my view, to try this
 5    case in an opening statement.  And in your statement to the
 6    jury -- put a note there, will you -- this is -- you know, you
 7    and I, you more than I, work with this, and you have hundreds
 8    of hours and perhaps thousands historically in this area.  You
 9    can have Einstein on a jury, and he doesn't know anything about
10    this.  You got to help him in a very, as I said, stilted forum.
11    How are you going to help them?  Well, here's what's going on
12    here, and you got -- there was a little fella, diminutive
13    little attorney, whose mind was as big as his body, okay?  Big
14    statement.  This son of a gun -- I'm saying it nicely -- son of
15    a gun was a smart guy -- okay? -- and he took butcher paper --
16    okay? -- jury is sitting there, and one thing that really helps
17    a jury is visualization.  You can talk until the cows come
18    home, and a jury, if their eyeballs start circling -- and so
19    does the judge's for that matter -- they start circling, but if
20    you take that -- and I commend this to you strongly, one or
21    both sides -- jury, here's what's going on here, okay?  We got
22    a beef.  He stole my product, in a sense.  I'm entitled to
23    damages.  The law says what damage am I entitled to?  I'll tell
24    you what damage, what the law says.  It says you get under the
25    theory -- not going to call it the proxy theory, but can you if
```

1    you want -- the theory that the law engages in.  He says, Okay,

2    you get all of his gross revenue for starters, for starters.

3    He did it.  Again, why am I getting it?  I could make an

4    opening statement right now to 'em.  This isn't puffery, this

5    is the way to make it simple to them if you insist on going the

6    way you're going, i.e., you're not going to go the traditional

7    license royalty route.  Again, I understand.

8          If you're going to go that way, what happens here?

9    Well, I'll tell you what happens.  I'm the defendant.  What do

10   I get?  Yes, under the law I'm the guy that did it.  So

11   everything that I made, I pay; but it isn't quite that simple.

12   It's not fair now would it be.  What's fair is I get to back

13   out my operating expenses.  Well, no kidding.  And if you have

14   that, and you have shown what you're doing -- I'm going to

15   almost insist on you doing this -- okay? -- because I just -- I

16   mean, literally my hands are clasped -- for the record -- as I

17   think of this jury.  I literally think of this jury, and I

18   think poor jury, and I think, well, you know, you want a jury,

19   you'll get a jury.  But I will tell -- I clasp my hands -- how

20   do you make it easy, in quotes, for them?  It's not going to be

21   entirely easy because it's dull, not for you and your

22   clients -- I understand that -- but dull for them.  How do you

23   make it easy?  How do you zip this up?  I'll tell you how you

24   do it.  This is what's going on here.  Here it is in black and

25   white.  You know, this little guy with a big brain, I'm talking

```
 1    big, man, big.  He had that butcher paper, and he is writing
 2    all over it, and I'm thinking what the Sam Hill are you're
 3    doing?  And as he did it, I start thinking, wait a second.
 4    He's on to something.  This is why the guy was very successful
 5    by the way.  If you would do that here and you would start, you
 6    would see this.
 7              Now, we're down to the level where operating
 8    expenses:  Jury, if I get to deduct something, if what I sold
 9    cost me money as related to the product that's offending, the
10    law says I can back it out.  How tough is that to figure out?
11    You're not doing -- you have an expert doing this?  Forget it.
12    You do this, and they're going to know what you're doing.
13    Okay.
14              Now, we get in the back-out.  Now you're in the
15    back-out with me, and I'm talking with you about operational
16    expenses, and I'm saying to you, simplistically, that there are
17    finite operational expenses:  Legal, building, janitorial
18    services, attorney services, and I will say also:  You do what
19    you want, but when you start loading -- as has been described
20    to me by the law clerk -- various expenses such as legal
21    expenses that occurred, as I understand it, after the filing of
22    the lawsuit, into your operational expenses, that is bushwa
23    okay?  There's no way under the sun you're going to -- I'll
24    give you a preview.  There's no way under the sun that you're
25    going to be able to -- that's an operational expense as it
```

1    relates to the specific item, an after-the-fact expenditure in

2    the face of litigation.  No way, okay?

3           So what you do is you do what you want; I'm just

4    telling you if I'm Mr. Cohen, I'm salivating if you do that.

5    You go ahead and do that, and I'm going to argue what a pig

6    this defendant is trying -- they got the temerity, the gall,

7    the chutzpah -- you call it what you want; you choose the word

8    jury -- I' love to be arguing that -- you choose the word jury,

9    which one, but I'm going to guarantee you you're going to use

10   one of these words when he tries to do what he is doing with

11   the operational expenses.

12          And you want to cut these operational expenses

13   reasonably, and I'm not the trial man -- okay? -- you are, but

14   I'm telling you that the jury and I are prisoners of your

15   approach, and I'm telling you I'm trying to crisp this up, and

16   I'm trying to find agreement, if you can, with the other side,

17   and if you don't -- pump up is an inaccurate term, but I'm

18   going to have to use it because that is all I got right now --

19   if you don't pump up these operational expenses

20   inappropriately, you've got the potential for an agreement.  I

21   can sit down with you and get some agreement.  But you, as

22   described to me again, you haven't done that, and I'm not going

23   to be privy to this; you're going to be in front of a jury, but

24   I invite you -- I haven't yet come to the point where I'm

25   ordering you.  If you don't do it, there's a good likelihood

1    that I'm going to go down physically, I'm going to take a

2    board, and I'm entitled to ask questions in the case, okay?

3    I'm going to step down here, I'm going to have that jury

4    sitting there, and I'm going to say, Are you saying this:

5    Under your theory, you got to do this, this, this and this.  If

6    you don't do it, I'll do it, and you don't want me doing it;

7    and I'm doing it -- I am not abusing my prerogative, but I know

8    what you -- the fighting, that disputation, that's gone on in

9    this case so far, and I want you to know you're not dealing

10   with another judge, you're dealing with me now -- okay? -- and

11   I'm not overly imbued with me, I'm only telling you that I'm

12   not just here balls and strikes, just sitting with a long face,

13   okay, go ahead, huh-uh, I'm listing, and if this jury,

14   particularly, particularly in a case like this, needs help and

15   you're not giving them the help, I'm giving it to them.  Now, I

16   don't want to, but I will.

17          Now, with that said, I'm trying to get your

18   respective attention, and when I go for your respective

19   attention, what I'm saying to you is back to operational

20   expenses.  Category is easy, right?  Come on.  Operating

21   expenses are operating expenses.

22          Associating the expense and the degree of the expense

23   to the offending items is another issue I grant you but you

24   should be able to -- for the most part, you should be able to

25   do this.  This -- again, this kind of thing, that is, the issue

1   that's here now of proportioning.  This isn't a new issue, come

2   on.  This issue's been going on forever in damage cases.  How

3   do you apportion?  And it seems to me that you can look at the

4   approaches that have been used and arrive at one.  You know,

5   there's an old saying -- I'm not your settlement judge.  You

6   want to go sleeves up on the settlement, we go sleeves up, but

7   I'll tell you what.  There's an old saying, "A good settlement

8   doesn't make anybody happy," okay?  Neither side is happy you

9   got a good settlement.  Neither side is going to be happy,

10  probably, with agreeing on operational expenses, but you should

11  at least have it:  We got 18 areas, let's say, of 20 that we

12  agree on, maybe not 18 if we're going to use 20, maybe 15,

13  which gives you -- what does that give you -- a 60 percent

14  agreement.  You should have at least 75 percent agreement here,

15  at least, and maybe if you really work at it, better.

16          Now you've cut this down.  Now you've given them

17  the -- "them" being the jury -- now you've given them an

18  outline.  This is what we're dealing with.  This is what our

19  agreement is.  Now here's the disagreement.  We have -- and I

20  will say to them, you know, I want to commend both parties.  I

21  want you, the jury, I want you to know, court met with these

22  respective sides, and they had these areas of operational

23  expenses, and I requested them ever so nicely in my own

24  fashion, and I requested them to work with this and do it

25  better.  And this is -- they've done a lot of work, and they've

1    come up with this, and all we have left in this particular area

2    is five out of 20 areas where there is a disagreement.

3            Now, I put you in as good a light as I can with that

4    jury, and now you can say, Jury, my view, as the burden of

5    proof backer-outer -- for lack of a better term, i.e.,

6    defendant, my version is this, and you could say your version

7    is full of hot water; you're not entitled to use that at all,

8    and the jury can make its mind up.  Simple as that.  That isn't

9    that tough.  You could winnow this, boil it down, bango, you

10   got it.  And, you know, you say, well, he's got -- I mean, I'm

11   sitting on the bench, and I can give you all this stuff, but,

12   look it, systemically, you have, and appropriately so, you've

13   litigated to a fair-thee-well in this case.  You've got

14   papers -- I mean, you've got papers everywhere.  It's a

15   veritable blizzard, okay?

16           And, you know, I can look at your case.  I can look

17   at what you've done historically.  You don't think I understand

18   what the relationship has been here?  I don't think I'm missing

19   what the relationship has been, and I'm saying I want some --

20   while still maintaining your position -- I want some

21   self-discipline where you work toward helping this jury as much

22   as you can and getting this clear.  So there's your operational

23   expenses.

24           Do you have anything else that you want to talk to me

25   about operational expenses, and I invite you sincerely, both of

```
 1    you, ladies and gentlemen, the parties have agreed on this
 2    analytical tool.  Here's what -- we're both going to use it,
 3    ladies and gentlemen, and here's the first -- whatever --
 4    exhibit, big old board that has printed on it or,
 5    alternatively -- I've dated myself -- put it on the screen
 6    here, and here's what your first tool.  This is what we've
 7    agreed on.  Again, I will commend you in front of the jury, and
 8    I will commend you when we're together without the jury; and I
 9    think it will help your case big time.  So there you have it.
10            Is there anything else that I need to do before I get
11    to my Daubert and 702 analysis?  Because I'm going to give you
12    an analysis and get this thing taken care of, okay?  What?
13    Anything?  Nothing?  Pretty clear, isn't it?
14            Let me ask you this:  You, Mr. Cohen, I'll talk for
15    starters with you, you differed with me once already.  You want
16    to differ again?  Do you think I'm wrong?
17            MR. COHEN:  In principle, no.  I would love to reach
18    agreement, Your Honor, but here's the problem --
19            THE COURT:  I'm talking presentation too.
20            MR. COHEN:  Oh.  Presentation, great ideas.  I think
21    they're all great.
22            THE COURT:  Pretty helpful?
23            MR. COHEN:  Yeah, I think the court is right about
24    all of that.  We'll digest all of them and incorporate.
25            THE COURT:  Jointly if you can.
```

```
 1          MR. COHEN:  That would be swell.

 2          But let's look at the reality of what's actually

 3  happened in the case, not what we would like to happen, what's

 4  actually happened.

 5          For three weeks, opposing counsels had the

 6  stipulations about damages, nothing until the court said, Give

 7  me an answer.  We can lead a horse to water, can't make him

 8  drink.  Similarly, back on April 10, we sent the defense

 9  counsel 232 proposed factual stipulations, and the reason there

10  are so many is we did alternatives -- if they couldn't agree to

11  one, they might agree to another -- and we said, If you have

12  different wording, get it to us.  We haven't heard anything.

13  Lastly, last Friday we notified the court and opposing counsel

14  of continuing violations in the permanent injunction --

15          THE COURT:  I saw it.

16          MR. COHEN:   -- and we said, Let us know when you

17  take this stuff down, get back to us.  Silence.  The reason

18  we're in this court is because we can't get cooperation without

19  the court.

20          THE COURT:  You will have cooperation, okay?

21          MR. WEGNER:  May I respond, Your Honor?

22          THE COURT:  You're not -- here's the thing:  If you

23  go --

24          Get them to get it.

25          -- if you go back to the record, you're going to see
```

```
 1   that that was a nonresponsive answer.  I'm not looking for

 2   argumentation now, all I'm looking for is, frankly, is there

 3   agreement or isn't there because if there's agreement, then do

 4   your thing, and if there's no agreement, then I want to help

 5   you.  Is there agreement?  Answer, he says, Yes, and then he

 6   starts talking about something else, which if I were the

 7   plaintiff's attorney, and if he's correct, I would be annetled

 8   over, okay?  But, look it, that's really not the issue now.

 9           I think what really is the issue now -- and then we

10   can move on to the next area -- is do you want to further input

11   me as to an approach regarding how to resolve this operating

12   expenses issue, or do you want to just go ahead work with what

13   I've given you?

14           What do you want to do, Mr. Wegner?

15           MR. WEGNER:  Your Honor, we would welcome the

16   discussion about, you know, ways we can stipulate to some

17   operating expenses, that's fine; but so far their position has

18   been that there just simply are no operating expenses.

19           THE COURT:  Well, that's bull.

20           MR. WEGNER:  I agree --

21           THE COURT:  Do you know the word "bull"?

22           MR. WEGNER:  I do.

23           THE COURT:  Okay.  That's bull.

24           MR. COHEN:  Can I adopt that, Your Honor?  Because

25   what he just said is bull.
```

```
 1            THE COURT:  For the record, the court guffawed.
 2    Here, here's the thing -- no, I don't want to get into that.
 3            You know, there was a vice-president years ago who
 4    was a heel.  You know the world "heel"?  Spelled with two e's.
 5    And he was from Maryland.  You know who I'm talking about?  And
 6    he had a saying that he used on the campaign trial, and that
 7    saying was, to the effect, that "Nattering nabobs of nepotism,"
 8    an alliteration, Mr. Cohen; and what that all is prefatory to
 9    saying I don't want any nattering from any of you people, no
10    more nattering, okay?  This is kind of -- you know, this is
11    kind of the start of the -- well, he, he, he.  No, not going to
12    happen with me, okay?
13            Now, that being the case, I think we do have
14    agreement:  One, how you can go about hopefully jointly
15    presenting some -- an approach to this jury to make it visually
16    easy and real assistance to you, and you may want to use it
17    when you get to operational expenses:  Here are our expenses;
18    here's where the disagreement is, okay?
19            Now, I don't care if he says -- at this stage, it's
20    not my role; I'm just trying to resolve how we can best
21    prepare, you and we.  You know, I'm yoked to you in a sense
22    here, okay?  It may be anathema to you, but this yoking is
23    taking place, okay?  And where we are is we've gone through the
24    basics; we're really at the point where we get to Daubert and
25    anything else at hand.
```

```
 1              So operational expenses are an issue, but I sincerely
 2    believe that they can with an approach that hopefully is
 3    informed by the input I'm giving you, you can get this done,
 4    and I'll leave it to you.  Okay.
 5              With that said, we're going to take a recess, and it
 6    will be about 20 minutes.  If you're back here -- the clock
 7    says roughly 10:25 -- you're back at a quarter of, and what I
 8    want to do is give you a preview -- I think you know what I'm
 9    going to do -- and it may well be now that we need the experts,
10    but at some point we will; but what we're going to do is I want
11    to give you an overview of what I believe -- well, what I
12    know -- I'm sure you do -- of the law referred to -- relating
13    to this factor test that Mr. Martin went through in assessing
14    the impact on the sales that was independent allegedly of the
15    actual infringement.  So he is saying, yeah, there is an
16    impact; there isn't any doubt about it, but it isn't anything
17    like what you're talking about.  And so we're now into
18    operational expenses on steroids -- okay? -- is what we are,
19    and we have to go through what the eight factors -- we'll go
20    through the eight factors.  If appropriate we'll get testimony,
21    and I'll give you a ruling, and then we're going to be --
22    overarching this is I'm going to give you -- from my memory in
23    assessing it and your information as to what I'm relying on, on
24    what I'm looking to -- I'm going to give you a couple of quotes
25    that I think inform the analysis that we're going to factor
```

1    analysis and we're going to go through; and then we'll get into

2    any miscellaneous.

3            One thing that Mr. Cohen did refer to a moment ago,

4    Mr. Wegner, and that is this issue of an injunction.  I'm not

5    the person who issued the injunction, but the fact of the

6    matter systemically, i.e., the court has issued an injunction.

7    I -- the record can't reflect heaved a sigh by the judge, which

8    is an exception to the hearsay rule, but I did heave a sigh

9    that's prefatory to saying I don't want to muck around with

10   your injunction.  How difficult is it?  It's pretty clear:

11   Don't do it.

12           Now, I'm not saying you did it; I don't know what the

13   extenuating circumstances may be.  I'm only saying to you:  I'm

14   not here looking for further litigation in the area of the

15   injunction.  The injunction is the injunction; it's pretty

16   simple.  As far as I know, very straightforward.  This isn't

17   a -- you know, I don't understand the injunction.  Come on,

18   man.  You understand the injunction "man" being a general term,

19   not meant to be offensive.  I haven't been on the bench that

20   much in a while, and I'm using the word "man" too much; but the

21   fact of the matter is I'm only saying to you, Mr. Wegner:  I'm

22   not taking sides.  I don't want to hear anything more about

23   this, and I will tell you not menacingly but firmly, nicely

24   okay?  Do it properly, and you got no problem.  For the record

25   I'm moving forward.  Do it improperly, and you got a problem.

1          And if you think that you're talking about some

2    little namby-pamby here, you're wrong; I'm not, and I don't

3    want to be displaying my distress and displeasure.  I do not

4    want to be in that position, but you judge me.  You think I'm

5    kidding?  I'm not.  So don't -- and tell your people:  Don't

6    make it a problem, and now we won't be dealing with it until

7    the issue of exceptional, okay?  That's it.

8          Now, with me holding forth for another five minutes,

9    we now have added five minutes to our clock, and we're going to

10   rejoin at ten minutes of 11:00.  Thank you.

11                              (Recess)

12          THE COURT:  Okay.  Now, we're going to move into the

13   testimony of Mr. Martin and allocating the operating expenses

14   that you're going to be at least 75 percent agreed upon in days

15   to come.

16          I want to just one more time refresh myself regarding

17   *Daubert* and 702, and in doing so, share it with you; and I'm

18   reading from 702, and this is a quote -- and mind you for

19   ions -- and I use that term advisedly -- you didn't have

20   *Daubert* out there.  We didn't have *Daubert* explaining 702.  Far

21   be it from me to say that you didn't need *Daubert*, but 702

22   pretty well tells you what you're about, and many times it's

23   very easy, the evaluation of the qualification of an expert to

24   testify; however, on occasion, well, such as this as to

25   allocation, it's not that easy, and because the road that has

1  been chosen here is not the license gross profits road, which

2  wouldn't even -- which wouldn't raise this issue that we're at

3  about now, we have to examine what really I think you've

4  jointly referred to as the qualitative aspect of the damages,

5  and when you're looking at this qualitative aspect, there is

6  little exactitude, but one can argue, I think, there's a lot of

7  commonsense, and we'll see if it's enough to carry the day or

8  not.

9          Getting back to 702, it's states, "A witness who is

10  qualified as an expert by knowledge, skill, experience,

11  training or education may testify" -- "testify in the form of

12  an opinion...."

13          Let me pause there.  Mr. Martin has a -- and

14  Mr. Anson, both have CV's -- as they're referred to -- that

15  would, an old proverbial saying, "choke a horse."  So they're

16  both qualified in this area, but, again, it's not an area that

17  really lends itself to that much exactitude.  That is why

18  you're here on -- with the dispute that you have.

19          Continuing with the section, and it says --

20  continuing after the ellipses, "If, A, the expert's scientific,

21  technical, or specialized knowledge will help the trier of fact

22  to understand the evidence or to determine a fact in issue."

23          I've referred to the jury and did not intend to, and

24  I don't believe I did, but I don't intend to denigrate the

25  jury; I'm not denigrating the jury.  I'm commiserating with

1   them; I'm not denigrating them.  There is a difference in the

2   verb, okay?  And the question is, when you look at subsection

3   a, does it -- does the testimony of this well-versed witness

4   help the trier of fact to understand the determination of fact,

5   i.e., is the operating expense related to the offending

6   product.  I think clearly -- I'll say maybe not clearly, but I

7   think it dos.  Allocation, I don't think they the have

8   background for it, and I've got to query whether I've got the

9   background for it.  It is helpful to the analysis that is being

10   proffered by the defense.  Again, I'm not saying admissible,

11   I'm just saying in a general sense.  Now, continuing B, "The

12   testimony is based on sufficient facts or data."

13           Now, there is an issue, okay?

14           "C, the testimony is the product of reliable

15   principles and methods."  Yet another issue.

16           And I might say, parenthetically, that the

17   methodology connecting the factors and translating them to the

18   percentages that the operating expenses are is going to be the

19   principle focus here, in my view, because I don't think

20   Mr. Martin has explained his methodology, and if he can't

21   explain it, query:  Can you use it even though you carry the

22   day with the factors?  Questions?  I don't know.  C -- well,

23   D -- I'm sorry -- "The expert has reliably applied the

24   principals and methods to the facts of the case."

25           Well, that really is -- C and D meld in reality, but

1    they're stated separately.

2           Then you got -- along comes *Daubert*, and they're

3    going to spiff up the analysis here of 702.  I say query:  Do

4    you really need that?  Well, answer:  The Supreme Court says

5    yes.  So legally you really need it.  Now, let's use it as long

6    as they've given it to us.

7           And certain things that I look to, and these are all

8    quotes.  "Whether the theory or technique employed by the

9    expert is generally accepted in the scientific community."

10          I don't know if it is or not.  That is why we're

11   going to have to have Mr. Martin, and you may need Mr. Anson to

12   say that -- rebut Mr. Martin; I don't know.  Next, quote,

13   "Whether it has been subjected to peer review and publication."

14          I don't think that we have any citation of peer

15   review in supporting Mr. Martin; I think I asked for it, and I

16   don't think I got it.  Maybe it's not out there.  I don't know.

17   But, again, I think we're going to have to ask Mr. Martin, Hey,

18   who is supporting you on this?  Are you a pioneer?  Is that

19   what you're about?  Or is this just some off-the-wall theory

20   that I'm sure Mr. Cohen is going to argue that it is.

21          Next quote, "Whether it can be and has been tested."

22   Lastly, "Whether known or potential rate of error is

23   acceptable."  Now, these are all factors to consider.

24          Now, with that background, we have Mr. Martin's

25   proffered testimony that, Hey, when you're talking about the

1    revenues that we were referring to earlier in the hearing, when

2    you're talking about revenues, the revenues that were

3    experienced by the defendant, were driven by eight factors --

4    okay? -- and they weren't driven by infringement.  So you're

5    going to give me anything, the plaintiff says -- I'm being the

6    plaintiff for a moment -- you're going to give me anything?

7    Yeah, I'll give you ten percent.  We cost ten percent of your

8    revenues for the -- and this is, again, gentlemen and gentle

9    lady, Ms. Lee, again, this is the kind of thing that I think

10   you may think I'm wrong, and you think stop being so preachy.

11   I'm being preachy for a reason, and I don't really think it's

12   preachy; I think it's instructive, and I think it -- frankly, I

13   wouldn't be saying it if I didn't think it was helpful.  This

14   is the kind of that you give to the jury, if you get that far,

15   if the defendant can get that far and get by the objections;

16   and he may be able to, to a point.  I don't know.  We get to

17   figure that out.

18           Jury:  We talked about operating expenses, the

19   operating expenses in order to -- you got to look to do they

20   apply to the offending product, and a lot of these expenses per

21   the defendant don't relate to the product.  If you look at the

22   first of the eight factors that, according to Mr. Martin -- I

23   think he uses the term "value drivers," and by that he means

24   they drive the majority of the revenue and the profitability of

25   The Milkman -- first one he looks to is the One Hit Wonder

```
 1   umbrella brand, i.e., the sales attributable to brand value.

 2          Now, again, jury think about it:  You're going to the

 3   market, okay?  Going to the market, and you got General Mills,

 4   as a for instance, and General Mills makes a product, and you

 5   bought that product, and you think, I like that product made by

 6   General Mills.  And you say, I wonder if they make any other

 7   products.  This is the kind of thing he is arguing for here,

 8   and he is saying, Look it, it wasn't The Milkman that drove it,

 9   it was One Hit Wonder, the umbrella, and the umbrella affect

10   was such that he ascribes a percentage, and that's another

11   issue.  But the umbrella affect is what, in part, drove the

12   revenue associated with the sale of this product, not the

13   infringement.

14          It's your argument, isn't it, Mr. Wegner?

15          MR. WEGNER:  Yes, Your Honor, that it's a factor.

16          THE COURT:  A factor, yes.  That's what I'm saying.

17   So is it or isn't it?

18          Now, you got the 702, and you got Daubert.  Let me

19   ask in a prefatory way, Mr. Wegner -- Wegner, W-e, right?

20          MR. WEGNER:  Correct, Your Honor.

21          THE COURT:  Okay.

22          Mr. Wegner, did you -- I know I invited it, and from

23   my discussion with the law clerk, I don't know that you have

24   identified it -- did you and/or Mr. Martin identify any other

25   court proceedings or any writings or anybody supporting this
```

1    brand value?  I will say as I discuss it -- excuse me -- if I

2    were looking at this as a defense expert, first thing I'm

3    looking to is brand value, I'm telling you.  That, again,

4    ascribing revenue to brand value has to be an age-old approach,

5    nothing new about that.

6             Am I right?

7             MR. WEGNER:  Right, Your Honor.

8             THE COURT:  What percentage did he ascribe?  Any

9    percentage?

10             MR. COHEN:  Yes, Your Honor.

11             MR. WEGNER:  Your Honor, in deposition he ascribed

12    ranges, and let me get to the compendium of those.

13             THE COURT:  You have really two issues going on here,

14    don't you?  One, the first issue, is can you use this factor as

15    a value driver; and secondly, if can you use it, how do you

16    arrive at that percentage?  Is that a fair analysis?

17             MR. WEGNER:  That's fair, Your Honor, but it's a

18    little more complicated then just arriving at an isolated

19    percentage --

20             THE COURT:  I don't want to complicate it,

21    Mr. Wegner.

22             Yes.

23             MR. WEGNER:  The percentages are relevant to each

24    other, and that's what Mr. Martin is going to testify to that

25    they're ranked; and so it's not as easy as just isolating a

```
1    particular value driver and deciding, okay --

2              THE COURT:  You got to have the package in order to

3    do it.  That's what you're telling me.

4              MR. WEGNER:  That's what I'm telling you, Your Honor,

5    yes.

6              THE COURT:  Okay.

7              Let's get Mr. Martin and Mr. Anson -- A-n-s-o-n --

8    let's get them both sworn, please.  Would you both stand and

9    identify yourselves, please.

10             Gentleman on the right.

11             MR. ANSON:  Yes, sir.  My name is Weston Anson.

12             MR. MARTIN:  My name is Daryl Martin.

13             THE COURT:  Would you both raise your right hand.

14                        (Witness sworn.)

15             MR. ANSON:  Yes, sir, I do.

16             MR. MARTIN:  Yes, sir, I do.

17             THE COURT:  Thank you.

18             Mr. Anson, if you want to come forward and sit down

19   at counsel table so you can help your clients while Mr. Martin

20   is testifying, you may do so; and just be aware that if I ask

21   you any questions, Mr. Martin, and you're sitting down there at

22   the counsel table or vice versa -- you're up and Mr. Martin is

23   at counsel table -- you're still under oath even though you're

24   at the counsel table.

25             You both understand that?
```

```
 1              MR. ANSON:  Yes, sir.  I understand that.

 2              MR. MARTIN:  Yes.

 3              THE COURT:  Do you have a "yes" from both of them,

 4   Reporter?

 5              THE REPORTER:  Yes, Your Honor.

 6              THE COURT:  Yes from the reporter, too?

 7              THE REPORTER:  Yes, Your Honor.

 8              THE COURT:  Mr. Martin, will you step forward,

 9   please.

10              (Discussion held off the record.)

11       DARYL MARTIN; COURT'S WITNESS, SWORN, TESTIFIED:

12                           EXAMINATION

13   BY THE COURT:

14   Q.   Good morning to you, Mr. Martin.

15   A.   Good morning, Your Honor.

16   Q.   What was the purpose of identifying these eight factors?

17              Speak into the microphone, please.

18   A.   The purpose of the profit apportionment was to identify

19   all of the factors that played a primary role in the generation

20   of the defendant's sales and profits of the infringing product.

21   Q.   Is it your belief that one of the -- you identified eight

22   factors, correct?

23   A.   Well, eight factors, plus the infringing Milkman mark

24   or --

25   Q.   Right, and one of the factors was the so-called brand
```

1  value.

2  A.   Are you referring, sir, to the One Hit Wonder umbrella

3  brand?

4  Q.   Yes.

5  A.   Yes.

6  Q.   Okay.

7         And has this approach in your experience been used by

8  other experts and accepted as testimony in courts when you're

9  talking about valuation?

10  A.   The apportionment --

11  Q.   You heard what I said a moment ago about this has got to

12  be going on all the time?

13  A.   Yes, sir.

14         The concept of brand valuation and identifying the

15  relative contribution of value of a trademark has been -- is

16  decades old.  It's in every major publication from the *Smith* --

17  the *Gordon-Smith* and *Russell Park* publications to the *Riley* and

18  *Schwarts* books on intellectual property valuation.  Identifying

19  the relative contribution of trademarks is very well

20  documented.

21  Q.   Okay.

22         But what traditionally is the way that experts go

23  about identifying the brand value component vis-a-vis the

24  consumer?  In other words, how do you tie that brand value --

25  how do you identify that a consumer really is thinking of brand

```
 1   value when the consumer buys?

 2   A.   They're a number of different ways to go about it.  There

 3   are survey techniques in place.

 4   Q.   What?

 5   A.   Survey techniques in place --

 6   Q.   Okay.  That's -- stop you.

 7        You didn't use the survey here, did you?

 8   A.   No, sir.

 9   Q.   What other ways are there to go about it?

10   A.   Traditionally, the most common way to value a trademark

11   asset and the most widely used methodology is what's called

12   relief from royalty.

13   Q.   Okay.

14        And you did that at one point in time here in this

15   case?

16   A.   Both Mr. Anson and I both provided a relief from royalty

17   valuation of The Milkman mark.

18   Q.   But for purposes of the status of this lawsuit, we're not

19   using it, or are you using it?

20   A.   I think --

21   Q.   You use it to buttress your argument at the end, don't

22   you?

23   A.   We use it in two ways:  One, it's used to validate the --

24   Q.   Validate, buttress.  When I said, "buttress," I meant

25   validate.  Okay.  Go ahead.
```

```
 1    A.    The other way that traditionally both Mr. Anson and I -- I
 2    don't know, Your Honor, if you're aware I worked for Mr. Anson
 3    for eight-and-a-half years.
 4    Q.    No, I was not aware.
 5    A.    So, yes, I -- beginning in 2001, when I first started
 6    valuing intellectual property I worked under Mr. Anson and ran
 7    his practice through the end of 2009.
 8    Q.    Okay.
 9    A.    So we have collaborated on literally hundreds of
10    intellectual property valuation assignments and valued
11    thousands of intellectual property components together.
12          But traditionally the relief-from-royalty method is
13    something that has been employed by, I would guess, more than
14    98 percent of the experts out there because it's the most
15    widely recognized and accepted method for identifying the
16    relative contribution of a trademark to a -- the success of a
17    product or business.
18    Q.    Did you use that in your brand value here?
19    A.    Yes, sir.
20    Q.    What did you do?  How did you go about doing it?
21    A.    The relief-from-royalty method to determine the brand
22    value of The Milkman mark follows several steps:  First is you
23    identify the revenue base attributable to sales of products
24    bearing the mark at issue; second is the determination of a
25    comparable royalty rate; that royalty rate is multiplied by
```

1  sales to give you an avoided royalty cost.  So relief from

2  royalty tells you if I didn't own the asset, what would I have

3  to pay as a licensee to rent that asset in the marketplace.  So

4  those avoided royalty payments serve as the basis for valuing

5  the mark under relief from royalty.

6  Q.   When you came up with a brand -- when you came up with an

7  analysis, that basically caused you to believe that the brand

8  indeed contributed to the value; is that right?

9  A.   The relief-from-royalty valuation method is to isolate the

10 value that brand contributes to the generation --

11 Q.   Okay.

12       And you did that.

13 A.   For The Milkman mark, yes.

14 Q.   Are there any other approaches that you utilized in trying

15 to term the brand value?

16 A.   The brand value?

17 Q.   Yes.

18 A.   No.  The relief-from-royalty method using a reasonable

19 royalty was the primary method based on the information

20 available.

21       And, Your Honor, the question you asked earlier, I

22 did use it in two places in my report:  One was to validate the

23 profit apportionment; the second one was to provide the court,

24 in response to Mr. Anson's Milkman mark valuation, with the

25 basis for comparing the value of the asset that was infringed

```
 1    against the damages that were ultimately be awarded.  It's been

 2    my understanding that in damages cases involving profit

 3    disgorgement, that the award of money damages should not far

 4    exceed the value of the asset infringed on the eve of the

 5    hypothetical infringement.

 6          So we provide that as essentially a validation for

 7    the damages framework.  If you have 6 million of profits on an

 8    asset that was only worth 250,000, that would create a windfall

 9    situation, theoretically, for the plaintiff.

10          THE COURT:  Okay.

11          Mr. Cohen, this particular value driver, do you want

12    to examine Mr. Martin regarding his testimony?

13          MR. COHEN:  I do, Your Honor.

14          THE COURT:  Go ahead, please.

15          MR. COHEN:  May I approach, Your Honor, so the

16    witness has some stuff in front of him?

17          THE COURT:  Yes.

18          You remember Roberto Duran's average --

19          MR. COHEN:  Absolutely.

20          THE COURT:  Do you remember what he said?  When you

21    keep pulling these papers out here that applies?

22          MR. COHEN:  "No mas."

23          THE COURT:  Exactly.  No mas, Mr. Cohen.

24          MR. WEGNER:  Your Honor, may I inquire if there is a

25    copy of those documents for the defense table?
```

```
 1          THE COURT:  Do you have them for them?

 2          MR. COHEN:  Yeah, for the record, Your Honor, I've

 3   handed the witness four documents and the court as well; we've

 4   got copies for you as well:  The original report from

 5   Mr. Martin; his supplemental report; his deposition; and his

 6   corrections to his deposition.  So if at any point he has to

 7   reference the deposition, he can look and see if he made any

 8   corrections to the passage that I"m referring, and that's all

 9   in front of the witness in case I need to refer to it.

10          THE COURT:  Try to be as succinct as you can, will

11   you please?

12          MR. COHEN:  Before I get started, Your Honor, just to

13   clarify.  I've actually provided both the -- well, the court

14   and Mr. Martin and opposing counsel with five documents:

15   Mr. Martin's original report, which was marked as Exhibit 32 in

16   his deposition -- 232 in his deposition; Mr. Martin's

17   supplemental report, supplemental rebuttal report, which had

18   been marked as Exhibit 209 in Patty Chan's deposition but later

19   used with the same number; I handed Mr. Martin a copy of the

20   deposition transcript from his deposition; a copy of the

21   corrections that he made, dated April 20, 2017; and the last

22   document is an excerpt from document 251.  It lists the

23   percentages that Mr. Martin testified to in his deposition for

24   all eight of the so-called value drivers, and so I just want to

25   make sure the record reflects all that.
```

1          **EXAMINATION**

2   BY MR. COHEN:

3   Q.   Good morning, Mr. Martin.  I have a few questions for you

4   about this first value driver, as you called it.

5          This was based on conversations that you had with

6   Robert Hackett and William Hackett, correct?

7   A.   That was part of the research and analysis that I did.

8   Q.   Okay.

9          And what other analysis did you do to determine that

10  this was a factor?

11         THE COURT:  Excuse me.  I'm trying to figure out the

12  humming noise, and I'm trying to figure out who is causing it,

13  you or me or another person; and this system is quite new, as

14  you probably know, Mr. Cohen.  I don't know what's causing it,

15  but at any rate, you haven't figured it out, Kelly?

16         THE CLERK:  No, Your Honor.

17         THE COURT:  I don't mean to interrupt.

18         Go ahead.

19         MR. COHEN:  Happy to use this microphone.

20         THE COURT:  Let's hear your dulcet tones, Mr. Cohen.

21  See what's going on there, if it works.

22         MR. COHEN:  All right.

23  Q.   For this first -- perhaps it will help if you look at one

24  of your reports.  I'm looking at your supplemental report.  It

25  was Exhibit 209, and I'm looking at page 13.  The top of it

```
 1    says page 13, and bottom-right corner says page 15, for

 2    sequential numbering.

 3    A.    Can you repeat the standing question.

 4    Q.    Do you have the report in front of you?

 5    A.    Yes, sir.

 6    Q.    Okay.

 7          Are you on page 13?

 8    A.    Page 15 in the lower-right corner, yes.

 9    Q.    Yes, same page, right.

10          Now I'm asking about that first --

11          (Interruption)

12          THE COURT:  It's not you, Mr. Cohen.  I'm just

13    shaking my head with the system.

14          What can we do there, Kelly?

15          (Discussion held off the record)

16          THE COURT:  Try again.

17          MR. COHEN:  Actually, Your Honor, I'm going to go

18    back to this factor, but I think I want to lay a little -- do a

19    little groundwork first.

20    Q.    Mr. Martin, can you please turn to page 19 of your

21    supplemental report.  That's Exhibit 209, and the page I'm

22    referring to is in the lower-right corner.

23          THE COURT:  Wait a second, Mr. Cohen.  You got the

24    technical individual here.  Let's see what he --

25          (Discussion held off the record)
```

```
 1                 THE COURT:  Go ahead, please.

 2  BY MR. COHEN:

 3  Q.   Mr. Martin, are you on -- do you have page 19 of your

 4  supplemental report in front of you?

 5  A.   Yes, sir.

 6  Q.   I'd like you to look at the language in the last

 7  paragraph.  It begins with the language "Based on a review."

 8                 Do you see that language?

 9  A.   Yes, I do.

10  Q.   I'm going to read it, and I have a couple of questions.

11                 "Based on review of these key value drivers for

12  Milkman product sales, it is my opinion that no more than ten

13  percent of the indicated net profits can be attributable to the

14  alleged unauthorized use of The Milkman mark."

15                 Now, I read that accurately, correct?

16  A.   Yes.

17  Q.   And that same language can be found in your original

18  report, correct?

19                 THE COURT:  To the best of your knowledge.

20                 THE WITNESS:  To the best of my knowledge, yes.

21                 MR. COHEN:  I'd be happy to point it out to you if

22  you'd like.

23                 THE COURT:  He's -- go ahead.

24  BY MR. COHEN:

25  Q.   Where did the ten percent figure come from?  How did you
```

```
 1   arrive at ten percent?

 2   A.    The ten percent profit apportionment conclusion was the

 3   culmination of a detailed analysis of the defendant's

 4   operational activities.   The eLiquid industry landscape --

 5   through that detailed analysis, my experience, my knowledge,

 6   and my work on previous cases, the factors were developed in

 7   terms of what was most important to driving revenue and

 8   profitability in the -- in the eLiquid Duce Juice industry.

 9   Once the factors are identified, we came up with eight

10   additional factors on top of The Milkman sales that left us

11   with nine factors.   The starting point from that point was to

12   make the assumption that each of those factors had an

13   equivalent weighting under that premise that would give us a

14   starting point of 11 percent being equally attributed to all

15   the factors in the analysis.

16          From there we take a -- we take a -- we have to

17   endeavor to rank the factors in terms of relevant importance to

18   the business.   With that ranking, and once the most important

19   factors identified are identified, we then take a look at the

20   list, and we see where Milkman falls in relation to the other

21   factors; and then we can draw an inference based upon that 11

22   percent starting point as to where Milkman would post likely

23   follow in term of its relevant contribution percentage.

24   Q.    Have you finished your answer?

25   A.    Yes.
```

1    Q.    Okay.

2          So the ten percent you're saying, or the figure of no

3    more than ten percent, was the end result of looking at

4    these -- looking at everything you just talked about,

5    identifying these factors -- the -- or the value of the mark

6    being one, and then eight other factors and you weighted them,

7    and you come up with ten percent.  That's how it works.

8    A.    How it works we identify the factors, I analyze the

9    factors, rank the factors in terms of relevant importance to

10   the business industry and then draw a conclusion as to a

11   no-more-than-ten-percent conclusion for The Milkman mark.

12   Q.    Okay.  But this ten percent figure ties to these value

13   drivers.  That's the process, yes?

14   A.    The ten percent figure comes out of the analysis --

15   identification and analysis of the value drivers.

16   Q.    Okay.  That's the connection:  The value drivers, and you

17   do that analysis you just talked about and you end up with no

18   more than ten percent, right?

19   A.    That is one way in which the ten percent is developed.

20   Q.    Well, you talked about other ways you confirmed it, but

21   that's how you got here, based on the language in your report,

22   right?

23   A.    I would agree.

24   Q.    Thank you.

25          THE COURT:  Wait a second.  No gratuities.

```
 1   BY MR. COHEN:
 2   Q.   Now, if you would, please, look at the table that I've
 3   presented to you.  It's one page; it's a table; it's excerpt
 4   page four from AOP's supplement to its reply to motion in
 5   limine No. 1.  It's -- at the top of the page it says document
 6   251, and at the bottom it says page four.
 7              Do you have that document in front of you?
 8   A.   I believe I do, yes.
 9   Q.   Okay.
10              Now, do you recall testifying that the percentages --
11   withdrawn and rephrase.
12              Isn't it true, sir, that before I asked you in your
13   deposition to assign percentages to each of those value drivers
14   that you had identified, you had not done that before, correct?
15   A.   It is true that when you asked that question in
16   deposition, I had not ascribed to -- specific values to each of
17   the factors, yes.
18   Q.   Well, okay.  Let's nail it down.
19              Could you please turn to page 158 in your deposition.
20   Do you have your deposition in front of you, sir?
21              THE COURT:  Bear with me a moment.
22              Mr. Cohen, what I'd like to do is -- I think you're
23   moving ahead to something we definitely have to address, and
24   that's the methodology of how do -- how do you translate these
25   eight factors into ten percent -- okay? -- and that is the --
```

1    to date myself, is the $64 question, all right?  That's where

2    this thing is, in my view, large measure.

3            He may be able to get by these factors by the skin of

4    his chinny chin chin -- do you remember that saying?  He may be

5    able to get there, okay?  But the question is, if you really

6    want to get down to it, how -- maybe not all the factors, maybe

7    the eighth factor can't pass muster -- m-u-s-t-e-r -- if it

8    can't pass muster; then the question is even if I give you the

9    eight preliminarily, how are you -- how in the heck do you come

10   up with the ten?  I know there are eight, and many of them are

11   traditional.  Branding only goes on a long, long time, you're

12   using that.

13           The fact of the matter is you haven't gotten the

14   whole way by doing that.  You have to have -- you have to close

15   the -- you have to close the deal, i.e., get the admission, and

16   the only way you're going to get the admission is to give the

17   court under 702, and *Daubert*, the confidence that this is

18   reliable.  That's what's going on here, correct?  Okay.

19           But I think what you're doing is segueing into how

20   the heck are you coming up with this ten percent, and, believe

21   me, I've got three stars on that issue on my bench memo, and

22   the reason I got three stars:  I told the law clerk to put them

23   there, okay?  And I've got bold print.  You know, you and I are

24   probably onto the same thing.

25           What I want to do is, is -- analytically, what I'm

1    trying to do is segment that -- perhaps I can have more clarity

2    if I segment.  What I want to do is say, Look it, Mr. Martin,

3    how can I rely on your eight or nine, as the case may be?  And

4    if I rely on one or more of them, how do you come up with ten

5    percent?  Thin air?  What's going on here?  Can you rely on

6    that?  That's what I want to do.  So if you would please, if

7    you want to -- if you want to contest these eight -- and I

8    think you do --

9              MR. COHEN:  Yes.

10             THE COURT:   -- then identify what are you doing

11   coming up with this as a value factor?  How in world is that a

12   value factor?  How do you justify that, that kind of

13   questioning and more perhaps.

14             And then once we've determined -- I frankly would sit

15   down with the law clerk, and we have some preliminary views,

16   but I haven't finalized them, and once I've done that, the

17   question becomes -- and the witness knows, maybe he doesn't

18   have ten percent left after I cull some of his factors; I don't

19   know if I'm going to cull them.  If I did, now he may have to

20   rethink the ten.

21             But be that as it may, it's going to be the same

22   methodology to get to the ten or the eight or whatever it is.

23   That's what I'm looking for.

24             Please take the tack that I asked you to, and that is

25   if you want to attack any of his factors, brand factor, brand

```
 1  value, which is the first factor that I identified that, do so;

 2  and then we will compartmentalize that for the moment.  We're

 3  not gone away from it, but we can compartmentalize it; then

 4  let's go to our next driver and go through each of them, and

 5  then after we're through that, the $64 question:  Based on what

 6  you did here, how in the world do you come up with a reliable

 7  ten percent?  And I, Cohen, am telling you you can't.  That's

 8  what's going on, isn't it?

 9          MR. COHEN:  Yes.

10          THE COURT:  Fine.  Do it.  Do it, but do it my way.

11  I say that with a smile, okay?

12          So I can follow you, and you're not scrambling me.

13  You don't want to scramble anything.  You got problems when you

14  scramble, okay?

15          MR. COHEN:  Okay.

16          THE COURT:  Okay.  Thank you.  Go ahead.

17          MR. COHEN:  Can I just finish the one question --

18          THE COURT:  You want to keep going?

19          MR. COHEN:  I just want to finish the one question.

20  Yes, sir.

21          THE COURT:  I'm going to be really difficult, okay?

22  I'm not going to be difficult.  You're there so do it.

23  BY MR. COHEN:

24  Q.  Mr. Martin, do you have page 158 of your deposition in

25  front of you?
```

```
 1   A.   Yes, I do.

 2   Q.   I asked you the following question that begins on page

 3   458, line five.

 4              "Q    Had you calculated percentages until you

 5              did it just now during the deposition.  In other

 6              words, before I asked you the question and asked

 7              you to nail down those percentages and testify

 8              about each, had you calculated them somewhere?"

 9              Your answer was "No," correct?

10   A.   I'm sorry, Mr. Cohen.  You were just reading the

11   deposition transcript, correct?

12   Q.   Hold on one second.

13              THE COURT:  Go ahead.

14              MR. COHEN:  Okay.

15              THE COURT:  You had a question.  You got an answer,

16   no?

17              MR. COHEN:  Not yet.

18              THE COURT:  Okay.

19              Do you have an answer?

20              THE WITNESS:  Yes.

21              I think you were just reading my answer in the

22   deposition transcript.

23   BY MR. COHEN:

24   Q.   When I asked you whether you had calculated before you --

25   before I asked from the deposition, your answer was "No,"
```

1   correct?

2   A.   Correct.

3   Q.   Now, turn your attention to the table that you have in

4   front of you, the one with the percentages that --

5           THE COURT:  You're still going percentages.  Go for

6   factors, will you please.

7   BY MR. COHEN:

8   Q.   The first factor, the One Hit Wonder umbrella brand, where

9   did you come up with the eight percent number?  What was that

10  based on?

11  A.   In my deposition you asked me to come up with, during the

12  deposition, rough estimates for each of these factors; and

13  based upon the research and analysis that I did previously and

14  the relevant ranking of these factors in terms of their

15  importance -- and I attempted to discuss this in the

16  deposition, but you tried to cut me off -- I ranked them on a

17  relative basis, determining which factors I believe were most

18  important to the successful driving of sales activity for this

19  product, and I used that relative framework to provide you with

20  estimates based upon such.

21  Q.   I'll repeat my question:  Where did you come up with the

22  eight percent?  Why eight percent?  Why not seven or six?  Why

23  not five?

24  A.   We had 100 percent of profits that needed to be allocated

25  among nine factors -- okay? -- and the One Hit Wonder umbrella

1   brand was -- was ranked relative to the other factors here.  I

2   believe in my deposition testimony, you'll see that I ranked

3   premium classification, high quality flavors, and the volume

4   pricing model as the three most important factors, followed up

5   by the One Hit Wonder umbrella brand.

6   Q.   Mr. Martin, where did you get the eight percent from?

7   A.   I used that framework to determine where that would fall

8   on a relative basis in breaking up 100 percent among the nine

9   factors.

10  Q.   Okay.

11       Well, let me try it a little different way.

12       THE COURT:  Are you suggesting that it's an inexact

13  analysis?

14       MR. COHEN:  At a minimum.  Yes, Your Honor.

15       THE COURT:  What's your response to that?  You see

16  what's going on here.  He is saying, Hey, look it, thin area,

17  grab eight percent.  You tell me -- look it, I'm not after you,

18  I'm not at all.  What I'm trying to do is get to the bottom of

19  this.

20       THE WITNESS:  Your Honor, I'd say in response to him,

21  we have nine factors; we have 100 percent of profit.  If all of

22  them are equal, there are 11 percent each.  Based upon the

23  relative ranking higher and lower than the mean, that would

24  adjust my percentage range so that I would ascribe to that

25  particular factor based on that -- based on that analysis.

1  BY MR. COHEN:

2  Q.   Okay.

3       Is it fair to say, then, that you didn't use any kind

4  of customer survey or consumer survey, correct?

5  A.   That is correct.

6  Q.   And --

7  A.   Survey in the technical sense.  I reviewed customer

8  responses, and in regards to their thoughts on the product, its

9  performance, the various attributes.  So I incorporated a

10  multitude of new information from customers and postings in

11  discussion forums, blog posts, websites, Facebook and Instagram

12  postings to inform the analysis of these factors.

13       THE COURT:  Have you ever testified to a similar

14  percentage analysis vis-a-vis a brand in another court, state

15  or federal, and that approach has been accepted?

16       THE WITNESS:  Yes.

17       THE COURT:  When and where, do you remember?

18       THE WITNESS:  Two cases that I have actually

19  submitted testimony on profit apportionment.  The first case

20  went back to 2006 --

21       THE COURT:  Profit apportionment.

22       THE WITNESS:  The first case was *Precision*

23  *Replacement Parts versus Auto Glass*.  I believe it was out of

24  Washington --

25       THE COURT:  State?

```
 1              THE WITNESS:  -- state.

 2              And plaintiff's expert, Mr. Anson, was actually my

 3    co-expert who co-authored the report with me, and we developed

 4    the profit apportion analysis which identified the key value

 5    drivers for that particular business and apportioned profit

 6    based upon our analysis of those factors.

 7              THE COURT:  And in the same manner you're testifying

 8    to here now?

 9              THE WITNESS:  In a similar manner to what --

10              THE COURT:  And Mr. Anson agreed with you, is what

11    you're saying?

12              THE WITNESS:  Mr. Anson and I cosigned the expert

13    report.  Not only did Mr. Anson agree with it, Mr. Anson

14    published the entire expert report in redacted form in his

15    latest book published by the American Bar Association on expert

16    witness and damages.

17              THE COURT:  Were you aware of that, Mr. Cohen?

18              MR. COHEN:  No.

19              THE COURT:  See, that's --

20              MR. COHEN:  But I'm afraid -- not afraid -- I believe

21    based on Mr. Anson's reaction that perhaps there's more to the

22    story.

23              THE COURT:  May be.

24              MR. COHEN:  But do you want me to continue

25    questioning on factor one or ...
```

```
 1              THE COURT:  You made your point, okay?

 2              THE WITNESS:  Your Honor, just to follow up on your

 3   question, the second case was heard in federal court in

 4   San Diego in the last three, four years.  The case was -- it's

 5   on my CV, but the defendant party was Ameri-Skills, the case

 6   went to trial, and we got a full defense verdict.

 7              THE COURT:  Okay.

 8              Mr. Anson, you've got the microphone there.  You are

 9   under oath.  Move the microphone to you, will you please.  See

10   you can never, never do this in a jury case.  This is the way

11   you get to something, okay?

12                          EXAMINATION

13   BY THE COURT:

14   Q.   What's your response to him on this -- and, look it, I am

15   endorsing what Mr. Anson and I -- the approach that we arrived

16   at it in the first case he described.

17   A.   We did work together on Precision Replacement Parts in

18   which we did look at profits, in which we did look at elements

19   of profits --

20              (Interruption)

21              THE WITNESS:  But the cases -- the situation is quite

22   different from -- there we go -- quite different from this, and

23   I'm happy to discuss that after the break.  I think -- I think

24   I brought a copy of that book with me.  We can take a look at

25   it at the lunch break.  If I've got one, I'll bring it in to
```

```
 1    you.

 2            THE COURT:  My lunch break is not going to be

 3    occupied by looking at your book.  I don't want you to take any

 4    offense.  But, you know, I'll be honest with you.  That's -- I

 5    want to read about Comey, okay?

 6            THE WITNESS:  I don't blame you.

 7            THE COURT:  I haven't done so as yet, okay?  You want

 8    to me to read your book.  No, I should stop my jocularity,

 9    okay?

10            Go ahead, please.

11            THE WITNESS:  I think there are a couple of comments

12    that need to be made, though, and one is that before you can

13    get into these factors of apportionment, you have to remember

14    that they are meaningless without the trademark itself; you

15    can't apportion anything.  It's the trademark that enables this

16    whole process, and so the trademark is the asset that drives

17    all these sales.  This so-called objective apportionment is

18    really an issue that doesn't exist; it's the trademark that is

19    the mover of sales.  This is a commodity business after all.

20    It's really driven just as cigarettes or beer is.  It's a

21    business that's moved by the trademark.  All of the things are

22    basically equal for all suppliers in this business.  It's a

23    simple distribution channel, and a business that is driven,

24    frankly, parity pricing.  It's a single channel --

25    simplistically speaking -- two channels of distribution, and so
```

```
 1    your trademark drives sales.

 2              The balance of this analysis of factors is relatively

 3    simplistic, and one of the things has to bother you, Your

 4    Honor, I would think, is you look at this first factor, and

 5    Mr. Martin has a minimum percentage of eight percent for factor

 6    No. 1 and a maximum percentage of 12 percent.  That's a 50

 7    percent swing.  Eight percent or 12 percent, which is it?  You

 8    know, frankly, I don't care because it's meaningless.  That is

 9    a 50 percent swing between attributing eight percent of sales

10    or 12 percent of sales.  It's that sort of thing that has to

11    bother you about this analysis.

12              THE COURT:  Any response?

13              THE WITNESS:  May I respond?

14              First of all, I have the utmost respect for

15    Mr. Anson.

16              THE COURT:  I can't hear you.

17              THE WITNESS:  I have the utmost respect for

18    Mr. Anson, and he was a mentor of mine for eight-and-a-half

19    years, but his comments that just were provided to --

20              THE COURT:  Speak into the microphone, please.

21              THE WITNESS:  His comments that were just provided to

22    the court on the record just demonstrates his absolute lack of

23    understanding of this particular industry, and for him to say

24    that the trademark drives 100 percent of the sales, he gives no

25    mention to the umbrella brand of One Hit Wonder, which in this
```

1    business -- the vape industry has literally thousands of

2    manufacturers.  It's very fragmented.  There are tens of

3    thousands of Duce Juice products.

4           How does a manufacturer differentiate itself against

5    the competition?  Well, if you look at the majority of retail

6    websites for listing of products, they're almost always is

7    going to be the flavor name combined with the source of the

8    goods.  For example, the plaintiff's use The Milkman by Vaping

9    Rabbit.  Right on the packaging, "From the creators of Vaping

10   Rabbit."  If the Vaping Rabbit umbrella brand didn't mean

11   anything to the plaintiff's operation, why is it there?  What's

12   the point?

13          THE COURT:  Okay.  I got it.  Here, here.

14          You see a lot of this -- look it, we've got a number

15   of eight factors, and then we've got to go percentages.  So

16   there's a limit to how long we can spend on it, and what you're

17   trying to do is somehow connect with me so I understand and can

18   rule.

19          MR. COHEN:  Understood.

20          THE COURT:  But what I will get back to -- I

21   understand Mr. Anson's rejoinder, and I understand the response

22   by Mr. Martin, and that's the stuff -- if it's admissible --

23   that's the stuff of cross-examination to a jury, okay?  The

24   question is, is this so loosey-goosey -- to use a nonlegal

25   term, but however a term that arguably applies here -- that you

 1   can't, from a *Daubert* standpoint, let it in for later

 2   argumentation?  That's what's going on here, okay?

 3             Now, what particularly concerns me is, is I would

 4   tend to say that Mr. Martin is correct vis-a-vis the umbrella

 5   brand being a driver.  I believe it is and -- but that still

 6   doesn't answer how do you get the percentage, okay?  You heard

 7   me.  How do you get the percentage?  I mean, what you seem to

 8   be saying is I get the percentage.  Well, you start off with a

 9   hundred, you take nine pieces -- or whatever it is -- that's 11

10   percent a piece, okay?

11             Now, how do you then tune the 11 percent for each of

12   the factors?  That then that's where it gets really gray, and I

13   don't understand how you're tuning it is really what's going on

14   here.  How do you tune it?  How do you move off that nine or

15   over that nine as the case may be?  That's where this is, isn't

16   it?

17             Getting an endorsement from the law clerk that I'm

18   right.  How's that?  She better say I am, okay?  Really.

19             That's what to me is -- if your testimony is to be

20   accepted, you've got to cross that bridge, the same bridge

21   you're facing on the percentages when you want to ascribe it

22   the ten percent.  Okay.

23             So how do you tune it from the starting nine to the

24   eight to 12?  You know what I mean by "tune it"?

25             THE WITNESS:  To the eight to 12.

```
 1              THE COURT:  Eight to 12 is what you said in here,

 2   isn't it?

 3              THE WITNESS:  Yes.  And, Your Honor, I would preface

 4   that with this eight to 12 was on the fly in deposition without

 5   having access to -- to all my papers and analysis.  So he asked

 6   me in deposition to -- even though he knew I had not done it

 7   before -- to quickly give him an answer --

 8              THE COURT:  I understand that.

 9              THE WITNESS:  So these are approximations, which I

10   would just want to preface the discussion.

11              THE COURT:  I understand.

12              THE WITNESS:  The process itself, and I think, you

13   know, when we start with the total pool of profits, and we

14   start divvying it up -- right? -- we have to start with the

15   premise, and the premise is they all matter; they're all

16   equivalent --

17              THE COURT:  I understand that.

18              THE WITNESS:  -- they're at an 11 percent range.

19   Then we begin the process of understanding the role that each

20   of these factors plays in driving revenues and profitability,

21   and all my research and experience and knowledge in this

22   industry -- and I've also done a year and a half ago another

23   case in the vape industry where trademark value and profits

24   were a part of that.  So I've done extensive research in this

25   industry.  I'm am avid vape enthusiast.  I've been in the
```

```
 1   industry using products, buying products, researching products
 2   for over five years now --
 3            THE COURT:  Slow it down.
 4            THE WITNESS:  Sorry.
 5            THE COURT:  You tell me when any of us, including me,
 6   are too fast, because I tend to be.  So I'm not talking of
 7   thinking, I'm talking about the speaking, okay?
 8            THE WITNESS:  Thank you, Your Honor.
 9            THE COURT:  So go ahead, please.
10            THE WITNESS:  So based upon my assessment of these
11   factors, the premium nature of this product and flavor drive
12   everything in this business.  It's the most important aspect.
13   If you don't have a flavor that is spot on with the description
14   and the customer expectation, you will not get repeat business.
15   There are literally hundreds of competing strawberry flavors.
16   For example, type in "milk" on Ejuices.com, who is a major
17   wholesaler.  You will get 581 milk flavor alternatives
18   presented to you.
19            THE COURT:  Identified as milk?
20            THE WITNESS:  Identified as milk.
21            So how do you differentiate yourself?  How do you get
22   your customer A to buy your product?  That's the importance of
23   the One Hit Wonder brand and the other marketing elements that
24   we will talk about.  Grass roots is everything in the vape
25   industry.  They are highly regulated.  They cannot use
```

```
 1    traditional media for marketing.  They don't have TV and radio.

 2    They don't have newspaper --

 3              THE COURT:  They're prohibited from doing so?

 4              THE WITNESS:  They are prohibited, just like they're

 5    classified --

 6              THE COURT:  Not prohibited from producing it --

 7    interestingly -- but -- little inconsistency there -- but

 8    prohibited from advertising it in what you and I would refer to

 9    a traditional way.

10              THE WITNESS:  Yes, sir.

11              THE COURT:  Ergo, you got this -- I won't call it an

12    underground, but you got this secondary advertising market --

13    and that's the term used -- secondly advertising market, and

14    what you're saying in the secondary advertising.

15              Go ahead.

16              THE WITNESS:  So they are restricted from

17    traditional; they also are not allowed to purchase Google ad

18    words for promoting the products and services; they can't

19    advertises on traditional social media like Facebook and the

20    like.

21              THE COURT:  Okay.

22              THE WITNESS:  So they are restricted to a grass-roots

23    marketing effort, right?  That's where the factors of curating

24    relationships with the industry influencers are so important

25    for spreading the word, getting positive reviews from people
```

1    who have strong followings, who then can expand their -- you

2    know, reach out to their networks to expand the presence and

3    exposure of these products.  This is the only way they can do

4    it.  You're getting the forces on the ground, and you're

5    telling them to talk to everyone in the world.  Facebook and

6    Instagram pages, right?  You're curating your relationships.

7    It gives you a direct access to -- platform to speak to your

8    customers.

9             THE COURT:  That's very helpful, okay?  It really is

10   because obviously -- not obviously, but I'll rephrase that.  I

11   don't have any exposure to vaping.  Now --

12            THE WITNESS:  Most people don't, Your Honor; it's a

13   niche market.

14            THE COURT:  Well, "niche" -- you hear the way he

15   pronounced that?  She continually mispronounces that word, but

16   the fact of the matter -- you see -- the fact of the matter

17   is -- getting away from pronunciation -- what we need to do

18   is -- you've explained what's going on -- what, in your view,

19   is going on here -- okay? -- and what we get back to, and what

20   Mr. Cohen has been after you about, and that is let's assume

21   you're correct.  How do you come up with the percentage?  You

22   know, do I think you're correct based on what you're telling

23   me?  Yes, I think you probably are correct.  You know, if your

24   representations particularly about advertising are what you

25   said, you better believe that some of these things that you're

1   identifying in here are critically important, and they're

2   driving this thing.

3          Query:  Where do you get percentage?  We're right

4   back to that again.  So what you've done is -- and I did say it

5   earlier -- there are two faucets to this.  One the 702 facet,

6   the first 702 facet:  Is this the subject of expert testimony?

7   Well, as witnessed by what's transpired just now, you better

8   believe it's the subject of expert testimony.  And then the

9   second is can expert testimony -- given the identification of

10  the driver with expert testimony, can the expert then take the

11  next step and say, Having identified the driver -- just a

12  second.  Make sure you -- I want this in.  I'm trying to get

13  this boom, boom, boom, boom -- can the expert take the next

14  step and say, Having identified the driver, I now ascribe this

15  percentage?  And then you run into 702 and *Daubert* again, and

16  the question is how do you answer that 702-*Daubert* complaint

17  that Mr. Cohen is lodging on behalf of his client?

18         Do you understand what I'm saying.

19         THE WITNESS:  I believe I do, Your Honor.

20         THE COURT:  Not too garbled?

21         THE WITNESS:  No, sir.

22         THE COURT:  Thank you.  Now, go ahead.

23         How do you get it?  Let's say I buy your brand.

24  Provisionally, I do.  That the -- the tent top, if you will.  I

25  do provisionally.  That doesn't -- you haven't gotten the whole

```
 1    way, and that's the same problem you're going to have with this

 2    ten percent that Mr. Cohen was drifting toward earlier, and we

 3    will get back to.  Okay.  Question:  How do you get it?

 4              THE WITNESS:  Just to clarify, Your Honor, how do you

 5    get there with the ten percent after analyzing the factor, or

 6    are we --

 7              THE COURT:  No, forget the ten percent.  Forget the

 8    ten percent.  I'm just giving you a preview.  You're going to

 9    get to that down the road.

10              I'm looking now to how do you get the eight to 12

11    percent?

12              THE WITNESS:  As I stated previously, as you go

13    through and identify the factors -- right? -- based on my

14    research and analysis, I rank those factors from top to bottom.

15              THE COURT:  Well, then you got a beef by Mr. Cohen

16    that, Hey, where is your survey?  And your answer is I don't

17    need no stinking survey.  That seems to be, in street talk,

18    would be your response, what you're saying:  I don't need a

19    survey.  I'm the guy who's worked this industry repeatedly, and

20    I don't need a survey.

21              Is that what you're saying?

22              THE WITNESS:  I think is that partially the answer to

23    this because a survey is surveying customers about attributes

24    of the industry, and that's exactly what I'm doing in

25    researching all of the product websites, reading thousands of
```

1  customer reviews, reading discussion forum posts, reading blog

2  posts, going to industry influencers, getting feedback as to

3  actual reviews of the products; what's most important in this

4  industry.

5              THE COURT:  Okay.

6              What you're saying:  This is a de facto, albeit a bit

7  different survey.

8              THE WITNESS:  It's circulating the --

9              THE COURT:  I don't have to go out there in person

10  and do it, I've got all these fora -- Latin, plural -- I've got

11  all these fora to look to that will be tantamount to a survey.

12             THE WITNESS:  The information is all there waiting to

13  be had --

14             THE COURT:  So --

15             THE WITNESS:  -- you just have to look for it.

16             THE COURT:  And ergo, I don't have to go out and do

17  it your way, Mr. Cohen.

18             THE WITNESS:  I don't think --

19             THE COURT:  Is that what you're saying?

20             THE WITNESS:  Absolutely.

21  BY MR. COHEN:

22  Q.   Did you keep copies of these thousands of postings you

23  looked at?

24  A.   I do not have copies of the thousands of --

25  Q.   Did you download them?

1    A.    I did not download.  I have long rated this information

2    and knowledge over the last five years in multiple cases, and

3    this is my experience, and this is what I've seen.  I've

4    provided samples to the court as to the comments that are out

5    there, most notably from the industry influencers who have

6    absolutely raved about the premium nature of the product; the

7    high quality flavors and being spot on; how these vapes are

8    more -- are the most smooth vape products out there.

9              THE COURT:  Mr. Cohen --

10             MR. COHEN:  I'm sorry --

11             THE COURT:  -- do we have an online site of how do

12   you get the percentage and -- again, what concerns me -- again,

13   remember, we have a jury system -- let's think about this just

14   for a second.  Take a step back.  We have a jury system where

15   the fact finder can't ask any questions.  Now, that is

16   oxymoronic, right?  Doesn't make any sense.  What in the world

17   is going on here?  I'm the fact finder, and I can't ask any

18   questions.  And by the way, don't discuss it during your --

19   during the recess.  You got to be kidding me, okay?  I'm not in

20   a position to change it.  Perhaps -- or I'd give away 50 years,

21   I'd do it.  Now I tell you what:  That doesn't make any sense.

22             So what you're doing here now is we're going back and

23   forth trying to figure out -- we can ask the questions, and

24   getting me back on train is if I accept your driver analysis

25   and I say -- and I think I do -- I say, yes, there is a

1  traditional way, but you don't have to do those the way it's

2  already done, especially when effectively it's being done for

3  me with these blogs and everything.

4         So what I'm saying is let's say I accept that.  I

5  don't say it's correct.  You can cross-examine as far as you

6  need to in front of the jury.  I'm just saying, Now, give me

7  the next, and I'm sorry.  I may be overlooking your answer, but

8  what I'm trying to find out is, assuming you're correct, that

9  this is a driver, for purposes of your testimony, what is

10  giving me pause to this point is the same thing I've repeated

11  again and again.

12         (Discussion held off the record)

13         THE COURT:  The law clerk pointed out something; she

14  may be right.  I won't pay parenthetically for once -- but she

15  may be right, and that's this:  I failed to boil it down

16  further, and that is give me your ranking system and why you

17  took it that way.  I've got my nine, and I rank, and then once

18  you ranked, you've answered the percentage; is that right?

19         (Discussion held off the record)

20         THE COURT:  Let me -- again, I'm sorry to move around

21  on you, okay?  Ever seen a crab on the beach?  You know, they

22  move on you, crab walk, moving.  So I don't mean to give you a

23  problem, believe me, but maybe I ought to be looking to

24  Mr. Wegner, and say Mr. Wegner, Do you have any input that

25  could crisply, in contrast to what I've been weighting around,

1    help me identify how reliably you can go about ranking and in

2    so doing come up with percentages.  That's what's -- how do you

3    do it?  My voice piquing?  How do you do it?

4              MR. WEGNER:  Your Honor, when you say "input," are

5    you saying you want me to give you the --

6              THE COURT:  Give me your argument.

7              MR. WEGNER:  Okay.

8              And I will -- I don't want to put words into

9    Mr. Martin's mouth, but the argument --

10             THE COURT:  He is going to put the words into your

11   mouth in a second; so we're just shortcutting it.

12             MR. WEGNER:  Very well.

13             Mr. Martin evaluates market data, data that is

14   available to him about the client; as he's testified to, data

15   that is available out there on the Internet, which is a primary

16   means of conducting business, commerce in this area.  He takes

17   that information, synthesizes it to identify value drivers.

18   Based on the information he sees -- and there are some -- there

19   are some metrics that he can point to for some of these value

20   drivers.  He then ranks them for the next step.

21             THE COURT:  That's what I'm doing.  How do you get

22   the ranking?

23             MR. WEGNER:  Well, he takes -- he introduces his

24   expertise and the metrics that are available to him and makes a

25   determination about which of these factors weigh more than the

```
 1    others --
 2            THE COURT:  Yeah.  But you see, that's the problem.
 3    He introduces these metrics in his evaluation.  I don't know
 4    what the metrics are; I don't know what the valuation is.  What
 5    are they?
 6            THE WITNESS:  I --
 7            THE COURT:  You see what I'm looking for.
 8            THE WITNESS:  Yeah.  I think I missed what the segue
 9    was.  Which metrics were you referencing?
10                (Discussion held off the record)
11            THE WITNESS:  If I understood your question, was your
12    question, Your Honor, what are the metrics supporting in
13    support of this ranking of the factors?
14            THE COURT:  Yes.
15            THE WITNESS:  You do have quantitative metrics for
16    many of the factors.
17            THE COURT:  What are the quantitative metrics?
18            THE WITNESS:  For example, in addition to all the
19    field research I did and all the reviews that I read regarding
20    high-quality flavors -- okay? -- in order to have a
21    consistently performing product, meaning the product
22    consistently performed month over month, customers keep
23    repurchasing, flavor is top priority in this industry with
24    dozens -- well, we saw 580 Milk products.  You have to a have
25    product that resonates with your customer if they want -- if
```

```
 1    they keep buying.  It's not easy because the components of

 2    these -- and Mr. Tellez will testify at trial as to how

 3    complicated the flavor development process is -- but once you

 4    have a high-quality flavor and you're known for that, that

 5    helps not only continue sales of that product but launch

 6    addition, facilitate launching additional products.

 7              Now, it's most important in the sales data -- if you

 8    look at it month after month, you see consistent performance of

 9    the defendant's Muffin Man, which was their initial launch;

10    Milkman, the second product; Rocket Man; My Man; and Policeman.

11    Policeman is the perfect example of how flavor can absolutely

12    destroy you.

13              THE COURT:  Because it failed basically.

14              THE WITNESS:  It -- "failed" is an understatement.

15    It was successful at launch with $1.2 million of initial

16    sales --

17              THE COURT:  Which would suggest your brand drives it.

18              THE WITNESS:  Which would suggest your brand drives

19    it, the -- your quality flavors, that there's an expectation;

20    your premium classification; and your volume pricing model.

21    Everything plays into the successful launch of each subsequent

22    product.

23              THE COURT:  Okay --

24              THE WITNESS:  Policeman is the perfect example.

25              THE COURT:  -- again, I tend to agree with you, but
```

 1   please -- always there's the specter here of how do you get

 2   those percentages, okay?  Get into metrics, and there's no --

 3   there's no hard evidence how do you get -- how do you translate

 4   your experience, your identification of the drivers?  How do

 5   you break it out as you did?  That's what's going on here.  How

 6   do you do it?

 7           THE WITNESS:  Maybe I misunderstood the last

 8   question, but when we're talking about the overall framework.

 9   We have a total profit pool that has to be divided among the

10   identified drivers; that's what the job here.

11           THE COURT:  I understand that.

12           THE WITNESS:  We identify those drivers, and we start

13   with the starting point of 11 percent per driver, but then we

14   rank those factors based on their importance to the business in

15   this industry.

16           THE COURT:  How do you rank it is the question.

17           THE WITNESS:  Well, that's what we are talking about.

18   It's a review of understanding how the industry works, what

19   customers are looking for, what marketing assets are most

20   relevant and most opportunistic.  What are the most important

21   product attributes.  All that is done through the field

22   research, through my experience, through my action, use of the

23   products and my review of products in the industry; and it's

24   done on a relevant basis.  It has to be.  There is no exact way

25   to say, Oh, you scored a 61.  There is no scoring system.  You

1     have to rely on the expert who knows, who has researched, who

2     has analyzed the business in detail, the industry in detail, to

3     provide that framework of what's important.

4              I wish I had another answer, but there is no other

5     way.  You have to rely on that interpretation.  If the jury

6     doesn't want to agree with my interpretation of flavor because

7     maybe there's a vape enthusiast on the jury, I mean, that's

8     their choice; but I have a foundation of knowledge that I am

9     applying here and trying to help the trier of fact be

10    reasonable in the assessment of the apportionment here because

11    100 percent is not the answer.

12             THE COURT:  Mr. Cohen.

13             MR. COHEN:  Yes, Your Honor.  He actually -- I asked

14    this in his deposition, and he gave a different answer.  I

15    think it's a good time to take a look at the question and the

16    answer.

17             THE COURT:  All right.

18    BY MR. COHEN:

19    Q.   Could you please turn to page 159 in your deposition.

20    A.   Yes.

21    Q.   I'm going to read the question, and I'd like you to read

22    the answer.  The question begins on line two of page 159 of

23    your transcript of deposition.

24             "Q    Well, if I want to figure out how to

25             apportion these or how much emphasis to put on

1          *each one, how do you choose between eight and 12*

2          *percent or 15 and 18 percent, the various ranks?*

3          *How do you pick a number?*

4          Please read your answer?"

5          THE WITNESS:  Your Honor, the answer is a full page.

6     Do you want me to go ahead and read the whole thing into the

7     record?

8          THE COURT:  Yes, if you need to, so-called "rule of

9     completeness," Mr. Cohen.

10         Why don't you just read me the answer, Mr. Cohen.

11         MR. COHEN:  I will, your Honor.

12         Here's your answer.  It begins on line 7 or page 159.

13         THE COURT:  Read the entire answer, please.

14         MR. COHEN:  I will, Your Honor.

15         *"A    I think you're taking the discussion of*

16         *the relevant -- the key drivers out of context.*

17         *The discussion in this framework is designed to*

18         *provide a qualitative discussion of what were*

19         *identified as, aside from The Milkman mark,*

20         *which is the subject of this litigation, what*

21         *those primary drivers were, how they played into*

22         *the situation, and how important they were on a*

23         *relative basis to the overall revenue and*

24         *profitability of the business.  Then that*

25         *qualitative discussion gets wrapped up with the*

1          *apportionment to the trademark, which our*

2          *industry evaluates trademarks in a very distinct*

3          *fashion:  Fair market value for the use of a*

4          *trade mark is codified typically in a royalty*

5          *rate, and that royalty rate serves as the fair*

6          *market indication of relative value or*

7          *contribution to the entity's operation.  So by*

8          *taking a look at Mr. Anson's opined three*

9          *percent royalty in this case, I believe it to be*

10         *one and a half, but we can beg to differ.  But*

11         *for purposes of this discussion, that*

12         *one-and-a-half to three-percent royalty can be*

13         *translated to a profit percentage, and then that*

14         *profit percentage, whether it be no more than*

15         *five percent or ten percent, then gets overlaid*

16         *in comparison with, okay, if that's ten percent*

17         *of the profit"* --

18              THE COURT:  Excuse me, Mr. -- I'm sorry, Mr. Cohen.

19    You're trying to persuade me, and I'm going to give you my

20    response.  I don't think this addresses this ascription -- if

21    there's such a word -- of percentages.

22              Go ahead.

23              MR. COHEN:  Two points, Your Honor:  One, you're

24    exactly right, but when asked the question under oath, that's

25    what he said.  He said, It's not quantitative, it's

```
 1   qualitative.

 2              THE COURT:  Well, sure it's qualitative --

 3              MR. COHEN:  That's my point.  You can't ascribe

 4   numbers to it.  That's exactly my point.  What you just said is

 5   exactly the point.  That's exactly right, Your Honor, and

 6   that's why we couldn't answer it then, and he was being honest.

 7              THE COURT:  You're getting almost as excited as I do.

 8              Now, you're not suggesting that when one has to lead

 9   quantitative, he cannot go to qualitative?  You're not doing

10   that, are you, because --

11              MR. COHEN:  Ask the question again, please, Your

12   Honor.

13              THE COURT:  Well, rephrased, isn't qualitative

14   used -- an analysis, qualitative analysis used with some

15   frequency in these valuation cases?  It's not all quantitative,

16   right?

17              MR. COHEN:  There have been instances, for example,

18   in copyright --

19              THE COURT:  Well, but --

20              MR. COHEN:  -- where they're qualitative, but in this

21   one, he's got -- there's no way to do this reliably; he's

22   making it up.

23              THE COURT:  Why you can do it in copyright and you

24   can't do it in infringement.

25              MR. COHEN:  The case I'm thinking of in particular --
```

1          THE COURT:  Trademark.

2          MR. COHEN:  Was -- oh, why you can't do it in

3  trademark, just the --

4          THE COURT:  Why can't you do it in this case when you

5  can do it in copyright.  They're cousins -- okay? -- kissing

6  cousins.  No you're different?

7          MR. COHEN:  One is --

8          THE COURT:  What I'm saying is if you can implicate

9  qualitative in the context of copyright, why can't you

10  implicate it in the context of brand trade name, trademark,

11  whatever?

12          MR. COHEN:  The answer I think lies in Rule 702.

13  Rule 702 -- and not reading from the notes to Rule 702.

14          THE COURT:  I think that copyright informs the

15  analysis, the qualitative analysis here is what I'm saying, and

16  I find it very surprising that the infringement area that we're

17  dealing with here hasn't implicated the -- according to you, I

18  think -- hasn't implicated the qualitative analysis.  You

19  almost have to.

20          In other words, what are you doing?  You're saying

21  are you suggesting that -- okay -- you've identified in your

22  operational expenses, after we sort it out, you've identified

23  the quantitative, okay?  But forget qualitative because there's

24  not enough certitude so you can't use.

25          Is that what you're saying?

```
 1              MR. COHEN:  In this instance, yes.

 2              THE COURT:  Okay.  Now I understand what you're

 3    saying, and I won't -- intuitively -- I didn't say "legally," I

 4    said "intuitively" -- intuitively I don't think you're right.

 5    I don't think that the defendants left -- you know dog-gone

 6    well as a reviewer of this area -- "you" being who's ever

 7    looking at it, not you, me or anyone else.  So I can rephrase

 8    it.

 9              When one looks at an area like this, you're

10    thinking -- well, you're looking big picture, and you're

11    saying, Well, once I've gotten through -- I'm trying to value

12    that infringement, if you will, and part of the analysis, the

13    easy part -- relatively easy part is the quantitative.  I don't

14    think that you can, because it's -- because it's -- I use the

15    word fumerole because you can't crisply identify it, I don't

16    think because of that you can say, well, it's qualitative;

17    you're guessing; you can't come up with any specifics.

18    Admittedly, it's not the exactitude that one would prefer, but

19    the subject matter drives the analysis, and you're not left

20    without analysis because it's -- I would say this:  You're not

21    left without the analysis because it's difficult.

22              MR. COHEN:  But in this case, it's not.

23    Q.   Mr. Martin, you talked about how a lot of customers get

24    this through the Internet.  They buy this over the Internet,

25    right?
```

1    A.    Online retailer as well as brick and mortar --

2              THE COURT:   Speak to the microphone.

3              THE WITNESS:   Sorry, sir.

4              Online retailers versus then as well as brick and

5    mortar retailers.

6    BY MR. COHEN:

7    Q.    Sure.  Could you have sent out an email to the customers

8    and say, Hey, why did you buy our product?  Was it because of

9    the brand or was it because of the flavor or was it because of

10   the price?  You could have done the -- you could have done

11   that, right?

12   A.    The client could have done that for the customers that

13   they contained email addresses for, yes.

14   Q.    Sure.

15             How many do they have?

16   A.    I am not certain how many email addresses they'd have.

17   Q.    Did it occur to you to ask?

18   A.    I don't think -- I don't think the topic came up.

19   Q.    Okay.

20             So they could have emailed all these customers and

21   said, Hey, we'd like to know why you're buying our product so

22   we can do a better job of selling.  So please tell us why you'd

23   buy it or give them a list of factors and ask them to rank

24   them.

25   A.    But, Mr. Cohen, I think --

1    Q.   Sir, is that something --

2    A.   Mr. Cohen, I think what you're saying is --

3    Q.   Mr. Martin --

4    A.   -- is exactly what I did.  I went out to customers who

5    purchased products of the company.  If I would have gone and

6    had them send an email to their customers; then you would

7    accuse me of not following the legal statute for a proper

8    survey.  I did exactly what you just said; I just didn't send

9    the email out to their customers in their email database.  I

10   went to the industry data, and I reviewed countless reviews on

11   their products.

12   Q.   Right, but you didn't save them, right?

13        So we can't go and replicate your work, can me?

14   A.   You can replicate the work because the information is out

15   there; it's in abundance.

16   Q.   We don't know -- well, we won't know what you looked at

17   because you didn't save it.

18   A.   The information is consistently out there and in

19   abundance.

20        THE COURT:  Okay.  Here, this percentage issue that

21   we're talking about here is going to be present at every one of

22   these drivers --

23        MR. COHEN:  Yes, it will.

24        THE COURT:  And it's present in the ten percent, too.

25        So I think I -- I think understand his position, and

1   I think I understand your position.

2        What I really suppose we should focus on is the

3   drivers, and when you go through the percentage ascribed to the

4   various drivers, going to be the same basic analysis, I think.

5   Again, it may be nuanced a bit, but it's going to be the same

6   basic analysis.

7        So what you end up with is can -- let's figure out --

8   can you use these various drivers.  And the first driver is

9   umbrella driver, I'll call it.  He can use it, okay?  That's

10  the ruling.

11       Now, the question -- he can use it subject to where

12  you come up with a percentage, and I haven't decided that yet

13  at all, but let's get to the other eight drivers and then we'll

14  finalize this, unless there's something new on the percentages

15  and how you arrive at them; then let's go back to the

16  percentages, and then let's go to the ten percent.

17       Do you want to say something?

18       Just a second.

19            (Discussion held off the record)

20       THE COURT:  Co-opting you, Mr. Cohen, but by now

21  you're used to it.  Give me the -- let me ask of Mr. Martin:

22  How did you arrive at these rankings?

23       THE WITNESS:  The rankings were based upon all the

24  research and analysis I did on the company, the industry, the

25  products, and understanding how products are purchased in the

1   electronic cigarette industry.

2              THE COURT:  Okay.

3              And your critique of that, Mr. Anson?

4              MR. ANSON:  Sir, I just -- Your Honor, I listened to

5   this.  I can only say this:  First, you have to go to first

6   premise.  I apologize, sir.  You have to go back to first

7   premise; none of these factors make any sense without the

8   trademark; without the trademark, none of these exist.  The

9   trademark is the driver of all of these factors.  To relegate

10  the trademark to a parity position with these other eight

11  factors is simply foolishness.  It's the trademark that drived

12  the majority of what we're talking about.

13             Secondly, these are, to a great extent, as you

14  recognized already, subjective; and to a great extent they are

15  based on opinion.  I can sit there as well as he can and say it

16  is my opinion that these are the eight drivers.  I would not

17  presume to do that to you.  I would come to you with facts; I

18  would come to you with results of my work.

19             THE COURT:  What facts would you propose he should

20  come up with?

21             MR. ANSON:  I would indeed have done a survey of

22  their online customers; I would indeed have done a survey of

23  some of their distributors; and I'm not here to criticize --

24             THE COURT:  What are you going -- excuse me -- what

25  are you going to elicit from a survey that isn't already

1    embedded in their observations on the Internet?

2              MR. ANSON:  I'm working for the plaintiffs.  I would

3    have -- I would have -- if I were to build this kind of case, I

4    would not have built this kind of case --

5              THE COURT:  You're critiquing him, and you're saying,

6    Look it, not only is it infirm, i.e., this -- this amorphous,

7    well, here's how I feel, but you could refine the analysis, and

8    to suggest -- what he's suggesting is it seems to me -- from

9    the plaintiff's standpoint, what he is suggesting is there

10   isn't any way to -- there's no way other than a qualitative

11   analysis that you can do it at this point, aren't you?

12             THE WITNESS:  Yes and --

13             THE COURT:  That's what I'm -- that's what I'm

14   saying --

15             THE WITNESS:  -- Mr. Anson knows that.  We've done it

16   together --

17             THE COURT:  -- excuse me.  And that's what I'm

18   saying, and I'm asking you if you're loading Mr. Cohen's gun,

19   or you're on the stand, and you're the one who's going to

20   testify, are you going to say, That's wrong.  There are ways

21   that you can do what you're doing, and you didn't do them.

22             MR. ANSON:  There are indeed, and one of the things

23   that should have been done is take a good look at The Milkman

24   trademark, and, for example, do an analysis -- we call a

25   Valmatrix analysis, the strength of the trademark; and I'm not

1    here to introduce my testimony but --

2              THE COURT:  Yes, you are.

3              MR. ANSON:  Am I?  All right.  I'm surprised at that

4    then, sir.  I did not realize that.

5              The strength of the trademark is a critical factor

6    here.  Yes, there are 561 or -- there's over 500 Milk

7    trademarks; there's only one Milk Man trademark with the logo

8    devised that truly distinguishes this product from amongst the

9    field of 500.  It is a critical factor here, and you can

10   attempt to dilute it by introducing other factors.  Yes,

11   Mr. Martin and I worked together.  Yes, he was asked to leave

12   the firm.  I do have respect for him.  It's been a while since

13   we've worked together, but I have -- he's a personal friend;

14   and so I'm reluctant to get in a test of wills here.

15             But I will tell you that our approach to this would

16   have been much more empirical than you what see here today.

17   I've read his deposition.  His deposition was not fact filled.

18   I choose not to attack him any further on a personal basis, but

19   our approach would have been much more quantitative than his

20   approach is.

21             THE COURT:  But there is a -- but that's --

22             MR. ANSON:  I believe there is, sir, yes.

23             THE COURT:  What's the qualitative approach that was

24   there, and he didn't use it?

25             MR. ANSON:  I would have talked to distributors and

```
 1   e-retailers and said, Does this Milkman trademark and logo
 2   distinguish it from the other 500 Milk logos out there?  I
 3   would have asked that question.  I would have asked the same
 4   question of consumers.  I would have done at least those two
 5   basic things, sir; and those weren't done.  It's critical.
 6   It's the trademark that drives this.  This is a trademark
 7   issue, this is not an issue primarily of how many distributors
 8   you have.  For example --
 9            THE WITNESS:  May I respond?  If this is a about the
10   trademark, Mr. Anson, you don't even contemplate the One Hit
11   Wonder brand umbrella trademark.  So if this is this is off the
12   trademark, the trademark drives everything, what does Milkman
13   signify here?  Number one.  Number two, you say you would have
14   done a Valmatrix technique, well, we want to talk about
15   qualitative assessment, and Valmatrix is an identification of
16   20 factors that Mr. Anson subjectively scores from one to five
17   to make a determination as to the relevant strength of the
18   brand.  That's entirely a qualitative assessment of those
19   various attributes, and I would like to have your 20 attributes
20   submitted into the record because it is not a quantitative
21   method, it is a subjective method, and for you to say that the
22   trademark drives everything here, Milkman versus Muffin Man, is
23   Muffin Man as valuable a trademark as the plaintiff's Milkman
24   brand?  Because sales of those products during the relevant
25   damages period were almost equivalent.  Eleven percent -- 11 --
```

1    I believe Milkman did 11 percent greater sales than the

2    defendant's Muffin Man sales during the same time period.  So

3    if the other value drivers don't matter, Milkman, this great

4    trademark that 100 percent of the profits should be

5    attributable to, only accounts for 11 percent more sales than

6    the defendant's Muffin Man product, which was their initial

7    launch under the One Hit Wonder umbrella brand.

8           For you to say in this industry that the marketing

9    assets, the grass roots marketing effort of social media, of

10   industry influencers, the volume pricing model of a premium

11   classified in -- premium perceived product in the marketplace

12   being driven at tremendous prices, that these things don't

13   matter, that you take away The Milkman name and all the profits

14   go away?  Well, how come, after The Milkman name was taken off

15   the product, that The Man -- which was the new name for the

16   product -- continued to perform at a similar level.  It's

17   absurd; it's nonsensical.  These other value drivers are

18   critical to the generation of revenues and profits, and they

19   have to be considered.

20          THE COURT:  And Mr. Wegner, is there any case law to

21   support what he just said?

22          MR. WEGNER:  Your Honor, that the qualitative factors

23   matter?  Yes.  We've cited -- and I think you've referenced the

24   copyright cases at a minimum --

25          THE COURT:  Why aren't there trademark infringement

1    cases?

2           MR. WEGNER:  I think the *Maier Brewing* case is an

3    example of that, Your Honor; and *Maier Brewing* is a case that

4    AOP likes to rely on; but it has a comment in there that is

5    really telling, and that is that if you can -- I can actually

6    quote it directly.  Pardon me, Your Honor.

7           "If it can be shown that the infringement" --

8           THE COURT:  Give me the cite, please.

9           MR. WEGNER:  Yes, sir.  The cite is 390 F.2d 117,

10   page 124, Ninth Circuit.  I don't have the year.  I apologize.

11          "If it can be shown that the infringement had no

12   relation to the profits made by the defendant that some

13   purchasers of goods bearing the infringing mark" -- I'm

14   sorry -- "bought the goods bearing the infringing mark because

15   of defendant's recommendation or his reputation, or for any

16   other reason other than a response to the diffused appeal of

17   the plaintiff's symbol, the burden of showing this is upon the

18   poacher" --

19          THE REPORTER:  I'm sorry.  Wait, wait.  The burden is

20   what?

21          MR. WEGNER:  "The burden is upon the poacher."

22   That's the direct quote.

23          The question I would pose is how do you quantify

24   exactly reputation?  Even the *Maier Brewing* case contemplates a

25   value that must be given to something like reputation, and that

```
 1   is essentially what this analysis is all about.  It's about

 2   those other drivers of sales that are apart from just the mark,

 3   and if the Maier Brewing case can talk about something as

 4   amorphous as reputation, you know it's got to be qualitative.

 5            THE COURT:  What's your response to that, Mr. Cohen,

 6   to that citation that Mr. Wegner just read to all of us?  Seems

 7   to be on point.

 8            MR. COHEN:  No, it's not because it doesn't say

 9   that -- it says it's a factor to be considered, and there's no

10   dispute about that, but the fact is to be admissible, there has

11   to be some measure of quantification.  That's what we're

12   talking about here, and perhaps to clarify something I said

13   earlier, I'm not saying you can't discuss qualitative factors,

14   what I'm saying is to be admissible and to reliable, it has to

15   be a quantitative component.  In other words, if you have

16   quantitative analysis, you don't necessarily have to talk about

17   qualitative thing necessarily; but the law doesn't preclude you

18   from discussing qualitative factors, but there has it be

19   quantitative basis so that you can evaluate and so you have

20   some way to determine that this isn't all just made up.

21            THE COURT:  You're -- are you suggesting there has to

22   be a quantitative basis to a qualitative analysis?

23            MR. COHEN:  If what you're talking about is

24   apportionment of numbers, yes.

25            THE COURT:  I don't think so, and I got to go back
```

```
 1    and talk with the law clerk about that.  Give you something

 2    to --

 3               MR. COHEN:  Understand.

 4               THE COURT:  -- mull over.  And listen, Mr. Cohen,

 5    when I look at it -- no, I understand your argument, and it

 6    obviously -- it's frustrating legally not to be able to get a

 7    hold of it, and the answer is, well, yeah, you can get a hold

 8    of it, and you may not like the answer that you can't come up

 9    with an answer, but that's the reality here is what you're

10    saying.

11               So what I -- I guess what I -- boil it down, after

12    lunch we'll complete the analysis of the driving factors.

13    We've beat the percentages ascription to a fair-thee-well.

14    There may be more analysis that's warranted that hasn't been

15    brought to my attention, but I don't want -- unless it's new, I

16    don't want any more argument.  I understand -- I think I

17    understand the argument.

18               So then the question becomes are all these nine

19    appropriately received by the court?  And I'll make a decision

20    for you, and then we're going to get into, well, how are you

21    then taking the arguable leap to say having identified these

22    drivers, having given them percentage valuation, and having

23    arrived at -- how do you then say, well, there's a ten percent

24    discount that can be taken here and no more?  And the rest of

25    it is the defendant's profit because you're trademark didn't
```

```
 1    contribute that.  I mean, that's what it is.

 2              MR. COHEN:  Yes, that is their argument.

 3              THE COURT:  I'm not arguing, I'm just saying.

 4              MR. COHEN:  Well, that's a correct summary of the

 5    defendant's argument, yes, and we're saying this doesn't meet

 6    the rigor required of Rule 702 or Daubert.  I mean, we can keep

 7    saying the same thing, but that's what it is.

 8              But, yes, there are specific questions I have about

 9    each factor, but you're right.

10              THE COURT:  Let's go through it and -- after lunch

11    and go through the factors, hopefully, and I'm the one who's

12    drawing this out, but I'm trying to get to an answer.

13              Let me ask you, the two counsel:  Do you think it

14    would be of any value -- I've never seen it done, but I'm

15    prepared to do it.  I may have done it in days gone by.  I

16    don't remember, but I may have.  You got a jury in there, and

17    you have, for instance, Mr. Martin on the stand.  Mr. Anson is

18    here, and why couldn't you have a back and forth, which is much

19    more helpful than having theoretically several hours of

20    testimony and a night, and it's lost, and now the next morning

21    in comes the contradiction.  Why can't you have the back and

22    forth between the experts and basically, in effect, put them

23    both on the stand and with the spontaneity, interestingly

24    enough -- spontaneity is important -- with the spontaneity

25    associated with them going back and forth so somebody is not
```

```
 1   saying, Hey, you haven't thought of this -- whispering or

 2   something?  Hey, wait a second, right there, face to face, go

 3   at each other.  Why couldn't do you that, if could you -- and

 4   if you could -- and I think you could -- if you -- do you agree

 5   on it, and if you don't agree on it, I might just do it any

 6   way.  Why don't you mull that over at lunch too.  Because I

 7   think it's a good idea; I think's wholesome.  I mean, as long

 8   as you keep it in control, right.

 9           MR. COHEN:  Sure.

10           THE COURT:  Back, forth, back, forth.

11           MR. COHEN:  I'm happy to consider it, and another

12   thing just for the court and opposing counsel's consideration,

13   we're willing to waive jury in the damages trial, just have a

14   bench trial.

15           THE COURT:  After having heard me?

16           MR. ANSON:  Your Honor, can I comment on your

17   suggestion?

18           THE COURT:  On his suggestion of a bench trial?

19           MR. ANSON:  No, on the --

20           THE COURT:  We'll get you.  You can talk with -- I'm

21   not looking for a bench trial -- okay? -- but I'll do it, but

22   I'm not looking for it, but I'll do it if you want.  But talk

23   about that with Mr. Wegner during the recess, also, if you

24   want.  But you've got several things to talk about.  Here's the

25   thing:  I will try to be on time for you.  I've got to make a
```

```
 1    medical appointment for minor -- a mole procedure -- okay? --

 2    and I got to put together the meeting with the plastic surgeon

 3    and the mole surgeon, and I got to get them on the phone; I

 4    haven't been able to do it.  So I'm trying to get them at the

 5    recess because when we get off the bench tonight, they're gone

 6    home.  So I don't think I'll be late, or I can have them --

 7    they will call the secretary, and I go in, but I might be

 8    little late.  But let's just go on the theory that we'll be

 9    back in here at quarter of 2:00, and if need be -- I'm not

10    saying we will -- if need be, we're going to 5:30 okay?  I'll

11    try to get you closure.  I think it may move a little faster

12    because you've get my meanderings analytically.  You know, I've

13    kind of come to where I think -- I think I know generally what

14    he is talking -- the same argument is going to be made with all

15    these other elements, ment don't kid yourself.  Same thing.

16    And your same argument basically can be made about the

17    percentages.

18              MR. COHEN:  Correct.

19              THE COURT:  So we've been through a lot of this now,

20    and there are -- there are one or two of his drivers that are

21    suspect, I think.  The others may well past muster.  So I

22    certainly will permit you to question regarding the other

23    drivers.  I think that's it.

24              We'll be in recess until quarter to 2:00.

25              MR. COHEN:  Do we need to vacate the courtroom, or
```

1    can we work in the courtroom.

2              THE COURT:  You can work here as far as I'm

3    concerned.  Just don't look at my notes, what I said about you

4    in my notes, okay, Mr. Cohen?

5              MR. COHEN:  Wouldn't dare and I'm afraid to look.

6              THE COURT:  No.  Unnecessary joshing, I suppose, but

7    yes, of course you can use the courtroom and no problem.

8              THE WITNESS:  Your Honor, should I leave the witness

9    documents here?

10              THE COURT:  Leave what?

11              THE WITNESS:  The witness documents here.

12              THE COURT:  Leave it there, please, yes.

13              (Noon recess.)

14              ///

15              ///

16

17

18

19

20

21

22

23

24

25

```
1        LOS ANGELES, CALIFORNIA; MONDAY, MAY 10, 2017; 2:00 P.M.

2                              - - - - -

3

4             THE COURT:  Mr. Cohen, yet another approach occurs to

5    me, and that is to take Mr. Wegner and say, Mr. Wegner, I want

6    you to go through the remaining factors, and it's kind of like

7    a balance sheet.  You've got factors, and you've got

8    percentages, okay?  There are two issues, albeit related, and

9    when that's complete, well, I can tell you that as I looked at

10   the -- go back even further.  Law clerk looks at me without

11   more -- when we go to the chambers -- she said, You know what

12   Mr. Cohen was about to do.  He wanted to read to you from the

13   annotations -- looks like she was right -- he wanted to read to

14   you the annotations -- do you have it there? -- in 702 after

15   Daubert -- okay? -- after the Daubert decision; and you don't

16   know this, but internally we have highlighted here these

17   annotations, and yesterday we talked about these annotations,

18   and what you apparently wanted it lead from, which she brought

19   anew to my attention, was some part of the -- the annotation at

20   2702, which says, in part, and I'm quoting, "Subpart one of

21   section" -- excuse me -- "of Rule 702 calls for a quantitative

22   rather than a qualitative analysis."

23             And parenesis, mine, "(just what you're talking

24   about.)"  Close parenesis.

25             Continuing, The amendment requires that expert
```

1   testimony be based on sufficient underlying -- quotes within

2   quotes -- facts or data, close quotes within quotes, the term

3   data, in quotes, is intending to encompass the reliable opinion

4   of other experts.  And then excerpting, the language facts or

5   data is broad enough to allow an expert to rely on -- not

6   applicable thereafter.

7          So you wanted to bring it to our attention; we looked

8   at it yesterday; I looked at anew with her, but what you have

9   to understand is that I understand that, the annotation, but

10  that's not binding on me, okay?  It's instructive, it's not

11  binding and I'm not high hatting it saying I got all the

12  answers.  It must be pretty apparent that I don't, but the fact

13  of the matter is that this analysis -- this

14  quantitative-qualitative issue has been addressed, and we

15  talked about it every so briefly in the morning session; and

16  that is in the copyright realm -- and you say, Judge, that's

17  copyright, and where is the trademark analysis?  Well,

18  seemingly, there is no trademark analysis, but can this court

19  rely on the copyright analysis because of the allied -- and I

20  use that term advisedly -- the allied fields, and in relying on

21  it, can I -- well, let me just say:  Can I rely on it?  The

22  answer is absolutely I can.  Why can I rely on it?  Because it

23  is, as I said, allied -- okay? -- closely allied, as a matter

24  of fact, analytically allied and therefore I look to these

25  cases -- to these cases and one -- first case -- thank you --

```
 1   first case is Frank Music Corp. v Metro-Goldwyn-Mayer, Inc.,
 2   886 F.2d 1545 at 1548-50.  It's a Ninth Circuit 1989.  And in
 3   that case, the court said, in part, quote, "If the District
 4   Court relied exclusively on a qualitative comparison and failed
 5   to consider the relative quality" -- parenthetical, "mine,"
 6   qualitative, close parenthetical -- "or drawing power of the
 7   show's various component parts (eight factors), it erred."
 8   "Erred" is the proper pronunciation, I might add -- close
 9   quotes, okay?
10           Now, moving on, Cream Records v. Joseph Schlitz -- a
11   beer that was very prominent in days gone by and now has run
12   its course apparently -- Ninth Circuit 1985, 754 F.2d 826, and
13   it says, in part, at page 828, 829, "Where it is clear" --
14   excerpt, excerpt, "that not all of the profits are attributable
15   to the infringing material, the copyright owner is not entitled
16   to recover all of those profits merely because the infringer
17   fails to establish with certainty the portion attributable to
18   the noninfringing elements.  In cases such as this where an
19   infringer's profits are not entirely due to the infringement
20   and the evidence suggests some division" -- and this is the
21   most important part of this quote -- "some division which may
22   rationally be used as a springboard, it is the duty" -- look
23   it, when the circuit court goes writing, I'm telling you, they
24   over and over the verbiage they're going to use; they just
25   don't wing it, okay?  Somebody -- there have been three judges,
```

```
 1    nine law clerks, umpteen interns, they're all looking at this,

 2    okay?  So when they say it is the duty of the court to make

 3    some apportionment, they're not kidding.

 4            Now, what I'm telling you is that as much as I

 5    commiserate with you -- and I do, I really do.  I understand

 6    what you're saying.  You're saying, effectively, first they rip

 7    me, and then they do this.  "Rip" being infringe, they infringe

 8    me, and then they do this, okay?  "This" being they give me the

 9    quantitative and -- on this amorphous qualitative.

10            And you can massage this, Judge, any way you want,

11    and that's exactly what this man is doing.  I'm not endorsing

12    this, I'm just saying that's your argument.  And you don't

13    think that argument is apparent?  Of course it's apparent, but

14    this is a weighing process, hopefully an informed weighing

15    process, and I subscribe intuitively to the -- and

16    commonsensically, I believe, to the analysis that you just

17    don't cut things off at quantitative.  They're entitled to

18    include qualitative, and I'm going to get to some quotes later

19    on.  It's up to you to argue about it.  I mean, you know, you

20    make anything up.  First they do this, ladies and gentlemen,

21    infringed to a fair-thee-well and then guess what they then do?

22    Then they come in and say, Oh, by the way.  I'm going to lob

23    this out there and say I can divine that the percentages are as

24    follows, and I can divine that the impact was as follows.

25            Here's the thing, Mr. Cohen:  It isn't a question of
```

```
 1   me choosing sides one way or another; I could see both sides.

 2   If you said which side do you like the better, which is -- you

 3   know, probably yours.  But so what?  They're entitled to their

 4   side is what's going on here, and I don't need to gratuitously

 5   give you my view, but, you know, I shake my head.  You don't

 6   think I understand maybe this touchy-feely approach that he's

 7   using?  And we know the reasons he says he's using it, and

 8   there may be some moment to that.

 9        I think in the last analysis that unless with these

10   remaining factors -- and I'm going to let Mr. Wegner examine

11   regarding these factors unless there are some -- some different

12   considerations in the balance of these factors than we've

13   already had that would cause me to believe that one or more of

14   the factors are suspect, I'm preliminarily inclined to say you

15   can use them.  That doesn't mean I endorse -- not my function

16   at this stage, at least.  Doesn't mean that I endorse their

17   view.  It just means they're entitled to their view.  There's a

18   difference there -- okay? -- with a distinction.

19        So there we are, and I think as much as you'd like to

20   go further probably now, I don't need it now; I need to get

21   some control over the balance of the proceeding, and I admit to

22   spending a lot of time verbally/analytically, but it's helped

23   me.  And, again, you get back to does it -- we get back to the

24   jury and whether they need the assistance of an expert.

25        I'm -- almost guarantee you that you're not going to
```

1  have somebody who vapor smokes or whatever it is use these --

2          THE CLERK:  Vaping.

3          THE COURT:  Vaping.  I don't think you're going to

4  have any vapers on this jury.  Number one, you won't have them.

5  If you did, one of you might exclude them -- okay? --

6  likelihood.  So where you go here is the jury doesn't know

7  anything about this world; this is a world onto themselves, and

8  the jury needs to help.  The jury doesn't know how -- how do

9  you sell in this industry?  Well, you're going to have

10  testimony, Hey, look it, I can't advertise.  It's going to be

11  testimony:  I can't advertise in the traditional way.  I am

12  committed to going the way that I, in this case Mr. Martin,

13  am -- or my client is -- I'm committed to going the route that

14  I'm describing for you.

15          So I'm beating on it too much.  You know the basis of

16  my ruling.  You obviously are entitled to have the circuit

17  review it, and I once again add:  Not for a moment can you not

18  add, Hey, this is poppycock.  This is pie in the sky.  You're

19  making this stuff up.  First you infringe it, and then you make

20  it up.  That's bad, jury.

21          MR. COHEN:  May I address the *Frank Music* and *Cream*

22  *Records case, or you were just telling me* --

23          THE COURT:  You know, I'd like to let you, but I

24  don't think so.  I appreciate your politeness.  I don't think

25  it's appropriate.  I made a ruling.  No.  No, nicely.

```
 1          MR. COHEN:  Okay.  So are you ruling on the motion --

 2   okay.  So I am clear, what's the ruling?  What's this man going

 3   to be testifying about?  Are you saying you've ruled on the

 4   motion in limine?  Is that what you --

 5          THE COURT:  No, I haven't ruled on, totally, the

 6   motion in limine; I ruled on one factor, the first factor.  I

 7   haven't ruled on the other eight factors, but the

 8   approach I'm -- if the underlying analysis on the other eight

 9   factors -- and he's already alluded to three or four of them --

10   is the same, or in large measure it's going to be same, you're

11   going to have the same ruling.  That's what I'm saying.

12          Now, to the extent that it's different on the other

13   factors, you don't have a ruling, and I haven't given you a

14   ruling on the other part of this analysis.  You got the

15   factors, and now you want to ascribe something to them, and

16   what's left over you're going to give me.  And what I'm saying

17   to you is that this is -- this is a little farther out

18   qualitatively.  This is a little more extreme.  You're asking

19   for a little more room, defendant, in this qualitative arena

20   than you're -- you know, you're taking it to way out there.

21   How far can you go on this, and can you go on these percentages

22   like this or, instead, can I rule -- I'll ask you this:  Can I

23   rule you could use the -- you know, I don't know that you want

24   to do this, frankly, forensically, but that's up to you.  Can I

25   rule?  I'll let you -- here's your factors and get your expert
```

```
 1   to do so, but I'm not going to let you use the percentages
 2   because I don't buy the way he's saying, Well, I've got to rank
 3   them.  What's your position on -- you want to have his
 4   rankings?  Mr. Anson makes a good point on eight to 12.
 5   There's a 50 percent difference.  What kind of -- what's the
 6   degree of accuracy?  You just ask yourself, jury, what is the
 7   degree of accuracy here when you're talking 50 percent?  I'd
 8   love that; I'd like to argue that.  It's a major argument.  So
 9   I don't know.  You could say I don't -- if you're going to let
10   that first part in, then be my guest.  Get the second part in
11   because I don't want to argue.  I don't want him to put some
12   figures on here, and I don't want to argue.
13            What do you want to do?
14            MR. COHEN:  Oh, I definitely want to try to keep the
15   figures out.
16            THE COURT:  Okay.  Then --
17            MR. COHEN:  But when I say that, I mean each -- for
18   each of the factors, and the resulting ten percent.
19            THE COURT:  And what?
20            MR. COHEN:  The resulting ten percent.  I don't want
21   that number coming in either.  I want to have the chance to
22   persuade you that's it's not appropriate.
23            THE COURT:  Okay.
24            Then let's go with -- thank you.  Let's go with
25   Mr. Wegner, and I want you -- go through the remaining factors
```

1  and find out if there's any -- what basis -- factors as I've

2  gotten them down in my notes here are --

3          MR. COHEN:  Your Honor, the table that we provided,

4  that one page, that lists the factors.

5          THE COURT:  Right here.  Right here.

6          MR. COHEN:  That's right.

7          THE COURT:  Let's go through the next factor:

8  Premium classification.

9          Go ahead.

10          MR. WEGNER:  Okay, Your Honor.  Can I just ask a

11  point of clarification?  It will help me direct the questioning

12  better.  What are you asking me to accomplish by going through

13  each factor in light of the discussion we just had?

14          THE COURT:  Well, is the -- is your reasoning in

15  selecting this factor as contributing to value any different

16  than the reasoning you've already expressed as regards to the

17  umbrella brand?

18          MR. WEGNER:  Okay.

19          THE COURT:  You can just ask it that way.  Let's look

20  at the premium classification.  Same reasoning?  Or you got

21  some different reasoning?  That's what I'm looking for.

22          MR. WEGNER:  Understood, Your Honor.

23                          **EXAMINATION**

24  BY MR. WEGNER:

25  Q.   Okay.  Mr. Martin, the next factor in your analysis, your

1    apportionment analysis is premium classification.

2           Can you describe what "premium classification" means.

3    A.   One Hit Wonder has developed an array of products that are

4    marketed in the eLiquid industry as a premium or upper-tier

5    e-liquid product.  The reasons for the classifications begin

6    with the quality of the components, the raw materials that are

7    used within the liquid development process.  They use the

8    highest food grade, vegetable glycerin and propylene gylcol,

9    which VG and PG are the base components of e-liquid fluid, and,

10   more importantly, their nicotine is 100 percent American grown

11   and American extracted; and the vape community in all my

12   research has shown an appetite for USA-grown nicotine products

13   as being representative of a premium product.  The majority of

14   manufacturers out there are sourcing nicotine products from

15   either Indonesia or China, and they're considered to be a

16   lower-quality nicotine.

17          The -- my research -- and, Your Honor, forgive me if

18   I repeat myself here.  This goes back to everything I reviewed

19   in terms of blog posts, in terms of discussion forums, industry

20   influencers.  That will be a consistent theme throughout all

21   these factors as to where I got my information.  But the

22   customer reviews consistently touted the premium nature of the

23   product that was provided by One Hit Wonder, and the premium

24   product is embodied within a vape that is much smoother to

25   vape, doesn't have a harsh throat hit.  The fact that they use

```
 1   more VG content in their vape juices allows vapers to vape the
 2   juices at much higher wattages, and this is important because
 3   in this industry, which is much different than the eCigarette
 4   industry, the Cygolite products, which are emulating the look
 5   and feel of a cigarette, the devises are much more complicated.
 6   We've seen a transition over the last four years from -- from
 7   smaller wattage devices and mechanical mod devices to digital
 8   devices that are capable of putting out 300 watts of power.
 9           So you're starting to see juices not only be vaped at
10   higher wattages so that the juices have to be targeted with
11   high-quality components, but at higher wattages -- if you don't
12   have the premium ingredients, you're going to be struggling.
13           So my research came across a lot of the industry
14   influencers, every single one of the industry influencers --
15           THE REPORTER:  I'm sorry.  Every what?
16           THE WITNESS:  Every one of the industry influencers
17   that I had a chance to review product review videos,
18   consistently touted the premium quality nature of the product
19   being offered by One Hit Wonder, whether that be Milkman,
20   Muffin Man, Rocket Man, My Man, or Policeman, to a lesser
21   extent, because the flavor didn't perform; but in terms of the
22   quality of the vape, it was definitely there, and it was
23   consistent.
24   Q.   Thank you.
25           (Discussion held off the record)
```

```
 1              THE COURT:  Okay.

 2              We had the testimony on factors one and two.  I think

 3    that three, four, and five are more or less the same -- I

 4    understand from the pleadings what -- and the associated

 5    statements of the experts, I understand the basis upon which he

 6    says this is a value contributor.  I want to -- let's go to

 7    six, seven, and eight.

 8              Go to six, please, Mr. Wegner.

 9              MR. WEGNER:  Yes, Your Honor.

10    Q.   Okay, Mr. Martin, factor six is relationships with

11    industry influencers; is that correct?

12    A.   Yes, it is.

13    Q.   Okay.

14              What is the basis for your conclusion that was a --

15    that is a value driver that needs to be considered in this

16    case?

17    A.   Again, obviously, through all my research and experience

18    in this industry and discussions with management, one of the

19    most important elements of a grass roots marketing campaign is

20    to reach out to industry influencers to get them to review your

21    products and convey their positive reviews to their networkers'

22    sphere of influence.  The industry influencers, I think in a

23    supplemental declaration or something, we provided a list of

24    those industry influencers and their various following across

25    their social media presence, whether that be Facebook,
```

```
 1   Instagram, Snapchat, et cetera.  The industry influencers not
 2   only do -- did they absolutely love the One Hit Wonder product
 3   line, they touted the premium nature of it; they touted the
 4   high-quality flavors that were spot on; and then they conveyed
 5   these messages to their groups of followers which subsequently
 6   allows those people who acquired that information to show that
 7   with their personal network of influence.
 8            So it's one -- it's one of the important aspects of
 9   the grass roots marketing campaign; it goes along with social
10   media, developing personal connections with our fans.  This
11   develops a connection with industry influencers who then go out
12   and tout our product to their sphere of influence.
13   BY MR. WEGNER:
14   Q.   In --
15            THE COURT:  Go ahead.
16   BY MR. WEGNER:   --
17   Q.   I was going to just ask if you could provide a definition
18   for exactly what you mean by "industry influencer."
19   A.   "Industry influencer" is broadly defined -- and this can
20   be found in my supplemental report -- includes YouTube, your
21   product reviewers, and Vape.  It will be newsletters, forums,
22   vaping review sites.  Some of them that I believe I provided
23   included The Vapor Chronicles; Vapor Trail Channel; Flava --
24   F-l-a-v-a -- Chaser; Vaping Insider; Vaping 360; even on Zophie
25   Vapes.  She has a huge YouTube following of 80,000 people.  And
```

1    this just gives additional access to potential customers in a

2    market that is very, very closely defined and is niche in

3    nature.

4            THE COURT:  Mr. Wegner, have you addressed how the

5    company creates these relationship?

6            MR. WEGNER:  That was going to be my next question,

7    Your Honor.

8    Q.   How did you assess how the company creates the

9    relationships with industry influencers?

10   A.   The next thing is there's two aspects of it.  These

11   industry influencers are constantly canvassing the market for

12   products that have gained favor of customers and vapers out

13   there, but the company actively reaches out to these industry

14   influencers to chat with them about their products, to send

15   them products reviews, for upcoming videos.  It's an important

16   aspect and building block of the grass roots marketing campaign

17   to spread the word about the quality of the One Hit Wonder

18   umbrella brand of products.

19   Q.   How did you determine that the defendants were doing that?

20   A.   I had actual conversations with management -- Rob Hackett

21   and I went through this in detail, and William Hackett -- but I

22   also went out also and found all videos of these product

23   reviews being conducted by the industry influencers.

24   Q.   Okay.

25           THE COURT:  Mr. Cohen, do you want to question him on

1   that?

2            MR. COHEN:  Yes.

3                    **EXAMINATION**

4   BY MR. COHEN:

5   Q.   Mr. Martin, can you please point in the sources -- in your

6   report, you listed the documents and other sources.

7            Can you please identify in your report where you list

8   your sources, where you found those influences, so we can look

9   at them ourselves.

10  A.   Yeah.  I believe --

11  Q.   I want you to take the report --

12  A.   -- I believe we have a discussion in my deposition about

13  this very point, that that list was not provided in the report,

14  and I --

15  Q.   Say again?

16  A.   That list was not identified in the report, but it was

17  provided in deposition.

18  Q.   So when I look at your report, I can't find those sources,

19  can I?

20  A.   Those sources are not included in the report.

21  Q.   List for me all the influencers you relied on and where

22  they're found.

23  A.   The primarily influencers, to the best of my recollection,

24  included, as we just mentioned, *Vapor* Chronicles; *The Vapor*

25  *Trail Channel*; *Vaping 360*; *Vaping Insider*; *Flava* --

1   F-l-a-v-a -- *Chaser*; *Zophie's Vapes*; and *Matty Ice from*

2   *Convicted Vapes*.

3   Q.   Have you listed all of them?

4   A.   To the best of my recollection.  There may have been

5   others, but I can't recall.

6   Q.   They're not listed anywhere in either of the reports,

7   correct?

8   A.   The industry influencers are not.

9        MR. COHEN:  No further questions on this particular

10  issue, Your Honor -- oh, no, I'm sorry.  I do have a couple

11  more follow-up questions.

12  Q.   Now, if I'm understanding this correctly, industry

13  influencers, if one of these influencers says something

14  positive about one of the defendant's products, then that helps

15  drive sales, right?  That's the bottom line.

16  A.   In a nutshell, that's ultimately giving the product line

17  additional exposure and impressions in the marketplace, which,

18  thus, the hope is that it translates into actual sales.

19  Q.   Did you make -- and so, in other words, someone looks at

20  that person and looks at their site, gets some information and

21  then decides to buy the product.

22       Did you make any effort to look at things like

23  click-throughs or anything like that to quantify this affect?

24  A.   I would not have had access to their click-through

25  information.

1  Q.   You said a couple times that -- talking about your

2  experience in the eLiquid industry.

3          Are you contending that you're an expert in the

4  e-liquid industry?

5  A.   I've only contended that I have a strong knowledge and

6  understanding about the eLiquid industry.

7  Q.   Okay.  So you're not contending you're an expert in

8  eLiquids, correct?

9  A.   Correct.

10  Q.   Now, let's talk about that experience.

11          What experience are you specifically referring to?

12  You talked about -- you actually use the stuff, right?  You

13  vape.  You smoke the stuff, right?

14  A.   I have used the products and been actively participating

15  in the industry for four to five years.

16  Q.   By "actively participating," you buy these products, and

17  you vape them or smoke them or whatever, right?

18  A.   I buy eLiquid products.  I do research.  I purchase

19  hardware, and I do a lot of research on products.

20  Q.   Okay.

21          And you said you'd been retained as an expert in some

22  capacity for another eLiquid company?

23  A.   For -- I was the expert in the *Spark Industries v. V-Tech*

24  *International* case.

25  Q.   Okay.

1        And did you -- did that case go to trial?  Did you

2   testify?  What was that --

3   A.   That case entailed the submittal of my expert report and I

4   believe settled the day before my deposition.

5   Q.   Okay.

6        Okay.  So you didn't testify in that case, right?

7   A.   I provided an expert report, and I believe a supplement

8   report.

9   Q.   Okay.  I'll rephrase.

10       You weren't deposed, right?

11  A.   I was not deposed.

12  Q.   And it settled before the case went to trial so you didn't

13  testify at trial, right?

14  A.   Correct.

15  Q.   Any other professional assignments for eLiquid companies

16  other than the one you just mentioned?

17  A.   The only other valuation assignment in the eCigarette

18  industry was related to two years ago, an eLiquid company asked

19  us to value one of their fundamental patents for an eCigarette

20  product.

21  Q.   Any other experience you're relying on that you're saying

22  is the basis for your experience.  So when you say -- when I

23  testify about based on my experience, what other things are

24  drawing upon other than what you just told me about?

25  A.   It's the experience from those cases; it's the access to

```
 1  people involved in those cases; discussions with management for

 2  our respective clients and the associated research that I did

 3  in regards to the issues in that case -- those cases.

 4  Q.   All right.

 5       You mentioned one of the influencers, and you

 6  mentioned a number of -- I think you said viewers you had or

 7  something like that.

 8       Do you recall?

 9  A.   I made a reference to Zophie's Vapes, yes.

10  Q.   And is that a website or a YouTube channel?  What is it?

11  A.   It is a YouTube review.

12  Q.   Okay.

13       You mentioned a number.  What was that number?

14  A.   I mentioned that YouTube review had over 80,000 views.

15  Q.   These other sites that you mentioned, were they websites?

16  Were they YouTube sites?  What were they?

17  A.   The product -- the majority of the product reviewed video

18  reviews for YouTube reviewers, and then there were product

19  reviews proffered on websites for *Vaping Insider*, *Vaping 360*.

20  And I'm not certain if that was all, but I believe that covered

21  everyone --

22  Q.   Okay.

23       And you didn't save any of those videos that you

24  looked at or that you're relying on, correct?

25  A.   I'm sorry.  Could you please repeat that question.
```

1   Q.   You didn't download or record for yourself, save copies of

2   any of the videos you're referring to, did you?

3   A.   I did not download the videos, no.

4   Q.   Okay.

5        And the websites, you didn't download the websites

6   and save those, correct?

7   A.   I believe at some time, some of that information was

8   downloaded and provided to the court.

9   Q.   So the only time it was provided was in those -- the

10  supplemental declaration you filed after your reports and after

11  your deposition.  Are you talking about materials that you

12  attached to your -- as part of your declaration?

13  A.   I can't say for certain that that was the only time, but

14  that was the first time it was provided.

15  Q.   Okay.

16       Well, let's make sure we know what we're looking at.

17       May I approach, Your Honor?

18            (Discussion held off the record)

19       THE COURT:  We're up here waiting for you.  It didn't

20  look like it, but we were ...

21       MR. COHEN:  I'm sorry.  When I hear the static, Your

22  Honor, I assume that you're conferring, and I'm waiting.

23       THE COURT:  No.  I appreciate it but go ahead.

24       MR. COHEN:  Okay.

25  Q.   Mr. Martin, you've been handed the document at the --

 1  that's entitled, "Declaration of Daryl Martin in support of

 2  defendant's further brief in opposition to plaintiff's motion

 3  in limine No. 1 re: expert testimony," and at the top of the

 4  page, it says, "Document 258-1."

 5          Do you have that?

 6  A.   Yes.

 7  Q.   Is that the declaration you were referring to where you

 8  said that was the first time you provided the materials you had

 9  looked at, the Internet materials that you had looked at?

10  A.   To the best of my recollection, yes.

11  Q.   Okay.

12          And this was filed -- you can see at the top of the

13  page -- April 17, 2017.  So this was filed about six weeks

14  after your supplemental report, right?

15  A.   I believe my supplemental report was March 3rd.  So that

16  sounds about right.

17  Q.   Okay.

18          And these materials weren't in your -- either your

19  original report or supplemental report, correct?

20  A.   I don't believe they were identified in those reports.

21  Q.   Okay.

22          Turning for a moment to those number of views -- I'm

23  sorry.  Which YouTube channel is that for the number of views?

24  You mentioned a YouTube channel that had like 80,000 views or

25  something like that?

```
 1   A.   I mentioned that there was a review of The Milkman

 2   performed by Zophie's Vapes that had over 80,000 hits.

 3   Q.   Okay.

 4        And do you know were they unique or people were --

 5   repeat or anything like that?

 6   A.   My understanding is that those are unique views.

 7        MR. COHEN:  Your Honor, I have no further questions

 8   with regard to the factors on No. 6, but with your permission,

 9   I would like to ask a few follow-up questions on factor No. 5,

10   the media strategies with regard to quantification if I may.

11        THE COURT:  All right.

12        MR. COHEN:  Thank, Your Honor.

13   Q.   You talked about -- you've testified a few minutes ago

14   about the social media strategies you called robust social

15   media strategy by the defendants.

16        Do you recall that?

17   A.   Yes.

18   Q.   How many Twitter followers do the defendants have on their

19   Twitter sites?

20   A.   Do the defendants?

21   Q.   Yes.

22   A.   I don't have those numbers readily available.

23   Q.   Okay.

24        How many followers do they have on any of their

25   Instagram accounts?
```

1  A.   To the best of my recollection, I thought I recalled

2  80,000 Facebook followers and 35,000 or so Instagram followers.

3  Q.   What about Snapchat?

4  A.   I don't recall the specific numbers.

5  Q.   Did you measure the number of -- did you do any evaluation

6  of the reach of any of these sites?

7  A.   I'm sorry, sir.  I don't understand what you mean by that

8  question.

9  Q.   Okay.

10      Did you look at the number of "likes" or "shares"

11 when people are sharing images back and forth or "likes" or

12 anything like that?

13 A.   Specifically, with Instagram I went through hundreds of

14 postings and clicked through the pictures to get a sense of how

15 many people were following and "liking" the various pictures.

16 Q.   Uh-huh.

17 A.   As well as any commentary that was being provided in

18 relation to those.

19 Q.   Did you look at the -- now, the company has access to its

20 own data about click-throughs from its own sites, correct?

21 A.   Click-throughs from what?

22 Q.   For example, if someone is on their Twitter account and

23 they click on something from their and follow through, there's

24 a way to measure that, and the company has access to that data,

25 correct?

```
 1   A.   I'm not certain of the data they have.

 2   Q.   Did you make an attempt to find out if they have that

 3   data?

 4   A.   I don't recall if we had those discussions.

 5   Q.   Okay.

 6        Did you make any effort to determine about

 7   click-throughs or anything from the defendant's Instagram

 8   accounts?

 9   A.   Same answer as the previous.

10   Q.   Meaning you don't recall if you asked them about that or

11   if it came up?

12   A.   I don't recall if we had that discussion about

13   click-through traffic.

14   Q.   But that's something that can be measured, right?

15   A.   It depends on what measurements are available to them.

16   Q.   Sure.  They have measurements for their own websites and

17   their own social media sites, right?  I do for my own law firm.

18   A.   I reviewed the number of followers for each of those

19   respective in relation to the plaintiffs as well as some other

20   brands --

21   Q.   Okay.

22   A.   -- competing brands, and they had a much larger presence

23   than the defendant, or than the plaintiffs, and a greater

24   presence than a number of the other competing --

25   Q.   That wasn't my question, Mr. Martin.
```

```
 1             My question was did you do any evaluation to see what

 2   kind of -- how much traffic was being driven from either the

 3   Twitter or Instagram or Snapchat or Facebook to sales?  Did you

 4   make any effort to measure that?  I think the answer is no?

 5   A.   Before I answer that question, I think the context in

 6   which you're framing is improper.

 7             The analysis was about determining what the grass

 8   roots marketing effort through social media was.  How many

 9   people were following One Hit Wonder products, and then

10   Facebook gave us the platform to interface with our customers

11   and then extend our reach to their friends and their social

12   networks.  So that traffic can never be measured.

13   Q.   Well --

14   A.   Therefore, just knowing what click-throughs from Facebook

15   took place would not accurately capture the extended breadth

16   and reach and impressions that are garnered through a social

17   media strategy.

18   Q.   You said something important just a moment ago.  You said

19   that cannot be measured.  What is it that cannot be measured?

20   A.   What can't be measured is how many people, the followers

21   of One Hit Wonder social media pages, how many people they then

22   interact with in their social networks and discuss and talk

23   about the quality of the One Hit Wonder products.

24   Q.   Okay.

25             Well, can you please refer to the table, that
```

```
 1    one-page table, you referred to a few times.  I just want to
 2    make sure I'm understanding how to read this.
 3            Looking at factor five, the social media strategy --
 4    and you've assigned the percentages -- I'm not going to ask
 5    about that -- but I want you to assume for the sake of my
 6    question that you're assigned a number of ten percent there --
 7    okay? -- just assume that.  I just want to make sure I'm
 8    reading this correctly.  And based on the earlier stipulations
 9    of the parties that the gross products are about $6.2 million,
10    give or take, based on your analysis, you're saying that the
11    damage number should be reduced by, again, if the number were
12    ten percent, by $600,000, right?
13    A.   Reduced by 600,000?
14    Q.   Right.
15            In other words, again, assume that factor five -- you
16    were to sign a ten percent figure to, just assume that.  I just
17    want to make sure I'm reading this correctly that the amount of
18    damages that should be awarded to AOP for that -- because of
19    that factor should be reduced by ten percent of that
20    $6.2 million figure for approximately a $600,000 hair cut,
21    right?
22    A.   Under the assumption that --
23            MR. WEGNER:  Your Honor, can I object?  I apologize.
24    I'm really not clear on what the hypothetical is saying here.
25            THE COURT:  Are you objecting?
```

```
 1              MR. WEGNER:  Well, I guess it would be a
 2    vague-and-ambiguous-type objection, but, yeah --
 3              THE COURT:  That's an interesting characterization.
 4    I guess it would be vague and ambiguous.  That's classic.
 5              What's your -- rephrase.
 6    BY MR. COHEN:
 7    Q.   I just want to make sure I'm reading your table correctly
 8    because you're saying at the end -- you apply this analysis,
 9    and you should reduce the damages of the gross profits, and it
10    should be, according to you, no more than ten percent.  I just
11    want to make sure I'm reading the rest of the table correctly.
12    For example, for a factor five of the social media strategy,
13    again assume the number is ten percent, you give a range of
14    eight to 12 percent, but assume that one were to assign ten
15    percent to that, then you're saying that the damages that
16    should be awarded to -- from the defendants to AOP should be
17    reduced, that figure, that $6.2 million figure, should be
18    reduced by ten percent, by 620 grand, give or take .
19              Would that -- am I reading this correctly?
20              MR. WEGNER:  If I could just interpose one comment.
21    This is not Mr. Martin's table.  That's, I think, the problem
22    there.
23              MR. COHEN:  The question where I'm confused --
24              MR. WEGNER:  It' a table that we've been talking
25    about, but it's not something Mr. Martin created.
```

```
 1              THE COURT:  Misstates the evidence is what you're
 2   saying.
 3              MR. WEGNER:  That's what I'm saying, yes.
     BY MR. COHEN:
 4
 5   Q.   Well, Mr. Martin, in your report you say that because no
 6   more than ten percent of the sales should be attributable to
 7   infringement, you came up with a number roughly 420 grand, give
 8   or take, 424,000 I think was the number in your report.
 9              So that number, that ten percent figure, you do a
10   mathematical calculation.  You say ten percent of the higher --
11   ten percent of that $4 million figure; so you should -- the
12   jury should only award 420-some-odd-thousand dollars.  That's
13   your opinion, right?
14   A.   That was my conclusion in Exhibit 1 to my report, yes.
15   Q.   So for each of these factors, essentially what you're
16   saying is based on this table, there's a hair cut for each of
17   these factors that they contributed to sales, and therefore it
18   isn't infringement, it's some other thing; and for each of
19   these factors, you're saying, okay, there should be a hair cut
20   of ten percent or 15 or 12 percent or whatever -- I mean,
21   that's basically what you're saying, right?
22   A.   I think in a summary form, yes.  I think that's what we're
23   saying.
24   Q.   Thank you.
25              Are there ways to estimate or quantify the value of
```

1    an influencer based on the number of followers they have?

2    A.   Sitting here nothing jumps out at me in terms of standard

3    metrics that could be applied to that.

4    Q.   Okay.

5         But do you know whether the defendants or anyone in

6    the industry pays or in some way compensates influencers?

7    A.   My general understanding of influencers across -- and not

8    just eCigarette industry, there are paid -- paid compensation

9    for -- for product endorsements, yes.

10   Q.   Uh-huh.

11        Do you know whether any of the influencers in this

12   instance were paid?

13   A.   Paid by the company?

14   Q.   Yes.

15   A.   I'm not aware of this list of influencers -- influencers

16   that were paid by the company.

17   Q.   Would you say as a general manner that companies would

18   typically pay more for influencers that have many followers

19   than fewer followers as a general rule?

20   A.   I think you can't just look at that in isolation because

21   the quality of the influencer, the reputation they have, all

22   that comes into play, and followers is one of those attributes

23   that would be considered, yes.

24   Q.   Uh-huh.

25        So all other things being equal, someone who had a

```
 1  million followers would be compensated more, paid more, than

 2  someone who had $10,000?

 3          MR. WEGNER:  Calls for speculation.

 4          THE COURT:  Overruled.

 5          THE WITNESS:  I think as a general rule, that would

 6  be accurate.

 7  BY MR. COHEN:

 8  Q.   Okay.

 9          And in arriving at the -- excuse me -- the percentage

10  range with regard to the social media strategy or the industry

11  influencers, those ranges you provided, that's based on your

12  experience that you testified about earlier?

13  A.   It's based upon my experience, but it's also based upon

14  the relative assessment of that factor in relation to the other

15  eight factors.

16  Q.   Okay.

17          Your Honor, I have no further questions about factor

18  No. 6.

19          THE COURT:  Thank you.

20          Let's go on the next factor.

21                          EXAMINATION

22  BY MR. WEGNER:

23  Q.   Okay.  No. 7, Mr. Martin, this relationship of

24  distributors and wholesalers, can you please describe what you

25  mean by that value driver.
```

```
 1    A.    "Also is not affiliates" --

 2    Q.    "Relationships with distributors and wholesalers."

 3    A.    Okay.

 4              So for a manufacturer such as -- as the defendants in

 5    this case, your distribution network is your lifeblood.  It's

 6    your means by which you get your product delivered to retail

 7    end points so your consumers can have access to purchase the

 8    product.

 9              If we have no distribution or -- through Steam

10    Wholesale, then we have no way of reaching the -- estimates are

11    there are possibly two to 3,000 or more retail end points for

12    sales of eLiquid products in this industry.  It's very

13    fragmented.  They're small mom and pop shops.  There are a

14    number of online retailers, but a company in its infancy, such

15    as the defendants in this case, with the launch of the One Hit

16    Wonder product line, they don't have the resources to be able

17    to go out there and sell product through to the thousands of

18    end points that are out there; therefore, they rely on a

19    distribution, and that distribution network is made up of

20    wholesalers, but it's also made up of master distributors and

21    subdistributors who have relationships and the means by which

22    to push product through to the end-point retailers.  It's --

23    it's one of the most important aspects of a manufacturer.  If

24    they don't have a distribution network to get their products

25    out into the marketplace and in the hands of consumers,
```

```
 1   consumers aren't going to purchase.  No matter what you're
 2   doing on the marketing side to promote new products to -- and
 3   on the product development itself in terms of developing a
 4   premium product, that is, a high-quality flavor, if you can't
 5   put that product in the hands of consumers through this
 6   network -- this distribution network, then you're going to fail
 7   miserably in sales performance; it's going to be dramatically
 8   less than anticipated.
 9   Q.   Was your basis for determining that that was a value
10   driver in this case different from your determination as to the
11   others?
12   A.   I follow the similar path of identifying the relevant
13   information in the industry and understanding how products flow
14   and move through the distribution channels, and ultimately the
15   conclusion came that this is an important aspect, and more
16   importantly I analyzed the sales data because having a strong
17   relationship with your wholesalers and your distributors, it
18   helps to facilitate the launch or introduction of new products,
19   and if we look at the monthly sales data for our subsequent
20   products releases of Milkman, Rocket Man, My Man, et cetera, we
21   see initial purchases from the distribution partners.  And
22   oftentimes they were purchasing the subsequent products sight
23   unseen, meaning they knew that we had realized success with the
24   previous product; therefore, they were willing to purchase a
25   product and sell it through the distribution channels.
```

```
 1              Even more importantly, if we look at the data, look
 2    for Policeman, Policeman is considered a failure, and although
 3    the initial launch of Policeman distribution -- our
 4    distribution network bought 1.2 million in our first full
 5    month, sales after that never exceeded $22,000 because the
 6    product didn't perform, and the distribution partners were not
 7    happy with having to eat a substantial amount of product.  And
 8    we see -- as a result, we see that impact across all of our
 9    products in the wholesale channel:  Muffin Man; Milkman;
10    Policeman; Rocket Man; My Man.  Every single product of the
11    defendants had declining sales in the month ensuing the
12    Policeman debacle.
13    Q.   Okay.
14              And the inferences that you just testified to, from
15    where did you draw those?
16    A.   From the Exhibits 3.2 and 4.1 to my expert report.
17    Q.   Okay.
18              And what are those exhibits?
19    A.   Those are the monthly sales spread sheets for the Steam
20    Wholesale and One Hit Wonder.  So they're wholesale sales by
21    product, by month, and the defendant's retail sales by product,
22    by month.
23              MR. WEGNER:  Your Honor, I think those are my
24    questions on factor seven as I understand the parameters of
25    what the court would like us to do.
```

```
 1                THE COURT:  Okay.

 2                Mr. Cohen.

 3                MR. COHEN:  A few questions, Your Honor.

 4                         EXAMINATION

 5     BY MR. COHEN:

 6     Q.   I want to make sure I understand the gist of your

 7     testimony, Mr. Martin.

 8                Is it your testimony that because the defendants had

 9     such a strong distribution network that led to increased sales,

10     the existence of that distribution network that allowed them to

11     sell more of the infringing product entitles to them to a

12     discount off the damages because of their infringement?  Is

13     that really your testimony?

14                MR. WEGNER:  Argumentative.

15                THE COURT:  What did you say?

16                MR. WEGNER:  I think this misstates testimony, too.

17                THE COURT:  Overruled.

18                THE WITNESS:  Can you please repeat that.

19                MR. COHEN:  Sure.

20                Can we ask the court reporter, please, to repeat the

21     question.

22                THE COURT:  Is it on your screen?

23                MR. COHEN:  It is not.

24                THE COURT:  Will you read it back, please.

25                (Record read.)
```

```
 1          THE WITNESS:  I think my testimony is that the

 2   distribution network helped to drive sales of One Hit Wonder

 3   products, and if it increased the sales of the entire product

 4   line, Milkman was one of those products, and without the

 5   distribution network, those sales would most likely not have

 6   taken place.

 7   BY MR. COHEN:

 8   Q.   I see.

 9          So because they had such a good distribution network,

10   it allowed them to sell more so they should get a discount off

11   the damages because they had a good distribution network, yes?

12   A.   The point is to properly -- or properly identify the

13   assets in place, or the value drivers in place, that are

14   helping to generate the sales and profitability of this

15   product.

16   Q.   In your report at page -- I'm looking at your supplemental

17   report.  I'm looking at page 18, if you look at the numbering

18   in the lower right-hand corner and page 16 at the top, you list

19   four categories of distributors.  You refer to master

20   distributors; subdistributor; wholesalers; and retailers.

21          Do you see that?

22   A.   Yes, I do.

23   Q.   Did you talk to any master distributors?

24   A.   I will short circuit this line questioning.  I did not

25   talk directly with any of the categories of individuals labeled
```

```
 1   in that.
 2   Q.   Okay.
 3        So you didn't talk to any master distributors, right?
 4   A.   Correct.
 5   Q.   You didn't talk to any subdistributors?
 6   A.   Correct.
 7   Q.   You didn't talk to any wholesalers?
 8   A.   Correct.
 9   Q.   You didn't talk to any retailers?
10   A.   Correct.
11   Q.   How many master distributors did the defendants have?
12   A.   I can't recommend in reviewing all the sales data.
13   Q.   How many subdistributors did they have?
14   A.   Same answer.
15   Q.   How many wholesalers?
16   A.   Same answer.
17   Q.   How many retailers?
18   A.   Same answer.  It's a lot.
19   Q.   But you don't know how many, right?
20   A.   I can't -- I'd have to go back to the full sales data
21   spread sheets that were submitted.
22   Q.   Did you -- you didn't talk to any of those folks.
23        Did you conduct a survey of any of those categories
24   of people?
25   A.   I think we already talked about the survey aspect in an
```

1   overall fashion.  I surveyed the landscape of retail websites,

2   of industry forums of blogs, of reviewers of influencers.  That

3   was my base of knowledge that I relied upon to develop my

4   understanding and analyze this company in this industry and

5   identify these value drivers.

6   Q.   Okay.

7        You didn't conduct any scientifically verifiable

8   customer or distributor survey, right?

9   A.   No.

10  Q.   Did you make any effort to determine for each of those

11  categories of distributors how many of them were repeat

12  customers so you could determine the strength of the

13  relationship?

14  A.   I did not.

15  Q.   Did you make any effort to determine how many of the

16  defendant's retail customers were repeat customers so you could

17  see that relationship?

18  A.   Patty Chan and I talked about some repeat customers, but

19  overall I had the conversation with the Hacketts early on, just

20  purely understanding the nature and the composition of the

21  network and the flex pricing model and understanding that they

22  had a number of key distributors and wholesalers in place.

23  Ejuices.com obviously is one of the more important ones, but

24  there were others.

25        We did have those conversations, but I did not have

1    discussions specifically with any of those.

2    Q.   Just a moment ago you said you -- someone said it was a

3    strong relationship or strong network.

4              Who said that?

5    A.   I've had so many conversations going back to July of last

6    year.

7    Q.   Someone inside the company, either, Ms. Chan or Mr. Robert

8    Hackett or William Hackett?

9    A.   It would most likely be one of those three.

10   Q.   Okay.

11             And did you attempt to identify or locate any

12   distributors who sold only premium product, whether on a

13   website or in any way, sold just premium product?

14   A.   In my research I did -- and I have done this briefly --

15   but I did do for this case a review of product listings on

16   prominent retail websites to try to get a determination as to

17   premium classifications, and some of those -- some of those --

18   a lot of those retailers will have their eLiquids broken down

19   by a premium classification, but many of them ended up just

20   having their liquids broken down by the umbrella brand or the

21   source identifier.

22   Q.   If you had wanted to, you could have looked at records

23   from the defendants and determined how many repeat players they

24   had who were mass distributors or subdistributors or

25   wholesalers?  In other words, when that customer first began

1  buying from them and then how many times they came back.  Did

2  you -- had access to those records, right?

3  A.   I wouldn't say the production in this case would provide

4  that information because the supplemental financial production

5  provided the sales information for the relevant damages period.

6  Therefore, if those customers made purchases prior to that

7  damages period, I would not be able to glean that from the

8  informing provided.

9  Q.   Okay.

10          Did you say, Hey, I'd like to see how many of these

11  master distributors, subdistributors, and wholesalers are

12  repeat customers?  When you first got them, how often did they

13  come back?  Did you make any effort to get that information

14  from the defendants?

15  A.   Ultimately, I had to fall back on the position of relying

16  on gaining a higher level of understanding of the distribution

17  network.  Time obviously was a factor in this case as there was

18  an enormous amount of document and general ledger detail and

19  sales spread sheets to review.  Time became a factor, and I was

20  able to, based upon, A, my knowledge and experience, but, B, my

21  analysis of the industry and of all the various retail and

22  wholesale websites that had product listings and getting a

23  sense of the fragmentation of the industry and how thousands of

24  manufacturing -- manufacturers were offering tens of thousands

25  of products, it gave me a comfort level with the company's

1   representations that they had good relationships with their

2   distributors and their wholesaler.

3   Q.   In essence you took your client's word for it, right?

4   A.   I did not just take my client's word for it; that is not

5   what I just said.  I took my client's word, and I confirmed it

6   with my research.

7   Q.   And what research was that to confirm the strength of

8   those relationships?

9   A.   It was to understand the nature of the industry in

10  relation to the importance of having distributors willing to

11  commit to your products in an industry that is so overcrowded

12  with products and new products, you know, were joining by the

13  hundreds in terms of the product mix out there.  So having

14  distributors and wholesalers being committed to your products

15  and being committed to your subsequent roll-outs and buying

16  them sight unseen, that gave me a strong indication that

17  Mr. Hackett's representations were an accurate depiction of the

18  situation.

19  Q.   I understand that that research would suggest that such a

20  thing as strong relationships would be important -- I can

21  understand that -- but how does that necessarily prove that the

22  defendants had such strong relationships?

23  A.   Ultimately, Mr. Cohen, this comes back to if they have no

24  distributors and wholesalers, 90 percent of their sales

25  disappear.

1    Q.   And therefore what?

2    A.   It's almost a nonsensical argument.  They had strong

3    relationships.  They were able to move over -- since inception

4    $20 million of eLiquid product at the wholesale and retail

5    level.

6    Q.   Okay.

7         Because they sold that, and they didn't -- you

8    figured -- you infer they must have a strong relationship with

9    distributors?

10   A.   I think it's a very -- it's very good evidence in support

11   of Mr. Hackett's representations.

12   Q.   Okay.

13        I have no further questions regarding factor No. 7.

14        THE COURT:  You have the last factor, Mr. Wegner.

15        MR. WEGNER:  May I ask one follow-up question on the

16   previous factor?

17        THE COURT:  Yes.

18        MR. WEGNER:  Maybe two?

19                        **EXAMINATION**

20   BY MR. WEGNER:

21   Q.   Mr. Martin, did you have access to the defendant's sales

22   data?

23   A.   Yes, I did.

24   Q.   Did that factor into your analysis of the distribution

25   networks?

1   A.    Absolutely.

2   Q.    Okay.

3          How so?

4   A.    This is similar to the discussion we had before.

5          The wholesale sales revenue, which is contained per

6   product on a monthly basis, which was provided in Exhibit 3.2

7   to my expert report, demonstrates the sales patterns for the

8   various products and demonstrates that new products were

9   launched and immediately accepted into the distribution network

10  and moved into retail outlets for ultimate sales to consumers.

11         This reinforces the distribution network; I think we

12  talked about this earlier, but also it demonstrates how you can

13  damage a relationship with your distributors and your

14  wholesalers through the introduction of a flavor that does not

15  perform and meet customer expectations.  And Policeman, again,

16  as we talked about, is a perfect example of that.  Sales in the

17  entire wholesale channel took a nose drive across all products,

18  not just the Policeman product.  Milkman right there, well, if

19  Milkman is 100 percent of the profits here, well, why didn't

20  Milkman take a nose dive in sales, had a declining sales trends

21  over the ensuing months after the debacle of Policeman

22  destroyed the wholesale channel for One Hit Wonder.

23         MR. WEGNER:  Nothing further on that topic, Your

24  Honor.

25         MR. COHEN:  I do have one follow-up question.

1 **EXAMINAITON**

2 BY MR. COHEN:

3 Q.    In that sales data, did it show you who bought?  Did you

4 have access who bought the goods?

5 A.    I'm not certain that the sales file for that particular

6 exhibit -- I'm not certain if the details were provided, but I

7 did have discussions with Mr. Hackett as to what happened, and

8 a number of distributors pulled back after the failure of

9 Policeman, and that's the extent of the information I have.

10        MR. COHEN:  Okay.

11        THE COURT:  Last one.

12 **EXAMINATION**

13 BY MR. WEGNER:

14 Q.    Okay, Mr. Martin, the ShareASale affiliate network, can

15 you describe what that value driver is.

16 A.    The SharASale network is another one of the marketing

17 assets, the grass roots marketing effort, that we've discussed.

18 So in this industry when you're restricted from traditional

19 media, when you're trucked from advertising on Google Ad Words

20 and some of the mainstream social media sites, the grass roots

21 marketing is everything.  This is one of those prongs from the

22 grass roots effort.  Facebook and Instagram, the robust social

23 media strategies, one of the primary marketing elements

24 curating relationships with industry influencers and then you

25 have ShareASale affiliates.  The affiliate network is an

1  incentive to provided to people to market and promote and

2  endorse the company's products.  And with that they're provided

3  with a link to the company's One Hit Wonder eLiquid.com site

4  that has code embedded in it to designate the affiliate is that

5  the providing the customer referral.  But the affiliate network

6  is really just another opportunity to leverage off of the

7  social -- friends/social networks of other individuals.  It

8  gives us an opportunity to incentivize people to continue to

9  talk up the quality of the One Hit Wonder product lines talk it

10  up to their friends, their social networks; get their social

11  networks talking about.  We're generating impressions that --

12  and positive impressions that is the ultimate goal to

13  ultimately drive sales of products at the retail level.

14  Q.   How did you determine -- what was your basis for

15  determining that this was a value driver in this matter?

16  A.   This is a value driver that is -- that is -- has a

17  commonality across most Internet-based businesses.  Companies

18  are constantly relying on affiliates to advertise and promote

19  to -- as a way to streamline the marketing efforts to reduce

20  marketing costs, to allow them to gain exposure to people who

21  may be previously didn't have access to their products.

22         The best part about affiliate network is a lot of the

23  advertising value goes uncompensated whereas only if somebody

24  ultimately uses that affiliate link to go to the company's

25  website and purchase the product is the commission paid, but

1    the impressions are still out there.  Whether or not that

2    person buys the product there, talks to their friends, goes to

3    a retailer and tests the product or purchases it from another

4    online retailer, it's all about garnering impressions because

5    brand impressions build up the stature and awareness of the One

6    Hit Wonder brand, which ultimately translates into sales.

7    Q.    What did you do in this case to evaluate the assured sale

8    affiliate network?

9    A.    The numbers that I was provided -- the statistics that I

10   was provided with by the company indicated that they had north

11   of 200-plus affiliates in the network that were endorsing their

12   products and actively promoting them.  Then I went out into the

13   marketplace looking for examples of those affiliate links.  I

14   think I may have -- I believe some were submitted -- examples

15   were submitted as to how they work.  Somebody is out there

16   endorsing a products telling everybody how wonderful it is;

17   then give a "click here" link to purchase the product, and that

18   affiliate link would then compensate them.

19          But the key is, as this is such a crowded space --

20   okay? -- and e-juice consumption is at an all-time high.  Your

21   Honor, I don't know if you understand how things have changed,

22   but digital devices are now dominating the category where

23   they're -- they're throwing out in excess of 300 watts of

24   power, which means that fluid is being consumed in a much more

25   rampant pace.  So as people are consuming a 30 ml bottle, you

1   can -- at ten milliliters a day, a 30 ml bottle is gone in

2   three days.  So people are much more -- do much more research

3   on understanding, looking to their sphere of influence before

4   they purchase a $26 bottle the of eLiquid that could last them

5   three days.  So that's where the ShareASale affiliate --

6   affiliates in general breach that gap to help give a trusted

7   endorsement to their -- to their networks that ultimately we

8   hope translates into a sale.

9          MR. WEGNER:  Nothing further on that topic.

10         MR. COHEN:  Few questions, Your Honor.

11                       **EXAMINATION**

12  BY MR. COHEN:

13  Q.   Now, I'm looking specifically at your supplemental report

14  at page 19, if you look in the lower right corner; page 17 if

15  you look at the top, and I'm looking at the portion talking

16  about the ShareASale affiliate network.  Do you see that?

17  A.   Yes, sir.

18  Q.   I'm going to read the first sentence, and I'll have a

19  couple questions.  "The defendants have an affiliate program

20  hosted with the ShareASale affiliate network.  The ShareASale

21  affiliate network, that's some sort of third-party network.

22  That's not the defendants, right?  There's some sort of third

23  party called ShareASale affiliate network, right?

24  A.   Yes, sir.

25  Q.   And the defendants had to pay some money to become -- to

1  be part of the network, right?

2  A.   I believe so.

3  Q.   And that was $650, right?

4  A.   I don't remember the exact figure.

5  Q.   Sounds about right?

6  A.   I don't remember the exact figure.

7  Q.   Okay.

8         Now, I'd like you to look at the last sentence of the

9  first paragraph of that section of your report.  You wrote the

10  following:  "When customers click through these custom links,

11  the traffic is recorded, and the affiliate is rewarded with a

12  sales commission if the customer makes a purchase."

13         Did I read that correctly?

14  A.   I believe you did.

15  Q.   Did you look at those traffic records?

16  A.   The only metrics I had in relation to this were the

17  numbers affiliates.

18  Q.   That wasn't my question.

19         Did you look at the traffic records?

20  A.   My answer answered that.  The only thing I looked at were

21  the number of affiliates.

22  Q.   Okay.

23         So you didn't look at the traffic records, correct?

24  A.   No.

25  Q.   All right.

```
 1              Did you ask to look at the traffic records?

 2   A.   Going back to July -- I don't recall.

 3   Q.   Okay.

 4              And that figure of 200 affiliates, that's nowhere in

 5   either of your reports, is it?  That's -- the first time I

 6   heard it was today.

 7   A.   I don't believe it's in either report, sir.

 8   Q.   So we learned some new stuff today.  Okay.

 9              Now, there are commissions for each sale, right?

10   A.   If, and only if, a sale is consummated based upon the

11   click-through of that link --

12   Q.   Right.

13   A.   -- if that customer decides to go directly to One Hit

14   Wonder eLiquid.com, that sale would not be recorded with the

15   affiliate; however, the impression has still been made.

16   Q.   Right.  But we've only been able to find two entries in

17   all of these tens of thousands of entries that reflected

18   anything to do with ShareASale.  There's an April 2015 entry

19   for $650 and a March 2015 entry that says, "Test, 59.99."  We

20   can find no other sales commission entries for the ShareASale

21   affiliate network.

22              Are you aware of any?

23   A.   I'm not certain where the Share of Sale Affiliate entries

24   would reside.

25   Q.   Okay.
```

```
 1              So as you sit here, do you know of a number for that?
 2   In other words, that's a measurable thing.  They would have
 3   paid "X" number of dollars in commissions based on "X" number
 4   of sales of product, right?
 5   A.   And I didn't analyze it from that perspective.
 6   Q.   Why not?
 7   A.   I analyzed it from the perspective of the ability of the
 8   network of affiliates to -- to -- to advertise and promote and
 9   endorse our products and garner impressions and generate good
10   will in the marketplace.
11   Q.   Okay.
12              But you do assign a percentage to it.  I'm looking at
13   the chart.  You give it a number.  So this is a readily
14   quantifiable thing.  How many sales were made by this group of
15   200 affiliates or 200-plus affiliates combined?  How many
16   bottles?
17   A.   Again, sir, the the impact of the affiliate network is
18   just not embodied within any identified commission.
19   Q.   That wasn't my question.
20              Do you know how many bottles were sold or how much
21   product was sold by this group, this network of 200-plus
22   affiliates?
23   A.   I don't believe that information was supplied.
24   Q.   And do you know dollar value of sales that were made
25   through these 200-plus affiliates?
```

1    A.   I don't recall if that was available.

2    Q.   Well, I haven't seen it anywhere, and it's nowhere in your

3    report.  So unless you got some new number today, it's not --

4    A.   I don't recall, sir, that that was available.

5    Q.   Okay.

6              But you agree with me this is all track.  That's the

7    whole point of the network is to track it -- right? -- to

8    quantify it, to see how many sales we've got so we can pay the

9    commissions, right?

10   A.   The tracking of the ShareASale affiliate network, yes, I

11   would agree with that; but the point of this value drive is the

12   ability of reaching new people that were previously unavailable

13   to the defendants.

14   Q.   According to your analysis, as I understand it, you're

15   saying there should be roughly a $420,000 or a $620,000 hair

16   cut on the damages that the defendants should have to pay to

17   AOP based on the ShareASale affiliate network, but you're

18   telling me you can't tell you -- you can't tell us how many

19   bottles were sold, even though it's measured and tacked, or how

20   many commissions were paid, even though it's tracked -- because

21   that's the point -- yet somehow you decided that there should

22   be a 4, or 5 or $600,000 hair cut because of the existence of

23   this network that is quantifiable that you didn't bother to

24   quantify?

25   A.   Again, I'll get back to the fact that affiliate

 1   networks -- not only would the ShareASale affiliate network is

 2   not on resident within the defendant companies, there are a

 3   number of other retailers out there that are employing a

 4   similar affiliate network that are paying commissions for sales

 5   of One Hit Wonder products.  There's no way to capture the

 6   essence of totality of sales that are being driven through

 7   affiliate networks.

 8   Q.   But you didn't say affiliate networks in your report; you

 9   talked about this affiliate network.

10   A.   I talked about --

11   Q.   You assigned a range of eight to ten percent for the

12   ShareASale affiliate network even though you don't know how

13   many sales were made through it or how many dollars or

14   commissions or anything, yet somehow you still decided that it

15   should be some sort of discount of eight to ten percent, yes?

16   A.   You keep going back to the eight to ten percent.  That was

17   had hoc discussion we had in our deposition that you asked me

18   to provide estimates.  I did commit to the fact that the

19   affiliate network was the lowest of the value drivers in terms

20   of relative value, and the eight to ten was in relation to it

21   being less important than the other value drivers; but it still

22   is an important marketing asset that is helping the company

23   market and promote its products in an industry with heavy

24   restrictions on how those products can be marketed.

25   Q.   Here you had an opportunity to actually dig into

```
 1   verifiable numbers, and you chose not to do it, right?
 2   A.   Chose not to do it?  I didn't have the information in the
 3   three days that I had to submit my initial report.
 4   Q.   Did you ask them for it?
 5   A.   I relied upon whatever documentation was available, and I
 6   used that documentation in concert with discussions with
 7   management to form my opinions.
 8   Q.   That wasn't my question.
 9        My question was did you ask for that information that
10   was readily available?
11   A.   I -- I told you before I don't recall if we had that
12   discussion.
13   Q.   Okay.
14        Your Honor, I have no further questions with regard
15   to the ShareASale affiliate network, but I'd like -- with the
16   court's permission, I do have a few questions specifically to
17   factor one but not about whether the factor qualitatively is
18   admissible -- I'm not arguing about that -- but I have a
19   question questions that go to the quantification that is
20   available for that factor.
21        THE COURT:  Okay.
22        You have to realize -- 20 minutes.  Be back at 15 of.
23                    (Recess)
24        THE COURT:  Okay.  Let me ask a few questions here.
25        Mr. Wegner, the testimony regarding ShareASale, you
```

 1    referred to commissions from other companies.  I'm unclear --

 2    if you would, would you summarize your position re commissions

 3    for other companies, because we had not been focusing on it.

 4    We've been focusing on people who were users basically going

 5    out and earning commission by their various contacts via the

 6    media, and we hadn't been thinking in terms of companies; and

 7    allied with that is Mr. Cohen's criticism of your witness's

 8    testimony vis-a-vis the issue of confirming the existence of

 9    these users in the -- individual users in the ShareASale

10    program.

11         As I understand Mr. Cohen's point, this is readily

12    verifiable, and it wasn't verified in the testimony, and it's

13    just one more example per Cohen of the failings of the witness

14    to I guess -- and this would be a quantification.  Let's see

15    the name, pal.  I don't want to just -- there are people out

16    there.  You could do it.  How many time did it happen?  Okay.

17    So two questions as relates to ShareASale.  One, the latter

18    question:  How do you answer the problem identified by

19    Mr. Cohen that whereas there were records to verify what the

20    witness is saying was happening, you haven't produced it; and,

21    secondly, what I believe to be a relatively entirely new issue,

22    it wasn't just the users and giving them a commission on sales

23    that they generated, it was also some other organizations,

24    companies or some such thing.  I don't understand that.

25         So let's go first with the -- where's the

```
 1   verification?  Where is your answer to the failure to identify

 2   and quantify the users who were actively participating

 3   successfully in the ShareASale program?

 4              MR. WEGNER:  I believe Mr. Martin testified that he

 5   did go out and check for the -- out in the Internet for the

 6   actual affiliates to see that they were there.  I thought that

 7   was the testimony that I heard.

 8              THE COURT:  You did?

 9              THE WITNESS:  I did a sampling.  I found a

10   cross-section --

11              THE COURT:  You have to speak into the microphone.

12              THE WITNESS:  I'm sorry, sir.

13              I did a sampling, and I found a number of affiliate

14   links that were endorsing the defendant's products.

15              THE COURT:  Were you able to quantify the number of

16   links?

17              THE WITNESS:  Quantify the number of links?  There

18   were just a handful.

19              THE COURT:  Or the number of people -- or the number

20   of people who were engaged in communicating?  Users who were

21   engaged in communicating --

22              THE WITNESS:  What I was able to quantify was

23   understanding how many affiliate links the company actually

24   issued through the ShareASale program, and that was in the

25   neighborhood of 200 total affiliates out there, but Mr. Cohen's
```

```
 1    discussion of the sales data, the thing about the affiliate
 2    links, Your Honor, is the sale is only recognized if, when that
 3    potential customer comes to that affiliate, reads their
 4    endorsement and immediately purchases 180 milliliter bottle of
 5    Duce Juice at $60, that's not how things happen in the e-juice
 6    industry.  Customers do their research.  They look for multiple
 7    resources of confirmation of the product before purchasing a
 8    180 milliliter bottle.  The standard bottle in the industry is
 9    a 30 milliliter, one-sixth of the size.
10          So when you're looking at making a purchase for 180
11    milliliters, you better like that Duce Juice; you better be
12    comfortable with your purchase.  So the purchase doesn't
13    typically happen immediately.  So now if someone's been exposed
14    through the affiliate network, they have the ability to go do
15    further research and due diligence on the products, find other
16    customer reviews, visit discussion forums, go to industry
17    influencers looking for product reviews, and when they
18    ultimately end up do making a sale, if they do -- making a
19    purchase, that would not be credited to that affiliate link.
20          The purpose of the affiliate network is, yes, we'd
21    love for sales to be consummated directly through those links,
22    but the affiliate network is designed to incentivize additional
23    people, in essence, quasi-salespeople, to be out there actively
24    promoting the One Hit Wonder product line.
25          THE COURT:  Companies he referred to besides
```

1    individuals, companies in the ShareASale program?

2          MR. WEGNER:  That's my understanding, Your Honor,

3    yes.

4          THE COURT:  Mr. Cohen.

5          MR. COHEN:  What was the question to -- what can I

6    addresses, Your Honor?  I mean, this was readily quantifiable

7    stuff, and they didn't bother.

8          THE COURT:  He says you can't readily quantify.

9          MR. COHEN:  Yes, he can.  He can say how many sales

10   went through and how many commissions, and then he is saying

11   there's this other halo affect of all of this, but we can't

12   measure that.  If he can't measure it, then how does he assign

13   eight to ten percent to it?  He can't.  He is making it up.

14   This is all made up, and he's also saying this is what people

15   typically do.  He doesn't know that either.  He's saying, Well,

16   based on my experience.  Okay.  That's saying, like, Because I

17   drive a car, I'm an expert on how cars are built, or I'm an

18   automotive engineer.  That's -- the sum total of his testimony

19   today is "trust me."  That's what it all boils down to, "trust

20   me."  And the whole point of 702 and *Daubert* is, No, trust me

21   isn't enough, and that's what his testimony is today.

22   Certainly with regard to any of the quantification it's all

23   made-up trust me stuff.

24          If the ShareASale affiliate network is such a

25   powerful tool -- as he suggests it is -- right? -- because he

```
 1   is saying it should be a discount of 4 or 5 or $600,000 because

 2   of the power of the ShareASale affiliate network, then to say,

 3   Oh, but we can't measure, that's exactly what he's doing.

 4                  (Discussion held off the record)

 5             THE COURT:  Let me ask a question that has been

 6   suggested by Mr. Cohen in some of the his questions, and if you

 7   look at factor five, five, Mr. Cohen; six; and eight, all

 8   right?  Do you have that in mind?

 9             MR. COHEN:  I'm sorry?

10             THE COURT:  Five, six and eight in mind?

11             MR. COHEN:  Yes, five, six, and eight.  Yes, Your

12   Honor.

13             THE COURT:  You seem to be suggested that there's

14   overlap there; is that right?

15             MR. COHEN:  In part, yes, but they have -- in part,

16   yes.  That is the short answer.

17             THE COURT:  Identify the overlap that you would argue

18   for -- in other words, you can't in this case triple dip.

19   Forget double dip, you're triple dipping, is your argument.

20             MR. COHEN:  That is one argument, yes.

21             THE COURT:  How are they doing that?

22             MR. COHEN:  Well, because they're saying there is a

23   Share of Sale affiliate.  Now, I can't really measure it

24   because people look at the ShareASale affiliate network, and

25   then they may go buy it somewhere else.  I think part of that
```

```
 1    is an incomplete because I think further development of the
 2    testimony would show that the Share of Sale Network uses
 3    something called cookies -- little pieces of code -- that track
 4    people.  So that if someone goes to the Share of Sale affiliate
 5    and then goes somewhere else, and if they buy within 30 or 45
 6    days -- is my understanding -- then it's still tracked; they're
 7    still credited.  But even if it's past those days, what they're
 8    asking for here is that, okay, we have this social media
 9    strategy --
10         THE COURT:  Excuse me, Mr. Cohen.  I don't think
11    you're addressing my question.  My question is -- you're going
12    back to what I talked about a moment ago.  What I'm questioning
13    you about, I thought that you were making an argument that much
14    of what's referred to, in fact, many of the -- that there is
15    overlap between factor five, the social media strategy; six,
16    which is the relationships with industry influencers; and
17    eight.  Now, maybe I'm misunderstood you, but I thought you
18    were suggesting that.
19         MR. COHEN:  Certainly between Share and Sale --
20    between ShareASale factor and other factors the answer is yes
21    because what Mr. Martin is saying is that there's this -- we
22    can't just -- even though I could measure it -- because we have
23    traffic records -- I'm sorry -- oh.  Okay.
24         Thanks.  Appreciate it.
25         I'm referring now to Mr. Martin's report, page 15 at
```

1    the top of it.  It says page 15 at the top of the page, and

2    under the heading in the middle of the page, it says, "Robust

3    Social Media Marketing Strategy, Facebook and Instagram."

4           There, in the next to last paragraph of the -- on

5    that page, it says -- Mr. Martin wrote the following:  "These

6    personal or sponsored referrals are an essential component in

7    the marketing of eLiquid, particularly at higher price points."

8           Now, there's no basis for any of that, but I want to

9    focus on the language "sponsored referrals."  The Share of Sale

10   affiliate, that's a sponsored referral.  They've got -- they're

11   saying, Oh, we also have sponsored referrals, but we're here on

12   Facebook and Instagram, and, Oh, by the way, there are all

13   these people on the Internet, on YouTube or Instagram or

14   Facebook or other places, that we have relationships with these

15   industry influencers, and that drives traffic.  We can't

16   measure it, but it drives it.

17          So they're really looking at three faucets of the

18   same thing, and the total, depending on whether you take the

19   high or the low, is between, let's see -- five, six, and

20   eight -- on the low end is eight percent each.  So that's 24

21   percent, and at the high end, you have 34 percent.  So

22   somewhere between roughly a quarter and a little more than a

23   third, they're saying that there should be that big a hair cut

24   for all this, sort of, vapory -- vaporous Internet-related

25   stuff, and --

 1          THE COURT:  I think what I've thrown to you -- as I

 2     said, it is your argument; it's not our argument; it's our

 3     internal view that there may be, indeed, be an overlap here,

 4     and I'm looking for -- in your view is there, even though you

 5     may not heretofore have argued that?

 6          MR. COHEN:  Short answer is yes, there is overlap,

 7     but here's the problem, and problem with this whole aspect of

 8     Mr. Martin's testimony, because it is so vaporous, because it

 9     is so vague, because it is so amorphous, you can't tell where

10     one ends and other the begins.  I can't cross-examine him.

11     Even today, he is giving me stuff that -- information that

12     isn't in his reports.  He testified with regard to factor No. 5

13     that the first time he disclosed any of this to us was in his

14     declaration after the last motion in limine hearing on

15     April 4th.  That's his April 17 declaration.  That is his

16     testimony on the stand today.

17          Part of all this, part of Rule 26, is I'm supposed to

18     know what they're saying and be able to examine him; part of

19     Rule 26 is the disclosure so I can dig through this to test the

20     bases for the testimony and challenge it, but I'm being

21     deprived of all of that because this is also vaporous,

22     amorphous, vague and made up.

23          Now, some of this -- I agree with the court -- it

24     makes sense.  The notion that, okay, people liked Muffin Man so

25     they tried Milkman, okay.  I'm persuaded.  That could happen.

1    The question is, as the court has repeatedly noted, do they get

2    to ascribe a percentage to it, and I don't think they should be

3    allowed to, to any of these.

4              THE COURT:  What would be -- if I were to permit the

5    subject to be raised, i.e., that these are factors but I'm not

6    going to give his percentages.  What's your response to that?

7    What happens then?  Then he argues it even though the expert

8    hasn't said it.

9              MR. COHEN:  Right.  I understand.  Let me think about

10   that for just a moment.

11             THE COURT:  Well, I haven't given it to you yet, but

12   I did ask --

13             MR. COHEN:  No, no, I -- well, I'm taking it as a --

14             THE COURT:  I'm not giving you anything, as a matter

15   of fact.  I'm just characterizing it.  What if I were to rule

16   on --

17             MR. COHEN:  Understood.

18             THE COURT:  There are two different points here.

19             MR. COHEN:  I understand.

20             Whether any particular factor should be allowed to be

21   discussed at all with the jury is one set of questions and one

22   set of arguments.

23             THE COURT:  Okay.

24             MR. COHEN:  The percentages is another set of

25   arguments; I agree, and there may be instances that the court

 1    decides I will allow Mr. Martin to testify about the

 2    qualitative thing, but I won't allow him to describe a

 3    percentage.  I understand the court might rule that way, and I

 4    will have to live with it and argue it; but I can't -- I can

 5    argue about the percentages -- I take that back.  Let me

 6    rephrase.

 7            Really the only way I see to do this, at least in

 8    argument I hope I'll be allowed to address these factor by

 9    factor, because in each instance there are arguments that

10    the -- even the -- Mr. Martin should be allowed to testify even

11    about the qualitative factor -- shouldn't be allowed to talk

12    about it at all, but each for good reason varies by the factor.

13            With regard to the quantification component, there's

14    certain arguments that are in common in terms of

15    quantification, but in addition, with regard to at least

16    certain of these factors, things were readily quantifiable, and

17    they chose not to quantify them, and that's --

18            THE COURT:  Readily quantifiable.  Okay.  Go ahead.

19            MR. COHEN:  And as I read earlier today in the first

20    part of the hearing, when I read from the *Wonderland* case, said

21    that, yes, a defendant may attempt to talk about other factors

22    or expenses and things like that, but they must show if it's

23    qualitative they must go and show that there's -- I'm sorry.

24    I'm mixing apples and oranges -- here, there are components

25    that they could readily have quantified and chose not to for

1   whatever reason.  And it may not be have been Mr. Martin's

2   choice.  I have no idea.  I wasn't involved in those

3   conversations, and least several times today, Mr. Martin has

4   noted that he had a very limited period of time to write his

5   report, three days, yes, that's the magic number, and that

6   because of that, he had limited information.  But that by

7   itself is only part of the story because he had roughly six

8   months between the initial report and the supplemental report,

9   and while the supplemental report addressed financial issues,

10   the issues with regard to these apportionment factors are the

11   same in both reports.

12          Those factors were identified in both reports, he had

13   plenty of time do the research, and he -- either the client

14   instructed him not to or he chose not to -- I don't know

15   because I'm not part of those conversations, but I have to have

16   a fair shot for my client to challenge that testimony, and I

17   don't -- with regard to the apportionment, whether it's the

18   factors themselves or to the percentages, I don't have a fair

19   shot; and that's all I want out of this is a fair shot to

20   examine him, and I don't, not on this portion of his testimony.

21   On the expenses and stuff like that, that's different.  Talk

22   about that separately.  But with regard to the apportionment, I

23   don't have fair shot at this because this is all made up.

24          THE COURT:  Okay.  I hear you.

25          Now, let me hear from Mr. Wegner in response to

```
 1    Mr. Cohen's input just now.

 2              MR. WEGNER:  Sure, Your Honor.

 3              I think the fact that Mr. Cohen is able to do a

 4    thorough cross-examination has been on display today.  I think

 5    that most of what he has been driving at goes to the

 6    persuasiveness of Mr. Martin's testimony, does not go to the

 7    method.  I think the court correctly recognized early on there

 8    is going to be some discussion about apportionment.  It's

 9    illogical that there wouldn't be.  There is a qualitative

10    element to this that must be recognized under the law; it's

11    part of that analysis.  It's -- as you said it's allied with

12    copyright; it's also allied with patent law.  In patent law,

13    for example, they're the *Georgia Pacific* factors that are not

14    necessarily qualitative.  It's a different kind of analysis,

15    but they are qualitative.

16              THE COURT:  Did you ever bring that up in your papers

17    to help us --

18              MR. WEGNER:  No.  *George Pacific* factors?

19              THE COURT:  Yes.

20              MR. WEGNER:  No, I did not bring them up in my

21    papers, but I'm referencing them as an example of

22    qualitative --

23              THE COURT:  I'm looking for some support and

24    consistent thinking is what I'm talking about.

25              Go ahead.
```

```
1              MR. WEGNER:  Understood -- oh, I thought I lost my

2    microphone.

3              And so most of what's been going on in Mr. Cohen's

4    questioning today may end up being some day admirable

5    cross-examination; it may give me some things to work on at

6    trial, but they are not a basis for excluding based on the

7    method.

8              I also note that, you know, Mr. Cohen has recently

9    started arguing about Mr. Martin's qualifications, but

10   qualifications were not at issue in this motion.  He said it at

11   the last hearing.  Mr. Martin is here to value the intellectual

12   property damages, and he has demonstrated a basis for doing

13   that.  He's demonstrated the bases for identifying these value

14   factors, and I understand that Mr. Cohen is struggling with,

15   you know, the qualitative feature to this, but that doesn't

16   make it go away.  There is a qualitative feature, and that is

17   exactly what expert testimony is for in a case like this.

18             THE COURT:  I'd like you to examine Mr. Martin to

19   establish this so-called sanity check.  What do you mean by a

20   "sanity check"?  How does it -- how did you go about doing it,

21   and did you back this in after the fact?  It was suggested -- I

22   think perhaps by some of the plaintiff's papers -- that this

23   was a product -- this was manufactured -- there is that

24   suggestion in the papers.

25             So speak to those issues, please, Mr. -- and you may
```

```
 1   want Mr. Martin to explain his sanity check.  Why don't you
 2   just do that.
 3            Mr. Martin, ask him -- you've implicated something
 4   that you've called a "sanity check."  What is that, and is that
 5   used -- is that often used in this area of valuation to
 6   basically validate and, associatedly, how did you do it?  Then
 7   I want afterwards -- Mr. Cohen, I want Mr. Anson to address the
 8   "sanity-check" issue.
 9   BY MR. WEGNER:
10   Q.   Mr. Martin, at the conclusion of your apportionment
11   analysis, you performed what you termed in your report a
12   "sanity check."
13            Do you recall that statement in your report?
14   A.   Yes, I do.
15   Q.   Okay.
16            Can you describe, first, the reason for performing
17   that "sanity check."  Actually, let me back up.  Let me strike
18   that question.
19            Can you first describe what the sanity check was in
20   very simple terms?
21            THE COURT:  Why did you do it?
22   BY MR. WEGNER:
23   Q.   Why did you do the "sanity check"?
24   A.   The "sanity check" was proffered as an alternative
25   methodology to ascribe the percentage of profit attributable to
```

```
 1    the infringement of the plaintiff's Milkman mark.

 2    Q.   Okay.

 3              And what did that tell you?

 4    A.   First, if I can, I'd like to walk through the process of

 5    how it was completed, and then I can provide --

 6              THE COURT:  Go ahead.

 7              THE WITNESS:  So in the intellectual property

 8    valuation industry -- and this is going back for decades --

 9              THE COURT:  Speak into the microphone, please.

10              THE WITNESS:   -- the most common methodology and

11    widely used methodology and widely accepted methodology for

12    valuing the relevant contribution of a trademark to an ongoing

13    business work product as such is called the relief-from-royalty

14    method.  We discussed this earlier; we valued the mark.

15              The reasonable-royalty component of the

16    relief-from-royalty method provides the fair-market indication

17    of what you would have to pay if you did not own that mark to

18    license it in the open market.  So if I am the defendants and I

19    went to plaintiff AOP and I decided to license that mark,

20    Mr. Anson has brought forward a fair-market reasonable royalty

21    of three percent.  That's representative of how the market

22    views the value of this particular asset in this context.  That

23    three-percent royalty is a royalty based on sales and 80-plus

24    percent of all royalties are going to be applied against sales.

25              But we have to -- but to use it as a "sanity check"
```

1    for the profit apportionment discussion, we have to translate

2    that to a -- if three percent is the royalty on sales, what

3    would be the equivalent percentage on profits.  So it's

4    strictly a translation where you take the three-percent

5    royalty, you divide it -- you divide it by the defendant's

6    profit margin, and that gives you what portion that royalty

7    represents of the profit.  In this case, it translate to 7.1

8    percent.

9           So that provides you with an indication that in no

10   less than ten percent -- no more than ten percent apportionment

11   is fair and reasonable based upon Anson's three-percent royalty

12   rate that he has provided in his initial report and his

13   supplemental report, indicating that the value of the The

14   Milkman mark is based on three percent of sales.

15          So that serves as a "sanity check" or "gut check" or

16   a validation point for the ultimate conclusions that come out

17   of a profit apportionment, and that is one of the checks that I

18   included in the report.  I did another check to determine

19   whether or not this was reasonable, and everything I did

20   pointing to the fact that a no more than ten percent range --

21   no more than ten percent estimate was fair and reasonable given

22   the information in this case.

23          THE COURT:  Just a second, please.

24              (Discussion held off the record)

25          THE COURT:  Do me a favor, will you please.  Go

```
 1   through the math on that.  In other words, what did you divide?

 2              THE WITNESS:  So, Your Honor, essentially what you're

 3   doing is if the fair-market royalty for recognizing the value

 4   contribution of the market is three percent, you would multiply

 5   three percent times the alleged infringing sales, and that

 6   would result in a number of around $300,000.  I can do the

 7   exact math if you like, Your Honor.

 8              THE COURT:  No, just ballpark it.

 9              THE WITNESS:  So that royalty of 300,000 would

10   represent fair-market compensation for use of that asset by the

11   defendant over the relevant damages period on sales of the

12   infringing product.

13              That $300,000 now, if that's fair-market

14   compensation, divide that by the total net profit, and that

15   tells you what portion that $300,000 royalty represents as a

16   percentage of the profit, thereby provides you with an

17   indication of apportioned profit to provide the plaintiffs with

18   fair and reasonable compensation for the use of their mark.

19              THE COURT:  And that figure comes out roughly 7.1

20   percent?

21              THE WITNESS:  Roughly -- roughly 300,000 divided by

22   4.2 million.

23              THE COURT:  Which is below your ten percent.

24              THE WITNESS:  Which is below my ten percent.

25              THE COURT:  But nevertheless informs the reliability
```

1    of the ten percent?

2                THE WITNESS:  It informs the reliability that no more

3    than ten percent is a reasonable indication.

4                THE COURT:  Your response, please, Mr. Anson.

5                MR. ANSON:  Yeah, I've been doing this for a long

6    time, longer than Mr. Martin, although he's an experienced

7    person, and I'm not quite sure I understood what he said

8    either.

9                He has a calculation on page 23, which boggles

10   certainly my mind.

11               THE COURT:  Page 23 of what?  Do you know?

12               MR. ANSON:  Of his report, supplemental report, which

13   I think is the calculation that we're all talking about and --

14               MR. COHEN:  Just a second.  Yes, Your Honor.  It's

15   page 23 with the page numbers at the top of the page, the

16   supplemental report.

17               THE COURT:  We have it.

18               Go ahead, please, Mr. Anson.

19               MR. ANSON:  Now, this is an unusual calculation and

20   certainly creative in the extreme, and I always admire

21   creativity, but this is not a royalty-rate calculation.

22               What he's done here is taken the net profit margin of

23   the defendant and multiplied it by ten percent and come out

24   with an equivalent royalty rate of -- what he calls an

25   equivalent royalty rate of 4.29 percent.  That is not a royalty

1  rate calculation.

2          First of all he is using defendant's net profit

3  margin.  A royalty rate calculation, Your Honor, as I'm sure

4  you're aware, is calculated on the basis of using wholesale

5  sales, net sales, and multiplying a royalty times that net

6  sales figure; so this is not a royalty-rate calculation here.

7  That's one of the things that I'd like to mention.

8          Secondly, for some reason in his report, he uses a

9  royalty rate of 1.5 percent as an acceptable royalty rate.

10 Again, it's not quite clear why he is using a one-and-a-half

11 percent royalty rate in his report, but most importantly is the

12 so-called "sanity check" is a -- is a --

13          THE COURT:  "Standard" or -- same thing as a "sanity

14 check"?

15          MR. ANSON:  It's not a "sanity check," Your Honor.

16 It's a check of some kind that I've never quite seen before and

17 does not represent a royalty -- doesn't represent either a

18 royalty rate or a royalty calculation; it represents neither of

19 those things.

20          THE WITNESS:  Your Honor, may I respond?

21          THE COURT:  Yes.

22          THE WITNESS:  Yes.  Mr. Anson has been at this

23 business much longer than I --

24          THE COURT:  Speak into the microphone.

25          THE WITNESS:  Yes, Mr. Anson has been in this

1    business much longer than I, but for him to make the claim that

2    he has no idea what this calculation represents and that it's

3    not a royal rate, that's a new one for me; I've seen it all

4    from you now, sir.

5         The purpose of this translation is similar to what we

6    just did in translating the three-percent royalty on sales to

7    an equivalent apportionment of profit.  This is the reverse of

8    that.  This is taking the ten percent profit apportionment,

9    multiplying it by the profit margin, to get what that profit

10   represents as a percentage of sales or a royalty on sales.  For

11   Mr. Anson to say this doesn't represent a royal on sales is

12   absurd.

13        I -- did you read the report, sir?  Apparently not.

14        MR. ANSON:  Yes, I did, and I find this to be an

15   exceedingly unusual way to calculate a royalty rate.  It's

16   neither appropriate nor in this case an accurate way of

17   portraying royalties.  This isn't a "sanity check"; what this

18   is is a way to justify Mr. Martin's predisposition to a royalty

19   rate of ten percent or 11 percent, ten percent.  It's a way to

20   justify a foregone conclusion.

21        THE WITNESS:  And in contrast, that is absolutely

22   untrue.  It's a way to determine what percentage of sales does

23   the apportioned profit represent.  If a reasonable royalty

24   indicates that that number should be three percent of sales,

25   then 300,000 is three percent of 10 million.  That would be the

1   appropriate relevant apportionment according to the way the

2   market views these assets.

3          What he is saying is entirely inaccurate.  This gives

4   you the basis of profit.  Compare it to the sales number; you

5   get a percentage.  That's how royalties are calculated.  So a

6   royalty rate provides us with a royalty amount, and all we're

7   doing is comparing the profit apportionment as an amount as a

8   percentage of sales to give you an indication of what royalty,

9   equivalent royalty, that represents.

10          THE COURT:  Did you anywhere in your testimony, or

11   the materials that you've supplied, statements that you

12   supplied in the proceedings, did you at any place go through

13   the actual computation using the theory that you've espoused in

14   this case?  Did you ever -- you know, did you ever use the

15   actual figures that we're dealing with in this case to come up

16   with what you did?

17          THE WITNESS:  I'm sorry, Your Honor.  I guess I'm not

18   understanding the question.  These are based on the actual

19   numbers that were gleaned from this case.

20          THE COURT:  Okay.  Do you have anymore?

21   BY MR. WEGNER:

22   Q.   Mr. Martin, how did your "sanity check" compare with

23   Mr. Anson's royalty rate?

24   A.   On an equivalent basis, the apportionment of ten

25   percent -- ten percent apportionment of profit is equivalent to

1  a 4.29 percent royalty on infringing sales.

2  Q.   So was it higher than the royalty rate that Mr. Anson came

3  up with?

4  A.   Yeah, it's significantly higher than the royalty rate that

5  Mr. Anson ascribed as the appropriate royalty to identify the

6  fair market value of the plaintiff's The Milkman mark.

7           MR. ANSON:  And if we're going to discuss the fair

8  market value of the trademark, then we need to open that

9  subject this afternoon, Your Honor, and go through that

10 valuation of the trademark that's in my report.

11          THE COURT:  Your response?

12          MR. WEGNER:  Well, Your Honor, I said before, and I

13 think that the, you know, the relief from royalty rate was made

14 relevant by AOP, and that we ought to be able to bring forth

15 our expert's opinion on that rate as well, which obviously

16 differs dramatically from Mr. Anson's.

17          THE COURT:  Okay.

18          I'd like to give it some thought with the law clerk,

19 this --

20          (Discussion held off the record)

21          THE COURT:  Okay.

22          Is there anything else that needs to be addressed

23 regarding this first motion in limine?

24          MR. COHEN:  Yes, Your Honor.

25          THE COURT:  What's that?

```
 1              MR. COHEN:  I haven't had a chance to ask Mr. Martin

 2    some questions on this recent accounting.

 3              THE COURT:  Go ahead.

 4    BY MR. COHEN:

 5    Q.   I have a few questions.

 6              Now, it's your testimony that you think a fair

 7    royalty rate would be ten percent; is that -- am I

 8    understanding that correctly?

 9    A.   No, that's incorrect.

10    Q.   Okay.

11              You're saying a royalty rate of three percent would

12    be appropriate -- I'm sorry.  That was Mr. Anson's.

13              Why on earth would a rational business person agree

14    to a license of three percent to a competitor in a niche market

15    when they're making 60 percent profit on their own sales?

16    One -- when -- under what circumstances would any rational

17    business person agree to license to a competitor in a niche

18    market for three percent when on their own sales they're making

19    profits of 50 or 60 percent?

20    A.   I think they're two answers to that particular question:

21    First and foremost -- and, Your Honor, I am not drawing any

22    legal conclusions here, but it's my understanding that for

23    purposes of determining a hypothetical royalty rate and a

24    reasonable-royalty analysis as an example, it is irrelevant as

25    to whether or not the plaintiff would have licensed the mark.
```

1   The goal is to identify what is the value of the mark in the

2   open market, what is the fair market value, and what is the

3   reasonable royalty that would be paid for use of that mark.  So

4   the punitive aspect of that is not designed to come in to a

5   situation where monetary damages are being calculated.

6   Q.   Have you finished your answer?

7   A.   Yes, sir.

8   Q.   Are you aware of any intent to license by AOP to the

9   defendants?

10  A.   I am not aware of any.

11  Q.   Are you aware of any intent to license by AOP to anybody

12  other than making their own stuff and selling it?

13  A.   I have -- I've heard some rumblings that there may have

14  been some licensing involving this mark between AOP and Deuce

15  Juice would have any concrete information to.

16  Q.   Are you aware of any previous negotiations between AOP and

17  the defendants where they discussed licensing?

18  A.   No.

19  Q.   Well, given your approach, why on earth would an infringer

20  like the defendants ever obey the law if all they can do is to

21  knock off everyone's stuff and then just have to pay three

22  percent?  Why would they ever obey the law?

23  A.   Unfortunately, I didn't write the laws.

24  Q.   That wasn't my question.

25  A.   If that's what's an available remedy under the laws, then

```
 1   the court is going to have to determine how to impose a
 2   punitive aspect of that --
 3            THE COURT:  Okay.  Next question.
 4   BY MR. COHEN:
 5   Q.   Do you think the -- why do you think the defendants would
 6   value AOP's mark as the same percentage as AOP values its own
 7   mark?
 8   A.   I believe that I'm valuing the AOP Milkman -- The Milkman
 9   mark.  So your question is -- is out of context or
10   mischaracterizes my statement.
11   Q.   Okay.  Did you --
12   A.   I'm sorry to interrupt, Mr. Cohen.
13            So Mr. Anson and I both brought forward an indication
14   of the fair market value based on a reasonable royalty for use
15   of the plaintiff's The Milkman mark.
16   Q.   Did you make any effort to determine what value the
17   defendants placed on their mark, Milkman?
18   A.   I did not value the defendant's Milkman mark.
19   Q.   Okay.
20            What royalty rate would you impute to the defendants
21   for their Milkman mark?
22   A.   I don't believe that that's something that I can sit here
23   on the stand and provide you with an answer.  I was not asked
24   to perform any analysis related to valuing the defendant's
25   Milkman mark.
```

```
 1              MR. WEGNER:  Your Honor, I feel we're getting well

 2    outside the scope of his opinion.

 3              THE COURT:  Next question.

 4              MR. COHEN:  Just a second, Your Honor.

 5              THE COURT:  Do you have anything else, Mr. Cohen?

 6              MR. COHEN:  I'm sorry, Your Honor?

 7              THE COURT:  Anything else?

 8              MR. COHEN:  No further questions about this.  I'd

 9    like to be able to argue it later, but I don't have any

10    questions.

11              THE COURT:  Okay.  Let's hear your argument -- let's

12    hear your argument in toto.

13              MR. COHEN:  Got it.

14              Just one second, Your Honor.

15              THE COURT:  You may step down.  I admit to having

16    forgotten you, and I apologize.

17              THE WITNESS:  No problem, sir.  Thank you.

18              MR. COHEN:  I'll do the argument in toto, but I have

19    to break it down into components because the court may agree --

20    or the court may conclude that there are parts that he can

21    testify to and parts that he can't; so I have to address in

22    parts, okay?

23              THE COURT:  Fair enough.

24              MR. COHEN:  Let's talk first about the royalty rate.

25    The royalty rate is simply no longer relevant.  The plaintiffs
```

1    in this case -- plaintiff in this case, AOP, has elected, and

2    has since it's summary judgment papers, maybe before, to

3    proceed on a proxy damage theory, proxy damages -- the

4    components of that are gross revenues, costs of goods sold, and

5    overhead.  Those are the components.  The royalty rate is not

6    relevant and therefore is not admissible under Rule 402;

7    moreover, even if it were admissible and somehow relevant, I

8    would suggest the court should exclude it under 403 because

9    it's a waste of time, unfairly prejudicial, and likely to

10   confuse the jury.

11          Moreover, the royalty rate here is based on the ten

12   percent figure, and the ten percent figure is not based on

13   anything.  Recall the testimony today and the prior deposition

14   testimony, repeatedly Mr. Martin complained that he got pressed

15   in his deposition, forced him to give numbers, and he'd never

16   done the math before.  If he had never done the math before,

17   the ten percent figure that you see in his report, both his

18   original report and the supplemental report, cannot have been

19   the result of any arithmetic or mathematical calculation

20   because he didn't do the calculation until he was being

21   deposed.  That ten percent figure is not the result of any math

22   or analysis; it's made up.

23          Moreover, the analysis by which Mr. Martin arrived at

24   the ten percent is inconsistent with the law.  The law says

25   that, in the trademark context, you must presume that all sales

1    are -- all infringing sales are -- all sales are the result of

2    infringing activity.  You start with the presumption a hundred

3    percent of the sales are -- resulting infringing activity, and

4    you back it out from there, we're provided the citation to the

5    *Spin Master* case, 944 F. Supp. 2d. 830, 2012 decision, and on

6    pages 839 and 840, you'll find the following language:  "When

7    the defendant's profits are the measure of the plaintiff's

8    losses" -- as they are in this case -- "the plaintiff has only

9    the burden of establishing the defendant's gross profits from

10   the infringing activity with reasonable certainty which are

11   presumed to be the result the infringing activity."  That

12   language is critical.

13          The next paragraph, the court goes onto write, "In

14   the end, any uncertainty in the amount of damages should be

15   born by the wrongdoer."

16          This ten percent number is -- has no basis in fact;

17   it was plucked from thin air; it's not the result of any

18   analysis, and the analysis he made up after fact, where he

19   said, Well, I decided there are these nine factors, eight

20   you've talked about as value drivers, and the ninth is

21   infringement.  That is an average of 11 percent, and then we do

22   the math from there, as you -- as the court called it

23   "tweaking."  That's inconsistent with the law.  He was supposed

24   to start with 100 percent and prove by a preponderance of the

25   evidence to reduce it from 100 percent to 90, 80, 70, whatever.

1    Yes, they can reduce it.  There's no argument they have a right

2    to try, but that's not what he did here.

3           The methodology that he's claiming to have applied

4    and that is nowhere explained in either report, is inconsistent

5    with the law; and his very own testimony demonstrate that that

6    ten percent figure was not the result of analysis; it was not

7    the result of math or anything else.  He decided on the ten

8    percent figure and then backed everything else into it.

9           So he should not, at a minimum, be allowed to testify

10   about the royalty rate because it's not relevant, and it's

11   unfairly prejudicial.  He shouldn't be allowed to give the ten

12   percent figure.

13          THE COURT:  You didn't make a motion -- you shouldn't

14   be able to testify to -- well, you didn't make a motion in

15   limine in that regard.

16          MR. COHEN:  Yes, we did.  We moved to exclude in it

17   entirety and in the components.

18          THE COURT:  Let me stop you there because I've got a

19   question.

20          MR. COHEN:  Sure.

21          THE COURT:  Let's say that you're in a trial before

22   the jury, and you've agreed on the revenue and you end up --

23   hopefully we're going to end up with a net profit, but at some

24   point in time you end up with your net profits either by

25   stipulation or by the jury determining what they accept as the

```
 1    operating expenses; then the question becomes how to evaluate

 2    the infringement, and you seek to evaluate it under the proxy

 3    theory --

 4              MR. COHEN:  Yes.

 5              THE COURT:   -- and the defendant says, Wait a

 6    second.  You're entitled to your proxy theory, but I'm not

 7    bound by it, and I want to prove that, through my expert, that

 8    there's such a thing as the royalty/license approach, and I'm

 9    suggesting to the jury that when you look -- when you examine

10    this testimony that's been given here, he is not going to do

11    that -- I'm getting scrambled here late in the day.  Let me --

12    because I think I am on to something, and I don't know that --

13    I know I'm not expressing it properly.  What --

14              (Discussion held off the record)

15              THE COURT:  What you're doing is -- I'm trying to

16    cram in here in this late hour -- you're seeing what goes on in

17    chambers, and I probably best to go on in chambers in the sense

18    that I talk it out with the law clerk.  This is not something

19    that I'm close to having an answer I think, but I'm not there,

20    and it doesn't make much sense for me to -- 5:00 o'clock to be

21    trying to go back and forth with the law clerk.

22              What I will say to you is this:  I think I need the

23    time to do just that with the law clerk, and I don't know if

24    I'm going to be need the input from you in this regard

25    tomorrow, but I hate to bring you back.
```

```
 1          MR. COHEN:  If you need us back, we'll be here.

 2          THE COURT:  That axiomatic.  That's, in fact,

 3   axiomatic.  I don't want to abuse that, okay?  And I just --

 4   you know, I get close and I think I got it, and then a lot of

 5   argument, and I'd like to distill it a little bit is what I'm

 6   saying.

 7          MR. COHEN:  Sure.

 8          THE COURT:  I'm thinking about timing and how to do

 9   it.  I could try to do it and give you a written order.  I

10   don't know if that's -- if I'm you, I don't know if I want it

11   that way because I rather have me tell you what it is, at least

12   give you a shot at what you're saying if I'm the injured party,

13   i.e., I lost the motion; and I can't tell you how long it's

14   going to take me with the law clerk to work our way through

15   this.  I don't think it will take that long.  Frankly, on

16   the -- frankly, on the -- frankly, I have pretty well decided

17   what the outcome is on the remaining motions in limine.  I

18   mean, they're all down here.  I've discussed them with the law

19   clerk, and I don't think I'm going to change my mind.  I got

20   the answers.

21          So what -- I don't think I need any input on the

22   motions in limine, but where I may need some input, further

23   input, is on this -- what we've been discussing today.  So I

24   suppose you could put, if you wanted to, without bringing your

25   experts here -- they're all gone anyway -- you could have them
```

```
 1   on call, or you could bring them back.  I don't know if I need

 2   them.

 3              (Discussion held off the record)

 4              THE COURT:  So I suppose the best thing do is to

 5   rejoin tomorrow, and I don't want to force you too early and

 6   just say we'll rejoin at 10 o'clock, and I will do my best -- I

 7   meet the law clerk at 8:30 or 9:00, and I'll talk to her for

 8   another half hour or so tonight; so I should have an hour and a

 9   half into it.  And I'll do my best to have you an answer by

10   10:00.  If I don't, I'll have the clerk tell you and give you

11   an idea of where we are, and I can give you the reading -- the

12   reading -- not the reading -- the rulings on the motion in

13   limine.

14              One thing that I got close to a moment ago, and then

15   I started backing off the analysis, was to ask the defendant to

16   respond to Mr. Cohen's argument that when you're trying to

17   reduce the damages here, are you intending to try to use the,

18   through your expert, the royalty or license approach and say,

19   You can use your approach all you want on proxy, but I'm

20   entitled to respond in reducing damages by using the royalty

21   aspect of it.  I see a head going up and down.

22              Is that what you're intending to do?

23              MR. WEGNER:  Your Honor, that's one aspect of it,

24   okay?  We think that it is an accurate measure of the value of

25   the mark.
```

```
 1          THE COURT:  So you put your witness on the stand, and

 2    you say, Now, look it, we're trying to evaluate what can be

 3    backed out, what should be properly paid, and the answer is,

 4    Well, I, the expert, tell you that I'm aware of the ways to go

 5    about this and a way to go about this -- a way to go about this

 6    is the royalty-rate approach.  I quantify and then they go

 7    through an analysis how they come up with a royalty rate, which

 8    Mr. Cohen has said is very infirm because of -- for the reasons

 9    he identified -- but that is neither here nor there; that is

10    for argument -- you identify the royalty rate.  You then back

11    it out, along with the operating expenses, and you say, The

12    rest of it is -- we earned it.

13          MR. WEGNER:  Not quite, Your Honor.  The royalty rate

14    is instead of that analysis, it is the value of the mark.

15          THE COURT:  Yeah.

16          MR. WEGNER:  Okay.

17          So it's not backed out in the sense that is actually

18    stated:  This is the value of the mark based on a relief from

19    royalty model, which is, again, a recognized model.  Instead of

20    this analysis where you back out all profit apportionment and

21    operating expenses, et cetera.  Now, there is a second utility

22    to the royalty rate analysis, and I want to clear one thing up:

23    The second utility to it in this case is that it provides

24    backstop in the event that we do go through the proxy damages

25    model and analysis because it tends to validate the
```

1    reasonability of the conclusion that our expert has reached so

2    that it's -- so that the ten percent number is not just plucked

3    out of thin air; it can be verified and balanced against --

4    compared with what result would be for the value of the

5    trademark under relief from royalty analysis.  And that's, in a

6    nutshell, the conceptual framework that we're talking about.

7            I think Mr. Cohen either -- I think he misunderstood

8    the way that our reasonable royal analysis was calculated.

9    There's a separate analysis in Mr. Martin's report that is a

10   relief-from-royalty analysis.  The part that Mr. Cohen was just

11   referencing was the, I guess, the secondary math that was done

12   following Mr. Martin's apportionment analysis which

13   incorporated elements of the reasonable-royalty analysis by

14   basically choosing the royalty rate that Mr. Anson used and

15   then applying it to his calculation to translate it into ...

16           THE COURT:  Judge, if I'm outlining my rejoinder to

17   the proxy approach -- just the macro proxy approach, okay? --

18   once we get by this operational cost, we're going to have a net

19   figure.  I don't know what it is yet.  There's argument on both

20   sides as to what is included and what's not.  We hope we have

21   stipulations, and we will have a resolution; but once you

22   resolve that, and you get the net profits, then the question is

23   you want to back something else out, correct?

24           MR. WEGNER:  That's correct, Your Honor.  We do want

25   to back something else out, and that's --

```
 1            THE COURT:  You intend to do it the way it's been

 2   done here by your expert.

 3            MR. WEGNER:  Our expert will testify to those value

 4   drivers --

 5            THE COURT:  Right --

 6            MR. WEGNER:  -- that are then the bases for backing

 7   out additional profits, and it's an apportionment that

 8   obviously the profits between the value drivers that he

 9   identified and the value of the mark itself.

10            THE COURT:  And you're not intending -- what

11   relationship does the royalty rate have if you're using these

12   value drivers?

13            MR. WEGNER:  Two points on that:  We think the proxy

14   approach is wrong, which we've talked about at the very

15   beginning of the day, and I understand there's disagreement

16   about that, and the second is, again, it provides a bench mark

17   to look at the back end of that apportionment analysis.  They

18   don't go together in the sense that the relief from royalty

19   numbers are backed out of the profits; they are just a data

20   point that you can look at after that apportionment analysis is

21   done, just say, Look, my result is not so incredibly out -- you

22   know, out to lunch that it makes no sense.  It can be balanced

23   against a different measure in intellectual property damages.

24            THE COURT:  Your rejoinder.

25            MR. COHEN:  The wrong-doer does not get to elect my
```

```
 1   client's remedies.

 2             THE COURT:  Correct.

 3             MR. COHEN:  And that's what they're doing.  They're

 4   saying we get to argue the reasonable royalty that that should

 5   be the measure of damages.  That's one of their two arguments.

 6             THE COURT:  Correct.

 7             MR. COHEN:  That's what he just said.

 8             MR. WEGNER:  That is one of our arguments; everything

 9   else is not correct, Your Honor.

10             THE COURT:  Well, if -- are you arguing this

11   alternatively?

12             MR. WEGNER:  Yes.  That's one reason for it, yes.

13   It's an alternative because, again, even under a proxy

14   theory --

15             THE COURT:  What would you argue to the jury then?

16   Take your pick, but here's the two ways to go at it?  It would

17   undermine your -- the royalty; it would undermine the deep

18   discount that your expert is giving you under his apportionment

19   theory, right?

20             MR. WEGNER:  No.  If you took our royalty rate and

21   the -- and the translation into dollars that Mr. Martin's

22   royalty analysis yields, that's actually a lower damages number

23   than his apportionment analysis, which is -- and this is --

24   those numbers are summarized in Exhibit 1 of his report, the

25   two different calculations.
```

```
1          THE COURT:  And what's your response to Mr. Cohen's
2    response that he is entitled to elect the manner in which he
3    recovers under the -- his under his complaint?
4          MR. WEGNER:  The proxy theory of damage is not --
5    again, not a fait accompli, okay?  It has to be a -- the
6    damages have to be reasonably related to the infringement
7    and --
8          THE COURT:  This is interesting because -- I'm
9    interrupting you, but you see what's happening here is -- the
10   order of proof, the way you're going to go at this.
11         Mr. Cohen's client is entitled to use the proxy
12   theory; there's no doubt about it, but that doesn't bind you.
13   It doesn't mean I agree with the proxy theory as a defendant.
14   That would be, I think, the rejoinder, and if I'm not bound by
15   the proxy theory, I mean, maybe -- but I think you have chosen
16   to be bound by the proxy theory because, yes, go ahead and
17   argue your proxy theory, and then I'm going to put Mr. Martin
18   on to deep discount on his -- on his -- based on the testimony
19   given.
20         MR. WEGNER:  I don't think that it makes me bound,
21   Your Honor, defendants bound to choosing that as the proper
22   measure of damages.  I think it's a response to their expert's
23   report that we have to make in order to preserve our position
24   if the proxy theory ends up carrying the day.  So I don't
25   think it's -- it is not a concessions that we think the proxy
```

```
 1   theory of damages is appropriate in this case, and so look,

 2   today we've been talking about it.  Granted we've been talking

 3   about the proxy theory of damage and the calculations that

 4   emanate from it, and our position on those, granted.  That is

 5   not a concession, though, that we think that really should be

 6   the measure of damages in the end of the case.  As we said

 7   before, we think there is a threshold matter, and the threshold

 8   matter is that because our client's product outsold AOP's

 9   product by I think it's a factor of two to three, between two

10   and three --

11              MR. COHEN:  Not.

12              MR. WEGNER:   -- it outsold the flavor, the flavor

13   The Milkman, AOP's flavor Milkman was outsold by our product,

14   they can't show that they would have been entitled to those

15   profits.  And if they can't do that, I don't think that they

16   can show that can use the proxy theory.

17              (Discussion held off the record)

18              THE COURT:  This perhaps is the court -- the theories

19   and the explications associated therewith have a life of their

20   own, seemingly, and I know you want closure and some measure of

21   determining how to go about resolving the case perhaps and,

22   most importantly, on trying the case, and I'll give it to you;

23   but this issue that you just raised, that last issue -- what

24   was it?

25              (Discussion held off the record)
```

```
 1              THE COURT:  The outselling, I haven't focused on this
 2    and -- okay?
 3              MR. COHEN:  May I make a suggestion, Your Honor?
 4              THE COURT:  Yes.
 5              MR. COHEN:  Rather than argue about this on the fly,
 6    let's brief it; we'll win.  I have every confidence in the
 7    world we will persuade you what you already know, which is the
 8    proxy measure of damages is appropriate in this case, and the
 9    map will back it up; and I'm tired of listening to this
10    nonsense about the difference in the rates and everything.
11    It's uninformed by the law, but, okay, let's quit doing it on
12    the fly.  Let's actually brief the dang thing, but let's brief
13    a couple of issues:  One, are we entitled to proxy theory of
14    damages here or not?  Because if we're not, then we got to
15    start this thing over.  The court -- the court on granting
16    summary judgment had no problem granting proxy damages, none.
17              THE COURT:  I understand that.
18              MR. COHEN:  But -- okay.  We're revisiting the issue,
19    so be it; then let's brief, and quit knocking it around in an
20    offhanded way like this, because we'll win on the law, and
21    we'll win on the facts.  No. 2, as part of this same briefing,
22    I want to be able to brief that they cannot bring up this
23    royalty rate because -- and there's case law that says once the
24    plaintiff has chosen a particular ranking, evidence or argument
25    that go to other remedies that the plaintiff -- or other
```

```
 1    measures of damages the plaintiffs have not chosen are not

 2    admissible.  So that's the *Apple* case.

 3              THE COURT:  Is that a correct statement of the law in

 4    your view?

 5              MR. WEGNER:  I don't think that it is, Your Honor,

 6    but I'd be happy to go look up that case.

 7              MR. COHEN:  I'd be happy to brief it, and that is

 8    because we've done the research, and we know the answer.  But

 9    we keep knocking this stuff around; we keep arguing it at the

10    margins and then say, Oh, by the way, we don't even think the

11    proxy measure as appropriate here, okay.

12              THE COURT:  Slow down for her.

13              MR. COHEN:  Sorry.

14              Okay.  Let's brief the dang thing.  Let's brief those

15    two issues.  One:  AOP, are they entitled to recover under the

16    proxy theory of damages here?  Maybe I'm wrong.  I don't think

17    so.

18              THE COURT:  You know, I'm not suggesting you're

19    wrong.  I'm only saying how is it -- how do they go about --

20    how can they go about attempting to reduce the amount of

21    damages?

22              MR. COHEN:  Simple.  They have been doing it.

23    They --

24              THE COURT:  Don't go trying to do it on a proxy

25    theory when I'm not pursuing.
```

```
 1          MR. COHEN:  My point is that under the law, the

 2    existing authority, that --

 3          THE COURT:  Excuse me.  Don't go trying to do it on

 4    a --

 5          MR. COHEN:  Right.

 6          THE COURT:   -- royalty theory when I'm not pursuing

 7    that theory.

 8          MR. COHEN:  That's correct.  And in the Apple case,

 9    Apple was -- the court granted a motion to exclude -- came as a

10    motion to exclude evidence because Apple was pursuing a

11    particular theory of damages, and that theory of damages did

12    not require them to have to prove their profits; but the

13    defendant in that case wanted to know their profits, and the

14    court said, You don't get to discover them, or you don't get to

15    put on evidence of it because it's not relevant to the theory

16    of recovery or the theory of damages that Apple is prosecuted.

17    Same thing here.  But rather than just take my word on it, let

18    us brief these issues so that the court can make a fully

19    informed decision because it's very frustrating, as the court

20    can image.  Here we've been arguing since nine o'clock this

21    morning on the proxy theory, and then in a footnote, or an

22    aside, Oh, by the way, we don't think they're ever entitled to

23    this anyway.  Then why were you all here?

24          MR. WEGNER:  To be clear, Your Honor, in our

25    opposition brief in the first section.
```

```
 1            MR. COHEN:  Then let's brief the dang thing.
 2   Let's -- give me a schedule, please.  Let's brief those two
 3   issues:  One, are we entitled to proxy theory of damages in
 4   this case?
 5            THE COURT:  Well, of course you are.
 6            MR. COHEN:  Okay, but they keep -- they say no.  He
 7   keeps saying we're not, and I don't want to roll into trial and
 8   then say, Oh, by the way, you can't do that.
 9            And the second issue I'd like to brief --
10            THE COURT:  You respond to that.  H is saying he is
11   entitled to his proxy theory and under that ...
12                (Discussion held off the record)
13            THE COURT:  I don't think I need briefing on the
14   proxy theory.
15            MR. COHEN:  Let me be clear -- or make sure I
16   understand clearly, this court is ruling that AOP may recover
17   under a theory of proxy damages.
18            THE COURT:  Absolutely.
19            MR. COHEN:  Okay.  Good.  That's decided.
20            Now, if --
21            THE COURT:  I was only inquiring about what he was
22   defending, what his theory of defense was.
23            MR. COHEN:  Okay.
24            The second thing -- so we don't have to brief the
25   first issue, great, less to do.
```

```
 1            MR. WEGNER:  Can I speak on that, Your Honor?

 2            MR. COHEN:  No, let me finish, please.

 3            I want to be able to brief the second issue because I

 4   believe the law is clear that because -- once we've elected --

 5   once AOP has elected to the proxy theory, while they certainly

 6   have arguments within that framework that they can make to

 7   reduce the damage number, absolutely.

 8            THE COURT:  That's the issue I'm talking about.

 9            MR. COHEN:  Absolutely, they do.  But that doesn't

10   mean they get to drag in the royalty rate here because that is

11   not relevant and unfairly prejudicial, and it's -- I pointed

12   out that whole calculation rests -- turns on the ten percent

13   number that the man made up.

14            So for all those reasons, it shouldn't come in.  But

15   again, if we have to brief just that narrow issue whether they

16   can advance at trial a royalty theory when we've elected to do

17   the proxy theory, whether they can sneak that in in that way,

18   we would like to brief that narrow issue.

19            THE COURT:  I would absolutely permit you to brief

20   it, but -- okay.  Let me get back to what's your theory of

21   defense, Mr. Wegner?  Mr. Cohen says I'm pursuing a proxy

22   theory, I'm entitled to do so, and the answer is certainly you

23   are.

24            What are you -- what theories are entitled to defend

25   with other than trying, via Mr. Martin, to reduce the damages
```

 1   that are associated with the proxy theory by Mr. Martin's

 2   testimony regarding the apportionment?

 3           MR. WEGNER:  Your Honor, I don't want to frustrate

 4   the court by bringing the issue up again.

 5           THE COURT:  Further frustrate the court.

 6           MR. WEGNER:  Further frustrate -- fair enough -- the

 7   court, but there's a authority for the proposition that I was

 8   advancing before about the entitlement to proxy damages theory

 9   as the only -- and it may be that they're allowed to advance it

10   at trial okay? -- but we certainly are allowed to preserve the

11   position that they're not entitled to do so; and the case I'm

12   thinking of --

13           THE COURT:  How can they -- okay, I'm sorry -- but

14   how can they possibly not be entitled to pursue that theory

15   now.

16           MR. WEGNER:  Because there is authority that says

17   "It's inappropriate in cases of reverse confusion where the

18   junior user's profits are likely to exceed the senior's users

19   diverted sales."  I'm sorry.  The case is *Quia* -- Q-u-i-a --

20   *Corp. versus Matel, Inc.*, No. C10-1902, JF-HRL, and it's -- it

21   has a Westlaw number.  It's 2011, WL2749576.

22           THE COURT:  Have you ever been to an arcade, and the

23   duck going along there, you shoot it, and it comes back up?

24           MR. WEGNER:  Yes, I've been to an arcade, Your Honor.

25           THE COURT:  Mr. Cohen, what's your response to what

1    he just offered by the newest wrinkle, if you will?

2          MR. COHEN:   This case is full of wrinkles, Your

3    Honor.

4          The cases where the proxy theory has been disallowed

5    have ratios of like 2,000 to one, 20,000 to one.  So, for

6    example, if a nail parlor in Bakersfield says, We're Google

7    Nails, and we -- you know, they sue Google, saying, You

8    infringed on our mark.  You're confusing things so that the

9    nail place in Bakersfield that, you know, grosses $50,000 a

10   year, can't get a windfall by getting $50 billion from Google,

11   that's what those cases are about.  It isn't -- he doesn't hold

12   up here, and if you look at the math -- and this is the math

13   from their expert -- the $9.8 million figure to which we

14   stipulated includes Steam Distribution, Havz LLC, which does

15   business as Steam Wholesale, and One Hit Wonder, the website.

16         During the deposition of Patty Chan, the CFO,

17   Ms. Chan acknowledged that transactions between Steam

18   Distribution and Steam Wholesale or between Steam Distribution

19   and One Hit Wonder, are essentially the left-hand, right-hand

20   transactions; left pocket, right pocket.  So if you were to

21   back those out, the number on the sales for when you take out

22   these left-pocket, right-pocket transactions, is about 7.4 --

23   roughly -- million dollars; and our sales were about seven --

24   sorry -- this is from Mr. Martin's report.  This is Exhibit 5.1

25   in his supplemental report.  Our total sales, AOP's total

```
1   sales, of The Milkman were 4.1 million.  So we're talking

2   about -- oh, I'm sorry.  Oh, I'm sorry, wrong, sorry.  I read

3   the wrong column.  7.9 million almost 8 million.

4              So when you back out the left-hand, right-hand sales,

5   the numbers are almost -- very close, by over one, but even if

6   you include as genuine arm's-length transactions, Steam

7   Distribution as well -- so you get that additional

8   $2.4 million, you're talking about a difference between $9.8

9   million and $7.9 million.  It isn't the kind of enormous

10  difference in which courts have said you can't -- that the

11  rights holders cannot pursuit proxy theory because of the

12  disparity between them, that there was no way for this little

13  rights holder to have captured the sales.  These companies are

14  roughly the same size, roughly the same sales, not identical

15  but roughly.

16             So, again, the court has, I think, ruled that we're

17  entitled to the proxy theory of damages, that we are entitled

18  to prosecute that.  Certainly the defendants have a right to

19  preserve the argument that they should be -- that it isn't

20  proper, that they can preserve that.  I have no dispute about

21  that.

22             THE COURT:  That's a given.

23             MR. COHEN:  Sure.  No dispute there.  Okay.  Let them

24  preserve.

25             THE COURT:  Make an offer of prove what you want to
```

```
 1   prove and get a ruling, and if it's negative, you've preserved
 2   it.
 3            MR. COHEN:  Correct.  That's all that needs doing.
 4   Again, oral, written, I don't care.  We just -- we need to do
 5   what we need to do, and they have a right to preserve the
 6   argument.  That's fair, and that relieves the argument of
 7   whether or not they can sneak in the royalty, this alternative
 8   theory of recovery that we're not prosecuting when we've
 9   elected to prosecute under the proxy theory of damages.  We
10   would like to brief that.
11            Now, the court said we don't need any more briefing,
12   but I'm offing that because I want to help the court; I'm not
13   doing it to burden you, I'm doing to it to help you if it will
14   be helpful.
15            THE COURT:  Okay.
16            Here's the thing:  Let me internally figure out when
17   we rejoin tomorrow.  We're going to rejoin ...
18                (Discussion held off the record)
19            THE COURT:  We're wrapping it up.
20            Mr. Wegner, just give me a little preview:  Are you
21   contending that when the plaintiff is pursuing a proxy theory,
22   you are entitled to defend on alternative bases, one basis
23   being the theory of apportionment analysis the factor analysis
24   that Mr. Martin used, and I can use an alternative theory to,
25   one, validate, and two, to say to a jury:  You make a choice.
```

```
 1   You can go either way.

 2           Are you saying that?

 3           MR. WEGNER:  Essentially, Your Honor, yes.

 4           THE COURT:  And you're saying as regards the -- not

 5   looking at validation initially, we're looking to -- can he

 6   seek to -- can you seek to value it in the way that's been

 7   discussed here and then argued to the jury to the affect, Look

 8   it, I'm arguing one theory of apportionment, but if you don't

 9   buy that, here's the royalty-rate theory?

10           MR. COHEN:  I understand the question.  Our position

11   is no, that they cannot pursue that alternative -- the offer --

12   the royalty theory as an alternative theory of damages.  That's

13   the answer to that question.

14           THE COURT:  Okay.  Give me that case tomorrow and

15   call it in to Mr. Wegner, and to us, just send an email.

16               (Discussion held off the record)

17           THE COURT:  You give me the case that says you can do

18   that, and you give me the case that says you can't do that and

19   exchange that with one other.

20               (Discussion held off the record)

21           THE COURT:  We'll give you -- how to communicate with

22   us.

23           MR. COHEN:  Okay.

24           THE COURT:  And that will put that to rest now.

25           MR. COHEN:  And then, separately, whether or not they
```

```
 1   can back door it through the validation --

 2           THE COURT:  That's -- exactly.  That's -- once you

 3   get by that, you still haven't gone away, okay?

 4           MR. COHEN:  I understand.

 5           THE COURT:  And then the question is, is a limiting

 6   instruct enough?  Maybe not because of the poison that's in the

 7   water.

 8           MR. COHEN:  No, there's no way to get that skunk out

 9   of the jury box.

10           THE COURT:  I don't know; it may be.  In which case

11   you get into a 403 analysis, and maybe you can't use it.  I

12   don't know.

13           MR. COHEN:  Well, that's what I was referring to.  I

14   made two arguments, as you may recall, both under 402,

15   relevance.  It was irrelevant, and 403.  I agree with you that

16   there is a 403 element.  Yes, I agree with that.

17           THE COURT:  Have you ever seen in a -- fireworks time

18   is coming up here shortly, and there is a firework that you

19   light it as a child, and it is black and it kind of winds it's

20   way up, keeps growing?

21           MR. COHEN:  Snakes, yeah.

22           THE COURT:  This is a firework.  This keeps growing.

23   It has a life of its own.  You keep coming up with something,

24   and some of it is new; some of may be -- I don't know.  I don't

25   think I can get through this; I'd rather give myself more time.
```

```
 1              You're coming from Orange County, aren't you,

 2   Mr. Wegner?

 3              MR. WEGNER:  That's right, Your Honor.

 4              THE COURT:  How long do you need mid morning?

 5              MR. WEGNER:  To get -- in the traffic, to get here,

 6   hour and a half.

 7              THE COURT:  Mid morning?

 8              MR. WEGNER:  Hour and a half to two hours at most,

 9   depends.

10              THE COURT:  You're coming from Sunset Boulevard?

11              MR. COHEN:  My office is on Sunset, yes, Your Honor,

12   but I live on the westside; but I'm here in Los Angeles.

13              THE COURT:  I was going to put you on call.  On call

14   doesn't do you any good.  Let's just have you here -- you

15   got -- Mr. Martin wants to talk to you.  Do you need Mr. Martin

16   tomorrow?  Do we need him?  Do you think you need your expert

17   tomorrow?

18              MR. WEGNER:  Your Honor, I think we don't probably,

19   but if you have questions that may call for him, you know, we

20   can have him available; but I think that he's testified

21   comprehensively to that.

22              THE COURT:  What about you, Mr. Cohen?

23              MR. COHEN:  I don't have any further questions; I

24   don't anticipate any further questions for Mr. Martin.  I have

25   argument.
```

```
 1              (Discussion held off the record)

 2              THE COURT:  The point is made that you didn't --

 3    there was no testimony of the royalty rate.

 4              MR. COHEN:  Well --

 5              THE COURT:  I would suggest you have your -- at least

 6    your client available, Mr. Wegner, because you're the one

 7    advancing the royalty rate, and we may need his testimony.  I

 8    don't care if Mr. Anson is here.  I'm not going to order your

 9    client back, your witness back.  If he is not here, you may be

10    putting yourself at risk.  I just warn you.

11              MR. WEGNER:  Understood, Your Honor.

12              MR. COHEN:  Do our clients need to be here tomorrow?

13              THE COURT:  No.

14              MR. COHEN:  Okay.

15              THE COURT:  Thank you for coming today on both sides.

16    Sorry it was so long.

17              MR. COHEN:  What time would you like us here?

18              THE COURT:  See you at 11:00 o'clock.  Give me those

19    citations, both sides, on this issue.

20              MR. WEGNER:  Thank you, Your Honor.

21              THE COURT:  Ms. Reporter, I apologize for the late

22    hour.

23              (Proceedings concluded at 6:40 p.m.)

24                        - - - - -

25
```

1                    C E R T I F I C A T E

2

3          I hereby certify that pursuant to Section 753,

4    Title 18, United States Code, the foregoing is a true and

5    correct transcript of the stenographically reported proceedings

6    held in the above-entitled matter and that the transcript page

7    format is in conformance with the regulations of the Judicial

8    Conference of the United States.

9

10     Date:  SEPTEMBER 6, 2017

11

12                    /S/_____

13                         Deborah K. Gackle
                              CSR No. 7106
14

15

16

17

18

19

20

21

22

23

24

25

{PLAINTIFF} v.
{DEFENDANT}

{WITNESS NAME}
{DATE}

**BY MR. COHEN: [21]**
65/1 67/1 67/23 69/25
73/22 74/22 75/6
76/25 90/20 97/17
103/5 132/3 144/5
145/3 147/6 151/4
152/6 160/1 163/11
192/3 194/3
**BY MR. WEGNER: [9]**
126/23 130/12 130/15
147/21 158/19 160/12
183/8 183/21 190/20
**BY THE COURT: [2]**
58/12 79/12
**MR. ANSON: [18]**
57/10 57/14 57/25
106/3 106/20 107/1
107/21 108/2 108/21
108/24 115/15 115/18
187/4 187/11 187/18
188/14 189/13 191/6
**MR. BROWN: [1]**  6/6
**MR. COHEN: [187]**
5/6 13/7 13/9 13/21
14/1 14/3 14/6 14/17
14/20 15/23 15/25
16/4 16/8 16/11 16/17
16/21 16/24 17/3 17/5
18/2 18/5 18/13 18/16
18/20 18/23 19/9
20/10 20/13 20/19
21/4 21/7 22/9 22/21
22/23 22/25 23/7
23/13 23/21 23/25
29/5 30/17 30/20
30/24 31/2 31/7 32/9
33/1 44/16 44/19
44/22 44/25 45/15
46/23 56/9 63/12
63/14 63/18 63/21
64/1 64/11 65/18
65/21 66/16 67/20
72/8 73/8 73/14 73/16
73/18 74/13 74/16
78/23 82/18 91/9
97/12 98/10 98/13
99/22 100/2 100/10
100/16 100/19 100/24
101/1 101/6 101/11
101/25 102/21 104/22
112/7 112/22 113/2
114/1 114/3 115/8
115/10 116/17 116/24
117/4 123/20 123/25
125/13 125/16 125/19
126/2 126/5 132/1
133/8 137/20 137/23
139/6 139/11 144/22
151/2 151/18 151/22

159/24 160/9 163/9
173/4 173/8 174/8
174/10 174/14 174/19
174/21 175/18 177/5
178/8 178/12 178/16
178/18 178/23 179/18
187/13 191/23 191/25
195/3 195/5 195/7
195/12 195/17 195/23
198/15 198/19 199/3
199/25 200/6 204/24
205/2 205/6 207/10
208/2 208/4 208/17
209/6 209/12 209/21
209/25 210/4 210/7
210/25 211/5 211/14
211/18 211/22 212/1
212/8 214/1 215/22
216/2 217/9 217/22
217/24 218/3 218/7
218/12 218/20 219/10
219/22 220/3 220/11
220/13 220/16
**MR. GATIEN: [2]**  5/16
5/19
**MR. KAMELGARD:
[2]**  5/20 5/23
**MR. KEAT: [1]**  5/11
**MR. KEATS: [1]**  5/9
**MR. MARTIN: [3]**
57/11 57/15 58/1
**MR. WEGNER: [98]**
5/24 6/3 11/18 11/22
11/25 12/20 13/3
13/13 24/3 24/8 24/15
24/19 24/25 27/4
27/21 28/24 29/7 29/9
29/16 30/6 30/10 33/5
35/23 35/25 36/9
45/20 46/14 46/19
46/21 55/14 55/19
56/6 56/10 56/16
56/22 57/3 63/23 93/3
93/6 93/11 93/22
110/21 111/1 111/8
111/20 126/9 126/17
126/21 129/8 131/5
143/22 143/25 144/19
144/23 145/2 147/2
150/22 151/13 151/15
158/14 158/17 159/22
163/8 171/3 173/1
181/1 181/17 181/19
181/25 191/11 194/25
201/22 202/12 202/15
203/23 204/2 204/5
204/12 205/7 205/11
205/19 206/3 206/19
207/11 209/4 210/23
211/25 213/2 213/5
213/15 213/23 217/2
219/2 219/4 219/7

219/17 220/10 220/19
**THE CLERK: [3]**  5/2
65/15 123/1
**THE COURT: [389]**
**THE REPORTER: [7]**
13/16 13/18 16/15
58/4 58/6 111/18
128/14
**THE WITNESS: [80]**
67/19 74/19 76/19
77/15 77/17 77/21
77/25 78/8 78/11 79/1
79/20 80/5 80/10
81/12 81/16 81/20
83/24 84/2 84/8 84/11
84/17 85/3 85/7 85/9
85/19 86/3 86/9 86/15
86/21 87/11 88/18
88/20 89/3 89/11
89/21 90/7 90/11
90/14 90/17 90/19
94/5 94/7 94/10 94/14
94/17 95/13 95/17
95/23 96/6 96/11
96/16 98/4 103/2
105/22 107/11 107/14
109/8 117/7 117/10
128/15 147/4 151/17
151/25 171/8 171/11
171/16 171/21 184/6
184/9 186/1 186/8
186/20 186/23 187/1
188/19 188/21 188/24
189/20 190/16 195/16

**$**
**$1.2 [1]**  95/15
**$1.2 million [1]**  95/15
**$10,000 [1]**  147/2
**$2.4 [1]**  215/8
**$2.4 million [1]**  215/8
**$20 [1]**  158/4
**$22,000 [1]**  150/5
**$26 [1]**  163/4
**$3,831,196 [1]**  30/11
**$300,000 [3]**  186/6
186/13 186/15
**$4 [1]**  145/11
**$420,000 [1]**  167/15
**$50 [1]**  214/10
**$50,000 [1]**  214/9
**$6,052,232 [1]**  30/18
**$6.2 [4]**  17/18 143/9
143/20 144/17
**$6.2 million [4]**  17/18
143/9 143/20 144/17
**$60 [1]**  172/5
**$600,000 [4]**  143/12
143/20 167/22 174/1
**$620,000 [1]**  167/15
**$64 [2]**  71/1 73/5
**$650 [2]**  164/3 165/19

**$7.9 [1]**  215/9
**$7.9 million [1]**  215/9
**$9.8 [3]**  23/23 214/13
215/8
**$9.8 million [2]**  23/23
214/13

**,**

**'em [1]**  38/4

**/**

**/S [1]**  221/12

**0**
**0080 [4]**  3/5 3/9 3/13
3/17
**0717 [1]**  2/18

**1**
**1.2 million [1]**  150/4
**1.5 [1]**  188/9
**10 [6]**  1/18 5/1 45/8
118/1 189/25 201/6
**100 [10]**  75/24 76/8
76/21 81/24 97/11
110/4 127/10 159/19
197/24 197/25
**1050 [4]**  3/4 3/8 3/12
3/16
**10:00 [1]**  201/10
**10:25 [1]**  48/7
**11 [12]**  68/14 68/21
76/22 83/9 83/11
84/18 96/13 109/25
110/1 110/5 189/19
197/21
**1117 [2]**  11/1 15/6
**117 [1]**  111/9
**11:00 [2]**  50/10 220/18
**12 [12]**  81/6 81/7
81/10 83/24 83/25
84/1 84/4 89/10 98/1
125/4 144/14 145/20
**120 [1]**  2/17
**1202 [2]**  10/21 11/1
**124 [1]**  111/10
**125 [1]**  4/6
**13 [3]**  65/25 66/1 66/7
**132 [1]**  4/6
**1453 [1]**  2/12
**147 [1]**  4/7
**15 [9]**  11/1 42/12 66/1
66/8 98/2 145/20
169/22 175/25 176/1
**15,000-page [1]**  19/18
**15-01586-WDK [1]**  1/9
5/4
**151 [1]**  4/7
**1545 [2]**  31/20 120/2
**1548-50 [1]**  120/2
**158 [3]**  4/8 70/19
73/24

**159 [3]**  97/19 97/22
98/12
**16 [1]**  152/18
**160 [2]**  4/8 4/9
**17 [3]**  138/13 163/14
177/15
**18 [5]**  42/11 42/12
98/2 152/17 221/4
**180 [3]**  172/4 172/8
172/10
**19 [3]**  66/20 67/3
163/14
**1902 [1]**  213/20
**1910 [1]**  2/7
**1985 [1]**  120/12
**1989 [2]**  31/20 120/2

**2**
**2,000 [1]**  214/5
**20 [9]**  21/1 42/11
42/12 43/2 48/6 64/21
109/16 109/19 169/22
**20,000 [1]**  214/5
**200 [3]**  165/4 166/15
171/25
**200-plus [4]**  162/11
166/15 166/21 166/25
**2001 [1]**  61/5
**2006 [1]**  77/20
**2009 [1]**  61/7
**2011 [1]**  213/21
**2012 [1]**  197/5
**2015 [2]**  165/18
165/19
**2017 [7]**  1/18 5/1
30/13 64/21 118/1
138/13 221/10
**207 [1]**  2/17
**209 [3]**  64/18 65/25
66/21
**213 [1]**  1/25
**213-403-6405 [1]**  2/8
**213-413-6400 [1]**  2/8
**218 [1]**  1/21
**23 [3]**  187/9 187/11
187/15
**232 [2]**  45/9 64/16
**24 [1]**  176/20
**250,000 [1]**  63/8
**251 [2]**  64/22 70/6
**258-1 [1]**  138/4
**26 [2]**  177/17 177/19
**2603 [4]**  3/4 3/8 3/12
3/16
**2702 [1]**  118/20
**2:00 [3]**  116/9 116/24
118/1
**2d [1]**  197/5

**3**
**3,000 [1]**  148/11
**3.2 [2]**  150/16 159/6

**3**

**30 [4]** 162/25 163/1
172/9 175/5
**300 [3]** 2/12 128/8
162/23
**300,000 [3]** 186/9
186/21 189/25
**310-746-9800 [1]** 2/13
**310-746-9820 [1]** 2/13
**32 [1]** 64/15
**34 [1]** 176/21
**35,000 [1]** 140/2
**350 [1]** 1/24
**360 [3]** 130/24 132/25
136/19
**390 [1]** 111/9
**3rd [3]** 2/12 30/13
138/15

**4**

**4.1 [1]** 150/16
**4.1 million [1]** 215/1
**4.2 million [1]** 186/22
**4.29 [2]** 187/25 191/1
**402 [2]** 196/6 218/14
**403 [4]** 196/8 218/11
218/15 218/16
**420 [1]** 145/7
**420-some-odd-thousa
nd [1]** 145/12
**424,000 [1]** 145/8
**424-302-0717 [1]** 2/18
**440 [1]** 2/7
**45 [1]** 175/5
**458 [1]** 74/3
**4th [2]** 1/24 177/15

**5**

**5.1 [1]** 214/24
**50 [8]** 8/20 81/6 81/9
91/20 120/2 125/5
125/7 192/19
**500 [3]** 108/6 108/9
109/2
**529 [1]** 31/24
**533 [1]** 31/24
**561 [1]** 108/6
**58 [1]** 4/5
**580 [1]** 94/24
**581 [1]** 85/17
**59.99 [1]** 165/19
**5:00 [1]** 199/20
**5:30 [1]** 116/10

**6**

**60 [3]** 42/13 192/15
192/19
**600,000 [1]** 143/13
**61 [1]** 96/25
**620 [1]** 144/18
**6400 [1]** 2/8

**6405 [1]** 2/8
**65 [1]** 4/5
**6:40 [1]** 220/23

**7**

**7.1 [2]** 185/7 186/19
**7.4 [1]** 214/22
**7.9 million [1]** 215/3
**70 [1]** 197/25
**702 [20]** 9/13 44/11
50/17 50/18 50/20
50/21 51/9 53/3 55/18
71/17 88/5 88/6 88/15
101/12 101/13 101/13
114/6 118/14 118/21
173/20
**702-Daubert [1]** 88/16
**7106 [1]** 221/13
**75 [2]** 42/14 50/14
**753 [1]** 221/3
**754 [1]** 120/12
**79 [1]** 4/11

**8**

**80 [1]** 197/25
**80,000 [5]** 130/25
136/14 138/24 139/2
140/2
**80-plus [1]** 184/23
**826 [1]** 120/12
**828 [1]** 120/13
**829 [1]** 120/13
**830 [1]** 197/5
**835 [1]** 31/24
**839 [1]** 197/6
**840 [1]** 197/6
**886 [2]** 31/20 120/2
**8913 [1]** 1/25
**893-8913 [1]** 1/25
**8:30 [1]** 201/7

**9**

**9,883,420 [1]** 29/8
**9.8 million [1]** 29/6
**90 [2]** 157/24 197/25
**90012 [1]** 1/24
**90026 [1]** 2/7
**90212 [1]** 2/18
**90401 [1]** 2/12
**92614 [4]** 3/4 3/8 3/12
3/16
**944 [1]** 197/5
**949-705-0080 [4]** 3/5
3/9 3/13 3/17
**98 [1]** 61/14
**9800 [1]** 2/13
**9820 [1]** 2/13
**9:00 [1]** 201/7
**9:10 [1]** 5/1
**9:45 [1]** 17/4

**A**

**A-n-s-o-n [1]** 57/7
**A.M [1]** 5/1
**ability [3]** 166/7
167/12 172/14
**able [29]** 7/5 9/20
12/14 19/5 24/14 30/2
32/24 39/25 41/24
41/24 54/16 71/3 71/5
113/6 116/4 148/16
156/7 156/20 158/3
165/16 171/15 171/22
177/18 181/3 191/14
195/9 198/14 208/22
212/3
**above [3]** 11/4 11/4
221/6
**above the [1]** 11/4
**above-entitled [1]**
221/6
**absent [1]** 18/18
**absolute [1]** 81/22
**absolutely [15]** 24/12
24/21 34/24 63/19
90/20 91/6 95/11
119/22 130/2 159/1
189/21 211/18 212/7
212/9 212/19
**absurd [2]** 110/17
189/12
**abundance [2]** 104/15
104/19
**abundantly [1]** 20/17
**abuse [1]** 200/3
**abusing [1]** 41/7
**accept [4]** 18/9 91/24
92/4 198/25
**acceptable [3]** 14/17
53/23 188/9
**accepted [8]** 28/14
53/9 59/8 61/15 77/15
83/20 159/9 184/11
**access [12]** 84/5 87/7
131/1 133/24 135/25
140/19 140/24 148/7
156/2 158/21 160/4
161/21
**accompli [2]** 25/18
206/5
**accomplish [1]**
126/12
**according [6]** 11/3
54/22 101/17 144/10
167/14 190/1
**account [1]** 140/22
**accounting [1]** 192/2
**accounts [3]** 110/5
139/25 141/8
**accuracy [2]** 125/6
125/7
**accurate [4]** 147/6

157/17 189/16 201/24
**accurately [2]** 67/15
142/15
**accuse [1]** 104/7
**accusing [1]** 16/23
**acknowledged [1]**
214/17
**acoustics [1]** 12/16
**acquaintanceship [1]**
7/2
**acquaintanship [1]**
8/24
**acquired [1]** 130/6
**across [6]** 128/13
129/24 146/7 150/8
159/17 161/17
**Act [1]** 10/18
**acted [1]** 14/16
**action [1]** 96/22
**actively [6]** 131/13
134/14 134/16 162/12
171/2 172/23
**activities [1]** 68/4
**activity [5]** 75/18
197/2 197/3 197/10
197/11
**acto [3]** 36/9 36/9
36/11
**actual [11]** 11/5 32/2
34/12 48/15 90/3
131/20 133/18 171/6
190/13 190/15 190/18
**actually [19]** 8/23
32/18 32/22 33/11
45/2 45/4 64/13 66/17
77/18 78/2 97/13
111/5 134/12 168/25
171/23 183/17 202/17
205/22 208/12
**ad [2]** 86/17 160/19
**add [4]** 10/9 120/8
123/17 123/18
**added [1]** 50/9
**addition [5]** 20/22
32/17 94/18 95/6
179/15
**additional [7]** 68/10
95/6 131/1 133/17
172/22 204/7 215/7
**address [6]** 16/2
70/23 123/21 179/8
183/7 195/21
**addressed [5]** 10/25
119/14 131/4 180/9
191/22
**addresses [4]** 99/20
103/13 103/16 173/6
**addressing [2]** 31/16
175/11
**adjust [2]** 24/14 76/24
**adjustable [1]** 24/14
**Adlderton [1]** 2/11

**admirable [1]** 182/4
**admire [1]** 187/20
**admissible [9]** 17/13
52/10 82/22 112/10
112/14 169/18 196/6
196/7 209/2
**admission [2]** 71/15
71/16
**admit [2]** 122/21
195/15
**admittedly [2]** 21/14
102/18
**adopt [1]** 46/24
**advance [5]** 25/18
25/20 33/17 212/16
213/9
**advanced [5]** 10/9
16/19 25/4 28/2 29/1
**advances [1]** 10/11
**advancing [5]** 10/13
10/13 12/15 213/8
220/7
**advertise [4]** 123/10
123/11 161/18 166/8
**advertises [1]** 86/19
**advertising [7]** 86/8
86/12 86/13 86/14
87/24 160/19 161/23
**advisedly [1]** 50/19
119/20
**advocated [2]** 16/20
17/6
**advocating [2]** 18/6
18/10
**affect [5]** 55/9 55/11
133/23 173/11 217/7
**affiliate [45]** 160/14
160/25 161/4 161/5
161/22 161/24 162/8
162/13 162/18 163/5
163/16 163/19 163/20
163/21 163/23 164/11
165/15 165/21 165/23
166/17 167/10 167/17
167/25 168/1 168/4
168/7 168/8 168/9
168/12 168/19 169/15
171/13 171/23 172/1
172/3 172/14 172/19
172/20 172/22 173/24
174/2 174/23 174/24
175/4 176/10
**affiliates [15]** 148/1
160/25 161/18 162/11
163/6 164/17 164/21
165/4 166/8 166/15
166/15 166/22 166/25
171/6 171/25
**affirmed [1]** 17/20
**afoul [1]** 12/24
**afraid [4]** 16/9 78/20
78/20 117/5

**(2) 30 - afraid**

## A

**after [32]** 6/19 12/6 17/18 32/12 39/21 40/1 51/20 72/18 73/5 76/17 79/23 80/19 87/20 89/5 95/8 101/22 110/14 113/11 114/10 115/15 118/14 118/15 137/10 137/10 138/14 150/5 159/21 160/8 177/14 182/21 197/18 204/20
**after-the-fact [1]** 40/1
**afternoon [1]** 191/9
**afterwards [1]** 183/7
**again [47]** 13/17 28/2 29/10 29/23 38/3 38/7 40/22 41/25 44/7 44/16 51/16 52/10 53/17 54/8 54/9 55/2 56/3 66/16 88/4 88/15 91/12 91/12 92/11 92/11 92/20 95/25 100/11 105/5 122/23 123/17 129/17 132/15 143/11 143/15 144/13 159/15 166/17 167/25 188/10 202/19 204/16 205/13 206/5 212/15 213/4 215/16 216/4
**against [6]** 36/1 63/1 82/4 184/24 203/3 204/23
**age [1]** 56/4
**age-old [1]** 56/4
**aged [1]** 7/10
**aged-old [1]** 7/10
**ago [13]** 18/10 28/5 35/4 47/3 49/3 59/11 84/22 135/18 139/13 142/18 155/2 175/12 201/14
**agree [34]** 22/8 23/24 26/12 26/13 26/18 28/23 29/18 29/25 32/9 32/9 32/9 32/20 36/3 36/4 42/12 45/10 45/11 46/20 69/23 78/13 95/25 97/6 115/4 115/5 167/6 192/13 192/17 195/19 206/13 218/15 218/16
**agree with [1]** 26/12
**agreed [5]** 44/1 44/7 50/14 78/10 198/22
**agreeing [2]** 29/14 42/10
**agreement [22]** 19/17 21/18 21/19 21/19 21/21 21/22 21/23

22/17 36/8 36/17 40/16 40/20 40/21 42/14 42/14 42/19 44/18 46/3 46/3 46/4 46/5 47/14
**ahead [37]** 9/4 9/4 9/5 14/1 16/17 17/3 19/8 24/19 27/9 31/4 34/14 40/5 41/13 46/12 60/25 63/14 65/18 67/1 67/23 70/23 73/16 74/13 80/10 85/9 86/15 88/22 98/6 99/22 126/9 130/15 137/23 179/18 181/25 184/6 187/18 192/3 206/16
**ain't [1]** 34/5
**air [3]** 72/5 197/17 203/3
**al [2]** 1/11 5/5
**albeit [2]** 90/6 118/8
**alert [1]** 31/15
**all [127]** 8/20 9/17 9/21 10/6 10/10 10/24 12/6 12/17 15/20 17/10 20/5 20/7 20/17 21/11 25/8 25/8 28/19 28/20 29/13 34/21 36/17 38/2 39/2 40/18 43/1 43/7 43/11 44/21 44/24 44/24 46/2 47/8 53/7 53/23 58/19 59/12 64/8 64/24 64/25 65/22 68/14 71/1 71/6 76/18 76/21 80/17 80/19 80/21 80/22 81/14 84/5 84/15 84/15 84/21 89/25 90/10 90/11 90/12 94/18 94/19 96/21 97/17 100/15 103/20 105/13 105/23 106/9 108/3 110/13 112/1 112/6 112/20 113/18 116/14 119/11 120/14 120/16 121/1 127/11 127/20 129/17 131/22 132/21 133/3 136/4 136/20 139/11 146/21 146/25 150/8 153/12 156/21 159/17 162/4 162/20 164/25 165/17 167/6 173/11 173/14 173/19 173/22 174/7 176/12 176/24 177/17 177/21 178/21 179/12 180/19 180/23 184/24 187/13 188/2 189/3 190/6 193/20 196/25 197/1 197/1 200/18 200/25 201/19

202/20 210/23 212/14 216/3
**all-time [1]** 162/20
**alleged [2]** 67/14 186/5
**allegedly [1]** 48/14
**allied [8]** 119/19 119/20 119/23 119/23 119/24 170/7 181/11 181/12
**alliteration [1]** 47/8
**allocate [3]** 32/15 35/20 35/21
**allocated [2]** 33/20 75/24
**allocating [2]** 32/14 50/13
**allocation [3]** 35/20 50/25 52/7
**allow [4]** 119/5 161/20 179/1 179/2
**allowed [13]** 25/10 86/17 151/10 152/10 178/3 178/20 179/8 179/10 179/11 198/9 198/11 213/9 213/10
**allows [3]** 33/18 128/1 130/6
**alluded [1]** 124/9
**almost [10]** 7/16 38/15 82/6 100/7 101/19 109/25 122/25 158/2 215/3 215/5
**along [6]** 28/21 33/21 53/2 130/9 202/11 213/23
**already [10]** 22/6 44/15 92/2 106/14 106/25 122/13 124/9 126/16 153/25 208/7
**also [20]** 6/10 10/17 15/7 19/19 39/18 84/22 86/17 115/23 131/22 131/22 147/13 148/1 148/20 159/12 170/23 173/14 176/11 177/21 181/12 182/8
**alternative [12]** 9/23 9/24 25/19 25/20 28/1 183/24 205/13 216/7 216/22 216/24 217/11 217/12
**alternatively [2]** 44/5 205/11
**alternatives [2]** 45/10 85/17
**although [4]** 7/1 26/23 150/2 187/6
**always [7]** 7/12 7/13 17/21 20/6 82/6 96/1 187/20
**am [26]** 9/3 15/23

16/10 16/25 34/14 36/6 37/23 38/3 41/7 56/6 73/7 79/14 83/18 84/25 97/8 103/16 108/3 123/11 123/13 124/2 144/19 184/18 192/7 192/21 193/10 199/12
**ambiguous [2]** 144/2 144/4
**amendment [1]** 118/25
**Ameri [1]** 79/5
**Ameri-Skills [1]** 79/5
**American [3]** 78/15 127/10 127/11
**amicus [1]** 13/5
**among [4]** 11/2 75/25 76/8 96/9
**amongst [1]** 108/8
**amorphous [5]** 107/6 112/4 121/9 177/9 177/22
**amount [12]** 11/4 27/3 27/16 29/16 34/12 143/17 150/7 156/18 190/6 190/7 197/14 209/20
**analyses [1]** 26/3
**analysis [108]** 9/21 15/6 15/17 24/22 25/4 25/6 25/22 26/2 26/9 27/24 27/25 28/9 33/16 44/11 44/12 48/25 49/1 52/9 53/3 56/16 62/7 65/7 65/9 68/3 68/5 68/15 69/14 69/15 69/17 75/13 76/13 76/25 77/12 77/14 78/4 78/6 81/2 81/11 84/5 89/14 91/24 100/14 100/14 101/15 101/15 101/18 102/12 102/19 102/20 102/21 105/4 105/6 105/24 107/7 107/11 107/24 107/25 112/1 112/16 112/22 113/12 113/14 118/22 119/13 119/17 119/18 119/19 121/16 122/9 124/8 124/14 126/25 127/1 142/7 143/10 144/8 156/21 158/24 167/14 181/11 181/14 183/11 182/24 194/24 196/22 196/23 197/18 197/18 198/6 201/15 202/7 202/14 202/20 202/22 202/25 203/5 203/8 203/9 203/10 203/12 203/13 204/17 204/20

205/22 205/23 216/23 216/23 218/11
**analytical [2]** 28/17 44/2
**analytically [4]** 71/25 116/12 119/24 122/22
**analyze [3]** 69/8 154/4 166/5
**analyzed [4]** 21/16 97/2 149/16 166/7
**analyzing [1]** 89/5
**analyzing the [1]** 89/5
**anathema [1]** 47/22
**anew [2]** 118/19 119/8
**ANGELES [6]** 1/17 1/24 2/7 5/1 118/1 219/12
**annelled [1]** 46/7
**annotation [2]** 118/19 119/9
**annotations [4]** 118/13 118/14 118/17 118/17
**ANSON [41]** 4/11 25/4 26/3 26/9 30/4 51/14 53/11 57/7 57/11 57/18 60/16 61/1 61/2 61/6 78/2 78/10 78/12 78/13 78/13 79/8 79/15 81/15 81/18 106/3 107/15 109/10 109/16 114/17 125/4 183/7 184/20 187/4 187/18 188/22 188/25 189/11 191/2 191/5 194/13 203/14 220/8
**Anson's [10]** 25/25 26/7 62/24 78/21 82/21 99/8 185/11 190/23 191/16 192/12
**answer [61]** 14/4 14/25 22/1 27/2 27/3 28/5 28/14 33/4 45/7 46/1 46/5 53/4 68/24 74/9 74/15 74/19 74/21 74/25 83/6 84/7 88/16 89/16 89/22 92/7 97/4 97/11 97/14 97/16 97/22 98/4 98/5 98/10 98/12 98/13 100/6 101/12 113/7 113/8 113/9 114/12 119/22 141/9 142/4 142/5 153/14 153/16 153/18 164/20 170/18 171/1 174/16 175/20 177/6 193/6 194/23 199/19 201/9 202/3 209/8 212/22 217/13
**answered [3]** 14/22 92/18 164/20
**answers [5]** 20/18

**A**

**answers... [4]** 20/19
119/12 192/20 200/20
**Anthony [4]** 2/16 5/10
5/12 5/13
**anticipate [1]** 219/24
**anticipated [1]** 149/8
**any [100]** 11/4 12/18
12/22 16/9 17/14
23/16 32/22 47/9 47/9
48/16 49/2 53/14 55/6
55/24 55/25 56/8
57/21 62/14 64/6 64/7
65/15 72/25 77/3 80/3
81/12 85/5 87/11
91/15 91/16 91/17
91/21 92/24 102/17
106/7 107/10 108/18
110/20 111/15 113/16
114/14 115/5 121/10
123/4 126/1 126/15
133/22 135/15 135/21
136/23 137/2 139/24
140/5 140/6 140/17
141/6 142/1 142/4
146/11 152/23 152/25
153/3 153/5 153/7
153/9 153/22 153/23
154/7 154/10 154/15
155/1 155/11 155/13
156/13 165/22 166/18
173/22 176/8 177/13
178/3 178/20 190/12
192/16 192/21 193/8
193/10 193/11 193/15
193/16 194/16 194/24
195/9 196/19 196/21
197/14 197/17 200/21
216/11 219/14 219/23
219/24
**anybody [4]** 35/16
42/8 55/25 193/11
**anymore [1]** 190/20
**anyone [2]** 102/7
146/5
**anything [28]** 19/3
37/9 43/24 44/10
44/13 45/12 47/25
48/16 49/22 54/5 54/6
73/13 80/15 82/11
121/20 123/7 133/23
139/5 140/12 141/7
165/18 168/14 178/14
191/22 195/5 195/7
196/13 198/7
**anyway [2]** 200/25
210/23
**anywhere [4]** 18/1
133/6 167/2 190/10
**AOP [26]** 1/7 5/4 5/8
5/17 5/21 14/2 17/6

17/18 18/6 19/11
111/4 143/18 144/16
167/17 184/19 191/14
193/8 193/11 193/14
193/16 194/6 194/8
196/1 209/15 211/16
212/5
**AOP Milkman [1]**
194/8
**AOP's [6]** 17/24 70/4
194/6 207/8 207/13
214/25
**apart [1]** 112/2
**APLC [1]** 2/6
**apologize [7]** 30/25
31/3 106/6 111/10
143/23 195/16 220/21
**apparent [3]** 119/12
121/13 121/13
**apparently [3]** 118/18
120/12 189/13
**appeal [1]** 111/16
**appear [2]** 23/17 36/6
**appearances [2]** 2/1
5/6
**appears [1]** 6/13
**appetite [1]** 127/12
**Apple [5]** 209/2 210/8
210/9 210/10 210/16
**apples [1]** 179/24
**applicable [1]** 119/6
**applied [4]** 52/23
146/3 184/24 198/3
**applies [2]** 63/21
82/25
**apply [2]** 54/20 144/8
**applying [2]** 97/9
203/15
**appointment [1]**
116/1
**apportion [6]** 33/18
33/19 42/3 78/4 80/15
97/25
**apportioned [3]** 78/5
186/17 189/23
**apportionment [38]**
26/9 58/18 59/10
62/23 68/2 77/19
77/21 80/13 80/17
97/10 99/1 112/24
121/3 127/1 180/10
180/17 180/22 181/8
183/10 185/1 185/10
185/17 189/7 189/8
190/1 190/7 190/24
190/25 202/20 203/12
204/7 204/17 204/20
205/18 205/23 213/2
216/23 217/8
**appreciate [3]** 123/24
137/23 175/24
**approach [36]** 9/14

9/24 10/1 10/3 10/9
10/14 26/19 26/23
27/1 27/12 29/23
40/15 46/11 47/15
48/2 56/4 59/7 63/15
77/15 79/15 108/15
108/19 108/20 108/23
118/4 122/6 124/8
137/17 193/19 199/8
201/18 201/19 202/6
203/17 203/17 204/14
**approach I'm [1]**
124/8
**approaches [2]** 42/4
62/14
**appropriate [14]**
15/14 27/13 28/20
29/11 48/20 123/25
125/22 189/16 190/1
191/5 192/12 207/1
208/8 209/11
**appropriately [2]**
43/12 113/19
**approximately [1]**
143/20
**approximation [1]**
25/11
**approximations [1]**
84/9
**April [7]** 21/1 45/8
64/21 138/13 165/18
177/15 177/15
**April 4th [1]** 177/15
**arcade [2]** 213/22
213/24
**are [245]**
**area [12]** 37/8 43/1
46/10 49/14 51/16
51/16 76/16 93/16
101/16 102/6 102/9
183/5
**areas [4]** 7/25 42/11
42/22 43/2
**aren't [4]** 107/11
110/25 149/1 219/1
**arena [1]** 124/19
**arguable [1]** 113/21
**arguably [1]** 82/25
**argue [16]** 14/19 40/5
51/6 53/20 121/19
125/8 125/11 125/12
174/17 179/4 179/5
195/9 205/4 205/15
206/17 208/5
**argued [2]** 177/5
217/7
**argues [1]** 178/7
**arguing [9]** 40/8 55/7
114/3 169/18 182/9
205/10 209/9 210/20
217/8
**argument [36]** 14/13

14/15 55/14 60/21
93/6 93/9 113/5
113/16 113/17 114/2
114/5 116/14 116/16
121/12 121/13 125/8
158/2 174/19 174/20
175/13 177/2 177/2
179/8 195/11 195/12
195/18 198/1 200/5
201/16 202/10 203/19
208/24 215/19 216/6
216/6 219/25
**argumentation [4]**
10/7 20/3 46/2 83/2
**Argumentative [1]**
151/14
**arguments [8]** 178/22
178/25 179/9 179/14
205/5 205/8 212/6
218/14
**arithmetic [1]** 196/19
**arm's [1]** 215/6
**arm's-length [1]**
215/6
**around [9]** 7/21 8/25
22/21 49/9 92/20
92/25 186/6 208/19
209/9
**array [1]** 127/3
**arrive [6]** 9/7 42/4
56/16 68/1 105/15
105/22
**arrived [4]** 31/10
79/15 113/23 196/23
**arriving [2]** 56/18
147/9
**as [225]**
**ascribe [8]** 56/8 76/24
83/21 88/14 100/3
124/15 178/2 183/25
**ascribed [4]** 56/11
70/16 105/3 191/5
**ascribes [1]** 55/10
**ascribing [1]** 56/4
**ascription [2]** 99/20
113/13
**aside [3]** 17/20 98/19
210/22
**ask [32]** 8/6 41/2
44/14 53/17 55/19
57/20 91/15 91/17
91/23 100/11 103/17
103/23 105/21 114/13
124/22 125/6 126/10
126/19 130/17 139/9
143/4 151/20 158/15
165/1 169/4 169/9
169/24 174/5 178/12
183/3 192/1 201/15
**asked [23]** 12/9 15/2
53/15 62/21 70/12
70/15 72/24 74/2 74/6

14/15 55/14 60/21
93/6 93/9 113/5
74/6 74/24 74/25
75/11 84/5 97/13
99/24 108/11 109/3
109/3 135/18 141/10
168/17 194/23
**asking [7]** 8/7 36/22
66/10 107/18 124/18
126/12 175/8
**aspect [14]** 6/25 7/2
7/3 51/4 51/5 85/12
131/16 149/15 153/25
177/7 193/4 194/2
201/21 201/23
**aspects [3]** 130/8
131/10 148/23
**assess [1]** 131/8
**assessing [3]** 11/2
48/13 48/23
**assessment [5]** 85/10
97/10 109/15 109/18
147/14
**asset [10]** 60/11 62/2
62/3 62/25 63/4 63/8
80/16 168/22 184/22
186/10
**assets [5]** 96/19 110/9
152/13 160/17 190/2
**assign [4]** 70/13
144/14 166/12 173/12
**assigned [3]** 143/4
143/6 168/11
**assignment [1]**
135/17
**assignments [2]**
61/10 135/15
**assist [1]** 36/21
**assistance [3]** 32/2
47/16 122/24
**assistant [1]** 35/4
**associated [7]** 34/24
55/12 114/25 129/4
136/2 207/19 213/1
**associatedly [1]**
183/6
**Associating [1]** 41/22
**Association [1]** 78/15
**assume [8]** 87/20
137/22 143/5 143/7
143/15 143/16 144/13
144/14
**assuming [1]** 92/8
**assumption [2]** 68/12
143/22
**assumptions [1]** 26/2
**assure [1]** 20/19
**assured [1]** 162/7
**at [211]** 9/7 10/17
10/18 10/19 11/10
12/12 12/12 12/25
13/4 14/5 14/6 14/12
15/1 15/3 16/18 17/12
25/2 31/10 33/7 33/8

Case 5:15-cv-01586-WDK-KK   Document 315   Filed 09/30/17   Page 226 of 257   Page ID
#:35455

{PLAINTIFF} v.
{DEFENDANT}

{WITNESS NAME}

{DATE}

**A**

**at... [191]** 33/9 35/11
35/16 35/18 37/2 42/3
42/4 42/11 42/14
42/15 42/15 43/7
43/16 43/17 45/2
47/19 47/24 47/25
48/7 48/10 50/10
50/14 51/2 51/5 52/2
54/21 56/2 56/16
56/18 57/19 57/21
57/23 57/24 60/14
60/21 61/24 64/6
65/15 65/23 65/24
65/25 67/6 68/1 68/19
69/3 69/4 70/2 70/5
70/6 76/14 76/18
79/16 79/18 79/18
79/24 79/25 80/3 81/4
82/5 84/18 90/23 95/2
95/8 95/15 97/15 99/8
102/7 102/9 104/16
104/21 105/13 105/15
105/22 107/11 107/23
108/3 109/4 110/12
110/16 110/24 113/5
113/23 115/3 115/6
116/4 116/9 117/3
118/9 118/10 118/19
119/8 119/8 120/2
120/13 121/1 121/17
122/16 122/16 126/20
128/2 128/9 128/11
132/9 132/18 133/19
133/20 133/22 135/13
136/24 137/7 137/16
137/25 138/3 138/9
138/9 138/12 140/10
140/19 143/3 144/8
146/2 146/20 147/9
149/19 150/1 152/16
152/16 152/17 152/17
152/18 155/22 158/4
161/13 162/20 163/1
163/13 163/14 163/15
163/15 164/8 164/15
164/19 164/20 164/23
165/1 166/12 169/22
172/5 172/10 174/7
174/24 175/25 176/1
176/7 176/17 176/21
178/21 179/7 179/12
179/15 180/23 181/5
182/5 182/10 182/10
183/10 187/15 188/22
190/12 196/23 198/9
198/23 200/11 200/12
201/6 201/7 204/14
204/17 204/20 205/16
206/10 209/9 212/16
213/10 214/12 217/5

219/8 220/5 220/10
220/18 220/23
**at the [1]** 147/9
**attached [1]** 137/12
**attack [2]** 72/25
108/18
**attempt [5]** 20/20
108/10 141/2 155/11
179/21
**attempted [1]** 75/15
**attempting [1]** 209/20
**attention [7]** 34/14
41/18 41/19 75/3
113/15 118/19 119/7
**attentive [1]** 31/15
**attorney [7]** 7/9 8/22
35/5 35/10 37/13
39/18 46/7
**attorney's [1]** 14/24
**attributable [9]** 33/23
55/1 61/23 67/13
110/5 120/14 120/17
145/6 183/25
**attributed [2]** 26/8
68/14
**attributes [6]** 77/9
89/23 96/21 109/19
109/19 146/22
**attributing [1]** 81/9
**authored [1]** 78/3
**authority [3]** 210/2
213/7 213/16
**Auto [1]** 77/23
**automotive [1]** 173/18
**available [15]** 32/15
62/20 93/14 93/15
93/24 139/22 141/15
167/1 167/4 169/5
169/10 169/20 193/25
219/20 220/6
**average [2]** 63/18
197/21
**averted [1]** 22/7
**avid [1]** 84/25
**avoid [1]** 25/17
**avoided [2]** 62/1 62/4
**award [2]** 63/3 145/12
**awarded [5]** 17/10
17/17 63/1 143/18
144/16
**aware [15]** 7/7 11/9
25/24 57/20 61/2 61/4
78/17 146/15 165/22
188/4 193/8 193/10
193/11 193/16 202/4
**awareness [1]** 162/5
**away [23]** 9/9 9/10
9/11 9/11 9/16 9/18
9/18 9/19 10/12 18/15
18/16 18/17 24/18
29/21 30/15 31/11
73/3 87/17 91/20

110/13 110/14 182/16
218/3
**axiomatic [2]** 200/2
200/3

**B**

**b-u-s-h-w-a [1]** 7/8
**back [85]** 6/19 8/5 8/6
9/13 9/13 9/22 11/11
21/1 23/14 25/2 27/24
29/25 33/8 35/6 35/12
35/13 38/12 39/10
39/14 39/15 41/19
45/8 45/17 45/25 48/6
48/7 51/9 66/18 77/20
82/20 87/19 88/4 89/3
91/14 91/22 91/24
105/15 106/6 112/25
114/18 114/21 114/25
115/10 115/10 116/9
118/10 122/23 122/23
127/18 140/11 151/24
153/20 155/5 156/1
156/13 156/15 157/23
160/8 165/2 167/25
168/16 169/22 175/12
179/5 182/21 183/17
184/8 197/4 199/21
199/25 200/1 201/1
202/10 202/20 203/23
203/25 204/17 208/9
212/20 213/23 214/21
215/4 218/1 220/9
220/9
**back-ending [1]** 27/24
**back-out [2]** 39/14
39/15
**backed [5]** 19/18
198/8 202/3 202/17
204/19
**backer [1]** 43/5
**backer-outer [1]** 43/5
**background [4]** 26/15
52/8 52/9 53/24
**backing [3]** 37/2
201/15 204/6
**backouts [3]** 20/2
20/3 20/5
**backstop [1]** 202/24
**bad [1]** 123/20
**Bakersfield [2]** 214/6
214/9
**balance [5]** 7/20 81/2
118/7 122/12 122/21
**balanced [2]** 203/3
204/22
**ballpark [1]** 186/8
**balls [1]** 41/12
**baloney [1]** 7/8
**bang [4]** 30/2 30/2
30/2 30/2
**bango [2]** 20/8 43/9

**bank [1]** 7/20
**Bar [1]** 78/15
**Barak [2]** 2/11 5/21
**base [3]** 61/23 127/9
154/3
**based [49]** 32/15
52/12 62/19 65/5 67/7
67/11 68/21 69/21
73/5 75/10 75/13
75/20 76/22 76/25
76/25 78/6 78/21
85/10 87/22 89/13
93/18 96/14 105/23
106/15 119/1 135/23
143/8 143/10 145/16
146/1 147/11 147/13
147/13 156/20 161/17
165/10 166/3 167/17
173/16 182/6 184/23
185/11 185/14 190/18
194/14 196/11 196/12
202/18 206/18
**bases [4]** 177/20
182/13 204/6 216/22
**basic [4]** 19/25 105/4
105/6 109/5
**basically [10]** 19/23
62/7 80/22 95/13
114/22 116/16 145/21
170/4 183/6 203/14
**basics [2]** 19/18 47/24
**basis [26]** 20/4 62/4
62/25 75/17 76/8
96/24 98/23 108/18
112/19 112/22 123/15
126/1 129/5 129/14
135/22 149/9 159/6
161/14 176/8 182/6
182/12 188/4 190/4
190/24 197/16 216/22
**beach [1]** 92/21
**Bear [2]** 5/14 70/21
**bearing [3]** 61/24
111/13 111/14
**beat [1]** 113/13
**beating [2]** 7/10
123/15
**became [1]** 156/19
**because [119]** 10/22
14/5 16/7 17/12 22/11
24/6 26/19 28/19
31/23 32/10 32/20
33/19 38/15 38/21
40/18 44/11 45/18
46/3 46/24 50/25
52/19 61/14 81/8 85/6
87/10 89/23 95/1
95/13 97/6 97/10
100/10 101/23 102/14
102/14 102/15 102/16
102/20 102/21 103/8
103/9 103/9 104/14

104/17 109/20 109/24
111/14 112/8 113/25
115/6 116/5 116/12
119/19 119/22 120/16
125/2 125/11 128/2
128/21 143/18 144/8
145/5 146/20 149/16
150/5 151/8 151/12
152/9 152/11 156/4
158/7 162/4 167/20
167/22 170/3 173/16
173/25 174/1 174/22
174/24 175/1 175/21
175/22 177/8 177/8
177/9 177/21 179/9
180/6 180/7 180/15
180/23 195/19 196/8
196/20 198/10 198/18
199/12 200/11 202/8
202/25 205/13 206/8
206/16 207/8 208/14
208/20 208/23 209/8
210/10 210/15 210/19
212/3 212/4 212/10
213/16 215/11 216/12
218/6 220/6
**become [3]** 20/17
35/5 163/25
**becomes [3]** 72/17
113/18 199/1
**beef [2]** 37/22 89/15
**beer [2]** 80/20 120/11
**beg [1]** 99/10
**began [1]** 155/25
**begin [2]** 84/19 127/5
**beginning [3]** 16/18
61/5 204/15
**begins [6]** 14/7 67/7
74/2 97/22 98/12
177/10
**behalf [1]** 88/17
**belief [1]** 58/21
**believe [45]** 11/16
11/19 17/11 19/19
20/9 34/18 48/2 48/11
51/24 62/7 70/8 71/20
75/17 76/2 77/23
78/20 83/5 87/25 88/8
88/19 92/23 99/9
108/22 110/1 121/16
122/13 130/22 132/10
132/12 135/4 135/7
136/20 137/7 138/15
138/20 162/14 164/2
164/14 165/7 166/23
170/21 171/4 194/8
194/22 212/4
**below [2]** 186/23
186/24
**bench [10]** 8/25 10/23
43/11 49/19 71/21
115/14 115/18 115/21

**B**

bench... [2] 116/5
204/16
benchmarks [1] 10/5
benefit [1] 6/11
besides [1] 172/25
best [14] 6/15 9/2
47/20 67/19 67/20
132/23 133/4 138/10
140/1 161/22 199/17
201/4 201/6 201/9
better [11] 42/15
42/25 43/5 83/18
87/25 88/7 103/22
122/2 126/12 172/11
172/11
between [19] 23/11
23/12 81/9 98/1
114/22 175/15 175/19
175/20 176/19 176/22
180/8 193/14 193/16
204/8 207/9 214/17
214/18 215/8 215/12
Beverly [1] 2/18
beyond [1] 26/14
big [9] 37/13 37/13
38/25 39/1 39/1 44/4
44/9 102/10 176/23
bill [2] 3/9 6/4
billion [1] 214/10
bind [1] 206/12
binding [2] 119/10
119/11
bit [4] 6/19 90/6 105/5
200/5
bkamelgard [1] 2/14
black [2] 38/24 218/19
blame [1] 80/6
blizzard [1] 43/15
block [1] 131/16
blog [3] 77/11 90/1
127/19
blogs [2] 92/3 154/2
board [2] 41/2 44/4
body [1] 37/13
boggles [1] 187/9
boil [3] 43/9 92/15
113/11
boils [1] 173/19
bold [1] 71/23
boo [3] 21/3 21/4 21/6
book [4] 78/15 79/24
80/3 80/8
books [3] 33/12 33/12
59/18
boom [4] 88/13 88/13
88/13 88/13
born [3] 8/20 9/14
197/15
both [31] 7/11 8/5
17/9 17/24 20/21

25/25 37/21 42/20
43/25 44/2 51/14
51/16 57/8 57/8 57/13
57/25 58/3 60/16
60/16 61/1 64/13
114/23 122/1 180/11
180/12 194/13 196/17
203/19 218/14 220/15
220/19
bother [4] 81/3 81/11
167/23 173/7
bottle [6] 162/25
163/1 163/4 172/4
172/8 172/8
bottles [4] 22/12
166/16 166/20 167/19
bottom [6] 13/2 66/1
70/6 76/18 89/14
133/15
bottom-right [1] 66/1
bought [5] 55/5
111/14 150/4 160/3
160/4
Boulevard [2] 2/7
219/10
bound [6] 19/21 199/7
206/14 206/16 206/20
206/21
box [1] 218/9
brain [1] 38/25
brand [45] 33/17
33/21 33/22 55/1 55/1
56/1 56/3 56/4 58/25
59/3 59/14 59/23
59/24 59/25 61/18
61/21 62/6 62/7 62/10
62/15 62/16 72/25
72/25 75/8 76/1 76/5
77/14 81/25 82/10
83/5 85/23 88/23
95/17 95/18 101/10
103/9 109/11 109/18
109/24 110/7 126/17
131/18 155/20 162/5
162/6
Branding [1] 71/11
brands [2] 141/20
141/22
breach [1] 163/6
breadth [1] 142/15
break [5] 79/23 79/25
80/2 96/5 195/19
breaking [1] 76/8
Brewing [4] 111/2
111/3 111/24 112/3
brick [2] 103/1 103/4
bridge [2] 83/20 83/20
brief [21] 16/18 138/2
208/6 208/12 208/12
208/19 208/22 209/7
209/14 209/14 210/18
210/25 211/1 211/2

211/9 211/24 212/3
212/15 212/18 212/19
216/10
briefing [3] 208/21
211/13 216/11
briefly [2] 119/15
155/14
briefs [1] 36/1
bring [10] 7/22 34/13
79/25 119/7 181/16
181/20 191/14 199/25
201/1 208/22
bringing [2] 200/24
213/4
broad [1] 119/5
broadly [1] 130/19
broken [2] 155/18
155/20
brought [5] 79/24
113/15 118/18 184/20
194/13
Brown [6] 3/3 3/7 3/7
3/11 3/15 6/4
build [2] 107/3 162/5
building [2] 39/17
131/16
built [2] 107/4 173/17
bull [4] 46/19 46/21
46/23 46/25
bunch [1] 34/20
burden [7] 22/16 43/4
111/17 111/19 111/21
197/9 216/13
bushwa [3] 7/7 7/7
39/22
business [21] 61/17
68/18 69/10 78/5
80/19 80/21 80/22
80/23 82/1 85/12
85/14 93/16 96/14
97/2 98/24 184/13
188/23 189/1 192/13
192/17 214/15
businesses [1]
161/17
butcher [2] 37/15 39/1
buttress [3] 60/21
60/24 60/24
buy [12] 85/22 88/23
102/24 103/8 103/23
125/2 133/21 134/16
134/18 174/25 175/5
217/9
buying [5] 85/1 95/1
103/21 156/1 157/15
buys [2] 60/1 162/2
bwmllp.com [4] 3/5
3/9 3/13 3/17

**C**

C10 [1] 213/20
CA [7] 2/7 2/12 2/18

3/4 3/8 3/12 3/16
calculate [1] 189/15
calculated [7] 74/4
74/8 74/24 188/4
190/5 193/5 203/8
calculation [15] 26/7
145/10 187/9 187/13
187/19 187/21 188/1
188/3 188/6 188/18
189/2 196/19 196/20
203/15 212/12
calculations [2]
205/25 207/3
CALIFORNIA [6] 1/2
1/17 1/24 5/1 12/7
118/1
call [19] 9/7 9/8 9/17
10/1 11/16 26/7 30/16
35/8 37/25 40/7 86/11
105/9 107/24 116/7
201/1 217/15 219/13
219/13 219/19
called [16] 23/5 31/23
58/25 60/11 64/24
65/4 80/17 98/8
139/14 163/23 175/3
182/19 183/4 184/13
188/12 197/22
calls [3] 118/21 147/3
187/24
came [12] 6/19 62/6
62/6 68/9 103/18
128/13 141/11 145/7
149/15 156/1 191/2
210/9
Camino [1] 2/17
campaign [4] 47/6
129/19 130/9 131/16
can [223]
can't [64] 16/1 27/10
27/25 32/10 32/25
36/18 45/7 45/18 49/7
52/20 71/7 71/8 73/7
80/15 81/16 83/1
86/18 91/15 91/17
100/3 100/24 101/2
101/4 101/9 101/24
102/15 102/17 104/13
112/13 113/8 114/21
123/10 123/11 132/18
133/5 137/13 142/20
146/20 149/4 153/12
153/20 167/18 167/18
173/8 173/11 173/12
173/13 174/3 174/18
174/23 175/22 176/15
177/9 177/10 179/4
195/21 200/13 207/14
207/15 211/8 214/10
215/10 217/18 218/11
cannot [10] 18/19
32/20 85/25 100/9

142/19 142/19 196/18
208/22 215/11 217/11
canvassing [1]
131/11
capable [1] 128/8
capacity [1] 134/22
capture [2] 142/15
168/5
captured [1] 215/13
car [1] 173/17
care [6] 12/11 44/12
47/19 81/8 216/4
220/8
carefully [1] 11/10
carry [2] 51/7 52/21
carrying [1] 206/24
cars [1] 173/17
case [112] 6/10 6/17
6/18 6/20 7/1 7/3 7/13
11/4 12/22 14/14
15/13 24/9 25/14
26/16 29/12 31/18
31/19 31/21 31/23
31/25 31/25 32/12
32/25 35/7 35/9 35/15
35/16 35/17 37/5 41/2
41/9 41/14 43/13
43/16 44/9 45/3 47/13
52/24 60/15 64/9 72/3
77/19 77/22 79/3 79/4
79/5 79/10 79/16
83/15 84/23 99/9
100/25 101/4 102/22
107/3 107/4 110/20
111/2 111/3 111/24
112/3 119/25 120/1
120/3 123/12 123/22
129/16 134/24 135/1
135/3 135/6 135/12
136/3 148/5 148/15
149/10 155/15 156/3
156/17 162/7 174/18
179/20 182/17 185/7
185/22 189/16 190/14
190/15 190/19 196/1
196/1 197/5 197/8
202/23 207/1 207/6
207/21 207/22 208/8
208/23 209/2 209/6
210/8 210/13 211/4
213/11 213/19 214/2
217/14 217/17 217/18
218/10
cases [19] 7/11 42/2
63/2 68/6 77/18 79/21
91/2 100/15 110/24
111/1 119/25 119/25
120/18 135/25 136/1
136/3 213/17 214/4
214/11
categories [4] 152/19
152/25 153/23 154/11

**C**

**category [2]** 41/20 162/22
**cause [1]** 122/13
**caused [1]** 62/7
**causing [2]** 65/12 65/14
**caveats [1]** 29/10
**central [2]** 1/2 32/13
**certain [12]** 7/25 15/5 53/7 103/16 136/20 137/13 141/1 160/5 160/6 165/23 179/14 179/16
**certainly [11]** 7/1 26/25 116/22 173/22 175/19 187/10 187/20 212/5 212/22 213/10 215/18
**certainty [2]** 120/17 197/10
**certify [1]** 221/3
**certitude [1]** 101/24
**cetera [3]** 130/1 149/20 202/21
**CFO [2]** 33/7 214/16
**challenge [4]** 7/25 19/11 177/20 180/16
**chambers [3]** 118/11 199/17 199/17
**Chan [4]** 154/18 155/7 214/16 214/17
**Chan's [1]** 64/18
**chance [4]** 12/23 125/21 128/17 192/1
**change [3]** 23/23 91/20 200/19
**changed [1]** 162/21
**channel [10]** 80/23 80/24 130/23 132/25 136/10 138/23 138/24 150/9 159/17 159/22
**channels [3]** 80/25 149/14 149/25
**characterization [1]** 144/3
**characterized [1]** 20/9
**characterizing [1]** 178/15
**characters [1]** 36/23
**chart [1]** 166/13
**Chaser [2]** 130/24 133/1
**chat [1]** 131/14
**check [21]** 171/5 182/19 182/20 183/1 183/4 183/8 183/12 183/17 183/19 183/23 183/24 184/25 185/15 185/15 185/18 188/12 188/14 188/15 188/16

**checks [1]** 185/17
**chest [1]** 7/10
**child [1]** 218/19
**chin [2]** 71/4 71/4
**China [1]** 127/15
**chinny [1]** 71/4
**choice [4]** 30/5 97/8 180/2 216/25
**choke [1]** 51/15
**choked [1]** 35/25
**choose [5]** 25/7 40/7 40/8 98/1 108/18
**choosing [3]** 122/1 203/14 206/21
**chose [7]** 26/22 28/5 169/1 169/2 179/17 179/25 180/14
**chosen [4]** 51/1 206/15 208/24 209/1
**Chronicles [2]** 130/23 132/24
**chutzpah [1]** 40/7
**cigarette [1]** 106/1 128/5
**cigarettes [1]** 80/20
**circling [2]** 37/18 37/19
**circuit [8]** 31/19 31/20 111/10 120/2 120/12 120/23 123/16 152/24
**circulating [1]** 90/8
**circumstances [9]** 11/3 14/8 14/13 14/17 14/17 14/23 27/22 49/13 192/16
**citation [3]** 53/14 112/6 197/4
**citations [1]** 220/19
**cite [6]** 31/14 31/16 31/17 31/19 111/8 111/9
**cited [1]** 110/23
**civil [1]** 7/11
**claim [1]** 189/1
**claiming [1]** 198/3
**clarification [1]** 126/11
**clarify [3]** 64/13 89/4 112/12
**clarity [1]** 72/1
**clasp [1]** 38/19
**clasped [1]** 38/16
**classic [1]** 144/4
**classification [7]** 76/3 95/20 126/8 126/20 127/1 127/2 155/19
**classifications [2]** 127/5 155/17
**classified [2]** 86/5 110/11
**clear [16]** 9/20 20/17

22/11 28/13 29/13 43/22 44/13 49/10 120/13 124/2 143/24 188/10 202/22 210/24 211/15 212/4
**clearly [4]** 27/5 52/6 52/6 211/16
**clerk [22]** 6/9 6/16 11/14 15/8 31/15 31/15 39/20 55/23 71/22 72/15 83/17 92/13 113/1 118/10 191/18 199/18 199/21 199/23 200/14 200/19 201/7 201/10
**clerks [1]** 121/1
**click [11]** 133/23 133/24 140/20 140/21 140/23 141/7 141/13 142/14 162/17 164/10 165/11
**click-through [3]** 133/24 141/13 165/11
**click-throughs [5]** 133/23 140/20 140/21 141/7 142/14
**clicked [1]** 140/14
**client [9]** 88/17 93/14 103/12 123/13 180/13 180/16 206/11 220/6 220/9
**client's [5]** 157/3 157/4 157/5 205/1 207/8
**clients [4]** 38/22 57/19 136/2 220/12
**clock [2]** 48/6 50/9
**close [11]** 32/5 71/14 71/15 118/24 119/2 120/6 120/8 199/19 200/4 201/14 215/5
**closely [2]** 119/23 131/2
**closer [1]** 16/10
**closure [2]** 116/11 207/20
**co [3]** 78/3 78/3 105/20
**co-authored [1]** 78/3
**co-expert [1]** 78/3
**Co-opting [1]** 105/20
**code [3]** 161/4 175/3 221/4
**codified [1]** 99/4
**cohen [76]** 2/6 2/6 2/9 4/5 4/6 4/7 4/8 5/7 13/21 13/22 14/1 14/2 16/24 20/15 21/15 22/23 23/4 24/18 29/4 30/1 36/4 40/4 44/14 47/8 49/3 53/20 63/11 63/23 65/14 65/20

66/12 66/23 70/22 73/7 74/10 78/17 87/20 88/17 89/2 89/15 90/17 91/9 97/12 98/9 98/10 99/18 103/25 104/2 105/20 112/5 113/4 117/4 118/4 118/12 121/25 131/25 151/2 157/23 170/13 170/19 173/4 174/6 174/7 175/10 181/3 182/8 182/14 183/7 194/12 195/5 202/8 203/7 203/10 212/21 213/25 219/22
**Cohen's [11]** 24/6 24/24 107/18 170/7 170/11 171/25 181/1 182/3 201/16 206/1 206/11
**collaborated [1]** 61/9
**collectively [1]** 7/7
**column [1]** 215/3
**combined [2]** 82/7 166/15
**come [37]** 13/21 22/21 34/25 37/17 40/24 41/20 42/1 43/1 49/17 50/15 57/18 67/25 69/7 71/9 72/4 73/6 75/9 75/11 75/21 87/21 93/2 102/17 105/12 106/17 106/18 106/20 110/14 113/8 116/13 121/22 156/13 185/16 187/23 190/15 193/4 202/7 212/14
**comes [10]** 9/19 32/5 53/2 69/14 114/21 146/22 157/23 172/3 186/19 213/23
**Comey [1]** 80/5
**comfort [1]** 156/25
**comfortable [1]** 172/12
**coming [9]** 19/20 71/20 72/11 125/21 218/18 218/23 219/1 219/10 220/15
**commend [4]** 37/20 42/20 44/7 44/8
**comment [3]** 111/4 115/16 144/20
**commentary [1]** 140/17
**comments [11]** 16/19 17/23 24/5 24/6 24/7 24/8 24/24 80/11 81/19 81/21 91/4
**commerce [1]** 93/16
**commiserate [1]**

121/5
**commiserating [1]** 51/25
**commission [6]** 161/25 164/12 165/20 166/18 170/5 170/22
**commissions [9]** 165/9 166/3 167/9 167/20 168/4 168/14 170/1 170/2 173/10
**commit [2]** 157/11 168/18
**committed [4]** 123/12 123/13 157/14 157/15
**commodity [1]** 80/19
**common [3]** 60/10 179/14 184/10
**commonality [1]** 161/17
**commonsense [2]** 34/23 51/7
**commonsensically [1]** 121/16
**communicate [1]** 217/21
**communicating [2]** 171/20 171/21
**communication [1]** 18/23
**community [2]** 53/9 127/11
**companies [11]** 135/15 146/17 161/17 168/2 170/1 170/3 170/6 170/24 172/25 173/1 215/13
**company [17]** 104/5 105/24 131/5 131/8 131/13 134/22 135/18 140/19 140/24 146/13 146/16 148/14 154/4 155/7 162/10 168/22 171/23
**company's [4]** 156/25 161/2 161/3 161/24
**comparable [1]** 61/25
**compare [2]** 190/4 190/22
**compared [2]** 10/8 203/4
**comparing [2]** 62/25 190/7
**comparison [2]** 99/16 120/4
**compartmentalize [2]** 73/2 73/3
**compendium [1]** 56/12
**compensate [1]** 162/18
**compensated [1]** 147/1

Case 5:15-cv-01586-WDK-KK   Document 315   Filed 09/30/17   Page 229 of 257   Page ID
#:35458

{PLAINTIFF} v.
{DEFENDANT}

{WITNESS NAME}
{DATE}

# C

compensates [1]
146/6
compensation [4]
146/8 186/10 186/14
186/18
competing [3] 85/15
141/22 141/24
competition [1] 82/5
competitor [2] 192/14
192/17
complained [1]
196/14
complaint [2] 88/16
206/3
complete [2] 113/12
118/9
completed [1] 184/5
completeness [1]
98/9
complicate [1] 56/20
complicated [3] 56/18
95/3 128/5
component [7] 26/1
59/23 112/15 120/7
176/6 179/13 184/15
components [11]
25/25 61/11 95/1
127/6 127/9 128/11
179/24 195/19 196/4
196/5 198/17
composition [1]
154/20
comprehensively [1]
219/21
computation [1]
190/13
conceivably [1] 8/8
concept [1] 59/14
conceptual [1] 203/6
concerned [1] 117/3
concerns [2] 83/3
91/12
concert [1] 169/6
concession [1] 207/5
concessions [3]
31/24 32/12 206/25
conclude [1] 195/20
concluded [1] 220/23
conclusion [11] 15/1
15/4 68/2 69/10 69/11
129/14 145/14 149/15
183/10 189/20 203/1
conclusions [3] 6/15
185/16 192/22
concrete [1] 193/15
conduct [2] 153/23
154/7
conducted [1] 131/23
conducting [1] 93/16
Conference [1] 221/8

conferred [1] 36/3
conferring [1] 137/22
confidence [2] 71/17
208/6
confident [1] 9/1
confirm [2] 33/16
157/7
confirmation [1]
172/7
confirmed [2] 69/20
157/5
confirming [1] 170/8
conflict [8] 12/8 12/18
12/23 13/3 13/7 13/7
13/11 13/12
conformance [1]
221/7
confuse [1] 196/10
confused [1] 144/23
confusing [1] 214/8
confusion [1] 213/17
connect [1] 82/17
connecting [1] 52/17
connection [2] 69/16
130/11
connections [1]
130/10
connects [1] 33/11
consider [4] 14/7
53/23 115/11 120/5
considerably [1]
26/20
consideration [1]
115/12
considerations [1]
122/12
considered [7] 12/25
110/19 112/9 127/15
129/15 146/23 150/2
consistent [4] 95/8
127/20 128/23 181/24
consistently [5] 94/21
94/22 104/18 127/22
128/18
constantly [2] 131/11
161/18
constituents [1] 34/3
consumed [1] 162/24
consumer [4] 59/24
59/25 60/1 77/4
consumers [6] 109/4
148/7 148/25 149/1
149/5 159/10
consuming [1] 162/25
consummated [2]
165/10 172/21
consumption [1]
162/20
contacts [1] 170/5
contained [2] 103/13
159/5
contemplate [1]

109/10
contemplates [1]
111/24
contended [1] 134/5
contending [3] 134/3
134/7 216/21
content [1] 128/1
contest [1] 72/7
context [7] 98/16
101/9 101/10 142/5
184/22 194/9 196/25
continually [1] 87/15
continue [3] 78/24
95/5 161/8
continued [1] 110/16
continuing [6] 29/24
45/14 51/19 51/20
52/11 118/25
contradiction [1]
114/21
contrast [3] 9/19
92/25 189/21
contribute [1] 114/1
contributed [4] 32/18
32/22 62/8 145/17
contributes [1] 62/10
contributing [1]
126/15
contribution [7] 59/15
59/19 61/16 68/23
99/7 184/12 186/4
contributor [1] 129/6
control [4] 21/9 21/10
115/8 122/21
conversation [1]
154/19
conversations [6]
65/5 131/20 154/25
155/5 180/3 180/15
convey [2] 13/1
129/21
conveyed [1] 130/4
Convicted [1] 12/7
cookies [1] 175/3
cooperation [2] 45/18
45/20
copies [4] 64/4 90/22
90/24 137/1
copy [4] 63/25 64/19
64/20 79/24
copyright [11] 100/18
100/23 101/5 101/9
101/14 110/24 119/16
119/17 119/19 120/15
181/12
corner [5] 66/1 66/8
66/22 152/18 163/14
Corp [1] 120/1 213/20
corporate [3] 11/14
14/10 14/16
correct [50] 18/14
22/10 24/12 24/21

46/7 55/20 58/22 65/6
67/15 67/18 70/14
71/18 74/9 74/11 75/1
75/2 77/4 77/5 83/4
87/21 87/22 87/23
92/5 92/8 114/4
116/18 129/11 133/7
134/8 134/9 135/14
136/24 137/6 138/19
140/20 140/25 153/4
153/6 153/8 153/10
164/23 203/23 203/24
205/2 205/6 205/9
209/3 210/8 216/3
221/5
corrections [3] 64/6
64/8 64/21
correctly [10] 8/13
133/12 143/8 143/17
144/7 144/11 144/19
164/13 181/7 192/8
corrects [1] 26/2
cosigned [1] 78/12
cost [15] 17/14 20/23
21/2 22/13 23/6 23/10
29/21 30/1 30/9 30/15
32/22 39/9 54/7 62/1
203/18
costs [7] 21/21 21/24
32/14 32/15 32/18
161/20 196/4
could [39] 12/11 14/5
14/9 19/6 35/14 38/3
43/6 43/9 70/19 92/25
97/19 103/7 103/10
103/10 103/12 103/20
107/7 115/3 115/4
115/4 122/1 124/23
125/9 130/17 136/25
144/20 146/3 154/12
154/16 155/22 163/4
170/16 175/22 177/25
179/25 200/9 200/24
200/25 201/1
couldn't [5] 17/25
45/10 100/6 114/18
115/3
counsel [13] 2/1 5/6
12/12 12/13 21/1 45/9
45/13 57/19 57/22
57/23 57/24 64/14
114/13
counsel's [1] 115/12
counsels [1] 45/5
countless [1] 104/10
County [1] 219/1
couple [10] 15/12
20/16 24/7 48/24
67/10 80/11 133/10
134/1 163/19 208/13
course [6] 13/8 13/10
117/7 120/12 121/13

211/5
court [70] 1/1 4/5 4/11
11/3 14/7 15/10 16/23
17/23 18/12 18/18
19/13 19/13 20/21
25/24 32/12 34/16
35/12 42/21 44/23
45/6 45/13 45/18
45/19 47/1 49/6 53/4
55/25 62/23 64/3
64/13 71/17 77/14
79/3 81/22 91/4
113/19 115/12 119/18
120/3 120/4 120/23
121/2 137/8 150/25
151/20 177/23 178/1
178/25 179/3 181/7
194/1 195/19 195/20
196/8 197/13 197/22
207/18 208/15 208/15
210/9 210/14 210/18
210/19 211/16 213/4
213/5 213/7 215/16
216/11 216/12
court's [6] 4/3 15/7
16/18 17/16 58/11
169/16
Courthouse [1] 1/23
courtroom [4] 12/16
116/25 117/1 117/7
courts [2] 59/8 215/10
cousins [2] 101/5
101/6
covered [1] 136/20
cows [1] 37/17
crab [2] 92/21 92/22
cram [1] 199/16
Cream [2] 120/10
123/21
create [1] 63/8
created [1] 144/25
creates [1] 131/5
131/8
creative [1] 187/20
creativity [1] 187/21
creators [1] 82/9
credited [2] 172/19
175/7
criminal [2] 7/11 35/7
crisp [8] 9/21 10/8
22/1 22/2 24/22 26/13
26/25 40/15
crisply [2] 92/25
102/15
critical [6] 27/6 108/5
108/9 109/5 110/18
197/12
critically [1] 88/1
criticism [1] 170/7
criticize [1] 106/23
critique [1] 106/3
critiquing [1] 107/5

**C**

**cross [10]** 10/6 25/12 28/17 82/23 83/20 92/5 171/10 177/10 181/4 182/5
**cross-examination [4]** 10/6 82/23 181/4 182/5
**cross-examine [2]** 92/5 177/10
**cross-section [1]** 171/10
**crowded [1]** 162/19
**CSR [2]** 1/23 221/13
**cull [2]** 72/18 72/19
**culmination [1]** 68/3
**curating [3]** 86/23 87/6 160/24
**custom [1]** 164/10
**customer [15]** 77/4 77/7 85/14 85/22 90/1 94/25 127/22 154/8 155/25 159/15 161/5 164/12 165/13 172/3 172/16
**customers [24]** 77/10 87/8 89/23 94/22 96/19 102/23 103/7 103/12 103/20 104/4 104/6 104/9 106/22 131/1 131/12 142/10 154/12 154/16 154/16 154/18 156/6 156/12 164/10 172/6
**cut [10]** 40/12 42/16 75/16 121/17 143/20 145/16 145/19 167/16 167/22 176/23
**CV [2]** 5/4 79/5
**CV's [1]** 51/14
**Cygolite [1]** 128/4

**D**

**damage [12]** 6/25 7/3 35/8 37/23 37/24 42/2 143/11 159/13 196/3 206/4 207/3 212/7
**damages [80]** 6/23 9/16 11/2 11/5 14/24 15/7 15/17 15/20 17/7 17/10 17/10 17/17 17/21 18/7 18/11 18/12 18/18 19/9 19/12 22/6 24/9 25/5 25/8 25/10 25/19 26/16 26/19 27/4 27/16 27/24 28/15 37/23 45/6 51/4 63/1 63/2 63/3 63/7 78/16 109/25 115/13 143/18 144/9 144/15 151/12

152/11 156/5 156/7 167/16 182/12 186/11 193/5 196/3 197/14 201/17 201/20 202/24 204/23 205/5 205/22 206/6 206/22 207/1 207/6 208/8 208/14 208/16 209/1 209/16 209/21 210/11 210/11 210/16 211/3 211/17 212/25 213/8 215/17 216/9 217/12
**dang [3]** 208/12 209/14 211/1
**dare [1]** 117/5
**dark [1]** 33/24
**DARYL [4]** 4/5 57/12 58/11 138/1
**data [23]** 33/7 52/12 93/13 93/13 93/14 95/7 104/10 119/2 119/3 119/5 140/20 140/24 141/1 141/3 149/16 149/19 150/1 153/12 153/20 158/22 160/3 172/1 204/19
**database [1]** 104/9
**date [2]** 71/1 221/10
**dated [3]** 30/12 44/5 64/21
**Daubert [24]** 9/12 11/21 11/22 11/23 11/24 12/4 12/5 12/5 44/11 47/24 50/17 50/20 50/20 50/21 53/2 55/18 71/17 83/1 88/15 88/16 114/6 118/15 118/15 173/20
**daunting [1]** 8/17
**day [10]** 28/19 28/20 51/7 52/22 135/4 163/1 182/4 199/11 204/15 206/24
**days [11]** 6/21 6/21 50/14 114/15 120/11 163/2 163/5 169/3 175/6 175/7 180/5
**de [1]** 90/6
**deal [2]** 36/17 71/15
**dealing [9]** 11/8 11/8 11/9 41/9 41/10 42/18 50/6 101/17 190/15
**debacle [2]** 150/12 159/21
**DEBORAH [2]** 1/23 221/13
**decades [2]** 59/16 184/8
**decided [8]** 105/12 167/21 168/14 184/19 197/19 198/7 200/16 211/19

**decides [3]** 133/21 165/13 179/1
**deciding [1]** 57/1
**decision [10]** 17/8 17/9 17/16 17/17 17/20 17/20 113/19 118/15 197/5 210/19
**declaration [7]** 129/23 137/10 137/12 138/1 138/7 177/14 177/15
**declining [2]** 150/11 159/20
**deduct [2]** 32/1 39/8
**deducted [2]** 34/10 34/11
**deductions [1]** 17/14
**deep [2]** 205/17 206/18
**defend [2]** 212/24 216/22
**defendants [42]** 1/12 3/1 6/1 11/15 11/15 14/10 16/1 17/11 17/13 17/19 25/16 32/1 32/15 102/5 131/19 139/15 139/18 139/20 144/16 146/5 148/4 148/15 150/11 151/8 153/11 155/23 156/14 157/22 163/19 163/22 163/25 167/13 167/16 184/18 193/9 193/17 193/20 194/5 194/17 194/20 206/21 215/18
**defender [1]** 35/5
**defending [1]** 211/22
**defense [8]** 10/13 45/8 52/10 56/2 63/25 79/6 211/22 212/21
**defined [2]** 130/19 131/2
**definitely [3]** 70/23 125/14 128/22
**definition [1]** 130/17
**degree [3]** 41/22 125/6 125/7
**delightful [1]** 35/4
**delivered [1]** 148/6
**delving [1]** 13/1
**demonstrate [2]** 32/1 198/5
**demonstrated [2]** 182/12 182/13
**demonstrates [4]** 81/22 159/7 159/8 159/12
**denigrate [1]** 51/24
**denigrating [3]** 7/19 51/25 52/1
**depending [2]** 14/8 176/18

**depends [2]** 141/15 219/9
**depiction [1]** 157/17
**deposed [3]** 135/10 135/11 196/21
**deposition [38]** 56/11 64/5 64/6 64/7 64/16 64/16 64/18 64/20 64/20 64/23 70/13 70/16 70/19 70/20 73/24 74/5 74/11 74/22 74/25 75/11 75/12 75/16 76/2 84/4 84/6 97/14 97/19 97/23 108/17 108/17 132/12 132/17 135/4 137/11 168/17 196/13 196/15 214/16
**deprived [1]** 177/21
**describe [6]** 127/2 147/24 160/15 179/2 183/16 183/19
**described [4]** 26/24 39/19 40/22 79/16
**describing [1]** 123/14
**description [1]** 85/13
**designate [1]** 161/4
**designed [3]** 98/17 172/22 193/4
**despite [1]** 24/24
**destroy [1]** 95/12
**destroyed [1]** 159/22
**detail [4]** 97/2 97/2 131/21 156/18
**detailed [2]** 68/3 68/5
**details [1]** 160/6
**determination [6]** 52/4 61/24 93/25 109/17 149/10 155/16
**determine [18]** 9/15 10/5 32/21 51/22 61/21 65/9 76/7 112/20 131/19 141/6 154/10 154/12 154/15 161/14 185/18 189/22 194/1 194/16
**determined [2]** 72/14 155/23
**determining [7]** 75/17 142/7 149/9 161/15 192/23 198/25 207/21
**Deuce [1]** 193/14
**develop [1]** 154/3
**developed [4]** 68/6 69/19 78/3 127/3
**developing [2]** 130/10 149/3
**development [5]** 22/3 95/3 127/7 149/3 175/1
**develops [1]** 130/11
**devices [4]** 128/7

128/7 128/8 162/22
**devised [1]** 108/8
**devises [1]** 128/5
**did [149]** 6/18 11/21 12/10 14/17 17/24 23/18 31/3 31/3 33/6 33/16 35/10 38/3 38/10 39/3 45/10 49/3 49/8 49/12 51/23 51/24 55/22 55/24 56/8 60/7 60/14 61/18 61/20 61/20 62/12 62/22 65/7 65/9 67/25 67/25 72/19 73/6 74/5 75/9 75/13 75/21 76/6 78/13 79/17 79/18 79/18 88/4 90/22 90/25 91/1 94/19 96/5 103/8 103/17 104/4 104/8 105/22 105/24 108/4 110/1 123/5 130/2 131/8 131/19 133/19 133/22 135/1 135/1 135/1 136/2 137/2 137/3 140/5 140/5 140/10 140/19 141/2 141/6 142/1 142/3 150/15 151/15 152/23 152/24 153/11 153/13 153/22 153/23 154/10 154/14 154/15 154/25 154/25 155/11 155/14 155/15 156/1 156/10 156/12 156/13 157/4 158/21 158/23 158/24 160/3 160/3 160/7 161/14 162/7 164/13 164/14 164/15 164/19 165/1 168/18 169/4 169/9 170/16 171/5 171/8 171/9 171/13 178/12 181/16 181/20 182/20 182/21 183/6 183/21 183/23 184/3 184/17 185/18 185/19 186/1 189/6 189/13 189/14 190/10 190/12 190/14 190/14 190/16 190/22 192/14 194/16 194/18 198/2 198/16 210/11
**didn't [49]** 5/13 11/21 18/3 26/9 26/10 32/23 50/19 50/20 50/21 54/13 60/7 62/2 77/3 82/10 102/3 104/8 104/12 104/17 107/21 108/24 113/25 128/21 135/6 135/12 136/23 137/1 137/5 137/19 150/6 153/3 153/5 153/7 153/9 153/22

**D**

**didn't...** [15] 154/7
158/7 159/19 161/21
164/23 166/5 167/23
168/8 169/2 173/7
193/23 196/20 198/13
198/14 220/2
**Diego** [1] 79/4
**differ** [2] 44/16 99/10
**differed** [1] 44/15
**difference** [9] 21/25
23/11 35/1 52/1
122/18 125/5 208/10
215/8 215/10
**different** [19] 45/12
60/2 76/11 79/22
79/22 90/7 97/14
101/6 122/11 124/12
126/15 126/21 128/3
149/10 178/18 180/21
181/14 204/23 205/25
**differentiate** [2] 82/4
85/21
**differs** [1] 191/16
**difficult** [6] 27/9 28/11
49/10 73/21 73/22
102/21
**difficulty** [1] 30/3
**diffused** [1] 111/16
**dig** [2] 168/25 177/19
**digest** [1] 44/24
**digital** [2] 128/7
162/22
**diligence** [1] 172/15
**dilute** [1] 108/10
**diminutive** [1] 37/12
**dip** [2] 174/18 174/19
**dipping** [1] 174/19
**direct** [4] 10/4 87/7
111/22 126/11
**directly** [4] 111/6
152/25 165/13 172/21
**disagreement** [6] 6/14
32/5 42/19 43/2 47/18
204/15
**disallowed** [1] 214/4
**disappear** [1] 157/25
**disciplinary** [1] 34/17
**discipline** [3] 34/16
34/22 43/21
**disclosed** [1] 177/13
**disclosure** [1] 177/19
**discount** [7] 113/24
151/12 152/10 168/15
174/1 205/18 206/18
**discover** [1] 210/14
**discuss** [7] 56/1 75/15
79/23 91/18 112/13
142/22 191/7
**discussed** [7] 19/12
160/17 178/21 184/14

193/17 200/18 217/7
**discusses** [1] 33/10
**discussing** [3] 25/3
112/18 200/23
**discussion** [43] 16/15
46/16 55/23 58/10
66/15 66/25 77/11
84/10 90/1 92/12
92/19 94/10 98/15
98/17 98/18 98/25
99/11 105/19 126/13
127/19 128/25 132/12
137/18 141/12 159/4
168/17 169/12 172/1
172/16 174/4 181/8
185/1 185/24 191/20
199/14 201/3 207/17
207/25 211/12 216/18
217/16 217/20 220/1
**discussions** [6]
129/18 136/1 141/4
155/1 160/7 169/6
**disgorgement** [1]
63/3
**dismal** [1] 7/15
**disparity** [1] 215/12
**display** [1] 181/4
**displaying** [1] 50/3
**displeasure** [1] 50/3
**disputation** [1] 41/8
**dispute** [9] 19/14
19/15 20/23 22/15
22/16 51/18 112/10
215/20 215/23
**disputing** [2] 20/23
22/17
**distill** [1] 200/5
**distinct** [1] 99/2
**distinction** [1] 122/18
**distinguish** [1] 109/2
**distinguishes** [1]
108/8
**distress** [1] 50/3
**distribution** [31] 1/11
5/5 32/3 80/23 80/25
148/5 148/9 148/19
148/19 148/24 149/6
149/14 149/21 149/25
150/3 150/4 150/6
151/9 151/10 152/2
152/5 152/9 152/11
156/16 158/24 159/9
159/11 214/14 214/18
214/18 215/7
**distributor** [1] 154/8
**distributors** [24]
106/23 108/25 109/7
147/24 148/2 148/20
149/17 152/19 152/20
152/23 153/3 153/11
154/11 154/22 155/12
155/24 156/11 157/2

157/10 157/14 157/24
158/9 159/13 160/8
**DISTRICT** [4] 1/1 1/2
1/5 120/3
**dive** [1] 159/20
**diverted** [1] 213/19
**divide** [4] 185/5 185/5
186/1 186/14
**divided** [2] 96/9
186/21
**divine** [2] 121/23
121/24
**division** [3] 1/3
120/20 120/21
**divvying** [1] 84/14
**do** [333]
**document** [7] 64/22
64/22 70/5 70/7
137/25 138/4 156/18
**documentation** [2]
169/5 169/6
**documented** [1] 59/20
**documents** [6] 63/25
64/3 64/14 117/9
117/11 132/6
**doer** [1] 204/25
**does** [22] 9/12 9/12
30/4 30/4 37/19 42/13
52/3 52/3 82/4 109/1
109/12 122/23 157/21
159/14 173/12 181/6
182/20 188/17 189/22
204/11 204/25 214/14
**doesn't** [31] 10/21
14/13 27/2 37/9 42/8
72/17 80/18 83/6
88/25 91/16 91/21
97/6 112/8 112/17
114/5 122/15 122/16
123/6 123/8 127/25
172/12 173/15 182/15
188/17 189/11 199/20
206/12 206/13 212/9
214/11 219/14
**dog** [4] 9/9 9/9 9/19
102/5
**dog-gone** [1] 102/5
**doing** [46] 6/23 9/25
10/8 15/3 16/2 27/3
30/17 38/14 38/15
39/3 39/11 39/11
39/12 40/10 41/6 41/7
50/17 61/20 71/14
71/19 72/10 86/3
89/24 91/22 93/2
93/21 100/9 101/20
107/21 121/11 131/19
149/2 174/3 174/21
182/12 182/20 186/3
187/5 190/7 199/15
205/3 208/11 209/22
216/3 216/13 216/13

**dollar** [2] 15/22
166/24
**dollars** [6] 35/14
145/12 166/3 168/13
205/21 214/23
**dominating** [1]
162/22
**don't** [217] 7/6 7/17
7/18 7/22 12/10 12/11
12/13 12/16 13/2
14/21 14/25 16/6 16/6
18/16 18/17 19/1
19/20 20/17 21/12
21/19 21/19 21/23
22/17 23/15 23/16
27/1 28/12 28/18
28/20 29/17 29/23
30/5 31/21 33/4 34/18
34/18 35/1 35/15
36/11 40/17 40/19
40/25 41/6 41/6 41/16
43/17 43/18 47/2 47/9
47/19 49/9 49/11
49/12 49/17 49/22
50/2 50/5 50/5 51/24
51/24 52/7 52/19
52/22 53/10 53/12
53/14 53/16 53/16
54/11 54/16 54/21
55/23 56/14 56/20
60/21 61/2 65/14
65/17 72/18 73/13
80/3 80/6 81/8 83/13
85/13 86/1 86/2 87/11
87/12 89/16 89/18
89/20 90/9 90/16
90/18 91/18 92/1 92/5
92/22 93/8 94/3 94/4
98/10 99/20 102/4
102/5 102/13 102/15
103/18 103/18 104/16
109/10 110/3 110/12
111/10 112/16 112/25
113/15 113/16 114/16
115/5 115/6 116/6
116/15 117/3 118/15
119/12 120/25 121/12
121/17 122/4 122/5
122/20 123/3 123/24
123/24 124/13 124/23
125/1 125/9 125/9
125/11 125/11 125/12
125/20 128/11 138/20
139/22 140/4 140/7
141/4 141/10 141/12
148/16 148/24 153/19
162/21 164/4 164/6
165/2 165/7 166/23
167/1 167/4 168/12
169/11 170/15 170/24
175/10 178/2 180/14
180/17 180/18 180/20

180/23 183/1 194/22
195/9 199/12 199/23
200/3 200/10 200/10
200/15 200/19 200/21
201/1 201/5 201/10
203/19 204/18 206/20
206/24 207/15 209/5
209/10 209/16 209/24
210/3 210/14 210/14
210/22 211/7 211/13
211/24 213/3 216/4
216/11 217/8 218/10
218/12 218/24 218/24
219/18 219/23 219/24
220/8
**done** [36] 6/9 40/22
42/25 43/17 48/3
70/14 72/16 80/7 84/6
84/22 84/24 88/4 92/2
92/2 96/21 96/24
103/10 103/10 103/12
106/21 106/22 107/15
107/23 109/4 109/5
109/14 114/14 114/15
155/14 187/22 196/16
196/16 203/11 204/2
204/21 209/8
**door** [1] 218/1
**dos** [1] 52/7
**double** [1] 174/19
**doubt** [3] 32/7 48/16
206/12
**download** [5] 90/25
91/1 137/1 137/3
137/5
**downloaded** [1] 137/8
**dozens** [1] 94/24
**drag** [1] 212/10
**dramatically** [2] 149/7
191/16
**draw** [3] 68/21 69/10
150/15
**drawing** [4] 114/12
120/6 135/24 192/21
**drifting** [1] 89/2
**drink** [1] 45/8
**drive** [9] 2/17 54/24
85/11 133/15 152/2
159/17 161/13 167/11
173/17
**drived** [1] 106/11
**driven** [7] 54/3 54/4
80/20 80/23 110/12
142/2 168/6
**driver** [21] 56/15 57/1
63/11 65/4 73/4 83/5
88/10 88/11 88/14
91/24 92/9 96/13
105/8 105/9 106/9
129/15 147/25 149/10
160/15 161/15 161/16
**drivers** [35] 54/23

**D**

**drivers... [34]** 64/24
67/11 69/13 69/15
69/16 70/13 78/5
93/17 93/20 96/4
96/10 96/12 98/16
98/21 104/22 105/3
105/4 105/8 105/13
106/16 110/3 110/17
112/2 113/22 116/20
116/23 152/13 154/5
168/19 168/21 197/20
204/4 204/8 204/12
**drives [11]** 80/16 81/1
81/24 95/17 95/18
102/19 109/6 109/12
109/22 176/15 176/16
**driving [6]** 68/7 75/18
84/20 88/2 113/12
181/5
**drove [2]** 55/8 55/11
**Duce [4]** 68/8 82/3
172/5 172/11
**duck [1]** 213/23
**due [2]** 120/19 172/15
**dulcet [1]** 65/20
**dull [2]** 38/21 38/22
**dumb [2]** 7/12 7/13
**Duran's [1]** 63/18
**during [8]** 74/5 75/11
91/18 91/19 109/24
110/2 115/23 214/16
**duty [2]** 120/22 121/2

**E**

**e's [1]** 47/4
**e-juice [2]** 162/20
172/5
**e-liquid [3]** 127/5
127/9 134/4
**e-retailers [1]** 109/1
**each [30]** 6/6 32/17
35/23 36/1 56/23
68/12 70/13 70/16
73/4 74/8 75/12 76/22
83/11 84/19 95/21
98/1 114/9 115/3
125/17 125/18 126/13
141/18 145/15 145/16
145/18 154/10 165/9
176/20 179/9 179/12
**earlier [11]** 17/23 54/1
62/21 88/5 89/2
112/13 143/8 147/12
159/12 179/19 184/14
**early [3]** 154/19 181/7
201/5
**earned [1]** 202/12
**earning [1]** 170/5
**earth [2]** 192/13
193/19

**easier [1]** 20/21
**east [1]** 35/6
**easy [12]** 22/19 38/20
38/21 38/23 41/20
47/16 50/23 50/25
56/25 95/1 102/13
102/13
**eat [1]** 150/7
**eCigarette [4]** 128/3
135/17 135/19 146/8
**economic [2]** 7/6 20/7
**economics [2]** 7/15
35/7
**ED [1]** 5/4
**EDCV [1]** 1/9
**educate [1]** 7/5
**educated [1]** 7/14
**education [1]** 51/11
**effect [2]** 47/7 114/22
**effectively [2]** 92/2
121/6
**effort [14]** 32/21 32/23
86/23 110/9 133/22
141/6 142/4 142/8
154/10 154/15 156/13
160/17 160/22 194/16
**efforts [1]** 161/19
**eight [57]** 36/15 36/16
48/19 48/20 54/3
54/22 58/16 58/21
58/23 61/3 64/24 68/9
69/6 70/25 71/9 71/10
72/3 72/7 72/22 75/9
75/22 75/22 76/6
76/17 81/5 81/7 81/9
81/18 82/15 83/24
83/25 84/1 84/4 89/10
98/1 105/13 106/10
106/16 120/7 124/7
124/8 125/4 129/7
144/14 147/15 168/11
168/15 168/16 168/20
173/13 174/7 174/10
174/11 175/17 176/20
176/20 197/19
**eight-and-a-half [2]**
61/3 81/18
**eighth [1]** 71/7
**Einstein [1]** 37/9
**either [17]** 20/24
125/21 127/15 133/6
138/18 142/2 155/7
165/5 165/7 173/15
180/13 187/8 188/17
198/4 198/24 203/7
217/1
**Ejuices.com [2]** 85/16
154/23
**El [1]** 2/17
**elect [2]** 204/25 206/2
**elected [5]** 196/1
212/4 212/5 212/16

216/9
**election [1]** 18/18
**electronic [1]** 106/1
**element [2]** 181/10
218/16
**elements [7]** 79/18
85/23 116/15 120/18
129/19 160/23 203/13
**Eleven [1]** 109/25
**elicit [1]** 106/25
**eLiquid [13]** 68/4 68/8
127/4 134/2 134/6
134/18 134/22 135/15
135/18 148/12 158/4
163/4 176/7
**eLiquid.com [2]** 161/3
165/14
**eLiquids [2]** 134/8
155/18
**ellipses [1]** 51/20
**else [15]** 43/24 44/10
46/6 47/25 102/7
174/25 175/5 191/22
195/5 195/7 198/7
198/8 203/23 203/25
205/9
**email [14]** 2/9 2/14
2/19 3/5 3/9 3/13 3/17
103/7 103/13 103/16
104/6 104/9 104/9
217/15
**emailed [1]** 103/20
**emanate [1]** 207/4
**embedded [2]** 20/3
107/1 161/4
**embodied [2]** 127/24
166/18
**emphasis [1]** 97/25
**empirical [1]** 108/16
**employed [2]** 53/8
61/13
**employing [1]** 168/3
**emulating [1]** 128/4
**enables [1]** 80/15
**encompass [1]** 119/3
**end [22]** 25/8 26/11
60/21 61/7 69/3 69/17
105/7 144/8 148/7
148/11 148/18 148/22
172/18 176/20 176/21
182/4 197/14 198/22
198/23 198/24 204/17
207/6
**end-point [1]** 148/22
**endeavor [1]** 68/17
**ended [1]** 155/19
**ending [1]** 27/24
**endorse [4]** 122/15
122/16 161/2 166/9
**endorsement [3]**
83/17 163/7 172/4
**endorsements [1]**

146/9
**endorsing [6]** 28/13
79/15 121/11 162/11
162/16 171/14
**ends [2]** 177/10
206/24
**enforced [1]** 26/25
**engaged [2]** 171/20
171/21
**engages [1]** 38/1
**engineer [1]** 173/18
**English [1]** 34/5
**enhancement [1]**
14/23
**enormous [2]** 156/18
215/9
**enough [10]** 7/20 8/21
51/7 101/24 114/24
119/5 173/21 195/23
213/6 218/6
**ensuing [2]** 150/11
159/21
**entailed [1]** 135/3
**enter [1]** 11/3
**enthusiast [2]** 84/25
97/7
**entire [4]** 78/14 98/13
152/3 159/17
**entirely [5]** 38/21
109/18 120/19 170/21
190/3
**entirety [2]** 17/9
198/17
**entitled [36]** 25/20
27/20 27/23 28/6 28/7
28/16 28/22 34/13
37/22 37/23 41/2 43/7
120/15 121/17 122/3
122/17 123/16 138/1
199/6 201/20 206/2
206/11 207/14 208/13
209/15 210/22 211/3
211/11 212/22 212/24
213/11 213/14 215/17
215/17 216/22 221/6
**entitlement [1]** 213/8
**entitles [1]** 151/11
**entity [1]** 14/16
**entity's [1]** 99/7
**entries [4]** 165/16
165/17 165/20 165/23
**entry [2]** 165/18
165/19
**equal [3]** 76/22 80/22
146/25
**equally [1]** 68/14
**equals [1]** 36/13
**equipped [1]** 7/19
**equivalent [10]** 68/13
84/16 109/25 185/3
187/24 187/25 189/7
190/9 190/24 190/25

**ergo [2]** 86/11 90/16
**erred [2]** 120/7 120/8
**error [1]** 53/22
**escaping [1]** 9/23
**especially [2]** 7/15
92/2
**espoused [1]** 190/13
**essence [3]** 157/3
168/6 172/23
**essential [1]** 176/6
**essentially [7]** 25/25
63/6 112/1 145/15
186/2 214/19 217/3
**establish [2]** 120/17
182/19
**established [3]** 24/23
26/14 34/7
**establishing [1]** 197/9
**estimate [6]** 6/18 6/19
6/20 6/22 145/25
185/21
**estimates [4]** 75/12
75/20 148/10 168/18
**et [5]** 1/11 5/5 130/1
149/20 202/21
**et cetera [3]** 130/1
149/20 202/21
**evaluate [5]** 112/19
162/7 199/1 199/2
202/2
**evaluates [2]** 93/13
99/2
**evaluation [4]** 50/23
94/3 140/5 142/1
**eve [1]** 63/4
**even [37]** 7/18 12/15
17/4 22/15 23/1 26/9
26/10 32/23 32/23
51/2 52/21 57/23 71/8
84/6 109/10 111/24
118/10 130/24 150/1
167/19 167/20 168/12
175/7 175/22 177/4
177/11 178/7 179/10
179/10 196/7 205/13
209/10 215/5
**event [1]** 202/24
**ever [12]** 42/23 77/13
92/21 102/6 181/16
190/14 190/14 193/20
193/22 210/22 213/22
218/17
**every [8]** 59/16 104/21
119/15 128/14 128/15
128/16 150/10 208/6
**everybody [2]** 25/8
162/16
**everyone [2]** 87/5
136/21
**everyone's [1]** 193/21
**everything [16]** 8/13
20/8 38/11 69/4 85/12

## E

**everything... [11]** 85/24 92/3 95/21 109/12 109/22 127/18 160/21 185/19 198/8 205/8 208/10
**everywhere [1]** 43/14
**evidence [16]** 8/10 8/11 17/14 28/7 32/17 33/8 33/9 51/22 96/3 120/20 145/1 158/10 197/25 208/24 210/10 210/15
**evoke [1]** 21/6
**exact [6]** 29/7 31/22 96/24 164/4 164/6 186/7
**exactitude [3]** 51/6 51/17 102/18
**exactly [16]** 10/19 13/20 63/23 89/24 99/24 100/4 100/5 100/5 104/4 104/8 111/24 121/11 130/18 174/3 182/17 218/2
**EXAMINAITON [1]** 160/1
**examination [15]** 4/3 10/6 58/12 65/1 79/12 82/23 126/23 132/3 147/21 151/4 158/19 160/12 163/11 181/4 182/5
**examine [9]** 51/3 63/12 92/5 122/10 177/10 177/18 180/20 182/18 199/9
**example [19]** 9/12 36/12 82/8 85/6 94/18 95/11 95/24 100/17 107/24 109/8 111/3 140/22 144/12 159/16 170/13 181/13 181/21 192/24 214/6
**examples [2]** 162/13 162/14
**exceed [2]** 63/4 213/18
**exceeded [1]** 150/5
**exceedingly [1]** 189/15
**exception [1]** 49/8
**exceptional [5]** 14/8 14/12 14/14 14/23 50/7
**excerpt [4]** 64/22 70/3 120/14 120/14
**excerpting [1]** 119/4
**excess [1]** 162/23
**exchange [1]** 217/19
**excited [1]** 100/7

**exclude [5]** 123/5 196/8 198/16 210/9 210/10
**excluding [1]** 182/6
**exclusively [1]** 120/4
**excuse [12]** 5/11 30/22 34/4 56/1 65/11 99/18 106/24 107/17 118/21 147/9 175/10 210/3
**exhibit [11]** 30/11 44/4 64/15 64/18 65/25 66/21 145/14 159/6 160/6 205/24 214/24
**Exhibit 1 [1]** 30/11
**Exhibit 209 [3]** 64/18 65/25 66/21
**exhibits [2]** 150/16 150/18
**exist [2]** 80/18 106/8
**existence [4]** 14/8 151/10 167/22 170/8
**existing [1]** 210/2
**exists [1]** 26/4
**expand [2]** 87/1 87/2
**expectation [2]** 85/14 95/19
**expectations [1]** 159/15
**expenditure [1]** 40/1
**expense [4]** 39/25 41/22 41/22 52/5
**expenses [51]** 9/17 31/11 31/12 32/1 32/2 32/7 33/7 33/17 33/21 33/24 34/3 34/4 34/6 34/7 34/9 34/24 38/13 39/8 39/16 39/17 39/20 39/21 39/22 40/11 40/12 40/19 41/20 41/21 41/21 42/10 42/23 43/23 43/25 46/12 46/17 46/18 47/17 47/17 48/1 48/18 50/13 52/18 54/18 54/19 54/20 101/22 179/22 180/21 199/1 202/11 202/21
**experience [21]** 7/9 7/12 51/10 59/7 68/5 84/21 91/3 96/4 96/22 129/17 134/2 134/10 134/11 135/21 135/22 135/23 135/25 147/12 147/13 156/20 173/16
**experienced [3]** 23/19 54/3 187/6
**expert [55]** 8/7 8/7 25/1 25/4 25/5 25/22 25/23 25/24 26/6

26/12 28/2 29/1 39/11 50/23 51/10 52/23 53/9 56/2 78/2 78/3 78/12 78/14 78/15 88/6 88/8 88/9 88/10 88/10 88/13 97/1 118/25 119/5 122/24 124/25 134/3 134/7 134/21 134/23 135/3 135/7 138/3 150/16 159/7 173/17 178/7 182/17 199/7 201/18 202/4 203/1 204/2 204/3 205/18 214/13 219/16
**expert's [5]** 23/22 29/7 51/20 191/15 206/22
**expertise [1]** 93/24
**experts [11]** 8/6 9/7 15/17 48/9 59/8 59/22 61/14 114/22 119/4 129/5 200/25
**explain [6]** 8/15 8/17 20/4 23/3 52/21 183/1
**explained [4]** 15/11 52/20 87/18 198/4
**explaining [2]** 27/9 50/20
**explications [1]** 207/19
**exposed [1]** 172/13
**exposure [4]** 87/3 87/11 133/17 161/20
**expressed [1]** 126/16
**expressing [1]** 199/13
**extend [1]** 142/11
**extended [1]** 142/15
**extensive [1]** 84/24
**extent [5]** 106/13 106/14 124/12 128/21 160/9
**extenuating [1]** 49/13
**extracted [1]** 127/11
**extreme [2]** 124/18 187/20
**eyeballs [1]** 37/18

## F

**F-e-n-t-o-n [1]** 31/24
**F-l-a-v-a [2]** 130/24 133/1
**F.2d [4]** 31/20 111/9 120/2 120/12
**F.Supp [1]** 31/24
**face [4]** 40/2 41/12 115/2 115/2
**Facebook [12]** 77/11 86/19 87/5 129/25 140/2 142/3 142/10 142/14 160/22 176/3 176/12 176/14

**faces [1]** 19/11
**facet [2]** 88/5 88/6
**Facially [1]** 19/25
**facilitate [2]** 95/6 149/18
**facing [1]** 83/21
**fact [36]** 10/17 17/8 20/22 23/2 23/3 23/4 36/19 36/21 40/1 49/5 49/21 51/21 51/22 52/4 52/4 71/13 87/16 87/16 91/15 91/17 97/9 108/17 112/10 119/12 119/24 127/25 167/25 168/18 175/14 178/15 181/3 182/21 185/20 197/16 197/18 200/2
**facto [1]** 90/6
**factor [59]** 25/15 48/13 48/25 55/15 55/16 56/14 65/10 66/18 71/7 72/11 72/12 72/25 73/1 75/8 76/25 78/25 81/4 81/5 89/5 108/5 108/9 112/9 114/9 124/6 124/6 126/7 126/13 126/15 126/25 129/10 139/9 143/3 143/15 143/19 144/12 147/14 147/17 147/20 150/24 156/17 156/19 158/13 158/14 158/16 158/24 169/17 169/17 169/20 174/7 175/15 175/20 177/12 178/20 179/8 179/9 179/11 179/12 207/9 216/23
**factors [104]** 9/18 36/15 36/16 48/19 48/20 52/17 52/22 53/23 54/3 54/22 58/16 58/19 58/22 58/23 58/25 68/6 68/9 68/10 68/11 68/12 68/15 68/17 68/19 68/21 69/5 69/6 69/8 69/9 69/9 70/17 70/25 71/3 71/6 72/18 72/25 75/6 75/12 75/14 75/17 75/25 76/1 76/4 76/9 76/21 77/12 78/6 80/13 81/2 82/15 83/12 84/20 85/11 86/23 89/13 89/14 93/25 94/13 94/16 96/14 103/23 106/7 106/9 106/11 108/10 109/16 110/22 112/13 112/18 113/12 114/11 118/6 118/7 120/7

122/10 122/11 122/12 122/14 124/7 124/9 124/13 124/15 124/25 125/18 125/25 126/1 126/4 127/21 129/2 139/8 145/15 145/17 145/19 147/15 175/20 178/5 179/16 179/21 180/10 180/12 180/18 181/13 181/18 182/14 197/19
**facts [8]** 14/9 52/12 52/24 106/17 106/19 119/2 119/4 208/21
**factual [1]** 45/9
**fail [1]** 149/6
**failed [5]** 17/13 92/15 95/13 95/14 120/4
**failings [1]** 170/13
**fails [1]** 120/17
**failure [3]** 150/2 160/8 171/1
**fair [32]** 29/16 29/17 38/12 38/12 43/13 56/16 56/17 77/3 99/3 99/5 113/13 121/21 180/16 180/18 180/19 180/23 184/16 184/20 185/11 185/21 186/3 186/10 186/13 186/18 191/6 191/7 192/6 193/2 194/14 195/23 213/6 216/6
**fair-market [5]** 184/16 184/20 186/3 186/10 186/13
**fair-thee-well [3]** 43/13 113/13 121/21
**fairly [1]** 10/3 10/8 11/9
**fait [2]** 25/18 206/5
**fall [2]** 76/7 156/15
**falls [1]** 68/20
**fans [1]** 130/10
**far [12]** 6/22 20/12 41/9 46/17 49/16 50/20 54/14 54/15 63/3 92/5 117/2 124/21
**fare [1]** 8/9
**fare-thee-well [1]** 8/9
**farther [1]** 124/17
**fashion [3]** 42/24 99/3 154/1
**fast [1]** 85/6
**faster [1]** 116/11
**faucets [2]** 88/5 176/17
**fault [1]** 30/25
**favor [4]** 12/10 24/13 131/12 185/25
**favorable [1]** 26/19

## F

Fax [2]  2/8 2/13
feat [1]  10/2
feature [2]  182/15 182/16
federal [2]  77/15 79/3
fee [1]  10/1
feed [1]  19/2
feedback [1]  90/2
feel [3]  107/7 128/5 195/1
feely [1]  122/6
fees [1]  14/24
fella [1]  37/12
fellow [1]  35/9
Fenton [1]  31/24
few [10]  24/5 65/3 139/9 139/13 143/1 151/3 163/10 169/16 169/24 192/5
fewer [1]  146/19
field [3]  94/19 96/21 108/9
fields [1]  119/20
fight [10]  9/9 9/10 9/19 10/4 22/20 22/20 23/7 23/9 23/10 23/15
fighting [4]  22/22 33/3 35/19 41/8
figuratively [1]  7/4
figure [48]  8/1 9/16 19/14 20/23 21/2 21/7 22/16 23/21 23/22 29/3 29/12 29/20 30/21 30/21 30/23 32/20 39/10 54/17 65/11 65/12 67/25 69/2 69/12 69/14 91/23 97/24 105/7 143/16 143/20 144/17 144/17 145/9 145/11 164/4 164/6 165/4 186/19 188/6 196/12 196/12 196/17 196/21 198/6 198/8 198/12 203/19 214/13 216/16
figured [2]  65/15 158/8
figures [3]  125/12 125/15 190/15
file [1]  160/5
filed [6]  17/19 19/13 36/1 137/10 138/12 138/13
filing [1]  39/21
filled [1]  108/17
final [1]  27/16
finalize [1]  105/14
finalized [1]  72/16
financial [2]  156/4 180/9

find [12]  17/25 40/16 92/8 101/16 126/1 132/18 141/2 165/16 165/20 172/15 189/14 197/6
finder [2]  91/15 91/17
finding [1]  32/17
fine [3]  19/8 46/17 73/10
finish [3]  73/17 73/19 212/2
finished [2]  68/24 193/6
finite [1]  39/17
firework [2]  218/18 218/22
fireworks [1]  218/17
firm [2]  108/12 141/17
firmly [1]  49/23
first [58]  1/24 19/17 20/16 22/6 26/1 28/3 36/22 44/3 44/6 54/22 54/25 56/2 56/14 61/5 61/22 65/4 65/23 66/10 66/19 73/1 75/8 77/19 77/22 79/16 81/4 81/14 88/6 105/8 106/5 106/5 106/6 119/25 120/1 121/6 121/20 123/19 124/6 125/10 137/14 138/8 150/4 155/25 156/12 163/18 164/9 165/5 170/25 177/13 179/19 183/16 183/19 184/4 188/2 191/23 192/21 195/24 210/25 211/25
Fischer [1]  6/18
five [24]  6/20 6/21 19/7 43/2 50/8 50/9 64/14 74/3 75/23 85/2 91/2 99/15 109/16 129/3 134/15 143/3 143/15 144/12 174/7 174/7 174/10 174/11 175/15 176/19
fixed [2]  32/18 32/22
Flava [2]  130/23 132/25
flavor [19]  25/14 33/14 33/23 82/7 85/11 85/13 85/17 94/23 95/3 95/4 95/11 97/6 103/9 128/21 149/4 159/14 207/12 207/12 207/13
flavors [6]  76/3 85/15 91/7 94/20 95/19 130/4
flex [1]  154/21
Floor [1]  1/24
floors [1]  19/7

flow [2]  19/24 149/13
fluid [2]  127/9 162/24
fly [3]  84/4 208/5 208/12
focus [3]  52/19 105/2 176/9
focused [1]  208/1
focusing [2]  170/3 170/4
folks [1]  153/22
follow [9]  68/23 73/12 79/2 133/11 139/9 140/23 149/12 158/15 159/25
follow-up [4]  133/11 139/9 158/15 159/25
followed [1]  76/4
followers [12]  130/5 139/18 139/24 140/2 140/2 141/18 142/20 146/1 146/18 146/19 146/22 147/1
following [10]  74/2 104/7 129/24 130/25 140/15 142/9 164/10 176/5 197/6 203/12
followings [1]  87/1
follows [6]  61/22 121/24 121/24
food [1]  127/8
foolishness [1]  106/11
footnote [1]  210/21
fora [2]  90/10 90/11
force [3]  19/2 34/16 201/5
forced [1]  196/15
forces [1]  87/4
forcing [1]  19/3
foregoing [1]  221/4
foregone [1]  189/20
foremost [1]  192/21
forensically [1]  124/24
forever [2]  26/25 42/2
forget [6]  23/18 39/11 97/7 89/7 101/23 174/19
forgive [1]  127/17
forgotten [1]  195/16
form [4]  51/11 78/14 145/22 169/7
format [1]  221/7
forth [16]  8/5 8/6 9/13 9/13 35/12 35/13 50/8 91/23 114/18 114/22 114/25 115/10 115/10 140/11 191/14 199/21
forum [2]  37/10 90/1
forums [5]  77/11 127/19 130/21 154/2 172/16

forward [5]  49/25 57/18 58/8 184/20 194/13
found [8]  35/22 67/17 130/20 131/22 132/8 132/22 171/9 171/13
foundation [1]  97/8
four [6]  64/3 70/4 70/6 79/4 124/9 128/6 129/3 134/15 152/19
fractured [1]  34/5
fragmentation [1]  156/23
fragmented [2]  82/2 148/13
framework [8]  63/7 75/19 76/7 96/8 97/3 98/17 203/6 212/6
framing [1]  142/6
Frank [4]  31/18 31/25 120/1 123/21
frankly [9]  46/2 54/12 72/14 80/24 81/8 124/24 200/15 200/16 200/16
fraud [1]  35/8
frequency [1]  100/15
Friday [1]  45/13
friend [1]  108/13
friends [4]  142/11 161/7 161/10 162/2
friends/social [1]  161/7
front [12]  35/3 40/23 44/7 63/16 64/9 66/4 67/4 70/7 70/20 73/25 75/4 92/6
frustrate [3]  213/3 213/5 213/6
frustrating [2]  113/6 210/19
full [6]  43/7 79/6 98/5 150/4 153/20 214/2
fully [1]  210/18
fumerole [1]  102/15
function [1]  122/15
fundamental [3]  15/16 18/11 135/19
fundamentally [1]  20/7
further [22]  46/10 49/14 92/16 108/18 118/10 122/20 133/9 138/2 139/7 147/17 158/13 159/23 163/9 169/14 172/15 175/1 195/8 200/22 213/5 213/6 219/23 219/24

## G

GACKLE [2]  1/23 221/13

gain [1]  161/20
gained [1]  131/12
gaining [1]  156/16
gall [1]  40/6
gap [1]  163/6
garbled [1]  88/20
garner [1]  166/9
garnered [2]  25/12 142/16
garnering [1]  162/4
Gatien [4]  2/16 2/17 5/17 5/19
gave [4]  97/14 142/10 156/25 157/16
general [13]  21/13 34/8 49/18 52/11 55/3 55/4 55/6 146/7 146/17 146/19 147/5 156/18 163/6
generally [2]  53/9 116/13
generals [1]  8/22
generate [2]  152/14 166/9
generated [1]  170/23
generating [1]  161/11
generation [3]  58/19 62/10 110/18
gentle [1]  54/8
Gentleman [1]  57/10
gentlemen [4]  44/1 44/3 54/8 121/20
genuine [1]  215/6
George [1]  181/18
Georgia [1]  181/13
get [142]  7/14 7/14 7/22 7/24 8/1 8/2 9/4 10/4 10/25 11/11 13/5 18/24 19/16 19/17 20/1 20/16 21/9 21/12 21/21 22/20 23/18 25/7 25/13 25/18 27/25 28/12 29/6 30/3 30/19 35/3 36/7 36/8 37/24 38/2 38/10 38/12 38/19 39/8 39/14 40/21 41/17 44/10 44/12 45/12 45/17 45/18 45/24 45/24 47/2 47/17 47/24 48/3 48/20 49/1 54/14 54/15 54/15 54/16 56/12 57/7 57/8 64/12 71/3 71/5 71/6 71/15 71/16 72/22 76/6 76/18 79/11 80/13 82/20 83/6 83/7 83/8 85/14 85/17 85/21 87/19 88/3 88/12 88/23 89/3 89/3 89/5 89/9 89/10 91/12 93/21 96/1 96/2 96/3

## G

**get... [49]** 102/23
105/13 108/14 113/6
113/7 113/20 114/12
115/20 116/3 116/4
116/5 116/11 116/12
121/18 122/20 122/23
122/23 124/25 125/10
129/20 140/14 148/6
148/24 152/10 155/16
156/13 161/10 167/25
178/1 189/9 190/5
200/4 203/18 203/22
204/25 205/4 210/14
210/14 212/10 212/20
214/10 215/7 216/1
218/3 218/8 218/11
218/25 219/5 219/5
**gets [6]** 8/14 13/24
83/12 98/25 99/15
133/20
**getting [17]** 9/4 21/14
36/8 38/3 43/22 51/9
83/17 86/25 87/4
87/17 90/2 91/24
100/7 156/22 195/1
199/11 214/10
**giant [1]** 19/4
**gibberish [1]** 20/7
**gimme [2]** 23/5 23/6
**gist [2]** 31/22 151/6
**give [63]** 12/10 22/2
27/2 35/2 39/24 42/13
43/11 44/11 45/6 48/8
48/11 48/21 48/22
48/24 54/5 54/6 54/7
54/14 62/1 68/13 71/8
71/16 84/7 91/20 92/6
92/16 92/22 93/5 93/6
99/19 103/23 105/21
111/8 113/1 121/8
122/5 124/16 143/10
144/13 144/18 145/7
162/17 163/6 166/13
178/6 182/5 190/8
191/18 196/15 198/11
200/9 200/12 201/10
201/11 207/22 211/2
216/20 217/14 217/17
217/18 217/21 218/25
220/18
**given [20]** 6/11 6/22
9/23 15/9 15/17 27/19
42/16 42/17 46/13
53/6 88/9 111/25
113/22 124/13 178/11
185/21 193/19 199/10
206/19 215/22
**gives [7]** 42/13 81/24
87/7 131/1 161/8
185/6 190/3

**giving [13]** 8/20 10/19
11/12 41/15 41/15
48/3 89/8 92/10
133/16 170/22 177/11
178/14 205/18
**gladiating [1]** 36/20
**Glass [1]** 77/23
**glasses [1]** 5/15
**glean [1]** 156/7
**gleaned [1]** 190/19
**Glen [2]** 3/15 6/5
**glycerin [1]** 127/8
**gnuttall [1]** 3/17
**goal [2]** 161/12 193/1
**Goldwyn [1]** 120/1
**golf [2]** 22/23 22/25
**gone [12]** 25/2 41/8
47/23 73/3 102/5
104/5 114/15 116/5
120/11 163/1 200/25
218/3
**good [32]** 5/7 5/9 5/10
5/19 5/20 5/23 5/24
5/25 6/2 6/6 6/7 20/12
24/17 40/25 42/7 42/9
43/3 58/14 58/15 65/3
97/15 107/23 115/7
125/4 152/9 152/11
157/1 158/10 166/9
179/12 211/19 219/14
**goods [14]** 17/14
20/24 21/2 23/6 23/10
29/22 30/1 30/9 30/16
82/8 111/13 111/14
160/4 196/4
**Google [5]** 86/17
160/19 214/6 214/7
214/10
**goosey [1]** 82/24
**Gordon [1]** 59/17
**Gordon-Smith [1]**
59/17
**gotten [5]** 23/14 71/13
88/25 102/11 126/2
**grab [1]** 76/17
**grade [2]** 27/13 127/8
**grand [2]** 144/18
145/7
**grant [2]** 33/12 41/23
**granted [3]** 207/2
207/4 210/9
**granting [3]** 17/9
208/15 208/16
**grass [10]** 85/24
86/22 110/9 129/19
130/9 131/16 142/7
160/17 160/20 160/22
**grass-roots [1]** 86/22
**gratuities [1]** 69/25
**gratuitously [1]** 122/4
**gray [1]** 83/12
**great [7]** 12/17 44/20

44/21 106/13 106/14
110/3 211/25
**greater [2]** 110/1
141/23
**gross [25]** 17/11
17/11 19/14 19/25
20/23 21/1 21/17 22/7
22/8 22/12 22/13
27/17 29/12 30/16
30/16 30/17 30/22
31/10 32/16 38/2 51/1
143/9 144/9 196/4
197/9
**grosses [1]** 214/9
**ground [1]** 87/4
**groundwork [1]** 66/19
**group [2]** 166/14
166/21
**groups [1]** 130/5
**growing [2]** 218/20
218/22
**grown [2]** 127/10
127/12
**guarantee [4]** 7/16
35/3 40/9 122/25
**guess [9]** 33/20 61/13
113/11 121/21 144/1
144/4 170/14 190/17
203/11
**guessing [3]** 9/12
9/12 102/17
**guest [1]** 125/10
**guffawed [1]** 47/1
**gullet [2]** 16/11 16/13
**Gulliver [3]** 21/11
34/19 34/20
**gun [3]** 37/14 37/15
107/18
**gut [1]** 185/15
**guy [6]** 7/13 37/15
38/10 38/25 39/4
89/19
**gylcol [1]** 127/8

## H

**H-i-l-l [1]** 8/2
**Hackett [7]** 65/6 65/6
131/20 131/21 155/8
155/8 160/7
**Hackett's [2]** 157/17
158/11
**Hacketts [1]** 154/19
**had [73]** 16/19 35/9
39/1 42/22 45/5 47/6
64/17 65/5 68/12
70/14 70/14 70/16
74/4 74/8 74/15 74/24
75/24 84/6 90/13 97/4
104/6 111/11 122/13
126/13 128/17 129/2
131/20 133/24 136/6
136/14 138/8 138/9

138/24 139/2 141/4
141/12 141/22 146/25
147/2 149/23 150/11
151/8 152/9 152/11
154/19 154/22 155/5
155/22 155/24 156/2
156/15 156/22 157/1
157/22 158/2 159/4
159/20 162/10 163/25
164/16 168/17 168/17
168/25 169/3 169/11
170/3 180/4 180/6
180/7 180/12 192/1
196/16 208/16
**hadn't [1]** 170/6
**hair [6]** 143/20 145/16
145/19 167/15 167/22
176/23
**half [11]** 6/24 61/3
81/18 84/22 99/10
99/12 188/10 201/8
201/9 219/6 219/8
**halfway [1]** 12/9
**hall [1]** 35/6
**halo [1]** 173/11
**hand [8]** 13/15 47/25
57/13 152/18 214/19
214/19 215/4 215/4
**handed [3]** 64/3 64/19
137/25
**handful [1]** 171/18
**hands [4]** 38/16 38/19
148/25 149/5
**happen [8]** 7/16 21/20
45/3 47/12 170/16
172/5 172/13 177/25
**happened [2]** 45/3
45/4 160/7
**happening [2]** 170/20
206/9
**happens [4]** 24/17
38/8 38/9 178/7
**happy [10]** 42/8 42/8
42/9 65/19 67/21
79/23 115/11 150/7
209/6 209/7
**hard [2]** 19/7 96/3
**hardware [1]** 134/19
**harsh [1]** 127/25
**Harvard [1]** 8/23
**has [86]** 6/9 6/10
10/20 14/22 15/10
15/11 17/6 18/6 21/17
25/25 26/16 26/25
30/1 35/5 35/22 39/19
43/18 43/19 44/4
46/17 49/6 50/25
51/13 52/20 52/23
53/13 53/21 56/4 59/7
59/11 59/15 61/13
63/16 64/6 77/15 81/3
81/5 81/10 82/1 87/20

96/9 96/24 97/1 97/2
100/8 111/4 112/10
112/14 112/18 112/21
119/14 120/11 127/3
127/12 130/25 140/19
140/24 161/4 161/16
165/15 174/5 178/1
180/3 181/4 181/5
182/8 182/12 184/20
185/12 187/9 188/22
188/25 189/2 196/1
196/2 197/8 197/16
202/8 203/1 206/5
208/24 212/5 213/21
214/4 215/16 218/23
**has a [1]** 51/13
**hasn't [4]** 101/17
101/18 113/14 178/8
**hate [1]** 199/25
**hatting [1]** 119/11
**have [348]**
**haven't [25]** 16/13
17/1 21/2 36/4 40/22
40/24 45/12 49/19
65/15 71/13 72/16
80/7 88/25 105/12
115/1 116/4 124/5
124/7 124/13 167/2
170/20 178/11 192/1
208/1 218/3
**having [18]** 27/12
34/7 34/8 84/5 88/11
88/14 113/21 113/22
113/22 114/19 115/15
149/16 150/7 155/20
157/10 157/13 195/15
199/19
**Havz [1]** 214/14
**he'd [1]** 196/15
**head [4]** 7/4 66/13
122/5 201/21
**headed [1]** 24/10
**heading [1]** 176/2
**hear [14]** 12/14 16/12
21/4 23/17 24/15
49/22 65/20 81/16
87/14 137/21 180/24
180/25 195/11 195/12
**heard [10]** 21/3 24/6
45/12 59/11 79/3 83/6
115/15 165/6 171/7
193/13
**hearing [7]** 15/4 20/4
35/1 54/1 177/14
179/20 182/11
**hearsay [1]** 49/8
**heave [1]** 49/8
**heaved [1]** 49/7
**heavy [1]** 168/23
**heck [2]** 71/9 71/20
**heel [2]** 47/4 47/4
**held [24]** 14/10 16/15

## H

**held... [22]**  58/10
66/15 66/25 92/12
92/19 94/10 105/19
128/25 137/18 174/4
185/24 191/20 199/14
201/3 207/17 207/25
211/12 216/18 217/16
217/20 220/1 221/6
**help [23]**  8/19 13/25
34/2 36/6 36/7 37/10
37/11 41/14 41/15
44/9 46/4 51/21 52/4
57/19 65/23 93/1 97/9
123/8 126/11 163/6
181/17 216/12 216/13
**helped [2]**  122/22
152/2
**helpful [6]**  44/22 52/9
54/13 87/9 114/19
216/14
**helping [3]**  43/21
152/14 168/22
**helps [4]**  37/16 95/5
133/14 149/18
**here [166]**  6/15 7/6
7/16 7/18 8/3 8/15 9/6
9/19 10/8 10/15 11/7
12/18 13/5 13/13
13/14 15/18 15/25
17/21 19/13 19/17
19/18 19/20 19/22
20/5 20/18 21/7 21/20
21/24 22/11 23/5
28/19 32/6 32/13 33/3
34/5 34/12 34/15
34/20 36/14 37/12
37/21 38/8 38/24
38/24 39/5 41/3 41/12
42/1 42/14 43/18 44/6
49/14 50/2 51/1 51/18
52/19 53/3 55/7 56/13
60/7 60/14 61/18
63/21 66/24 69/21
71/18 72/5 73/6 76/1
76/16 78/8 82/13
82/13 82/25 83/2
83/14 84/1 87/19 88/1
91/17 91/22 96/1 96/5
96/10 97/9 97/10
101/15 101/17 104/20
104/21 106/23 108/1
108/6 108/9 108/14
108/16 109/13 109/22
112/12 113/9 113/24
114/18 116/9 117/2
117/9 117/11 118/16
122/4 123/6 125/7
125/12 126/2 126/5
126/5 127/18 137/19

**143/24 146/2 159/19**
162/17 166/1 168/25
169/24 175/8 176/11
177/3 178/18 179/24
182/11 187/22 188/6
192/22 194/22 196/11
198/2 199/10 199/11
199/16 200/1 200/18
200/25 201/17 202/9
204/2 206/9 208/14
209/11 209/16 210/17
210/20 210/23 212/10
214/12 217/7 218/18
219/5 219/12 219/14
220/8 220/9 220/12
220/17
**here's [26]**  15/13
21/24 26/17 26/17
31/18 32/11 34/1
37/11 37/21 42/19
44/2 44/3 44/6 44/18
45/22 47/2 47/18
98/12 107/7 115/24
121/25 124/25 177/7
205/16 216/16 217/9
**hereby [1]**  221/3
**heretofore [1]**  177/5
**hesitant [1]**  34/17
**Hey [12]**  9/22 53/17
53/25 76/16 89/16
103/8 103/21 115/1
115/2 123/10 123/18
156/10
**high [11]**  76/3 91/7
94/20 95/4 119/11
128/11 130/4 149/4
162/20 176/19 176/21
**high-quality [5]**  94/20
95/4 128/11 130/4
149/4
**higher [9]**  76/23 128/2
128/10 128/11 145/10
156/16 176/7 191/2
191/4
**highest [1]**  127/8
**highlighted [1]**
118/16
**highly [1]**  85/25
**Hill [3]**  8/2 8/3 39/2
**Hills [1]**  2/18
**his [75]**  13/18 24/8
25/5 26/3 26/10 27/13
28/15 28/23 29/18
33/8 37/13 38/2 52/20
61/7 63/12 64/5 64/5
64/5 64/6 64/16 64/16
64/20 64/23 71/4
72/18 72/25 78/14
81/19 81/21 81/22
88/17 93/23 94/3
97/14 104/25 108/17
108/17 108/19 111/15

**115/18 116/20 125/3**
173/18 173/21 174/6
177/12 177/13 177/15
177/15 178/6 180/4
180/20 183/1 185/12
185/12 187/12 188/8
188/11 195/2 196/15
196/17 196/17 198/5
203/15 205/18 205/23
205/24 206/3 206/3
206/18 206/18 211/11
211/22 214/25 220/7
**historically [3]**  28/13
37/8 43/17
**hit [32]**  33/18 54/25
55/9 59/2 75/8 75/25
76/5 81/25 85/23
109/10 110/7 127/3
127/23 127/25 128/19
130/2 131/17 142/9
142/21 142/23 148/15
150/20 152/2 159/22
161/3 161/9 162/6
165/13 168/5 172/24
214/15 214/19
**hits [1]**  139/2
**hoc [1]**  168/17
**hold [4]**  74/12 113/7
113/7 214/11
**holder [1]**  215/13
**holders [1]**  215/11
**holding [1]**  50/8
**home [2]**  37/18 116/6
**honest [2]**  80/4 100/6
**Honor [134]**  5/7 5/18
5/22 5/25 6/7 11/19
11/23 12/1 12/21 13/4
13/8 13/10 13/23 16/5
16/9 16/25 20/14
22/10 22/22 24/12
24/16 24/20 27/22
29/6 29/10 29/17 30/7
32/10 33/6 35/24
44/18 45/21 46/15
46/24 55/15 55/20
56/7 56/10 56/11
56/17 57/4 58/5 58/7
58/15 61/2 62/21
63/13 63/15 63/24
64/2 64/12 65/16
66/17 76/14 76/20
79/2 81/4 84/3 85/8
87/12 88/19 89/4 93/4
94/12 97/13 98/5
98/11 98/14 99/23
100/5 100/12 106/4
110/22 111/3 111/6
115/16 117/8 126/3
126/10 126/22 127/17
129/9 131/7 133/10
137/17 137/22 139/7
139/12 143/23 147/17

**150/23 151/3 159/24**
162/21 163/10 169/14
172/2 173/2 173/6
174/12 181/2 186/2
186/7 187/14 188/3
188/15 188/20 190/17
191/9 191/12 191/24
192/21 195/1 195/4
195/6 195/14 201/23
202/13 203/24 205/9
206/21 208/3 209/5
210/24 212/1 213/3
213/24 214/3 217/3
219/3 219/11 219/18
220/11 220/20
**HONORABLE [1]**  1/5
**hope [4]**  133/18 163/8
179/8 203/20
**hopefully [7]**  9/3
20/16 47/14 48/2
114/11 121/14 198/23
**horse [2]**  45/7 51/15
**hosted [1]**  163/7
**hot [2]**  8/10 43/7
**hour [6]**  199/16 201/8
201/8 219/6 219/8
220/22
**hours [3]**  37/8 114/19
219/8
**household [1]**  13/20
**how [168]**  9/6 9/15
12/23 24/16 27/14
30/19 33/11 35/9
35/20 35/20 36/7
36/21 36/22 36/22
37/11 38/19 38/22
38/23 38/23 39/10
42/2 46/11 47/14
47/20 49/10 56/15
59/24 59/25 61/20
67/25 69/7 69/8 69/21
70/24 70/24 71/6 71/9
71/9 71/19 72/3 72/4
72/11 72/12 73/6 82/4
82/16 83/6 83/7 83/11
83/13 83/14 83/14
83/23 85/21 85/21
87/21 88/16 88/23
89/3 89/4 89/10 91/7
91/11 93/1 93/2 93/3
93/21 95/2 95/11 96/1
96/3 96/3 96/4 96/5
96/16 96/18 97/24
97/25 98/1 98/3 98/21
98/22 102/23 103/15
103/16 105/15 105/22
105/25 107/7 109/7
110/14 111/23 113/20
113/23 123/8 123/8
124/21 131/4 131/8
131/8 131/19 139/18
139/24 140/14 142/2

**142/8 142/20 142/21**
143/2 149/13 153/11
153/13 153/15 153/17
153/19 154/11 154/15
155/23 156/1 156/10
156/12 156/23 157/21
159/3 159/12 161/14
162/15 162/16 162/21
166/14 166/15 166/20
166/20 167/8 167/18
167/19 168/12 168/13
168/24 170/16 170/18
171/23 172/5 173/9
173/10 173/12 173/17
174/21 182/20 182/20
183/6 184/5 184/21
190/5 190/22 194/1
199/1 200/8 200/13
202/7 207/21 209/19
209/19 209/20 213/13
213/14 217/21 219/4
**How's [1]**  83/18
**HRL [1]**  213/20
**huge [1]**  130/25
**huh [4]**  41/13 140/16
146/10 146/24
**huh-uh [1]**  41/13
**humming [1]**  65/12
**hundred [2]**  83/9
197/2
**hundreds [5]**  37/7
61/9 85/15 140/13
157/13
**hurdle [1]**  25/13
**hurdles [1]**  28/18
**hypothetical [3]**  63/5
143/24 192/23

## I

**I' [1]**  40/8
**I'd [25]**  19/23 67/6
67/21 70/22 76/20
91/20 91/21 97/21
123/23 125/7 125/8
153/20 156/10 164/8
169/15 182/18 184/4
188/7 191/18 195/8
200/5 209/6 209/7
211/9 218/25
**I'll [39]**  8/21 9/17 18/9
26/7 27/11 33/11 36/6
37/23 38/9 38/23
39/23 41/6 42/7 44/14
48/4 48/21 52/6 54/7
75/21 79/25 80/4
87/10 105/9 113/19
115/21 115/22 116/6
116/10 124/22 124/25
135/9 163/18 167/25
179/8 195/18 201/7
201/9 201/10 207/22
**I'm [334]**

**I**

**I've [45]** 6/22 6/25 7/2 7/10 8/25 9/4 44/5 46/13 51/23 52/8 52/8 64/2 64/13 70/2 71/21 71/23 72/16 79/25 84/22 84/24 84/25 90/10 90/10 91/3 91/3 92/10 92/17 92/25 102/11 108/17 114/14 115/25 116/12 125/2 126/1 134/5 155/5 177/1 187/5 188/16 189/3 193/13 198/18 200/18 213/24

**i.e [10]** 8/9 38/6 43/5 49/6 52/5 55/1 71/15 107/6 178/5 200/13

**Ice [1]** 133/1

**idea [5]** 25/7 115/7 180/2 189/2 201/11

**ideas [1]** 44/20

**identical [1]** 215/14

**identification [4]** 69/15 88/9 96/4 109/15

**identified [26]** 11/14 27/18 55/24 58/21 68/9 68/19 68/19 70/14 73/1 78/4 85/19 85/20 88/11 88/14 96/10 98/19 101/21 101/22 113/21 132/16 138/20 166/18 170/18 180/12 202/9 204/9

**identifier [1]** 155/21

**identify [22]** 36/23 55/24 57/9 58/18 59/25 61/23 69/8 72/10 89/13 93/1 93/17 96/12 102/15 132/7 152/12 154/5 155/11 171/1 174/17 191/5 193/1 202/10

**identifying [9]** 58/16 59/14 59/18 59/23 61/15 69/5 88/1 149/12 182/13

**if [238]**

**II [1]** 1/20

**illogical [1]** 181/9

**image [1]** 210/20

**images [1]** 140/11

**imbued [1]** 41/11

**immediately [3]** 159/9 172/4 172/13

**immodest [1]** 8/21

**impact [5]** 48/14 48/16 121/24 150/8 166/17

**implicate [2]** 101/8

**implicated [3]** 101/17 101/18 183/3

**implicates [1]** 15/17

**impolite [1]** 23/16

**importance [6]** 68/17 69/9 75/15 85/22 96/14 157/10

**important [26]** 32/13 68/7 68/18 75/18 76/4 85/12 86/24 88/1 90/3 95/7 96/20 97/3 98/22 114/24 120/21 128/2 129/19 130/8 131/15 142/18 148/23 149/15 154/23 157/20 168/21 168/22

**importantly [5]** 127/10 149/16 150/11 188/11 207/22

**impose [1]** 194/1

**impression [1]** 165/15

**impressions [8]** 133/17 142/16 161/11 161/12 162/1 162/4 162/5 166/9

**improper [1]** 142/6

**improperly [1]** 49/25

**impute [1]** 194/20

**in [600]**

**inaccurate [2]** 40/17 190/3

**inappropriate [1]** 213/17

**inappropriately [1]** 40/20

**INC [4]** 1/7 5/5 120/1 213/20

**incentive [1]** 161/1

**incentivize [2]** 161/8 172/22

**inception [1]** 158/3

**inclined [1]** 122/14

**include [2]** 121/18 215/6

**included [6]** 32/18 130/23 132/20 132/24 185/18 203/20

**includes [1]** 26/4 26/8 130/20 214/14

**including [1]** 85/5

**income [1]** 21/17

**incomplete [1]** 175/1

**inconsistency [1]** 86/7

**inconsistent [3]** 196/24 197/23 198/4

**incorporate [1]** 44/24

**incorporated [2]** 77/9 203/13

**incorrect [1]** 192/9

**increased [2]** 151/9

**152/3**

**incredibly [1]** 204/21

**incrementalized [1]** 34/2

**increments [1]** 28/10

**indeed [5]** 62/8 106/21 106/22 107/22 177/3

**independent [1]** 48/14

**indicated [2]** 67/13 162/10

**indicates [1]** 189/24

**indicating [1]** 185/13

**indication [8]** 99/6 157/16 184/16 185/9 186/17 187/3 190/8 194/13

**individual [3]** 11/15 66/24 170/9

**individually [1]** 7/6

**individuals [3]** 152/25 161/7 173/1

**Indonesia [1]** 127/15

**Industries [1]** 134/23

**industry [75]** 68/4 68/8 69/10 81/23 82/1 84/22 84/23 84/25 85/1 85/25 86/24 89/19 89/24 90/2 90/4 91/5 94/23 96/15 96/18 96/23 97/2 99/2 104/10 105/24 106/1 110/8 110/10 123/9 127/4 127/19 128/3 128/4 128/13 128/14 128/16 129/11 129/18 129/20 129/22 129/24 130/1 130/11 130/18 130/19 131/9 131/11 131/13 131/23 133/8 133/12 134/2 134/4 134/6 134/15 135/18 146/6 146/8 147/10 148/12 149/13 154/2 154/4 156/21 156/23 157/9 157/11 160/18 160/24 168/23 172/6 172/8 172/16 175/16 176/15 184/8

**inexact [1]** 76/12

**infancy [1]** 148/14

**infer [1]** 158/8

**inference [1]** 68/21

**inferences [1]** 150/14

**infirm [2]** 107/6 202/8

**influence [4]** 129/22 130/7 130/12 163/3

**influencer [4]** 130/18 130/19 146/1 146/21

**influencers [36]** 86/24 90/2 91/5 110/10

**127/20 128/14 128/14 128/16 129/11 129/20 129/22 129/24 130/1 130/11 131/9 131/11 131/11 131/14 131/23 132/22 132/23 132/23 133/8 133/13 133/13 133/13 136/5 146/6 146/7 146/11 146/15 146/15 146/18 147/11 154/2 160/24 172/17 175/16 176/15**

**influences [1]** 132/8

**inform [2]** 48/25 77/12

**information [26]** 48/23 62/19 77/10 90/12 91/1 93/17 93/18 104/14 104/18 127/21 130/6 133/20 133/25 137/7 149/13 154/4 156/5 156/13 160/9 166/23 169/2 169/9 177/11 180/6 185/22 193/15

**informed [3]** 48/3 121/14 210/19

**informing [1]** 156/8

**informs [3]** 101/14 186/25 187/2

**infringe [3]** 121/7 121/7 123/19

**infringed [4]** 62/25 63/4 121/21 214/8

**infringement [20]** 25/12 26/8 48/15 54/4 55/13 63/5 100/24 101/16 102/12 110/25 111/7 111/11 120/19 145/7 145/18 151/12 184/1 197/21 199/2 206/6

**infringer [2]** 120/16 193/19

**infringer's [1]** 120/19

**infringing [20]** 32/3 32/4 32/16 32/18 32/23 34/9 58/20 58/23 111/13 111/14 120/15 151/11 186/5 186/12 191/1 197/1 197/2 197/3 197/10 197/11

**ingredients [1]** 128/12

**initial [10]** 11/12 17/12 95/9 95/15 110/6 149/21 150/3 169/3 180/8 185/12

**initially [1]** 217/5

**injunction [10]** 45/14 49/4 49/5 49/6 49/10 49/15 49/15 49/15 49/17 49/18

**injured [1]** 200/12

**inkling [1]** 7/24

**input [10]** 27/21 46/10 48/3 92/24 93/4 181/1 199/24 200/21 200/22 200/23

**inquire [1]** 63/24

**inquiring [1]** 211/21

**inside [1]** 155/7

**Insider [3]** 130/24 132/25 136/19

**insight [1]** 8/20

**insist [2]** 38/5 38/15

**Instagram [12]** 77/11 87/6 130/1 139/25 140/2 140/13 141/7 142/3 160/22 176/3 176/12 176/13

**instance [6]** 15/6 55/4 102/1 114/17 146/12 179/9

**instances [3]** 32/24 100/17 178/25

**instead [3]** 124/22 202/14 202/19

**instruct [1]** 218/6

**instructed [1]** 180/14

**instructive [2]** 54/12 119/10

**intangibles [1]** 9/17

**intellectual [9]** 24/22 28/1 59/18 61/6 61/10 61/11 182/11 184/7 204/23

**intend [3]** 51/23 51/24 204/1

**intending [4]** 119/3 201/17 201/22 204/10

**intent [2]** 193/8 193/11

**interact [1]** 142/22

**interchangeably [1]** 18/5

**interest [2]** 12/8 12/18

**interesting [3]** 6/22 144/3 206/8

**interestingly [2]** 86/7 114/23

**interface [1]** 142/10

**interfered [1]** 8/14

**internal [1]** 177/3

**internally [3]** 15/16 118/16 216/16

**International [1]** 134/24

**Internet [9]** 93/15 102/24 102/24 107/1 138/9 161/17 171/5 176/13 176/24

**Internet-based [1]** 161/17

**Internet-related [1]** 176/24

**I**

interns [1]  121/1
interpose [1]  144/20
interpretation [2]  97/5
97/6
interrupt [2]  65/17
194/12
interrupting [1]  206/9
Interruption [2]  66/11
79/20
into [46]  19/9 21/21
23/18 27/17 28/12
34/16 35/6 39/22 47/2
48/17 49/1 50/12
58/17 70/25 71/19
80/13 81/20 88/15
93/8 93/10 95/21 96/2
98/6 98/21 109/20
113/20 133/18 146/22
148/25 158/24 159/9
159/10 162/6 162/12
163/8 168/25 171/11
184/9 188/24 195/19
198/8 201/9 203/15
205/21 211/7 218/11
introduce [1]  108/1
introduces [2]  93/23
94/3
introducing [1]
108/10
introduction [2]
149/18 159/14
intuitively [4]  102/3
102/4 102/4 121/15
invite [2]  40/24 43/25
invited [2]  12/12
55/22
involved [3]  35/7
136/1 180/2
involving [2]  63/2
193/14
ions [1]  50/19
irrelevant [2]  192/24
218/15
Irvine [4]  3/4 3/8 3/12
3/16
isolate [1]  62/9
isolated [1]  56/18
isolating [1]  56/25
isolation [1]  146/20
Israel [1]  36/17
Israel-Palestine [1]
36/17
issue [48]  10/25 15/9
18/11 19/21 22/7
25/16 29/21 31/16
35/20 36/14 41/23
41/25 42/1 46/8 46/9
46/12 48/1 49/4 50/7
51/2 51/22 52/13
52/15 55/11 56/14

61/24 71/21 80/18
104/20 109/7 109/7
119/14 133/10 170/8
170/21 182/10 183/8
207/23 207/23 208/18
211/9 211/25 212/3
212/8 212/15 212/18
213/4 220/19
issue there [1]  25/16
issue's [1]  42/2
issued [2]  49/5 49/6
171/24
issues [12]  27/17
28/19 56/13 118/8
136/3 180/9 180/10
182/25 208/13 209/15
210/18 211/3
it [640]
It' [1]  144/24
it's [210]  7/20 7/22
8/14 9/7 11/1 12/4
12/19 14/14 14/22
15/12 15/14 15/21
16/3 17/4 17/21 19/6
19/25 20/17 21/16
23/23 24/9 24/23 25/8
25/18 26/14 26/14
26/19 26/21 27/3
27/25 28/1 28/2 29/6
29/8 30/11 31/19
31/23 33/12 33/23
35/17 36/16 38/12
38/20 38/21 43/14
47/19 49/10 49/15
50/22 50/25 51/7 51/9
51/16 53/16 54/11
54/12 55/14 55/15
56/17 56/25 59/16
60/23 61/14 63/1
66/12 70/3 70/3 70/3
70/5 72/21 76/12 79/4
80/15 80/18 80/20
80/20 80/22 80/24
81/8 81/10 82/2 82/22
85/12 87/12 88/8 90/8
92/1 92/2 92/5 95/1
95/7 96/18 96/23
97/15 99/25 99/25
100/2 100/15 102/14
102/14 102/16 102/18
102/20 102/21 102/22
104/15 104/24 105/5
106/11 108/12 109/5
109/6 110/16 110/17
112/1 112/4 112/8
112/9 113/6 113/15
114/20 115/7 118/6
119/10 119/10 120/2
121/13 121/19 122/22
123/10 123/25 124/10
124/12 125/8 125/22
130/8 130/8 131/15

135/25 135/25 144/25
145/18 147/13 147/13
148/5 148/12 148/20
148/22 148/23 149/7
153/18 158/2 158/10
158/10 162/4 165/7
167/2 167/3 167/19
167/20 170/12 173/22
175/6 175/7 177/2
177/2 179/22 180/17
181/8 181/10 181/11
181/11 181/12 181/14
185/3 187/14 188/10
188/15 188/16 189/2
189/15 189/19 189/22
191/4 192/6 192/22
196/2 196/9 196/22
197/17 198/10 198/10
200/13 202/17 203/2
204/1 204/7 205/13
206/22 206/25 207/9
208/11 210/15 210/19
212/11 213/17 213/20
213/21 216/1 218/19
it's a [1]  14/22
item [3]  5/4 32/17 40/1
items [1]  41/23
its [16]  17/7 17/9
17/16 17/23 17/25
43/8 68/23 70/4 77/8
120/12 140/19 140/20
148/14 168/23 194/6
218/23
itself [9]  34/4 36/16
51/17 80/14 82/4
84/12 149/3 180/7
204/9

**J**

janitorial [1]  39/17
jest [1]  6/24
JF [1]  213/20
JF-HRL [1]  213/20
jive [1]  35/10
job [2]  96/10 103/22
jocularity [1]  80/8
Joe [2]  35/8 35/9
joining [1]  157/12
joint [1]  14/24
jointly [3]  44/25 47/14
51/4
Joseph [1]  120/10
joshing [1]  117/6
Jr [1]  3/7
judge [19]  1/5 6/17
8/15 10/18 10/20 13/2
17/17 17/19 19/2 30/5
31/5 35/13 41/10 42/5
49/7 50/4 119/6
121/10 203/16
judge's [1]  37/19
judges [1]  120/25

judgment [10]  9/25
10/10 11/3 17/7 17/8
17/9 17/13 17/25
196/2 208/16
Judicial [1]  221/7
juice [7]  68/8 82/3
162/20 172/5 172/5
172/11 193/15
juices [4]  128/1 128/2
128/9 128/10
July [2]  155/5 165/2
jumps [1]  146/2
junior [1]  213/18
jurors [2]  7/19 8/1
jury [72]  7/13 8/9 8/17
9/20 11/8 15/19 18/22
19/5 20/22 34/14 35/3
36/24 37/3 37/6 37/9
37/16 37/17 37/18
37/21 38/17 38/17
38/18 38/18 38/19
39/8 40/8 40/8 40/14
40/23 41/3 41/13
42/17 42/21 43/4 43/4
43/8 43/21 44/7 44/8
47/15 51/23 51/25
51/25 54/14 54/18
55/2 79/10 82/23
91/13 91/14 92/6 97/5
97/7 114/16 115/13
122/24 123/4 123/6
123/8 123/8 123/20
125/6 145/12 178/21
196/10 198/22 198/25
199/9 205/15 216/25
217/7 218/9
just [147]  8/14 10/18
11/11 12/15 14/14
14/25 18/4 19/3 20/9
21/11 21/15 25/7
25/12 25/18 26/24
30/17 32/12 35/2
36/14 38/15 40/3
41/12 41/12 46/12
46/18 46/25 47/20
50/16 52/11 53/19
56/18 56/25 57/20
64/12 64/24 66/12
69/4 69/17 73/17
73/19 74/5 74/10
74/21 79/2 80/20
81/19 81/21 81/22
84/10 86/4 88/7 88/11
89/4 89/8 90/15 91/13
92/6 93/11 98/10
100/4 101/3 104/8
104/8 105/18 106/4
110/21 112/2 112/6
112/20 114/3 115/5
115/12 115/13 116/8
117/3 118/23 119/21
120/24 121/12 121/16

122/17 123/22 125/6
126/10 126/13 126/19
130/17 131/1 132/24
135/16 135/24 142/14
142/18 143/1 143/7
143/7 143/16 143/16
144/7 144/10 144/20
146/8 146/20 150/14
154/19 155/2 155/13
155/19 157/4 157/5
159/18 161/6 166/18
170/13 170/15 170/22
171/18 175/22 178/10
178/15 181/1 183/2
185/23 186/8 187/14
189/6 193/21 195/4
195/14 199/23 200/3
201/6 203/2 203/10
203/17 204/19 204/21
205/7 207/23 210/17
212/15 214/1 216/4
216/20 217/15 219/14
220/10
justify [3]  72/12
189/18 189/20

**K**

Kamelgard [3]  2/11
5/21 5/23
Karl [1]  2/16
Keats [6]  2/16 2/17
5/10 5/12 5/13 5/14
keatsgatien.com [1]
2/19
keep [19]  6/22 7/20
10/24 14/3 25/6 25/17
63/21 73/18 90/22
94/22 95/1 114/6
115/8 125/14 168/16
209/9 209/9 211/6
218/23
keeps [4]  25/17 211/7
218/20 218/22
KELLER [1]  1/5
Kelly [2]  65/15 66/14
key [5]  67/11 78/4
98/16 154/22 162/19
kg [1]  2/19
kid [1]  116/15
kidding [4]  38/13 50/5
91/19 121/3
kind [24]  8/8 12/25
35/10 35/11 35/11
36/13 41/25 47/10
47/11 54/9 54/14 55/7
72/12 77/3 107/3
107/4 116/13 118/6
125/5 142/2 181/14
188/16 215/9 218/19
kissing [1]  101/5
knew [2]  84/6 149/23
knife [1]  36/9

{PLAINTIFF} v. {DEFENDANT}                                                                    {WITNESS NAME} {DATE}

**K**

**knock [1]** 193/21
**knocking [2]** 208/19
209/9
**know [145]** 6/17 6/20
6/25 7/3 7/6 7/17 8/11
10/4 10/21 11/6 12/5
12/10 12/16 13/20
14/21 14/25 16/4
19/17 19/24 20/6
21/22 21/23 22/19
23/6 23/15 23/19 25/3
25/17 27/2 27/3 28/23
28/23 33/4 33/10
34/23 35/3 36/2 37/6
37/9 38/18 38/25
39/12 41/7 41/9 42/4
42/20 42/21 43/10
43/16 45/16 46/16
46/21 47/3 47/4 47/5
47/10 47/21 48/8
48/12 49/12 49/16
49/17 52/22 53/10
53/12 53/16 54/16
55/22 55/23 61/2
65/14 65/14 71/10
71/23 72/19 80/4 81/8
83/24 84/13 87/2
87/22 87/23 92/21
94/3 94/4 102/5
103/21 104/16 104/16
112/4 116/12 116/13
118/11 118/16 121/19
122/3 122/5 122/7
123/6 123/8 123/15
123/23 124/20 124/23
124/23 125/9 137/16
139/4 146/5 146/11
153/19 157/12 162/21
166/1 166/20 166/24
168/12 173/15 177/18
180/14 182/8 182/15
187/11 190/14 191/13
199/12 199/13 199/23
200/4 200/10 200/10
201/1 203/19 204/22
207/20 208/7 209/8
209/18 210/13 214/7
214/9 218/10 218/12
218/24 219/19
**know that [1]** 199/12
**know what [1]** 48/8
**knowing [1]** 142/14
**knowledge [12]** 26/10
51/10 51/21 67/19
67/20 68/5 84/21 91/2
97/8 134/5 154/3
156/20
**known [2]** 53/22 95/4
**knows [3]** 72/17 97/1
107/15

**Konrad [2]** 2/16 5/17

**L**

**labeled [1]** 152/25
**lack [2]** 43/5 81/22
**ladies [3]** 44/1 44/3
121/20
**lady [1]** 54/9
**landscape [2]** 68/4
154/1
**language [9]** 67/6
67/7 67/8 67/17 69/21
119/4 176/9 197/6
197/12
**Lanham [1]** 10/17
**large [2]** 71/2 124/10
**larger [1]** 141/22
**last [18]** 12/11 45/13
64/21 67/6 79/4 91/2
96/7 122/9 128/6
155/5 158/14 160/11
163/4 164/8 176/4
177/14 182/11 207/23
**Lastly [2]** 45/13 53/22
**late [5]** 116/6 116/8
199/11 199/16 220/21
**later [6]** 17/18 33/19
64/18 83/1 121/18
195/9
**latest [1]** 78/15
**Latin [1]** 90/10
**latter [1]** 170/17
**launch [8]** 95/5 95/9
95/15 95/21 110/7
148/15 149/18 150/3
**launched [1]** 159/9
**launching [1]** 95/6
**law [50]** 6/9 6/16 8/23
11/14 14/22 15/8
27/23 31/14 31/15
33/18 37/23 37/24
38/1 38/10 39/10
39/20 48/12 55/23
71/22 72/15 83/17
92/13 110/20 112/17
113/1 118/10 121/1
141/17 181/10 181/12
181/12 191/18 193/20
193/22 196/24 196/24
197/23 198/5 199/18
199/21 199/23 200/14
200/18 201/7 208/11
208/20 208/23 209/3
210/1 212/4
**laws [2]** 193/23
193/25
**lawsuit [4]** 22/3 22/4
39/22 60/18
**lay [1]** 66/18
**lead [4]** 9/23 45/7
100/8 118/18
**leap [1]** 113/21

**learned [1]** 165/8
**least [14]** 7/14 17/12
35/18 42/11 42/14
42/15 50/14 109/4
122/16 179/7 179/15
180/3 200/11 220/5
**leave [5]** 48/4 108/11
117/8 117/10 117/12
**led [1]** 151/9
**ledger [1]** 156/18
**Lee [1]** 54/9
**left [11]** 43/1 68/10
72/18 102/5 102/19
102/21 124/16 214/19
214/20 214/22 215/4
**left-hand [1]** 214/19
215/4
**left-pocket [1]** 214/22
**legal [5]** 9/9 39/17
39/20 104/7 192/22
**legally [3]** 53/5 102/3
113/6
**lends [2]** 36/16 51/17
**length [2]** 33/7 215/6
**less [7]** 26/20 26/20
129/3 149/8 168/21
185/10 211/25
**lesser [1]** 128/20
**let [38]** 6/9 9/4 11/10
13/5 29/6 29/13 31/4
44/14 45/16 51/13
55/18 56/12 76/11
83/1 92/20 105/21
114/13 119/21 122/10
123/23 124/25 125/1
125/9 169/24 174/5
178/9 179/5 180/25
183/17 183/17 198/18
199/11 210/17 211/15
212/2 212/20 215/23
216/16
**let's [48]** 22/20 22/20
30/6 42/11 45/2 53/5
57/7 57/8 65/20 66/24
70/18 73/4 87/20
88/23 91/13 92/4
105/7 105/13 105/15
105/16 114/10 116/8
125/24 125/24 126/7
126/19 129/6 134/10
137/16 147/20 170/14
170/25 176/19 195/11
195/11 195/24 198/21
208/6 208/11 208/12
208/12 208/19 209/14
209/14 211/1 211/2
211/2 219/14
**level [6]** 39/7 110/16
156/16 156/25 158/5
161/13
**leverage [1]** 161/6
**Li [2]** 3/11 6/4

**liability [6]** 7/1 7/2
14/9 14/23 17/10
17/20
**license [15]** 10/1 10/3
18/2 18/3 26/24 38/7
51/1 184/18 184/19
192/14 192/17 193/8
193/11 199/8 201/18
**licensed [1]** 192/25
**licensee [1]** 62/3
**licensing [2]** 193/14
193/17
**lies [1]** 101/12
**life [2]** 207/19 218/23
**lifeblood [1]** 148/5
**light [4]** 9/3 43/3
126/13 218/19
**like [65]** 7/21 8/5 11/1
12/13 12/14 19/23
24/19 34/20 35/12
36/14 41/14 45/3
48/17 55/5 67/6 67/22
70/22 86/4 86/19
86/20 97/21 102/9
103/21 109/19 111/25
113/8 118/6 118/13
122/2 122/19 123/23
124/22 125/8 133/22
133/23 136/7 137/20
138/24 138/25 139/5
139/9 140/12 150/25
156/10 164/8 169/15
172/11 173/16 179/22
180/21 182/17 182/18
184/4 186/7 188/7
191/18 193/20 195/9
200/5 208/20 211/9
212/18 214/5 216/10
220/17
**liked [1]** 177/24
**likelihood [4]** 10/7
15/20 40/25 123/6
**likely [5]** 68/22 152/5
155/9 196/9 213/18
**likes [3]** 111/4 140/10
140/11
**liking [1]** 140/15
**Lili [1]** 6/4
**Lily [1]** 3/11
**limine [10]** 70/5 124/4
124/6 138/3 177/14
191/23 198/15 200/17
200/22 201/13
**limit [1]** 82/16
**limited [2]** 180/4
180/6
**limiting [1]** 218/5
**limits [1]** 34/15
**line [11]** 13/2 74/3
97/22 98/12 130/3
133/15 133/16 148/16
152/4 152/24 172/24

**lines [1]** 161/9
**link [6]** 161/3 161/24
162/17 162/18 165/11
172/19
**links [8]** 162/13
164/10 171/14 171/16
171/17 171/23 172/2
172/21
**liquid [4]** 127/5 127/7
127/9 134/4
**liquids [1]** 155/20
**list [10]** 21/24 68/20
103/23 129/23 132/7
132/13 132/16 132/21
146/15 152/18
**listed [1]** 132/6 133/3
133/6
**listen [1]** 113/4
**listened [1]** 106/4
**listening [1]** 208/9
**listing [2]** 41/13 82/6
**listings [2]** 155/15
156/22
**lists [2]** 64/22 126/4
**literally [6]** 7/4 38/16
38/17 61/9 82/1 85/15
**litigated [1]** 43/13
**litigation [3]** 40/2
49/14 98/20
**little [23]** 21/9 23/7
34/20 37/12 37/13
38/25 50/2 51/6 56/18
66/18 66/19 76/11
86/7 116/8 116/11
124/17 124/18 124/19
175/3 176/22 200/5
215/12 216/20
**live [2]** 179/4 219/12
**LLC [3]** 1/11 5/5
214/14
**lli [1]** 3/13
**LLP [6]** 2/11 2/17 3/3
3/7 3/11 3/15
**loading [1]** 39/19
107/18
**lob [1]** 121/22
**lobe [1]** 26/6
**locate [1]** 155/11
**lodging [1]** 88/17
**logo [2]** 108/7 109/1
**logos [1]** 109/2
**long [17]** 8/25 9/4
16/14 17/1 32/16
41/12 53/5 71/11
71/11 82/16 91/1
115/7 187/5 200/13
200/15 219/4 220/16
**longer [4]** 187/6
188/23 189/1 195/25
**longstanding [1]**
24/23
**look [83]** 9/22 10/17

**L**

**look... [81]** 14/12
15/20 18/3 19/20 25/2
29/14 35/16 36/5 36/8
36/23 42/3 43/12
43/16 43/16 45/2 46/8
52/2 53/7 54/19 54/21
55/8 64/7 65/23 67/6
68/19 70/2 72/2 76/16
76/17 79/14 79/18
79/18 79/24 81/4 82/5
82/14 90/11 90/15
95/8 97/15 99/8 107/6
107/23 113/5 117/3
117/5 119/24 120/22
123/10 126/19 128/4
132/8 132/18 133/22
137/20 140/10 140/19
146/20 149/19 150/1
150/1 152/17 163/14
163/15 164/8 164/15
164/19 164/23 165/1
172/6 174/7 174/24
199/9 202/2 204/17
204/20 204/21 207/1
209/6 214/12 217/7
**looked [12]** 10/19
18/4 90/23 104/10
118/9 119/7 119/8
136/24 138/9 138/9
155/22 164/20
**looking [42]** 11/10
15/8 36/24 46/1 46/2
48/24 49/14 51/5 56/2
56/3 65/24 65/25 69/3
69/4 72/23 80/3 89/10
92/23 94/7 96/19
102/7 102/10 115/21
115/22 121/1 126/21
137/16 143/3 152/16
152/17 162/13 163/3
163/13 163/15 166/12
172/10 172/17 176/17
177/4 181/23 217/5
217/5
**looks [8]** 35/11 37/2
54/25 102/9 118/10
118/13 133/19 133/20
**loosey [1]** 82/24
**loosey-goosey [1]**
82/24
**LOS [6]** 1/17 1/24 2/7
5/1 118/1 219/12
**Los Angeles [1]**
219/12
**loss [1]** 12/25
**losses [1]** 197/8
**lost [3]** 114/20 182/1
200/13
**lot [21]** 6/10 6/13 7/11
9/14 20/3 20/16 28/19

35/9 42/25 51/6 54/20
82/14 102/23 116/19
122/22 128/13 134/19
153/18 155/18 161/22
200/4
**love [5]** 40/8 44/17
125/8 130/2 172/21
**low [2]** 176/19 176/20
**lower [8]** 13/16 66/8
66/22 76/23 127/16
152/18 163/14 205/22
**lower-quality [1]**
127/16
**lower-right [2]** 66/8
66/22
**lowest [1]** 168/19
**lunch [6]** 79/25 80/2
113/12 114/10 115/6
204/22

**M**

**m-u-s-t-e-r [1]** 71/7
**macro [2]** 34/4 203/17
**made [34]** 19/22 22/8
31/2 31/6 32/21 38/11
55/5 64/7 64/21 79/1
80/12 111/12 112/20
116/14 116/16 123/25
136/9 148/19 148/20
156/6 165/15 166/14
166/24 168/13 173/14
173/23 177/22 180/23
191/13 196/22 197/18
212/13 218/14 220/2
**made-up [1]** 173/23
**magic [1]** 180/5
**Maier [4]** 111/2 111/3
111/24 112/3
**Main [4]** 3/4 3/8 3/12
3/16
**mainstream [1]**
160/20
**maintaining [1]** 43/18
**major [4]** 35/6 59/16
85/16 125/8
**majority [5]** 54/24
82/5 106/12 127/13
136/17
**make [57]** 8/2 19/5
20/20 24/5 29/13
32/23 35/14 38/3 38/5
38/20 38/23 42/8 43/8
45/7 47/15 50/6 55/6
64/25 68/12 88/12
91/16 91/21 106/7
109/17 113/19 115/25
121/2 121/20 123/19
133/19 133/22 137/16
141/2 141/6 142/4
143/2 143/7 143/17
144/7 144/11 151/6
154/10 154/15 156/13

182/16 189/1 194/16
198/13 198/14 199/20
206/23 208/3 210/18
211/15 212/6 215/25
216/25
**makes [7]** 55/4 93/24
125/4 164/12 177/24
204/22 206/20
**making [15]** 8/12 8/12
8/13 16/23 17/23
100/22 123/19 172/10
172/18 172/18 173/13
175/13 192/15 192/18
193/12
**malleability [1]** 16/7
**malleable [2]** 16/3
16/4
**man [29]** 21/13 21/13
23/2 39/1 40/13 49/18
49/18 49/20 95/9
95/10 95/10 108/7
109/22 109/23 110/2
110/6 110/15 121/11
124/2 128/20 128/20
128/20 149/20 149/20
150/9 150/10 150/10
177/24 212/13
**management [5]**
33/25 129/18 131/20
136/1 169/7
**manner [5]** 14/16 78/7
78/9 146/17 206/2
**manufactured [1]**
182/23
**manufacturer [3]** 82/4
148/4 148/23
**manufacturers [3]**
82/2 127/14 156/24
**manufacturing [1]**
156/24
**many [40]** 8/22 45/10
50/22 71/10 94/16
103/15 103/16 109/7
139/18 139/24 140/15
142/8 142/20 142/21
146/18 153/11 153/13
153/15 153/17 153/19
154/11 154/15 155/5
155/19 155/23 156/1
156/10 166/14 166/15
166/20 167/8 167/18
167/20 168/13 168/13
170/16 171/23 173/9
173/10 175/14
**map [1]** 208/9
**March [3]** 30/13
138/15 165/19
**March 3rd [1]** 30/13
**margin [4]** 185/6
187/22 188/3 189/9
**margins [1]** 209/10
**mark [40]** 58/23 60/17

61/22 61/24 62/5
62/13 62/24 67/14
69/5 69/11 98/19 99/4
111/13 111/14 112/2
184/1 184/14 184/17
184/19 185/14 186/18
191/6 192/25 193/1
193/3 193/14 194/6
194/7 194/9 194/15
194/17 194/18 194/21
194/25 201/25 202/14
202/18 204/9 204/16
214/8
**marked [2]** 64/15
64/18
**market [28]** 55/3 55/3
86/12 86/13 87/13
93/13 99/3 99/6 131/2
131/11 161/1 168/23
184/16 184/18 184/20
184/21 186/3 186/4
186/10 186/13 190/2
191/6 191/8 192/14
192/18 193/2 193/2
194/14
**marketed [2]** 127/4
168/24
**marketing [20]** 85/23
86/1 86/23 96/19
110/8 110/9 129/19
130/9 131/16 142/8
149/2 160/16 160/17
160/21 160/23 161/19
161/20 168/22 176/3
176/7
**marketplace [6]** 62/3
110/11 133/17 148/25
162/13 166/10
**Markiles [1]** 2/11
**MARTIN [80]** 4/5 26/2
26/12 27/18 30/4
32/21 48/13 50/13
51/13 52/20 53/11
53/12 53/15 53/17
54/22 55/24 56/24
57/7 57/12 57/19
57/21 57/22 58/8
58/11 58/14 63/12
64/5 64/14 64/19
64/23 65/3 66/20 67/3
72/2 73/24 76/6 81/5
82/22 83/4 93/13
102/23 104/3 105/21
108/11 114/17 123/12
126/25 129/10 132/5
137/25 138/1 141/25
144/25 145/5 147/23
151/7 158/21 160/14
171/4 175/21 176/5
179/1 179/10 180/3
182/11 182/18 183/1
183/3 183/10 187/6

190/22 192/1 196/14
196/23 206/17 212/25
216/24 219/15 219/15
219/24
**Martin's [18]** 25/6
30/12 53/24 64/15
64/16 93/9 144/21
175/25 177/8 180/1
181/6 182/9 189/18
203/9 203/12 205/21
213/1 214/24
**Maryland [1]** 47/5
**mas [2]** 63/22 63/23
**mass [1]** 155/24
**massage [1]** 121/10
**master [8]** 19/20
148/20 152/19 152/23
153/3 153/11 156/11
197/5
**Mat [1]** 5/25
**Matel [1]** 213/20
**material [1]** 120/15
**materials [6]** 127/6
137/11 138/8 138/9
138/18 190/11
**math [1]** 30/17 186/1
186/7 196/16 196/16
196/21 197/22 198/7
203/11 214/12 214/12
**mathematical [2]**
145/10 196/19
**matter [26]** 10/6 10/7
17/12 23/3 23/3 23/4
36/20 37/19 49/6
49/21 71/13 84/15
87/16 87/16 102/19
110/3 110/13 110/23
119/13 119/23 149/1
161/15 178/14 207/7
207/8 221/6
**matters [2]** 22/11
27/15
**Matthew [1]** 3/3
**Matty [1]** 133/1
**maximize [2]** 27/7
27/8
**maximum [1]** 81/6
**may [82]** 1/18 5/1 6/14
7/23 8/20 11/3 12/9
12/15 14/14 14/16
15/21 23/3 26/18
26/21 32/1 32/15 36/6
45/21 47/16 47/22
48/9 49/13 51/11
53/11 54/10 54/16
57/20 63/15 63/24
71/3 71/4 72/3 72/19
72/21 78/23 81/13
83/15 92/7 92/14
92/15 105/5 109/9
113/8 113/14 114/15
114/16 116/11 116/21

# M

**may... [34]** 118/1
120/21 122/8 123/21
133/4 137/17 139/10
158/15 161/21 162/14
174/25 177/3 177/5
178/25 179/21 180/1
182/4 182/5 182/25
188/20 193/13 195/15
195/19 195/20 200/22
208/3 211/16 213/9
218/10 218/14 218/24
219/19 220/7 220/9
**maybe [22]** 10/15
13/21 22/17 42/12
42/12 42/15 52/6
53/16 71/6 71/6 72/17
92/23 96/7 97/7 122/6
158/18 175/17 196/2
206/15 209/16 218/6
218/11
**Mayer [1]** 120/1
**me [158]** 5/11 5/14 6/4
6/9 6/11 7/23 9/4 9/23
11/8 11/9 11/10 12/10
12/10 13/5 15/23
16/12 19/2 21/11
24/13 27/21 29/6
29/13 30/22 34/2
34/18 34/21 35/11
39/9 39/15 39/20
40/22 41/6 41/10
41/11 42/3 43/24
44/14 44/15 45/7
46/11 47/12 50/4 50/8
50/21 51/13 54/5 54/6
55/18 56/1 56/12 57/3
65/11 65/13 70/21
71/21 73/12 75/11
75/16 76/11 76/17
78/3 78/24 79/24 80/8
82/17 83/3 83/7 83/19
84/6 85/5 85/5 87/23
91/12 91/19 91/24
92/3 92/6 92/10 92/16
92/20 92/23 93/1 93/5
93/6 98/6 98/10 99/18
99/19 102/7 104/7
104/13 105/21 105/21
106/24 107/8 107/17
111/6 111/8 114/13
115/15 118/5 118/10
118/21 119/10 119/21
121/7 121/8 121/8
122/1 122/13 122/23
123/22 124/16 126/11
126/12 127/17 132/21
135/24 146/2 147/9
156/25 157/16 167/6
167/18 168/17 169/24
173/19 173/20 173/20

173/23 174/5 175/10
177/11 178/9 179/5
180/25 182/5 183/17
183/17 185/25 189/3
198/18 199/11 199/20
200/11 200/14 206/20
210/3 211/2 211/15
212/2 212/20 216/16
216/20 217/14 217/17
217/18 220/18
**mean [31]** 15/19 16/6
21/13 35/15 38/16
43/10 43/14 65/17
76/23 82/10 83/7
83/24 92/22 97/7
114/1 114/6 115/7
121/19 122/15 122/16
125/17 130/18 140/7
145/20 147/25 173/6
182/19 200/18 206/13
206/15 212/10
**meanderings [1]**
116/12
**meaning [3]** 94/21
141/10 149/23
**meaningfully [1]**
10/16
**meaningless [2]**
80/14 81/8
**means [9]** 7/8 15/20
54/23 93/16 122/17
127/2 148/6 148/21
162/24
**meant [2]** 49/19 60/24
**measurable [1]** 166/2
**measure [22]** 29/11
71/2 112/11 124/10
140/5 140/24 142/4
173/12 173/12 174/3
174/23 175/22 176/16
197/7 201/24 204/23
205/5 206/22 207/6
207/20 208/8 209/11
**measured [6]** 141/14
142/12 142/19 142/19
142/20 167/19
**measurements [2]**
141/15 141/16
**measures [3]** 25/20
25/21 209/1
**measuring [1]** 28/1
**mechanical [1]** 128/7
**media [22]** 86/1 86/19
110/9 129/25 130/10
139/10 139/14 139/15
141/17 142/8 142/17
142/21 143/3 144/12
147/10 160/19 160/20
160/23 170/6 175/8
175/15 176/3
**medical [1]** 116/1
**meed [1]** 9/13

**meet [4]** 9/12 114/5
159/15 201/7
**meeting [1]** 116/2
**meld [1]** 52/25
**memo [2]** 10/23 71/21
**memorandum [1]**
6/11
**memory [1]** 48/22
**menacingly [1]** 49/23
**ment [1]** 116/15
**mention [2]** 81/25
188/7
**mentioned [9]** 132/24
135/16 136/5 136/6
136/13 136/14 136/15
138/24 139/1
**mentor [1]** 81/18
**merely [1]** 120/16
**messages [1]** 130/5
**met [2]** 36/2 42/21
**method [13]** 24/23
61/12 61/15 61/21
62/9 62/18 62/19
109/21 109/21 181/7
182/7 184/14 184/16
**methodology [10]**
52/17 52/20 60/11
70/24 72/22 183/25
184/10 184/11 184/11
198/3
**methods [3]** 32/14
52/15 52/24
**metrics [11]** 93/19
93/24 94/3 94/4 94/9
94/12 94/15 94/17
96/2 146/3 164/16
**Metro [1]** 120/1
**Metro-Goldwyn-Maye
r [1]** 120/1
**Michael [5]** 2/6 2/6 5/7
13/22 14/2
**microphone [18]**
12/13 12/19 13/9 14/3
15/3 16/3 16/8 24/14
58/17 65/19 79/8 79/9
81/20 103/2 171/11
182/2 184/9 188/24
**mid [2]** 219/4 219/7
**middle [1]** 176/2
**might [11]** 8/7 9/20
10/8 32/24 45/11
52/16 115/5 116/7
120/8 123/5 179/3
**milk [8]** 85/16 85/17
85/19 85/20 94/24
108/6 108/7 109/2
**Milkman [53]** 19/15
22/9 23/20 25/14
33/14 33/23 54/25
55/8 58/23 60/17
61/22 62/13 62/24
67/12 67/14 68/10

68/20 68/22 69/11
82/8 95/10 98/19
107/23 109/1 109/12
109/22 109/23 110/1
110/3 110/13 110/14
128/19 139/1 149/20
150/9 152/4 159/18
159/19 159/20 177/25
184/1 185/14 191/6
194/8 194/8 194/15
194/17 194/18 194/21
194/25 207/13 207/13
215/1
**milliliter [3]** 172/4
172/8 172/9
**milliliters [2]** 163/1
172/11
**million [23]** 17/18
23/23 29/6 35/14 63/7
95/15 143/9 143/20
144/17 145/11 147/1
150/4 158/4 186/22
189/25 214/13 214/23
215/1 215/3 215/3
215/8 215/9 215/9
**Mills [3]** 55/3 55/4
55/6
**mind [9]** 22/5 34/8
37/13 43/8 50/18
174/8 174/10 187/10
200/19
**mindful [2]** 11/7 19/11
**mine [3]** 81/18 118/23
120/5
**minimize [2]** 35/18
35/19
**minimum [4]** 76/14
81/5 110/24 198/9
**minor [1]** 116/1
**minus [1]** 21/18
**minusing [2]** 9/8 9/16
**minute [1]** 15/4
**minutes [6]** 48/6 50/8
50/9 50/10 139/13
169/22
**miscellaneous [1]**
49/2
**mischaracterizes [1]**
194/10
**misconduct [1]** 14/10
**miserably [1]** 149/7
**mispronounces [1]**
87/15
**missed [1]** 94/8
**missing [1]** 43/18
**misstates [2]** 145/1
151/16
**mistake [5]** 16/24 17/5
20/13 31/2 31/6
**mistaken [2]** 16/20
16/22
**misunderstood [3]**

96/7 175/17 203/7
**mix [1]** 157/13
**mixing [1]** 179/24
**ml [2]** 162/25 163/1
**mlcpiclaw.com [1]**
2/9
**mod [1]** 128/7
**mode [1]** 34/17
**model [7]** 76/4 95/20
110/10 154/21 202/19
202/19 202/25
**modestly [1]** 10/15
**mole [2]** 116/1 116/3
**mom [1]** 148/13
**moment [19]** 5/14
9/24 18/10 21/4 28/5
36/20 49/3 54/6 59/11
70/21 73/2 122/8
123/17 138/22 142/18
155/2 175/12 178/10
201/14
**MONDAY [3]** 1/18 5/1
118/1
**monetary [1]** 193/5
**money [3]** 39/9 63/3
163/25
**Monica [1]** 2/12
**month [8]** 94/22 94/22
95/8 95/8 150/5
150/11 150/21 150/22
**monthly [3]** 149/19
150/19 159/6
**months [2]** 159/21
180/8
**monumental [1]** 7/25
**moreover [3]** 196/7
196/11 196/23
**morning [24]** 5/7 5/9
5/10 5/19 5/20 5/23
5/24 5/25 6/2 6/6 6/7
9/2 15/18 16/19 18/12
20/18 58/14 58/15
65/3 114/20 119/15
210/21 219/4 219/7
**mortar [2]** 103/1 103/5
**most [30]** 15/19 41/24
60/10 60/11 61/14
68/7 68/18 75/17 76/4
85/12 87/12 90/3 91/5
91/8 95/7 96/19 96/20
96/20 120/21 129/19
148/23 152/5 155/9
161/17 181/5 182/3
184/10 188/11 207/22
219/8
**motion [19]** 8/16 9/25
10/10 17/18 17/24
70/4 124/1 124/4
124/6 138/2 177/14
182/10 191/23 198/13
198/14 200/13 201/12
210/9 210/10

**M**

motions [2] 200/17 200/22
mouth [2] 93/9 93/11
move [15] 15/14 15/15 16/3 16/9 19/9 92/3 46/10 50/12 79/9 83/14 92/20 92/22 116/11 149/14 158/3
moved [4] 35/11 80/21 159/10 198/16
mover [1] 80/19
moving [8] 16/7 24/18 31/9 35/12 49/25 70/23 92/22 120/10
MR [34] 4/5 4/6 4/6 4/7 4/7 4/8 4/8 4/9 5/19 5/23 6/2 6/3 12/9 13/14 24/8 33/5 46/14 47/8 53/11 56/24 57/21 76/6 78/13 82/21 88/17 99/18 107/15 132/5 145/5 147/23 175/10 175/21 182/25 188/25
Mr. [242]
Mr. Anson [35] 25/4 26/3 26/9 51/14 53/11 57/7 57/18 60/16 61/1 61/2 61/6 78/2 78/10 78/12 78/13 79/8 79/15 81/15 81/18 106/3 109/10 109/16 114/17 125/4 183/7 184/20 187/4 187/18 188/22 189/11 191/2 191/5 194/13 203/14 220/8
Mr. Anson's [8] 25/25 26/7 62/24 78/21 99/8 190/23 191/16 192/12
Mr. Cohen [61] 13/21 14/1 16/24 20/15 21/15 22/23 23/4 24/18 29/4 30/1 36/4 40/4 44/14 49/3 53/20 63/11 63/23 65/14 65/20 66/12 66/23 70/22 74/10 78/17 87/20 89/2 89/15 90/17 91/9 97/12 98/9 98/10 99/18 103/25 104/2 105/20 112/5 113/4 117/4 118/4 118/12 121/25 131/25 151/2 157/23 170/19 173/4 174/6 174/7 181/3 182/8 182/14 183/7 194/12 195/5 202/8 203/7 203/10 212/21 213/25 219/22

Mr. Cohen's [11] 24/6 24/24 107/18 170/7 170/11 171/25 181/1 182/3 201/16 206/1 206/11
Mr. Hackett [1] 160/7
Mr. Hackett's [2] 157/17 158/11
Mr. Keats [1] 5/14
Mr. Martin [67] 26/2 26/12 27/18 32/21 48/13 50/13 51/13 52/20 53/12 53/15 53/17 54/22 55/24 57/7 57/19 57/22 58/8 58/14 63/12 64/5 64/14 64/19 64/23 65/3 66/20 67/3 72/2 73/24 81/5 82/22 83/4 93/13 102/23 104/3 105/21 108/11 114/17 123/12 126/25 129/10 137/25 141/25 144/25 151/7 158/21 160/14 171/4 176/5 179/1 179/10 180/3 182/11 182/18 183/1 183/3 183/10 187/6 190/22 192/1 196/14 196/23 206/17 212/25 216/24 219/15 219/15 219/24
Mr. Martin's [18] 25/6 30/12 53/24 64/15 64/16 93/9 144/21 175/25 177/8 180/1 181/6 182/9 189/18 203/9 203/12 205/21 213/1 214/24
Mr. Robert [1] 155/7
Mr. T-e-l-l-e-z [1] 11/16
Mr. Tellez [6] 12/6 13/13 13/15 14/9 15/11 95/2
Mr. Wegner [30] 12/19 24/2 26/18 29/9 37/1 49/4 49/21 55/14 55/19 55/22 56/21 92/24 92/24 110/20 112/6 115/23 118/5 118/5 122/10 125/25 129/8 131/4 158/14 169/25 180/25 212/21 216/20 217/15 219/2 220/6
Ms. [4] 54/9 155/7 214/17 220/21
Ms. Chan [2] 155/7 214/17
Ms. Lee [1] 54/9
Ms. Reporter [1] 220/21

MSJ [1] 25/2
much [31] 9/21 12/23 22/1 22/13 23/7 34/22 43/21 49/20 49/20 51/17 97/25 108/16 108/19 114/18 121/4 122/19 123/15 127/24 128/2 128/3 128/5 141/22 142/2 162/24 163/2 163/2 166/20 175/13 188/23 189/1 199/20
muck [2] 22/21 49/9
mucking [1] 7/21
Muffin [8] 95/9 109/22 109/23 110/2 110/6 128/20 150/9 177/24
mull [2] 113/4 115/6
multi [1] 12/22
multi-defendant [1] 12/22
multiple [3] 36/1 91/2 172/6
multiplicity [1] 15/22
multiplied [2] 61/25 187/23
multiply [1] 186/4
multiplying [2] 188/5 189/9
multitude [1] 77/10
mushy [5] 36/13 36/14 36/15 36/15 36/16
Music [3] 31/18 120/1 123/21
muster [3] 71/7 71/8 116/21
mwegner [1] 3/5
myself [6] 9/4 44/5 50/16 71/1 127/18 128/25

**N**

nabobs [1] 47/7
nail [4] 70/18 74/7 214/6 214/9
Nails [1] 214/7
namby [1] 50/2
namby-pamby [1] 50/2
name [14] 5/11 5/11 13/17 13/18 13/21 13/22 57/11 57/12 82/7 101/10 110/13 110/14 110/15 170/15
namely [1] 26/24
narrow [2] 212/15 212/18
nasty [1] 31/5
nattering [3] 47/7 47/9 47/10
nature [8] 85/11 91/6

127/22 128/18 130/3 131/3 154/20 157/9
necessarily [4] 112/16 112/17 157/21 181/14
need [40] 5/14 24/6 44/10 48/9 50/21 53/4 53/5 53/11 64/9 80/12 87/17 89/17 89/18 89/20 92/6 98/8 116/9 116/10 116/25 122/4 122/20 122/20 122/24 191/8 199/22 199/24 200/1 200/21 200/22 201/1 211/13 216/4 216/5 216/11 219/4 219/15 219/16 219/16 220/7 220/12
needed [1] 75/24
needs [6] 13/25 41/14 123/8 129/15 191/22 216/3
negative [1] 216/1
negotiations [1] 193/16
neighborhood [1] 171/25
neither [5] 42/8 42/9 188/18 189/16 202/9
nepotism [1] 47/7
net [16] 9/8 20/1 27/17 30/20 30/21 31/9 67/13 186/14 187/22 188/2 188/5 188/5 198/23 198/24 203/18 203/22
network [52] 130/7 148/5 148/19 148/24 149/6 149/6 150/4 151/9 151/10 152/2 152/5 152/9 152/11 154/21 155/3 156/17 159/9 159/11 160/14 160/16 160/25 161/5 161/22 162/8 162/11 163/16 163/20 163/21 163/21 163/23 164/1 165/21 166/8 166/17 166/21 167/7 167/10 167/17 167/23 168/1 168/4 168/9 168/12 168/19 169/15 172/14 172/20 172/22 173/24 174/2 174/24 175/2
networkers' [1] 129/21
networks [11] 87/2 142/12 142/22 158/25 167/1 161/10 161/11 163/7 168/1 168/7 168/8
never [9] 23/14 79/10

79/10 114/14 142/12 150/5 188/16 196/15 196/16
nevertheless [2] 26/21 186/25
new [17] 42/1 56/5 65/13 77/10 105/14 110/15 113/15 149/2 149/18 157/12 159/8 165/8 167/3 167/12 170/21 189/3 218/24
newest [1] 214/1
newsletters [1] 130/21
newspaper [1] 86/2
next [22] 29/21 30/19 32/11 36/14 46/10 53/12 53/21 73/4 88/11 88/13 92/7 93/20 114/20 126/7 126/25 131/6 131/10 147/20 176/4 194/3 195/3 197/13
nice [3] 8/19 10/25 21/10
nicely [6] 7/8 34/15 37/14 42/23 49/23 123/25
niche [5] 87/13 87/14 131/2 192/14 192/17
nicotine [4] 127/10 127/12 127/14 127/16 night [1] 114/20
nine [15] 23/24 68/11 72/3 75/25 76/8 76/21 83/9 83/14 83/15 83/23 92/17 113/18 121/1 197/19 210/20
nine o'clock [1] 210/20
Nine-point [1] 23/24
ninth [6] 31/19 31/20 111/10 120/2 120/12 197/20
no-more-than-ten-per cent [1] 69/11
No. [10] 70/5 138/3 139/8 139/9 147/18 147/23 158/13 177/12 208/21 213/20
No. 1 [2] 70/5 138/3
No. 2 [1] 208/21
No. 5 [2] 139/9 177/12
No. 6 [2] 139/8 147/18
No. 7 [2] 147/23 158/13
No. C10-1902 [1] 213/20
NoDoz [4] 35/14 35/15 35/17 35/19
noise [1] 65/12
none [4] 32/21 106/7

| N | Nuttall [2]  3/15 6/5 | oh [17]  21/12 44/20 | 209/15 211/3 214/5 | opposition [2]  138/2 |
|---|---|---|---|---|

**N**

none... [2]  106/8
208/16
noninfringing [1]
120/18
nonlegal [1]  82/24
nonresponsive [1]
46/1
nonsense [1]  208/10
nonsensical [2]
110/17 158/2
Noon [1]  117/13
nor [2]  189/16 202/9
north [1]  162/10
nose [2]  159/17
159/20
not [310]
notably [1]  91/5
note [2]  37/6 182/8
noted [3]  29/24 178/1
180/4
notes [5]  19/22
101/13 117/3 117/4
126/2
nothing [7]  11/1 44/13
45/6 56/5 146/2
159/23 163/9
notified [1]  45/13
notion [1]  177/24
nowhere [3]  165/4
167/2 198/4
nuanced [1]  105/5
number [57]  20/24
22/12 22/16 29/7
29/19 60/2 64/19 75/9
82/14 98/3 109/13
109/13 123/4 125/21
136/6 136/13 136/13
138/22 138/23 140/5
140/10 141/18 141/24
143/6 143/11 143/11
144/13 145/7 145/8
145/9 146/1 148/14
154/22 160/8 164/21
166/1 166/3 166/3
166/13 167/3 168/3
171/13 171/15 171/17
171/19 171/19 180/5
186/6 189/24 190/4
197/16 203/2 205/22
212/7 212/13 213/21
214/21
numbering [2]  66/2
152/17
numbers [13]  100/4
112/24 139/22 140/4
162/9 164/17 169/1
187/15 190/19 196/15
204/19 205/24 215/5
nutshell [2]  133/16
203/6

**O**

o'clock [4]  199/20
201/6 210/20 220/18
oath [3]  57/23 79/9
99/24
obey [2]  193/20
193/22
object [3]  29/23 34/11
143/23
objecting [1]  143/25
objection [5]  8/12
29/24 29/24 30/8
144/2
objections [1]  54/15
objective [1]  80/17
observations [1]
107/1
obviously [10]  8/25
87/10 87/10 113/6
123/16 129/17 154/23
156/17 191/15 204/8
occasion [1]  50/24
occupied [1]  80/3
occur [1]  103/17
occurred [1]  39/21
occurs [1]  118/4
odd [1]  145/12
off [40]  10/22 16/15
19/25 21/16 22/5
36/25 53/19 58/10
66/15 66/25 75/16
83/8 83/14 92/12
92/19 94/10 105/19
109/11 110/14 116/5
121/17 128/25 137/18
151/12 152/10 161/6
174/4 185/24 191/20
193/21 199/14 201/3
201/15 207/17 207/25
211/12 216/18 217/16
217/20 220/1
off-the-wall [1]  53/19
offend [1]  16/6
offending [6]  34/23
35/22 39/9 41/23 52/5
54/20
offense [1]  80/4
offensive [2]  35/16
49/19
offer [2]  215/25
217/11
offered [6]  20/24
22/14 23/8 23/15
128/19 214/1
offering [1]  156/24
offhanded [1]  208/20
office [2]  6/5 219/11
offing [1]  216/12
often [2]  156/12 183/5
oftentimes [1]  149/22

oh [17]  21/12 44/20
96/25 101/2 121/22
125/14 133/10 174/3
175/23 176/11 176/12
182/1 209/10 210/22
211/8 215/2 215/2
okay [277]
old [9]  7/10 31/5 36/9
42/5 42/7 44/4 51/15
56/4 59/16
once [16]  44/15 68/9
68/18 72/14 72/16
92/14 92/17 95/3
102/11 123/17 203/18
203/21 208/23 212/4
212/5 218/2
one [153]  7/12 19/16
20/13 24/23 25/21
29/7 31/23 33/18
36/12 36/12 37/16
37/20 40/9 40/10 42/4
45/11 47/14 49/3
50/16 51/6 54/25
54/25 55/9 56/14
58/21 58/25 59/2
60/14 60/23 62/22
62/23 65/23 69/6
69/19 70/3 72/4 73/17
73/19 74/12 75/4 75/8
75/25 76/5 78/25
79/25 80/12 81/3
81/25 85/23 88/5 98/1
99/10 99/12 99/23
100/8 100/21 101/7
102/9 102/18 104/21
107/19 107/22 108/7
109/10 109/13 109/16
110/7 114/11 116/20
118/20 119/25 122/1
122/13 123/4 123/5
124/6 126/4 127/3
127/23 128/14 128/16
128/19 129/2 129/18
130/2 130/8 130/8
131/17 133/13 133/14
135/16 135/19 136/5
142/9 142/21 142/23
143/1 144/14 144/20
146/22 148/15 148/23
150/20 152/2 152/4
154/23 155/9 158/15
159/22 159/25 160/11
160/16 160/21 160/23
161/3 161/9 162/5
165/13 168/5 169/17
170/13 170/17 172/9
172/24 174/20 177/10
178/21 178/21 185/17
188/7 188/10 189/3
192/16 195/14 201/14
201/23 202/22 205/5
205/8 205/12 208/13

209/15 211/3 214/5
214/5 214/15 214/19
215/5 216/22 216/25
217/8 217/19 220/6
one-and-a-half [2]
99/12 188/10
one-page [1]  143/1
one-sixth [1]  172/9
ones [2]  21/17 154/23
ongoing [1]  184/12
online [6]  91/11 103/1
103/4 106/22 148/14
162/4
only [39]  6/23 6/24
18/22 33/15 34/8
41/11 49/13 49/21
63/8 71/11 71/16
78/13 87/3 95/5 106/5
107/6 108/7 110/5
128/9 130/2 134/5
135/17 137/9 137/13
145/12 155/12 161/23
164/16 164/20 165/10
165/16 168/1 172/2
179/7 180/7 197/8
209/19 211/21 213/9
onto [3]  71/24 123/7
197/13
open [4]  19/13 184/18
191/8 193/2
opening [2]  37/5 38/4
operating [20]  9/17
31/11 31/12 32/7
34/24 38/13 39/7
41/20 41/21 46/11
46/17 46/18 50/13
52/5 52/18 54/18
54/19 199/1 202/11
202/21
operation [2]  82/11
99/7
operational [20]  21/21
21/24 39/15 39/17
39/22 39/25 40/11
40/12 40/19 41/19
42/10 42/22 43/22
43/25 47/17 48/1
48/18 68/4 101/22
203/18
opined [1]  99/8
opinion [10]  21/25
33/8 51/12 67/12
106/15 106/16 119/3
145/13 191/15 195/2
opinions [1]  169/7
opportunistic [1]
96/20
opportunity [3]  161/6
161/8 168/25
opposing [5]  20/25
45/5 45/13 64/14
115/12

opposition [2]  138/2
210/25
opting [1]  105/20
oral [1]  216/4
Orange [1]  219/1
oranges [1]  179/24
order [11]  10/25 11/11
15/4 18/18 54/19 57/2
94/20 200/9 206/10
206/23 220/8
ordering [1]  40/25
organizations [1]
170/23
original [8]  17/8 17/16
17/17 64/4 64/15
67/17 138/19 196/18
other [85]  8/7 8/11
10/13 11/2 20/12
20/14 26/6 27/17
28/14 35/23 36/2
40/16 55/6 55/24
56/24 59/8 59/24 60/9
61/1 62/14 65/9 68/20
69/6 69/20 74/5 76/1
85/23 97/4 101/20
105/13 106/10 107/10
108/10 109/2 110/3
110/7 111/16 111/16
112/2 112/15 115/3
116/15 116/22 119/4
124/7 124/8 124/12
124/14 132/6 133/19
135/15 135/16 135/17
135/21 135/23 135/24
136/15 141/19 141/24
143/15 145/18 146/25
147/14 155/25 161/7
165/20 166/2 168/3
168/21 170/1 170/3
170/23 172/15 173/11
174/18 175/20 176/14
177/10 179/21 186/1
193/12 208/25 208/25
212/25 217/19
others [5]  94/1 116/21
133/5 149/11 154/24
Otherwise [1]  21/10
ought [4]  25/20 28/13
92/23 191/14
our [52]  17/24 19/12
22/16 25/25 25/25
25/24 26/8 26/15 29/1
29/12 29/19 42/18
47/17 50/9 73/4 78/6
99/1 103/8 103/21
108/15 108/19 119/7
130/10 130/12 136/2
142/10 142/11 149/19
150/3 150/14 150/8
166/9 168/17 177/2
177/2 191/15 200/14
203/1 203/8 204/3

**O**

**our... [12]** 205/8
205/20 206/23 207/4
207/8 207/13 210/24
214/8 214/23 214/25
217/10 220/12
**ourselves [1]** 132/9
**out [103]** 8/1 9/2 11/6
12/4 12/6 15/4 19/18
21/7 25/6 30/16 35/25
37/2 38/13 39/10
39/10 39/14 39/15
43/2 50/20 53/16
54/17 61/14 63/21
65/11 65/12 65/15
67/21 69/14 77/23
87/2 90/9 90/16 91/4
91/8 91/23 92/8 92/13
93/15 96/5 97/24
98/16 101/22 103/7
104/4 104/9 104/14
104/18 105/7 109/2
114/12 121/23 124/17
124/20 125/15 126/1
127/14 128/8 129/20
130/11 131/12 131/13
131/22 141/2 146/2
148/17 148/18 148/25
157/13 162/1 162/12
162/15 162/23 168/3
170/5 170/15 171/5
171/5 171/25 172/23
180/19 185/16 186/19
187/23 194/9 197/4
199/18 202/3 202/11
202/17 202/20 203/3
203/23 203/25 204/7
204/19 204/21 204/22
212/12 214/21 214/21
215/4 216/16 218/8
**outcome [1]** 200/17
**outer [1]** 43/5
**outlets [1]** 159/10
**outline [1]** 42/18
**outlining [1]** 203/16
**outs [1]** 157/15
**outselling [1]** 208/1
**outside [1]** 195/2
**outsold [3]** 207/8
207/12 207/13
**over [26]** 13/5 21/11
34/21 35/20 39/2 46/8
83/15 85/2 91/2 94/22
102/24 108/6 113/4
115/6 120/24 120/24
122/21 124/16 128/6
136/14 139/2 158/3
159/21 186/11 208/15
215/5
**overall [4]** 96/8 98/23
154/1 154/19

**overarching [1]** 48/22
**overcrowded [1]**
157/11
**overhead [12]** 17/15
32/1 33/10 33/17
33/24 34/3 34/4 34/6
34/7 34/9 35/21 196/5
**overlaid [1]** 99/15
**overlap [5]** 174/14
174/17 175/15 177/3
177/6
**overlooking [1]** 92/7
**overly [1]** 41/11
**Overruled [2]** 147/4
151/17
**overview [1]** 48/11
**own [16]** 10/2 42/23
62/2 140/20 140/20
141/16 141/17 141/17
184/17 192/15 192/18
193/12 194/6 198/5
207/20 218/23
**owner [1]** 120/15
**oxymoronic [1]** 91/16

**P**

**p.m [2]** 118/1 220/23
**pace [1]** 162/25
**Pacific [2]** 181/13
181/18
**package [1]** 57/2
**packaging [1]** 82/9
**page [43]** 19/18 65/25
66/1 66/1 66/7 66/8
66/9 66/20 66/21 67/3
70/3 70/4 70/5 70/6
70/19 73/24 74/2
97/19 97/22 98/5
98/12 111/10 120/13
126/4 138/4 138/13
143/1 152/16 152/17
152/18 163/14 163/14
175/25 176/1 176/1
176/2 176/5 187/9
187/11 187/15 187/15
187/15 221/6
**pages [4]** 1/21 87/6
142/21 197/6
**paid [12]** 33/13 146/8
146/8 146/12 146/13
146/16 147/1 161/25
166/3 167/20 193/3
202/3
**pal [1]** 170/15
**Palestine [1]** 36/17
**pamby [1]** 50/2
**paper [2]** 37/15 39/1
**papers [15]** 9/8 17/8
19/12 19/19 25/2
27/13 43/14 43/14
63/21 84/5 181/16
181/21 182/22 182/24

196/2
**paragraph [4]** 67/7
164/9 176/14 193/7
**parameters [1]** 150/24
**Pardon [1]** 111/6
**parenesis [2]** 118/23
118/24
**parenthetical [2]**
120/5 120/6
**parenthetically [2]**
52/16 92/14
**parity [2]** 80/24
106/10
**Park [1]** 59/17
**parlor [1]** 214/6
**part [35]** 12/19 25/5
31/25 33/13 35/19
41/24 55/11 65/7
84/24 102/12 102/13
102/13 118/19 118/20
120/13 120/20 120/21
124/14 125/10 125/10
137/12 161/22 164/1
174/15 174/15 174/25
177/17 177/17 177/18
179/20 180/7 180/15
181/11 203/10 208/21
**partially [1]** 89/22
**participating [3]**
134/14 134/16 171/2
**particular [16]** 10/9
32/22 43/1 57/1 63/11
76/25 78/5 81/23
100/25 133/9 160/5
178/20 184/22 192/20
208/24 210/11
**particular ranking [1]**
208/24
**particularly [6]** 25/21
41/14 41/14 83/3
87/24 176/7
**parties [4]** 20/21
42/20 44/1 143/9
**partners [2]** 149/21
150/6
**parts [6]** 77/23 79/17
120/7 195/20 195/21
195/22
**party [4]** 79/5 163/21
163/23 200/12
**pass [2]** 71/7 71/8
**passage [1]** 64/8
**past [2]** 116/21 175/7
**patent [2]** 181/12
181/12
**patents [1]** 135/19
**path [1]** 149/12
**patterns [1]** 159/7
**Patty [3]** 64/18 154/18
214/16
**pause [2]** 51/13 92/10
**pay [9]** 38/11 62/3

92/14 146/18 163/25
167/8 167/16 184/17
193/21
**paying [1]** 168/4
**payments [1]** 62/4
**pays [1]** 146/6
**peer [2]** 53/13 53/14
**people [34]** 7/5 21/11
22/2 33/9 47/9 50/5
86/25 87/12 130/6
130/25 136/1 139/4
140/11 140/15 142/9
142/20 142/21 153/24
161/1 161/8 161/20
162/25 163/2 167/12
170/4 170/15 171/19
171/20 172/23 173/14
174/24 175/4 176/13
177/24
**per [4]** 54/20 96/13
159/5 170/13
**perceived [1]** 110/11
**percent [152]** 42/13
42/14 50/14 54/7 54/7
61/14 67/13 67/25
68/1 68/2 68/14 68/22
69/2 69/3 69/7 69/11
69/12 69/14 69/18
69/19 70/25 71/20
72/5 72/18 73/7 75/9
75/22 75/22 75/24
76/6 76/8 76/17 76/21
76/22 81/5 81/6 81/7
81/7 81/7 81/9 81/9
81/10 81/24 83/10
83/11 83/22 84/18
89/2 89/5 89/7 89/8
89/11 96/13 97/11
98/2 98/2 99/9 99/12
99/15 99/15 99/16
104/24 105/16 109/25
110/1 110/4 110/5
113/23 125/5 125/7
125/18 125/20 127/10
143/6 143/12 143/16
143/19 144/10 144/13
144/14 144/15 144/18
145/6 145/9 145/10
145/11 145/20 145/20
157/24 159/19 168/11
168/15 168/16 173/13
176/20 176/21 176/21
184/21 184/23 184/24
185/2 185/4 185/8
185/10 185/10 185/11
185/14 185/20 185/21
186/4 186/5 186/20
186/23 186/24 187/1
187/3 187/23 187/25
188/9 188/11 189/6
189/8 189/19 189/19
189/19 189/24 189/25

190/25 190/25 191/1
192/7 192/11 192/14
192/15 192/18 192/19
193/22 196/12 196/12
196/17 196/21 196/24
197/3 197/16 197/21
197/24 197/25 198/6
198/8 198/12 203/2
212/12
**percentage [38]** 33/20
33/22 55/10 56/8 56/9
56/16 56/19 68/23
76/24 77/14 81/5 81/6
83/6 83/7 83/8 87/21
88/3 88/15 91/12
92/18 99/13 99/14
104/20 105/3 105/12
113/22 147/9 166/12
178/2 179/3 183/25
185/3 186/16 189/10
189/22 190/5 190/8
194/6
**percentages [27]**
52/18 56/23 64/23
70/10 70/13 74/4 74/7
75/4 75/5 82/15 83/21
93/2 96/2 99/21
105/14 105/16 113/13
116/17 118/8 121/23
124/21 125/1 143/4
178/6 178/24 179/5
180/18
**percentages that [1]**
75/4
**perfect [3]** 95/11
95/24 159/16
**perform [5]** 110/16
128/21 150/6 159/15
194/24
**performance [3]** 77/9
95/8 149/7
**performed [5]** 25/22
26/3 94/22 139/2
183/11
**performing [2]** 94/21
183/16
**perhaps [13]** 7/4
13/25 15/14 37/8
65/23 72/1 72/13
78/21 91/20 112/12
182/22 207/18 207/21
**period [6]** 109/25
110/2 156/5 156/7
180/4 186/11
**permanent [1]** 45/14
**permission [2]** 139/8
169/16
**permit [3]** 116/22
178/4 212/19
**person [8]** 49/5 65/13
90/9 133/20 162/2
187/7 192/13 192/17

Case 5:15-cv-01586-WDK-KK   Document 315   Filed 09/30/17   Page 245 of 257   Page ID
#:35474

{PLAINTIFF} v.
{DEFENDANT}

{WITNESSNAME}
{DATE}

**P**

**personal [5]** 108/13
108/18 130/7 130/10
176/6
**personally [1]** 7/11
**perspective [2]** 166/5
166/7
**persuade [3]** 99/19
125/22 208/7
**persuaded [1]** 177/25
**persuasiveness [1]**
181/6
**PG [1]** 127/9
**phase [1]** 14/5
**Phillips [2]** 17/17
17/19
**phone [1]** 116/3
**phrase [1]** 27/11
**physically [2]** 35/11
41/1
**pick [2]** 98/3 205/16
**picture [1]** 102/10
**pictures [2]** 140/14
140/15
**pie [1]** 123/18
**piece [1]** 83/10
**pieces [2]** 83/9 175/3
**pig [1]** 40/5
**piling [1]** 21/11
**pioneer [1]** 53/18
**piquing [1]** 93/3
**place [11]** 28/3 47/23
60/3 60/5 142/15
152/6 152/13 152/13
154/22 190/12 214/9
**placed [1]** 194/17
**places [2]** 62/22
176/14
**plaintiffs [8]** 25/1
25/15 107/2 141/19
141/23 186/17 195/25
209/1
**plastic [1]** 116/2
**platform [2]** 87/7
142/10
**play [2]** 22/23 146/22
**played [2]** 58/19 98/21
**players [1]** 155/23
**plays [2]** 84/20 95/21
**pleadings [1]** 129/4
**please [47]** 5/6 5/14
13/17 16/17 24/19
57/8 57/9 58/9 58/17
63/14 64/11 66/20
67/1 70/2 70/19 72/6
72/24 75/6 79/9 80/10
81/20 85/9 96/1 97/19
98/4 98/13 100/11
103/22 111/8 117/12
129/8 132/5 132/7
136/25 142/25 147/24

151/18 151/20 151/24
182/25 184/9 185/23
185/25 187/4 187/18
211/2 212/2
**plenty [1]** 180/13
**plucked [2]** 197/17
203/2
**plural [1]** 90/10
**plus [8]** 21/18 36/12
58/23 162/11 166/15
166/21 166/25 184/23
**poacher [2]** 111/18
111/21
**pocket [4]** 214/20
214/20 214/22 214/22
**point [39]** 13/4 23/24
40/24 47/24 48/10
54/16 60/14 64/6
67/21 68/11 68/11
68/14 68/22 79/1
82/12 92/10 93/19
96/13 100/3 100/4
100/5 107/11 112/7
125/4 126/11 132/5
167/7 167/11 167/21
170/11 173/20 185/16
198/24 204/20 210/1
220/2
**pointed [2]** 92/13
212/11
**pointing [2]** 11/6
185/20
**points [7]** 99/23 148/7
148/11 148/18 176/7
178/18 204/13
**poison [1]** 218/6
**Policeman [13]** 95/10
95/11 95/24 128/20
150/2 150/2 150/3
150/10 150/12 159/15
159/18 159/21 160/9
**politeness [1]** 123/24
**pollutions [1]** 34/20
**pool [2]** 84/13 96/9
**poor [2]** 23/2 38/18
**pop [1]** 148/13
**poppycock [1]** 123/18
**portion [5]** 120/17
163/15 180/20 185/6
186/15
**portraying [1]** 189/17
**pose [1]** 111/23
**position [16]** 23/13
26/15 43/20 46/17
50/4 91/20 104/25
105/1 106/10 125/3
156/15 170/2 206/23
207/4 213/11 217/10
**positive [4]** 86/25
129/21 133/14 161/12
**possible [2]** 22/1

34/22
**possibly [2]** 148/11
213/14
**post [1]** 68/22
**postings [4]** 77/10
77/12 90/22 140/14
**posts [4]** 77/11 90/1
90/2 127/19
**potential [9]** 12/8 13/7
13/11 15/10 15/10
40/20 53/22 131/1
172/3
**power [4]** 120/6 128/8
162/24 174/2
**powerful [1]** 173/25
**practice [4]** 7/25 8/16
8/22 61/7
**preachy [5]** 54/10
54/11 54/12
**precise [1]** 32/14
**Precision [2]** 77/22
79/17
**preclude [1]** 112/17
**predisposition [1]**
189/18
**preface [2]** 84/3 84/10
**prefatory [3]** 47/8
49/9 55/19
**prefer [1]** 102/18
**prejudicial [3]** 196/9
198/11 212/11
**preliminarily [1]** 71/9
122/14
**preliminary [1]** 72/15
**premise [5]** 68/13
84/15 84/15 106/6
106/7
**premium [22]** 76/3
85/11 91/6 95/20
110/10 110/11 126/8
126/20 127/1 127/2
127/4 127/13 127/22
127/23 128/12 128/18
130/3 149/4 155/12
155/13 155/17 155/19
**prepare [1]** 47/21
**prepared [3]** 22/8
29/22 114/15
**preponderance [1]**
197/24
**prerogative [4]** 7/22
19/1 26/22 41/7
**presence [4]** 87/2
129/25 141/22 141/24
**present [3]** 34/10
104/21 104/24
**presentation [3]** 22/4
44/19 44/20
**presented [2]** 70/3
85/18
**presenting [2]** 26/14
47/15

**preserve [6]** 206/23
213/10 215/19 215/20
215/24 216/5
**preserved [1]** 216/1
**president [1]** 47/3
**PRESIDING [1]** 1/6
**pressed [1]** 196/14
**presume [2]** 106/17
196/25
**presumed [2]** 197/11
196/25
**presumption [1]**
197/2
**pretty [8]** 37/4 44/13
44/22 49/10 49/15
50/22 119/12 200/16
**preview [6]** 10/19 35/2
39/24 48/8 89/8
216/20
**previous [5]** 68/6
141/9 149/24 158/16
193/16
**previously [4]** 75/13
89/12 161/21 167/12
**price [2]** 103/10 176/7
**prices [1]** 110/12
**pricing [5]** 76/4 80/24
95/20 110/10 154/21
**primarily [2]** 109/7
132/23
**primary [5]** 58/19
62/19 93/15 98/21
160/23
**principals [1]** 52/24
**principle [2]** 44/17
52/19
**principles [1]** 52/15
**print [1]** 71/23
**printed [1]** 44/4
**prior [2]** 156/6 196/13
**priority [1]** 94/23
**prisoners [1]** 40/14
**privilege [1]** 12/24
**privy [1]** 40/23
**probably [9]** 15/7
42/10 65/14 71/24
87/23 122/3 122/20
199/17 219/18
**problem [14]** 44/18
49/24 49/25 50/6 89/1
92/23 94/2 117/7
144/21 170/18 177/7
177/7 195/17 208/16
**problems [1]** 73/13
**procedure [1]** 116/1
**proceed [2]** 28/8
196/3
**proceeding [2]** 8/8
122/21
**proceedings [6]** 1/16
14/5 55/25 190/12
220/23 221/5
**process [9]** 69/13

80/16 84/12 84/19
95/3 121/14 121/15
127/7 184/4
**produce [1]** 28/7
**produced [1]** 170/20
**producing [1]** 86/6
**product [100]** 23/20
32/3 32/4 32/19 32/23
34/10 34/23 35/22
37/22 39/9 52/6 52/14
54/20 54/21 55/4 55/5
55/5 55/12 58/20
61/17 67/12 75/19
77/8 85/11 85/22
89/25 91/6 94/21
94/21 94/25 95/5
95/10 95/22 96/21
103/8 103/21 108/8
110/6 110/11 110/15
110/16 127/5 127/13
127/23 127/24 128/17
128/18 130/2 130/12
130/21 131/22 133/16
133/21 135/20 136/17
136/17 136/18 146/9
148/6 148/8 148/16
148/17 148/22 149/3
149/4 149/5 149/24
149/25 150/6 150/7
150/10 150/21 150/21
151/11 152/3 152/15
155/12 155/13 155/15
156/22 157/13 158/4
159/6 159/18 161/9
161/25 162/2 162/3
162/17 166/4 166/21
172/7 172/17 172/24
182/23 184/13 186/12
207/8 207/9 207/13
**production [4]** 32/3
33/14 156/3 156/4
**products [68]** 32/16
33/11 55/7 61/23 82/3
82/6 85/1 85/1 85/1
86/18 87/3 90/3 91/8
94/24 95/6 96/23
96/23 104/5 104/11
105/25 105/25 109/24
127/3 127/12 127/14
128/4 129/21 131/12
131/14 131/15 131/18
133/14 134/14 134/16
134/18 134/19 142/9
142/23 143/9 148/12
148/24 149/2 149/13
149/18 149/20 149/22
150/9 152/3 152/4
156/25 157/11 157/12
157/12 157/14 159/8
159/8 159/17 161/2
161/13 161/21 162/12
162/16 166/9 168/5

**P**

**products... [4]** 168/23 168/24 171/14 172/15
**professional [1]** 135/15
**proffered [4]** 52/10 53/25 136/19 183/24
**profit [37]** 30/21 30/22 58/18 62/23 63/2 68/2 76/21 77/19 77/21 78/4 78/5 96/9 99/13 99/14 99/17 113/25 183/25 185/1 185/6 185/7 185/17 186/14 186/16 186/17 187/22 188/2 189/7 189/8 189/9 189/9 189/23 190/4 190/7 190/25 192/15 198/23 202/20
**profitability [5]** 54/24 68/8 84/20 98/24 152/14
**profits [48]** 9/8 17/11 20/1 20/1 21/17 22/7 22/8 25/11 26/8 26/24 27/17 27/17 30/16 30/17 30/20 31/9 31/10 51/1 58/20 63/7 67/13 75/24 79/18 79/19 84/13 84/23 110/4 110/13 110/18 111/12 120/14 120/16 120/19 144/9 159/19 185/3 192/19 197/7 197/9 198/24 203/22 204/7 204/8 204/19 207/15 210/12 210/13 213/18
**program [6]** 5/14 163/19 170/10 171/3 171/24 173/1
**programs [1]** 8/24
**prohibited [4]** 86/3 86/4 86/6 86/8
**Promenade [1]** 2/12
**prominent [2]** 120/11 155/16
**promote [5]** 149/2 161/1 161/18 166/8 168/23
**promoting [3]** 86/18 162/12 172/24
**prongs [1]** 160/21
**pronounced [1]** 87/15
**pronunciation [3]** 11/17 87/17 120/8
**proof [2]** 43/5 206/10
**proper [4]** 104/7 120/8 206/21 215/20
**properly [5]** 49/24 152/12 152/12 199/13

202/3
**property [9]** 24/22 28/2 59/18 61/6 61/10 61/11 182/12 184/7 204/23
**proportioning [1]** 42/1
**propose [2]** 35/21 106/19
**proposed [5]** 20/5 20/25 28/24 30/1 45/9
**proposing [1]** 29/4
**proposition [1]** 213/7
**propylene [1]** 127/8
**prosecute [2]** 215/18 216/9
**prosecuted [1]** 210/16
**prosecuting [1]** 216/8
**prove [7]** 27/14 157/21 197/24 199/7 210/12 215/25 216/1
**proverbial [1]** 51/15
**provide [11]** 62/23 63/6 75/19 97/3 98/18 130/17 156/3 168/18 184/5 186/17 194/23
**provided [28]** 60/16 64/13 81/19 81/21 91/4 126/3 127/23 129/23 130/22 132/13 132/17 135/7 137/8 137/9 137/14 138/8 140/17 147/11 156/5 156/8 159/6 160/6 161/1 161/2 162/9 162/10 185/12 197/4
**provides [6]** 184/16 185/9 186/16 190/6 202/23 204/16
**providing [1]** 161/5
**provisionally [3]** 14/15 88/24 88/25
**proxy [61]** 17/7 17/10 17/17 17/22 18/7 18/10 18/11 18/18 22/6 25/7 25/10 25/19 28/8 28/10 28/22 29/11 36/24 37/3 37/3 37/25 196/3 196/3 199/2 199/6 201/19 202/24 203/17 203/17 204/13 205/13 206/4 206/11 206/13 206/15 206/16 206/17 206/24 206/25 207/3 207/16 208/8 208/13 208/16 209/11 209/16 209/24 210/21 211/3 211/11 211/14 211/17 212/5 212/17 212/21 213/1 213/8 214/4 215/11 215/17 216/9 216/21

**proxy approach [1]** 203/17
**public [1]** 35/5
**publication [2]** 53/13 59/16
**publications [1]** 59/17
**published [2]** 78/14 78/15
**puffery [1]** 38/4
**pulled [1]** 160/8
**pulling [1]** 63/21
**pump [2]** 40/17 40/19
**punitive [2]** 193/4 194/2
**purchase [13]** 86/17 134/18 148/7 149/1 149/24 161/25 162/17 163/4 164/12 172/10 172/12 172/12 172/19
**purchased [2]** 104/5 105/25
**purchasers [1]** 111/13
**purchases [4]** 149/21 156/6 162/3 172/4
**purchasing [2]** 149/22 172/7
**purely [1]** 154/20
**purpose [4]** 58/16 58/18 172/20 189/5
**purposes [8]** 10/16 15/22 18/22 30/10 60/18 92/9 99/11 192/23
**pursuant [1]** 221/3
**pursue [5]** 28/22 29/14 29/15 213/14 217/11
**pursuing [7]** 28/15 36/24 209/25 210/6 210/10 212/21 216/21
**pursuit [1]** 215/11
**push [1]** 148/22
**put [19]** 6/10 15/4 37/6 43/3 44/5 71/22 93/8 93/10 97/25 114/22 116/2 125/11 149/5 200/24 202/1 206/17 210/15 217/24 219/13
**putting [2]** 128/8 220/10

**Q**

**Q-u-i-a [1]** 213/19
**qualification [1]** 50/23
**qualifications [2]** 182/9 182/10
**qualified [2]** 51/10 51/16
**qualitative [42]** 9/18 51/4 51/5 98/18 98/25 100/1 100/2 100/9

100/13 100/14 100/20 101/9 101/15 101/18 101/23 102/16 107/10 108/23 109/15 109/18 110/22 112/4 112/13 112/17 112/18 112/22 118/22 119/14 120/4 120/6 121/9 121/18 124/19 179/2 179/11 179/23 181/9 181/14 181/15 181/22 182/15 182/16
**qualitatively [2]** 124/18 169/17
**quality [17]** 93/2 91/7 94/20 95/4 95/19 120/5 127/6 127/16 128/11 128/18 128/22 130/4 131/17 142/23 146/21 149/4 161/9
**quantifiable [5]** 166/14 167/23 173/6 179/16 179/18
**quantification [8]** 35/2 112/11 139/10 169/19 170/14 173/22 179/13 179/15
**quantified [1]** 179/25
**quantify [13]** 34/25 111/23 133/23 145/25 167/8 167/24 171/2 171/15 171/17 171/22 173/8 179/17 202/6
**quantitative [17]** 94/15 94/17 99/25 100/9 100/15 101/23 102/13 108/19 109/20 112/15 112/16 112/19 112/22 118/21 119/14 121/9 121/17
**quantitative-qualitative [1]** 119/14
**quarter [4]** 48/7 116/9 116/24 176/22
**quasi [1]** 172/23
**quasi-salespeople [1]** 172/23
**query [4]** 52/8 52/21 53/3 88/3
**question [79]** 12/9 14/4 14/22 22/6 29/25 29/25 34/8 34/25 52/2 62/21 66/3 70/15 71/1 71/5 71/8 72/17 73/5 73/17 73/19 74/2 74/6 74/15 75/21 79/3 82/24 88/16 89/3 94/11 94/12 96/8 96/16 97/15 97/21 97/22 99/24 100/11 105/11 109/3 109/4 111/23 113/18 116/22

121/25 131/6 131/25 136/25 140/8 141/25 142/1 142/5 143/6 144/23 151/21 158/15 159/25 164/18 166/19 169/8 169/9 169/19 170/18 173/5 174/5 175/11 175/11 178/1 183/18 190/18 192/20 193/24 194/3 194/9 195/3 198/19 199/1 203/22 217/10 217/13 218/5
**questioning [6]** 72/13 78/25 126/11 152/24 175/12 182/4
**questions [36]** 8/6 8/7 16/2 41/2 52/22 57/21 65/3 67/10 91/15 91/18 91/23 114/8 133/9 133/11 139/7 139/9 147/17 150/24 151/3 158/13 163/10 163/19 164/14 169/16 169/19 169/24 170/17 174/6 178/21 192/2 192/5 195/8 195/10 219/19 219/23 219/24
**Quia [1]** 213/19
**quickly [1]** 84/7
**quit [2]** 208/11 208/19
**quite [11]** 9/1 10/2 24/5 38/11 65/13 79/21 79/22 187/7 188/10 188/16 202/13
**quote [9]** 31/21 32/2 50/18 53/12 53/21 111/6 111/22 120/3 120/21
**quoted [2]** 31/23 31/25
**quotes [12]** 26/23 32/5 38/20 48/24 53/8 119/1 119/2 119/2 119/2 119/3 120/9 121/18
**quoting [1]** 118/20

**R**

**Rabbit [3]** 82/9 82/10 82/10
**radio [1]** 86/1
**raise [3]** 13/15 51/2 57/13
**raised [4]** 15/9 24/24 178/5 207/23
**rampant [1]** 162/25
**ran [2]** 35/6 61/6
**range [6]** 76/24 84/18 144/13 147/10 168/11 185/20
**ranges [2]** 56/12

{PLAINTIFF}V.
{DEFENDANT}

{WITNESSNAME}
{DATE}

# R

**ranges... [1]** 147/11
**rank [8]** 68/17 69/9
89/14 92/17 96/14
96/16 103/23 125/2
**ranked [5]** 56/25
75/16 76/1 76/2 92/18
**ranking [8]** 68/18
75/14 76/23 92/16
93/1 93/22 94/13
208/24
**rankings [3]** 105/22
105/23 125/4
**ranks [2]** 93/20 98/2
**rate [50]** 26/1 27/24
53/22 61/25 61/25
65/15 99/5 99/5
185/12 187/21 187/24
187/25 188/1 188/3
188/6 188/9 188/9
188/11 188/18 189/3
189/15 189/19 190/6
190/23 191/2 191/4
191/13 191/15 192/7
192/11 192/23 194/20
195/24 195/25 196/5
196/11 198/10 202/6
202/7 202/10 202/13
202/22 203/14 204/11
205/20 208/23 212/10
217/9 220/3 220/7
**rated [2]** 91/1
**rates [1]** 208/10
**rather [6]** 11/17
118/22 200/11 208/5
210/17 218/25
**rational [2]** 192/13
192/16
**rationally [1]** 120/22
**ratios [1]** 214/5
**raved [1]** 91/1
**raw [1]** 127/6
**re [2]** 138/3 170/2
**reach [7]** 6/15 44/17
87/2 129/20 140/6
142/11 142/16
**reached [1]** 203/1
**reaches [1]** 131/13
**reaching [2]** 148/10
167/12
**reaction [1]** 78/21
**read [25]** 32/13 67/10
67/15 80/5 80/8 94/19
97/21 97/21 98/4 98/6
98/10 98/13 108/17
112/6 118/12 118/13
143/2 151/24 151/25
163/18 164/13 179/19
179/20 189/13 215/2
**readily [9]** 139/22
166/13 169/10 170/11

173/6 173/8 179/16
179/18 179/25
**reading [15]** 50/18
74/10 74/21 89/25
90/1 90/1 101/13
143/8 143/17 144/7
144/11 144/19 201/11
201/12 201/12
**reads [1]** 172/3
**real [1]** 47/16
**realistically [1]** 19/4
**reality [3]** 45/2 52/25
113/9
**realize [2]** 108/4
169/22
**realized [1]** 149/23
**really [35]** 7/5 11/6
15/18 18/12 37/16
42/15 46/8 46/9 47/24
51/3 51/17 52/25 53/4
53/5 54/11 56/13
59/25 71/5 73/21
80/18 80/20 83/12
83/13 83/18 87/9
105/2 111/5 121/5
143/24 151/13 161/6
174/23 176/17 179/7
207/5
**realm [1]** 119/16
**reason [11]** 32/20
45/9 45/17 54/11
71/22 111/16 179/12
180/1 183/16 188/8
205/12
**reasonability [1]**
203/1
**reasonable [23]** 24/21
25/4 25/10 26/1 26/13
27/23 62/18 97/10
184/15 184/20 185/11
185/19 185/21 186/18
187/3 189/23 192/24
193/3 194/14 197/10
203/8 203/13 205/4
**reasonable-royalty [3]**
184/15 192/24 203/13
**reasonably [2]** 40/13
206/6
**reasoning [4]** 126/14
126/16 126/20 126/21
**reasons [4]** 122/7
127/5 202/8 212/14
**rebut [1]** 53/12
**rebuttal [1]** 64/17
**recall [15]** 70/10 133/5
136/8 139/16 140/4
141/4 141/10 141/12
165/2 167/1 167/4
169/11 183/13 196/13
218/14
**recalled [1]** 140/1
**received [2]** 23/19

113/19
**recent [1]** 192/2
**recently [1]** 182/8
**recess [8]** 48/5 50/11
91/19 115/23 116/5
116/24 117/13 169/23
**recognize [1]** 16/7
**recognized [6]** 61/15
106/14 172/2 181/7
181/10 202/19
**recognizing [1]** 186/3
**recollection [5]** 10/2
132/23 133/4 138/10
140/1
**recommend [1]**
153/12
**recommendation [1]**
111/15
**reconsideration [1]**
17/19
**record [42]** 16/15 29/3
31/2 31/4 31/5 31/6
31/15 35/13 35/25
38/16 45/25 47/1 49/7
49/24 58/10 64/2
64/25 66/15 66/25
81/22 92/12 92/19
94/10 98/7 105/19
109/20 128/25 137/1
137/18 151/25 174/4
185/24 191/20 199/14
201/3 207/17 207/25
211/12 216/18 217/16
217/20 220/1
**recorded [2]** 164/11
165/14
**records [11]** 33/12
120/10 123/22 155/22
156/2 164/15 164/19
164/23 165/1 170/19
175/23
**recover [4]** 18/19
120/16 209/15 211/10
**recovers [1]** 206/3
**recovery [3]** 17/7
210/16 216/8
**redacted [1]** 78/14
**reduce [11]** 11/5 20/6
32/25 144/9 161/19
197/25 198/1 201/17
209/20 212/7 212/25
**reduced [5]** 143/11
143/13 143/19 144/17
144/18
**reduces [1]** 15/19
**reducing [1]** 201/20
**refer [5]** 49/3 64/9
86/8 142/25 152/19
**reference [2]** 64/7
136/9
**referenced [1]** 110/23
**referencing [3]** 94/9

181/21 203/11
**referral [2]** 161/5
176/10
**referrals [3]** 176/6
176/9 176/11
**referred [12]** 7/16
18/10 19/19 34/19
48/12 51/4 51/14
51/23 143/1 170/1
172/25 175/14
**referring [9]** 54/1 59/2
64/8 66/22 134/11
137/2 138/7 175/25
218/13
**refine [1]** 107/7
**reflect [2]** 31/4 49/7
**reflected [2]** 30/11
165/17
**reflects [1]** 64/25
**refresh [1]** 50/16
**refreshed [1]** 10/2
**regard [13]** 139/8
139/10 147/10 169/14
173/22 177/12 179/13
179/15 180/10 180/17
180/22 198/15 199/24
**regarding [10]** 46/11
50/16 63/12 94/19
116/22 122/11 158/13
169/25 191/23 213/2
**regards [6]** 9/15 35/21
77/8 126/16 136/3
217/4
**regulated [1]** 85/25
**regulations [1]** 221/7
**reinforces [1]** 159/11
**rejoin [5]** 50/10 201/5
201/6 216/17 216/17
**rejoinder [4]** 82/21
203/16 204/24 206/14
**relate [2]** 34/9 54/21
**related [9]** 9/6 31/13
39/9 52/5 118/8
135/18 176/24 194/24
206/6
**relates [2]** 40/1
170/17
**relating [1]** 48/12
**relation [8]** 68/20
111/12 140/18 141/19
147/14 157/10 164/16
168/20
**relationship [11]**
43/18 43/19 131/5
147/23 149/17 154/13
154/17 155/3 158/8
159/13 204/11
**relationships [14]**
86/24 87/6 129/10
131/9 148/2 148/21
157/1 157/8 157/20
157/22 158/3 160/24

**relative [13]** 59/15
59/19 61/16 75/17
75/19 76/1 76/8 76/23
98/23 99/6 120/5
147/14 168/20
**relatively [4]** 26/25
81/2 102/13 170/21
**releases [1]** 149/20
**relegate [1]** 106/9
**relevance [1]** 218/15
**relevant [22]** 56/23
68/17 68/23 69/9
75/14 96/20 96/24
98/16 109/17 109/24
149/12 156/5 184/12
186/11 190/1 191/14
195/25 196/6 196/7
198/10 210/15 212/11
**reliability [2]** 186/25
187/2
**reliable [5]** 52/14
71/18 73/6 112/14
119/3
**reliably [3]** 52/23 93/1
100/21
**relied [4]** 120/4
132/21 154/3 169/5
**relief [15]** 60/12 60/16
61/12 61/21 62/1 62/5
62/9 62/18 184/13
184/16 191/13 202/18
203/5 203/10 204/18
**relief-from-royalty [7]**
61/12 61/21 62/9
62/18 184/13 184/16
203/10
**relieves [1]** 216/6
**reluctant [1]** 108/14
**rely [11]** 72/3 72/4
72/5 97/1 97/5 111/4
119/5 119/19 119/21
119/22 148/18
**relying [6]** 48/23
119/20 135/21 136/24
156/15 161/18
**remaining [4]** 118/6
122/10 125/25 200/17
**remedies [2]** 205/1
208/25
**remedy [1]** 193/25
**remember [11]** 35/4
36/9 63/18 63/20 71/4
77/17 80/13 91/13
114/16 164/4 164/6
**rent [2]** 33/13 62/3
**repeat [14]** 29/23 66/3
75/21 85/14 127/18
136/25 139/5 151/18
151/20 154/11 154/16
154/18 155/23 156/12
**repeated [1]** 92/10

Case 5:15-cv-01586-WDK-KK    Document 315    Filed 09/30/17    Page 248 of 257    Page ID
#:35477
{PLAINTIFF} v.
{DEFENDANT}
{WITNESS NAME}
{DATE}

# R

**repeatedly [3]** 89/19
178/1 196/14
**rephrase [6]** 70/11
87/10 102/7 135/9
144/5 179/6
**rephrased [1]** 100/13
**Replacement [2]**
77/23 79/17
**replicate [2]** 104/13
104/14
**reply [2]** 17/25 70/4
**report [82]** 25/2 25/5
25/23 25/24 26/1 26/3
26/3 26/4 26/6 26/10
29/7 30/12 30/12
62/22 64/4 64/5 64/15
64/17 64/17 65/24
66/4 66/21 67/4 67/18
69/21 78/3 78/13
78/14 130/20 132/6
132/7 132/11 132/13
132/16 132/18 132/20
135/3 135/7 135/8
138/14 138/15 138/19
138/19 145/5 145/8
145/14 150/16 152/16
152/17 159/7 163/13
164/9 165/7 167/3
168/8 169/3 175/25
180/5 180/8 180/8
180/9 183/11 183/13
185/12 185/13 185/18
187/12 187/12 187/16
188/8 188/11 189/13
191/10 196/17 196/18
196/18 198/4 203/9
205/24 206/23 214/24
214/25
**reported [1]** 221/5
**reporter [5]** 8/3 58/4
58/6 151/20 220/21
**REPORTER'S [1]** 1/16
**reports [8]** 65/24
133/6 137/10 138/20
165/5 177/12 180/11
180/12
**represent [5]** 186/10
188/17 188/17 189/11
189/23
**representation [1]**
18/9
**representations [4]**
87/24 157/1 157/17
158/11
**representative [2]**
127/13 184/21
**represents [6]** 185/7
186/15 188/18 189/2
189/10 190/9
**repurchasing [1]**

94/23
**reputation [5]** 111/15
111/24 111/25 112/4
146/21
**repute [1]** 26/14
**requested [2]** 42/23
42/24
**require [1]** 210/12
**required [1]** 114/6
**requires [1]** 118/25
**requisite [1]** 28/7
**research [24]** 65/7
75/13 84/21 84/24
89/14 94/19 96/22
105/24 127/12 127/17
128/13 129/17 134/18
134/19 136/2 155/14
157/6 157/7 157/19
163/2 172/6 172/15
180/13 209/8
**researched [1]** 97/1
**researching [2]** 85/1
89/25
**reside [1]** 165/24
**resident [1]** 168/2
**resolution [1]** 203/21
**resolve [7]** 6/14 34/12
36/18 36/18 46/11
47/20 203/22
**resolving [1]** 207/21
**resonates [1]** 94/25
**resources [2]** 148/16
172/7
**respect [3]** 81/14
81/17 108/12
**respective [6]** 34/13
41/18 41/18 42/22
136/2 141/19
**respond [7]** 45/21
81/13 109/9 188/20
201/16 201/20 211/10
**responded [1]** 25/5
**response [24]** 22/2
24/5 25/21 26/7 26/8
33/5 62/24 76/15
76/20 79/14 81/12
82/21 89/18 99/20
111/16 112/5 178/6
180/25 187/4 191/11
206/1 206/2 206/22
213/25
**responses [1]** 77/8
**responsible [1]** 14/10
**responsive [1]** 25/25
**rest [4]** 113/24 144/11
202/12 217/24
**restricted [3]** 86/16
86/22 160/18
**restrictions [1]**
168/24
**rests [1]** 212/12
**result [12]** 69/3 150/8

186/6 196/19 196/21
197/1 197/11 197/17
198/6 198/7 203/4
204/21
**result in [1]** 186/6
**resulting [3]** 125/18
125/20 197/3
**results [1]** 106/18
**retail [11]** 82/5 148/6
148/11 150/21 154/1
154/16 155/16 156/21
158/4 159/10 161/13
**retailer [3]** 103/1
162/3 162/4
**retailers [10]** 103/4
103/5 109/1 148/14
148/22 152/20 153/9
153/17 155/18 168/3
**retained [1]** 134/21
**rethink [1]** 72/20
**revenue [22]** 19/14
20/23 21/2 22/21 23/6
23/13 23/19 28/25
29/4 29/12 29/16
29/19 30/15 38/2
54/24 55/12 56/4
61/23 68/7 98/23
159/5 198/22
**revenues [14]** 17/11
22/12 22/13 28/10
28/24 32/16 35/7 54/1
54/2 54/2 54/8 84/20
110/18 196/4
**reverse [2]** 189/7
213/17
**review [16]** 53/13
53/15 67/7 67/11
96/18 96/23 123/17
128/17 128/17 129/20
130/22 136/11 136/14
139/1 155/15 156/19
**reviewed [6]** 33/6 77/7
104/10 127/18 136/17
141/18
**reviewer [1]** 102/6
**reviewers [3]** 130/21
136/18 154/2
**reviewing [1]** 153/12
**reviews [13]** 86/25
90/1 90/3 94/19
104/10 127/22 129/21
131/15 131/23 136/18
136/19 172/16 172/17
**revisiting [1]** 208/18
**rewarded [1]** 164/11
**right [118]** 8/21 9/1
10/5 14/21 16/11
16/20 19/9 20/10
20/12 21/10 21/12
29/13 30/20 31/16
32/12 34/12 36/18
38/4 40/18 41/20

44/23 55/19 56/6 56/7
57/10 57/13 58/25
62/8 65/22 66/1 66/8
66/9 66/22 69/18
69/22 71/1 82/9 83/18
84/14 86/23 87/6 88/3
89/13 91/16 92/14
92/15 92/18 97/17
99/24 100/5 100/16
102/4 102/25 103/11
104/12 104/12 108/3
114/9 115/2 115/8
118/13 126/5 126/5
126/6 133/15 134/12
134/13 134/17 135/6
135/10 135/13 136/4
138/14 138/16 139/11
141/14 141/17 143/12
143/14 143/21 145/13
145/21 152/18 153/3
153/19 154/8 156/2
157/3 159/18 163/14
163/22 163/23 164/1
164/3 164/5 164/25
165/9 165/12 165/16
166/4 167/7 167/9
169/1 173/25 174/8
174/14 178/9 198/1
204/5 205/19 210/5
214/19 214/20 214/22
215/4 215/18 216/5
219/3
**right-hand [3]** 152/18
214/19 215/4
**right-pocket [1]**
214/22
**rights [2]** 215/11
215/13
**rigor [1]** 114/6
**Riley [1]** 59/17
**rip [2]** 121/6 121/7
**risk [1]** 220/10
**road [4]** 28/21 50/25
51/1 89/9
**Rob [1]** 131/20
**Robert [2]** 65/6 155/7
**Roberto [1]** 63/18
**robust [3]** 139/14
160/22 176/2
**Rocket [4]** 95/10
128/20 149/20 150/10
**role [7]** 10/18 10/20
11/7 15/7 47/20 58/19
84/19
**roll [2]** 157/15 211/7
**roll-outs [1]** 157/15
**room [1]** 124/19
**roots [10]** 85/24 86/2
110/9 129/19 130/9
131/16 142/8 160/17
160/20 160/22
**rough [1]** 75/12

**roughly [12]** 48/7
145/7 167/15 176/22
180/7 186/19 186/21
186/21 214/23 215/14
215/14 215/15
**route [2]** 38/7 123/13
**royal [3]** 189/3 189/11
203/8
**royalties [3]** 184/24
189/17 190/5
**royalty [111]** 10/1
10/3 10/6 16/20 17/25
18/4 24/21 25/4 25/22
26/1 26/13 27/24 38/7
60/12 60/16 61/12
61/21 61/25 61/25
62/1 62/2 62/4 62/5
62/9 62/18 62/19 99/4
99/5 99/9 99/12
184/13 184/15 184/16
184/20 184/23 184/23
185/2 185/5 185/6
185/11 186/3 186/9
186/15 187/21 187/24
187/25 187/25 188/3
188/5 188/6 188/9
188/9 188/11 188/17
188/18 188/18 189/6
189/10 189/15 189/18
189/23 190/6 190/6
190/8 190/9 190/23
191/1 191/2 191/4
191/5 191/13 192/7
192/11 192/23 192/24
193/3 194/14 194/20
195/24 195/25 196/5
196/11 198/10 199/8
201/18 201/20 202/6
202/7 202/10 202/13
202/19 202/22 203/5
203/10 203/13 203/14
204/11 204/18 205/4
205/17 205/20 205/22
208/23 210/6 212/10
212/16 216/7 217/9
217/12 220/3 220/7
**royalty-rate [4]** 187/21
188/6 202/6 217/9
**royalty/license [1]**
199/8
**RPR [1]** 1/23
**rule [19]** 8/13 49/8
82/18 98/8 101/12
101/13 101/13 114/6
118/21 124/22 124/23
124/25 146/19 147/5
177/17 177/19 178/15
179/3 196/6
**Rule 26 [2]** 177/17
177/19
**Rule 402 [1]** 196/6
**Rule 702 [4]** 101/12

**R**

Rule 702... [3]  101/13
  101/13 118/21
ruled [5]  124/3 124/5
  124/6 124/7 215/16
rules [2]  8/10 8/11
ruling [11]  48/21
  105/10 123/16 123/25
  124/1 124/2 124/11
  124/13 124/14 211/16
  216/1
rulings [1]  201/12
rumblings [1]  193/13
run [2]  88/15 120/11
running [1]  12/24
Russell [1]  59/17

**S**

said [71]  6/17 6/19
  6/21 11/4 11/15 12/5
  12/11 15/18 16/19
  18/11 19/13 19/20
  22/7 28/5 28/12 30/24
  31/6 31/11 33/4 35/8
  35/9 37/10 41/17 45/6
  45/11 45/16 46/25
  48/5 59/11 60/24
  63/20 84/1 87/25
  99/25 99/25 100/4
  102/4 103/21 104/8
  109/1 110/21 112/12
  117/3 118/11 119/23
  120/3 122/2 134/1
  134/21 136/6 138/8
  142/18 142/18 155/2
  155/2 155/4 157/5
  177/2 178/8 179/20
  181/11 182/10 187/7
  191/12 197/19 202/8
  205/7 207/6 210/14
  215/10 216/11
sake [1]  143/5
sale [17]  22/8 23/20
  32/3 55/12 162/7
  163/8 165/9 165/10
  165/14 165/23 172/2
  172/18 174/23 175/2
  175/4 175/19 176/9
sales [107]  17/12
  19/15 25/16 33/20
  33/22 48/14 55/1
  58/20 61/23 62/1
  67/12 68/10 75/18
  80/17 80/19 81/1 81/9
  81/10 81/24 95/5 95/7
  95/16 109/24 110/1
  110/2 110/5 112/2
  133/15 133/18 142/3
  145/6 145/17 148/12
  149/7 149/16 149/19
  150/5 150/11 150/19

150/20 150/21 151/9
  152/2 152/3 152/5
  152/14 153/12 153/20
  156/5 156/19 157/24
  158/21 159/5 159/7
  159/10 159/16 159/20
  159/20 160/3 160/5
  161/13 162/6 164/12
  165/20 166/4 166/14
  166/24 167/8 168/4
  168/6 168/13 170/22
  172/1 172/21 173/9
  184/23 184/24 185/2
  185/14 186/5 186/11
  188/5 188/5 188/6
  189/6 189/10 189/10
  189/11 189/22 189/24
  190/4 190/8 191/1
  192/15 192/18 196/25
  197/1 197/1 197/3
  213/19 214/21 214/23
  214/25 215/1 215/4
  215/13 215/14
salespeople [1]
  172/23
salivating [1]  40/4
Sam [3]  8/2 8/3 39/2
same [38]  8/14 30/8
  34/18 34/19 64/19
  66/9 67/17 71/24
  72/21 78/7 83/20 89/1
  92/10 105/4 105/5
  109/3 110/2 114/7
  116/14 116/15 116/16
  124/10 124/10 124/11
  126/20 129/3 141/9
  153/14 153/16 153/18
  176/18 180/11 188/13
  194/6 208/21 210/17
  215/14 215/14
samples [1]  91/4
sampling [2]  171/9
  171/13
San [1]  79/4
San Diego [1]  79/4
sanity [17]  182/19
  182/20 183/1 183/4
  183/8 183/12 183/17
  183/19 183/23 183/24
  184/25 185/15 188/12
  188/13 188/15 189/17
  190/22
sanity-check [1]
  183/8
Santa [1]  2/12
save [5]  104/12
  104/17 136/23 137/1
  137/6
saw [2]  45/15 94/24
say [102]  6/9 6/16
  6/24 7/24 8/21 9/22
  10/17 10/18 12/23

13/24 15/9 18/16
  21/13 23/19 30/3 30/4
  30/4 30/4 30/5 31/6
  33/12 33/19 36/4
  39/18 41/4 42/11
  42/20 43/4 43/6 43/10
  50/21 52/6 52/16 53/3
  53/12 55/6 56/1 72/2
  73/11 76/20 77/3
  81/23 83/4 83/18 88/4
  88/11 88/14 88/23
  91/25 91/25 92/4 92/5
  92/24 93/4 96/25
  102/3 102/16 102/20
  103/8 105/17 106/5
  106/15 107/20 109/13
  109/21 110/8 112/8
  113/21 113/23 118/5
  119/16 119/21 121/2
  121/22 121/23 122/14
  125/9 125/17 132/15
  135/22 137/13 145/5
  145/10 146/17 151/15
  156/3 156/10 168/8
  173/9 174/2 189/11
  198/21 199/22 201/6
  201/18 202/2 202/11
  204/21 209/10 211/6
  211/8 216/25
saying [113]  7/19 8/11
  9/1 10/25 13/25 14/14
  14/15 15/23 18/18
  18/20 18/22 19/2 21/1
  27/10 28/4 31/1 34/14
  36/24 37/14 39/16
  41/4 41/19 42/5 42/7
  43/19 47/6 47/7 47/9
  48/15 49/9 49/12
  49/13 49/21 51/15
  52/10 52/11 54/13
  55/8 55/16 69/2 71/4
  76/16 78/11 83/8
  86/14 88/18 89/18
  89/21 90/6 90/19 92/4
  92/6 93/5 101/8
  101/15 101/20 101/25
  102/3 102/11 104/2
  107/5 107/14 107/18
  112/13 112/14 113/10
  114/3 114/5 114/7
  115/1 116/10 119/11
  121/6 121/6 121/12
  124/3 124/11 124/16
  125/2 135/21 143/10
  143/24 144/8 144/15
  145/2 145/3 145/16
  145/19 145/21 145/23
  167/15 170/20 173/10
  173/14 173/15 173/16
  174/1 174/22 175/21
  176/11 176/23 177/18
  190/3 192/11 200/6

200/12 205/4 209/19
  211/7 211/10 214/7
  217/2 217/4
says [40]  11/2 31/5
  31/25 35/13 37/3
  37/23 37/24 37/24
  38/1 39/10 46/5 47/19
  48/7 51/19 53/4 54/5
  66/1 66/1 70/5 70/6
  112/9 118/20 120/13
  122/7 129/6 133/13
  138/4 165/19 173/8
  176/1 176/2 176/5
  196/24 199/5 208/23
  212/21 213/16 214/6
  217/17 217/18
schedule [1]  211/2
Schlitz [1]  120/10
school [1]  8/23
Schwarts [1]  59/18
sciences [1]  7/15
scientific [2]  51/20
  53/9
scientifically [1]
  154/7
scope [1]  195/2
scored [1]  96/25
scores [1]  109/16
scoring [1]  96/25
scramble [2]  73/13
  73/14
scrambled [1]  199/11
scrambling [1]  73/12
scratch [1]  7/4
screen [2]  44/5
  151/22
script [1]  10/22
search [1]  17/24
searching [1]  6/19
second [27]  29/7 39/3
  61/24 62/23 66/23
  69/25 74/12 79/3 88/9
  88/12 91/14 93/11
  95/10 105/18 115/2
  125/10 185/23 187/14
  195/4 195/14 199/6
  202/21 202/23 204/16
  211/9 211/24 212/3
secondary [3]  86/12
  86/14 203/11
secondly [2]  26/6
  56/15 86/13 106/13
  170/21 188/8
secretary [2]  6/17
  116/7
section [7]  10/21
  51/19 118/21 164/9
  171/10 210/25 221/3
securing [1]  27/25
see [43]  9/3 11/10
  20/15 28/6 39/6 45/25
  51/7 64/7 65/21 66/24

67/8 68/20 76/2 76/15
  78/19 79/9 82/14
  87/16 94/2 94/7 95/8
  108/16 122/1 128/9
  138/12 142/1 149/21
  150/8 150/8 152/8
  152/21 154/17 156/10
  163/16 167/8 170/14
  171/6 176/19 179/7
  196/17 201/21 206/9
  220/18
seeing [1]  199/16
seek [4]  25/19 199/2
  217/6 217/6
seem [4]  10/12 16/7
  83/7 174/13
seemingly [2]  119/18
  207/20
seems [5]  34/2 42/3
  89/17 107/8 112/6
seen [10]  6/22 17/1
  91/3 92/21 114/14
  128/6 167/2 188/16
  189/3 218/17
sees [1]  93/18
segment [2]  72/1 72/2
segmented [1]  15/12
segue [1]  94/8
segueing [1]  71/19
selecting [1]  126/15
self [1]  43/21
self-discipline [1]
  43/21
sell [6]  26/23 123/9
  148/17 149/25 151/11
  152/10
selling [3]  35/14
  103/22 193/12
send [4]  104/6 104/8
  131/14 217/15
SENIOR [1]  1/5
senior's [1]  213/18
sense [18]  21/13 34/8
  36/2 37/22 47/21
  52/11 77/7 91/16
  91/21 106/7 140/14
  156/23 177/24 199/17
  199/20 202/17 204/18
  204/22
sent [3]  20/25 45/8
  103/7
sentence [4]  32/11
  32/12 163/18 164/8
separate [3]  20/3
  50/22 217/25
separately [3]  53/1
  180/22 217/25
SEPTEMBER [1]
  221/10
sequential [1]  66/2
serial [1]  15/12
serve [1]  62/4
serves [2]  99/5 185/15

**S**

service [1] 6/9
services [3] 39/18
39/18 86/18
session [1] 119/15
set [4] 17/20 178/21
178/22 178/24
settled [2] 135/4
135/12
settlement [4] 42/5
42/6 42/7 42/9
seven [4] 75/22 129/7
150/24 214/23
several [6] 14/24
14/25 61/22 114/19
115/24 180/3
shake [1] 122/5
shaking [2] 35/10
66/13
SharASale [1] 160/16
share [8] 32/16 50/17
165/23 174/23 175/2
175/4 175/19 176/9
ShareASale [24]
160/14 160/25 163/5
163/16 163/20 163/20
163/23 165/18 165/20
167/10 167/17 168/1
168/12 169/15 169/25
170/9 170/17 171/3
171/24 173/1 173/24
174/2 174/24 175/20
shares [1] 140/10
sharing [1] 140/11
sheet [1] 118/7
sheets [3] 150/19
153/21 156/19
shifting [1] 14/24
shoot [1] 213/23
shops [1] 148/13
short [3] 152/24
174/16 177/6
shortcutting [1] 93/11
shortly [1] 218/18
shot [7] 8/10 33/24
180/16 180/19 180/19
180/23 200/12
should [45] 22/19
23/7 24/14 41/24
41/24 42/10 42/14
63/3 80/8 105/2
106/19 107/23 110/4
117/8 143/11 143/18
143/19 144/9 144/10
144/16 144/16 144/17
145/6 145/11 145/12
145/19 152/10 167/15
167/16 167/21 168/15
174/1 176/23 178/2
178/20 179/10 189/24
196/8 197/14 198/9

201/8 202/3 205/4
207/5 215/19
shouldn't [6] 8/12
33/19 179/11 198/11
198/13 212/14
show [8] 27/25 130/6
160/3 175/2 179/22
179/23 207/14 207/16
show's [1] 120/7
showing [1] 111/17
shown [4] 38/14
111/7 111/11 127/12
side [9] 7/12 8/11 13/6
40/16 42/8 42/9 122/2
122/4 149/2
sides [8] 37/21 42/22
49/22 122/1 122/1
203/20 220/15 220/19
sigh [2] 49/7 49/8
sight [2] 149/22
157/16
sign [1] 143/16
significantly [1] 191/4
signify [1] 109/13
Silence [1] 45/17
similar [7] 77/13 78/9
110/16 149/12 159/4
168/4 189/5
Similarly [1] 45/8
simple [9] 28/11 37/4
38/5 38/11 43/8 49/16
80/23 183/20 209/22
simpler [1] 20/21
simplicity [1] 15/21
simplify [2] 10/16
18/24
simplistic [1] 81/3
simplistically [2]
39/16 80/25
simply [3] 46/18
106/11 195/25
since [9] 27/10 27/10
28/7 28/8 35/5 108/12
158/3 196/2 210/20
sincerely [2] 43/25
48/1
single [3] 80/24
128/14 150/10
sir [35] 34/21 57/11
57/15 57/16 58/1 59/2
59/13 60/8 61/19 66/5
67/5 70/12 70/20
73/20 86/10 88/21
103/3 104/1 106/4
106/6 108/4 108/22
109/5 111/9 140/7
163/17 163/24 165/7
166/17 167/4 171/12
189/4 189/13 193/7
195/17
sit [8] 12/12 36/19
40/21 57/18 72/14

106/15 166/1 194/22
site [3] 91/11 133/20
161/3
sites [8] 130/22
136/15 136/16 139/19
140/6 140/20 141/17
160/20
sitting [9] 6/12 8/1
34/20 37/16 41/4
41/12 43/11 57/21
146/2
situation [5] 63/9
79/21 98/22 157/18
193/5
six [12] 7/5 75/22
129/7 129/8 129/10
138/13 174/7 174/10
174/11 175/15 176/19
180/7
sixth [1] 172/9
size [2] 172/9 215/14
skill [1] 51/10
Skills [1] 79/5
skin [1] 71/3
skunk [1] 218/8
sky [1] 123/18
sleeves [2] 42/6 42/6
Slow [1] 85/3 209/12
small [2] 11/1 148/13
smaller [1] 128/7
smart [1] 37/15
smile [1] 73/11
smiling [2] 31/5 31/6
Smith [2] 59/16 59/17
smoke [2] 134/13
134/17
smokes [1] 123/1
smooth [1] 91/8
smoother [1] 127/24
Snakes [1] 218/21
Snapchat [3] 130/1
140/3 142/3
sneak [2] 212/17
216/7
so-called [6] 58/25
64/24 80/17 98/8
182/19 188/12
social [24] 86/19
110/9 129/25 130/9
139/14 139/14 141/17
142/8 142/11 142/16
142/21 142/22 143/3
144/12 147/10 160/20
160/22 161/7 161/7
161/10 161/10 175/8
175/15 176/3
sold [19] 17/14 20/24
21/2 22/13 23/6 23/10
25/14 29/22 30/1 30/9
30/16 39/8 155/12
155/13 158/7 166/20
166/21 167/19 196/4

some [82] 6/15 7/1
7/24 8/10 8/24 19/17
19/22 20/18 23/3 36/7
36/16 40/21 43/19
43/20 46/16 47/15
48/10 50/1 53/19
63/16 72/15 72/18
87/25 93/18 93/19
93/19 100/14 106/23
111/12 112/11 112/20
118/19 120/20 120/21
121/3 121/18 122/8
122/11 122/11 122/21
125/11 126/21 130/22
133/20 134/21 137/7
137/7 141/19 145/12
145/18 146/6 154/18
155/17 155/17 160/20
162/14 163/21 163/22
163/25 165/8 167/3
168/15 170/23 170/24
174/6 177/23 181/8
181/23 182/4 182/5
182/22 188/8 188/16
191/18 192/2 193/13
193/14 198/23 200/22
207/20 218/24 218/24
somebody [6] 7/17
114/25 120/25 123/1
161/23 162/15
somebody's [1] 14/19
somehow [4] 82/17
167/21 168/14 196/7
someone [7] 133/19
140/22 146/25 147/2
155/2 155/7 175/4
someone's [1] 172/13
something [36] 7/21
12/24 23/5 36/12 39/4
39/8 46/6 61/13 70/23
79/11 92/13 104/1
105/14 105/17 111/25
112/3 112/12 113/1
115/2 124/15 129/23
133/13 136/7 138/25
140/23 141/14 142/18
144/25 175/3 183/3
194/22 199/12 199/18
203/23 203/25 218/23
sometimes [2] 7/15
31/5
somewhere [4] 74/8
174/25 175/5 176/22
son [2] 37/14 37/14
sorry [33] 31/21 52/23
74/10 85/4 91/10 92/7
92/20 99/18 103/3
111/14 111/19 128/15
133/10 136/25 137/21
138/23 140/7 171/12
174/9 175/23 179/23
190/17 192/12 194/12

195/6 209/13 213/13
213/19 214/24 215/2
215/2 215/2 220/16
sort [6] 81/10 101/22
163/21 163/22 168/15
176/24
sorts [2] 19/24 34/17
sounds [2] 138/16
164/5
source [2] 82/7
155/21
sources [5] 132/5
132/6 132/8 132/18
132/20
sourcing [1] 127/14
South [1] 2/17
Southern [1] 12/7
space [1] 162/19
Spanish [1] 11/17
Spark [1] 134/23
speak [11] 12/16 16/1
58/17 81/20 87/7
103/2 171/11 182/25
184/9 188/24 212/1
speaking [3] 15/3
80/25 85/7
specialized [1] 51/21
specific [4] 40/1 70/16
114/8 140/4
specifically [5] 134/11
140/13 155/1 163/13
169/16
specifics [1] 102/17
specter [1] 96/1
speculation [1] 147/3
Spelled [2] 7/8 47/4
spend [3] 28/19 28/20
82/16
spending [1] 122/22
sphere [3] 129/22
130/12 163/3
spiff [1] 53/3
Spin [1] 197/5
spoke [1] 33/24
sponsored [4] 176/6
176/9 176/10 176/11
spontaneity [3]
114/23 114/24 114/24
spot [3] 85/13 91/7
130/4
spread [4] 131/17
150/19 153/21 156/19
spreading [1] 86/25
springboard [1]
120/22
stage [2] 47/19 122/16
stand [6] 57/8 107/19
114/17 114/23 177/16
194/23 202/1
standard [3] 146/2
172/8 188/13
standing [1] 66/3

## S

standpoint [2] 83/1 107/9
stars [2] 71/21 71/22
start [24] 9/8 19/25 21/16 21/20 22/5 24/18 27/16 28/10 36/25 37/1 37/18 37/19 39/3 39/5 39/19 47/1 83/8 84/13 84/14 84/14 96/12 197/2 197/24 208/15
started [5] 9/5 61/5 64/12 182/9 201/15
starters [3] 38/2 38/2 44/15
starting [7] 21/9 68/11 68/14 68/22 83/23 96/13 128/9
starts [2] 9/10 46/6
state [7] 5/6 8/22 13/17 35/6 77/14 77/25 78/1
stated [3] 53/1 89/12 202/18
statement [9] 29/16 29/17 37/5 37/5 37/14 38/4 183/13 194/10 209/3
statements [2] 129/5 190/11
states [6] 1/1 1/23 35/5 51/9 221/4 221/8
static [1] 137/21
statistics [1] 162/9
stature [1] 162/5
status [1] 60/18
statute [2] 10/20 104/7
STEAM [10] 1/11 5/5 148/9 150/19 214/14 214/15 214/17 214/18 214/18 215/6
stenographically [1] 221/5
step [9] 9/22 30/19 41/3 58/8 88/11 88/14 91/14 93/20 195/15
steps [1] 61/22
steroids [1] 48/18
still [13] 18/9 26/4 43/20 57/23 75/5 83/5 162/1 165/15 168/14 168/21 175/6 175/7 218/3
stilted [2] 8/9 37/10
stinking [1] 89/17
stipulate [11] 21/1 22/14 22/15 23/8 23/12 23/15 24/3 29/15 29/22 30/8

stipulated [2] 29/9 214/14
stipulating [1] 29/11
stipulation [6] 20/25 20/25 28/24 29/4 30/10 198/25
stipulations [4] 45/6 45/9 143/8 203/21
stole [1] 37/22
stop [5] 36/20 54/10 60/6 80/8 198/18
story [3] 11/22 78/22 180/7
straightforward [1] 49/16
strategies [3] 139/10 139/14 160/23
strategy [8] 139/15 142/17 143/3 144/12 147/10 175/9 175/15 176/3
strawberry [1] 85/15
streamline [1] 161/19
street [8] 1/24 2/12 3/4 3/8 3/12 3/16 21/13 89/17
strength [5] 107/25 108/5 109/17 154/12 157/7
stretch [1] 19/6
strictly [1] 185/4
strike [1] 183/17
strikes [1] 41/12
strong [11] 87/1 134/5 149/16 151/9 155/3 155/3 157/16 157/20 157/22 158/2 158/8
strongly [1] 37/20
struggling [2] 128/12 182/14
Stubbs [1] 2/11
stubbsalderton.com [1] 2/14
stuff [17] 43/11 45/17 63/16 82/22 82/23 123/19 134/12 134/13 165/8 173/7 173/23 176/25 177/11 180/21 193/12 193/21 209/9
subdistributor [1] 152/20
subdistributors [5] 148/21 153/5 153/13 155/24 156/11
subject [9] 27/15 30/8 88/6 88/8 98/20 102/19 105/11 178/5 191/9
subjected [1] 53/13
subjective [2] 106/14 109/21

subjectively [1] 109/16
submit [2] 17/13 169/3
submittal [1] 135/3
submitted [5] 77/19 109/20 153/21 162/14 162/15
Subpart [1] 118/20
subscribe [1] 121/15
subsection [1] 52/2
subsequent [4] 95/21 149/19 149/22 157/15
subsequently [1] 130/5
substantial [1] 150/7
substantive [1] 24/7
success [2] 61/16 149/23
successful [4] 39/4 75/18 95/15 95/21
successfully [1] 171/3
succinct [1] 64/10
such [21] 8/20 14/16 17/1 36/21 39/20 50/24 55/10 75/20 99/21 120/18 148/4 148/14 151/9 152/9 157/19 157/22 162/19 170/24 173/24 184/13 199/8
sue [1] 214/7
sufficient [2] 52/12 119/1
suggest [7] 36/5 95/17 95/18 107/8 157/19 196/8 220/5
suggested [3] 174/6 174/13 182/21
suggesting [9] 76/12 100/8 101/21 107/8 107/9 112/21 175/18 199/9 209/18
suggestion [4] 115/17 115/18 182/24 208/3
suggests [2] 120/20 173/25
Suite [7] 2/7 2/12 2/17 3/4 3/8 3/12 3/16
sum [2] 11/14 173/18
summarize [1] 170/2
summarized [1] 205/24
summary [11] 9/25 10/10 17/7 17/8 17/9 17/13 17/24 114/4 145/22 196/2 208/16
sun [2] 39/23 39/24
Sunset [2] 2/7 219/10 219/11
Supp [1] 197/5

supplement [2] 70/4 135/7
supplemental [24] 26/4 30/12 64/5 64/17 64/17 65/24 66/21 67/4 129/23 130/20 137/10 138/14 138/15 138/19 152/16 156/4 163/13 180/8 180/9 185/13 187/12 187/16 196/18 214/25
supplied [3] 166/23 190/11 190/12
suppliers [1] 80/22
support [6] 32/17 94/13 110/21 138/1 158/10 181/23
supporting [4] 53/15 53/18 55/25 94/12
suppose [5] 12/22 105/2 117/6 200/24 201/4
supposed [2] 177/17 197/23
Supreme [1] 53/4
sure [28] 8/2 10/19 12/23 34/25 48/12 53/20 64/25 88/12 100/2 103/7 103/14 115/9 137/16 141/16 143/2 143/7 143/17 144/7 144/11 151/6 151/19 181/2 187/7 188/3 198/20 200/7 211/15 215/23
surgeon [2] 116/2 116/3
surprised [1] 108/3
surprising [1] 101/16
survey [20] 60/3 60/5 60/7 77/4 77/4 77/7 89/16 89/17 89/19 89/20 89/23 90/7 90/11 104/8 106/21 106/22 106/25 153/23 153/25 154/8
surveyed [1] 154/1
surveying [1] 89/23
suspect [2] 116/21 122/14
swallowing [1] 16/10
swear [1] 8/5
swell [1] 45/1
swing [2] 81/7 81/9
sworn [3] 57/8 57/14 58/11
symbol [1] 111/17
synthesizes [1] 93/17
system [7] 7/24 65/13 66/13 91/13 91/14 92/16 96/25
systemically [2] 43/12

49/6

## T

table [18] 12/12 12/13 57/19 57/22 57/23 57/24 63/25 70/2 70/3 75/3 126/3 142/25 143/1 144/7 144/11 144/21 144/24 145/16
tack [1] 72/24
tacked [1] 167/19
taken [7] 9/15 27/12 44/12 110/14 113/24 152/6 187/22
takes [2] 93/16 93/23
taking [15] 9/9 9/16 9/18 9/18 9/19 9/8 35/16 47/23 49/22 98/15 99/8 113/21 124/20 178/13 189/8
talk [33] 21/13 24/17 37/17 43/24 44/14 85/24 87/5 89/17 109/14 112/3 112/16 113/1 115/20 115/22 115/24 134/10 142/22 152/23 152/25 153/3 153/5 153/7 153/9 153/22 161/9 161/9 179/11 179/21 180/21 195/24 199/18 201/7 219/15
talked [24] 6/16 11/13 33/7 35/23 36/2 54/18 69/4 69/17 69/20 102/23 108/25 118/17 119/15 134/12 139/13 153/25 154/18 159/12 159/16 168/9 168/10 175/12 197/20 204/14
talking [44] 8/16 12/13 15/15 15/16 19/6 20/2 20/8 20/9 23/5 31/14 38/25 39/15 44/19 46/6 47/5 48/17 50/1 53/25 54/2 59/9 85/6 85/7 96/8 96/17 104/21 106/12 112/12 112/23 116/14 118/23 125/7 134/1 137/11 144/24 161/11 163/15 181/24 187/13 203/6 207/2 207/2 212/8 215/1 215/8
talks [1] 162/2
tantamount [1] 90/11
targeted [1] 128/10
task [3] 8/17 19/8 27/9
taught [2] 8/21 8/23
Tech [1] 134/23
technical [3] 51/21 66/24 77/7

Case 5:15-cv-01586-WDK-KK   Document 315   Filed 09/30/17   Page 252 of 257   Page ID
#:35481
{PLAINTIFF} v.
{DEFENDANT}
{WITNESS NAME}
{DATE}

**T**

**technique [2]** 53/8
109/14
**techniques [2]** 60/3
60/5
**television [1]** 22/25
**tell [28]** 7/10 11/21
12/15 31/22 34/1 35/2
35/16 37/23 38/9
38/19 38/23 42/7
49/23 50/5 76/17 85/5
91/21 103/22 108/15
118/9 167/18 167/18
177/9 184/3 200/11
200/13 201/10 202/4
**Tellez [16]** 11/17
11/17 11/18 11/18
11/19 11/20 12/2 12/2
12/6 12/18 13/13
13/14 13/15 14/9
15/11 95/2
**telling [19]** 8/17 19/3
21/10 40/4 40/14
40/15 41/11 56/3 57/3
57/4 73/7 87/5 87/22
111/5 120/23 121/4
123/22 162/16 167/18
**tells [3]** 50/22 62/2
186/15
**temerity [2]** 17/1 40/6
**ten [80]** 50/10 54/7
54/7 67/12 67/25 68/1
68/2 69/2 69/3 69/7
69/11 69/12 69/14
69/18 69/19 70/25
71/10 71/20 72/4
72/18 72/20 72/22
73/7 83/22 89/2 89/5
89/7 89/8 99/15 99/16
104/24 105/16 113/23
125/18 125/20 143/6
143/12 143/16 143/19
144/10 144/13 144/14
144/18 145/6 145/9
145/10 145/11 145/20
163/1 168/11 168/15
168/16 168/20 173/13
185/10 185/10 185/20
185/21 186/23 186/24
187/1 187/3 187/23
189/8 189/19 189/19
190/24 190/25 192/7
196/11 196/12 196/17
196/21 196/24 197/16
198/6 198/7 198/11
203/2 212/12
**tend [4]** 24/18 83/4
85/6 95/25
**tends [1]** 202/25
**tens [3]** 82/2 156/24
165/17

**tent [1]** 88/24
**term [12]** 40/17 43/5
49/18 50/19 54/23
62/15 68/23 82/25
82/25 86/13 119/2
119/20
**termed [1]** 183/11
**terminology [1]** 22/11
**terms [15]** 20/8 68/7
68/17 69/9 75/14
127/19 127/19 128/21
146/2 149/3 157/13
168/19 170/6 179/14
183/20
**test [4]** 48/13 108/14
165/19 177/19
**tested [1]** 53/21
**testified [10]** 58/11
64/23 77/13 93/14
139/13 147/12 150/14
171/4 177/12 219/20
**testify [17]** 50/24
51/11 51/11 56/24
74/7 95/2 107/20
135/2 135/6 135/13
135/23 179/1 179/10
195/21 198/9 198/14
204/3
**testifying [4]** 57/20
70/10 78/7 124/3
**testimony [52]** 48/20
50/13 52/3 52/12
52/14 53/25 59/8
63/12 76/2 77/19
83/19 88/6 88/8 88/9
88/10 92/9 108/1
114/20 119/1 123/10
123/11 129/2 138/3
151/7 151/8 151/13
151/16 152/1 169/25
170/8 170/12 171/7
173/18 173/21 175/2
177/8 177/16 177/20
180/16 180/20 181/6
182/17 190/10 192/6
196/13 196/14 198/5
199/10 206/18 213/2
220/3 220/7
**tests [1]** 162/3
**thank [20]** 13/16
13/23 24/11 24/20
30/14 50/10 57/17
69/24 73/16 85/8
88/22 119/25 125/24
128/24 139/12 145/24
147/19 195/17 220/15
220/20
**Thanks [1]** 175/24
**that I [1]** 162/9
**that's [205]** 6/21 10/2
10/3 10/6 10/7 10/7
12/25 14/21 15/3

16/20 16/21 16/22
18/17 19/1 19/16
19/21 20/2 20/3 20/5
20/11 21/14 21/19
22/13 22/16 22/16
22/20 23/9 25/8 25/19
25/22 26/11 26/15
27/14 27/16 27/19
27/20 27/23 28/11
28/18 30/22 30/24
32/25 33/2 33/2 34/25
34/25 39/9 39/25 41/8
42/1 46/8 46/17 46/19
46/23 49/9 50/7 55/10
55/16 56/17 56/24
57/3 57/4 60/6 64/8
66/21 69/7 69/13
69/16 69/21 70/24
71/1 71/18 72/6 72/23
73/7 78/19 80/4 80/21
81/6 82/22 82/23 83/2
83/9 83/12 83/15
83/19 85/22 86/13
86/23 87/9 89/1 89/24
92/15 93/2 93/21 94/2
96/5 96/10 96/17 97/7
99/16 99/24 100/3
100/4 100/5 100/6
105/9 107/13 107/13
107/17 107/20 108/21
109/18 111/22 112/11
113/9 113/14 114/1
114/4 114/7 116/23
118/9 119/10 119/16
121/11 121/12 123/20
124/11 124/24 125/22
126/6 126/21 133/15
133/16 138/1 141/14
144/3 144/4 144/21
145/3 145/12 145/21
145/22 147/11 160/9
163/5 163/21 163/22
165/4 165/5 166/2
167/6 167/21 172/5
173/2 173/16 173/18
173/19 173/21 174/3
176/10 176/20 177/15
179/17 180/5 180/19
180/21 184/21 186/13
188/7 189/3 190/5
191/10 192/9 193/25
194/22 197/23 198/2
199/10 200/2 200/10
201/23 203/5 203/24
203/25 205/3 205/5
205/7 205/12 205/22
209/2 210/8 211/19
212/8 214/11 215/22
216/3 216/6 217/6
217/12 218/2 218/2
218/6 218/13 219/3
**thee [4]** 8/9 43/13

113/13 121/21
**their [84]** 7/20 18/18
23/13 23/22 25/1 25/3
25/22 28/2 29/7 32/20
37/18 46/17 75/14
77/8 87/1 87/2 95/9
96/14 97/8 104/6
104/9 104/9 104/11
106/22 106/23 107/1
110/6 114/2 122/3
122/16 122/17 127/10
128/1 129/21 129/21
129/24 129/25 130/5
130/7 130/12 131/14
133/20 133/24 135/19
139/18 139/24 140/22
140/23 141/16 141/17
142/11 142/11 142/22
148/24 151/12 155/18
155/20 157/1 157/2
157/24 161/10 161/10
161/10 161/21 162/2
162/11 163/3 163/7
163/7 170/5 172/3
172/6 186/18 192/15
192/18 193/12 194/17
194/21 205/5 206/22
207/19 210/12 210/13
214/13
**them [92]** 8/12 8/13
25/21 37/11 38/5
38/20 38/22 41/15
41/15 42/16 42/17
42/17 42/20 42/23
42/24 44/24 45/24
52/1 52/1 52/17 57/8
58/3 64/1 64/1 69/6
71/10 71/22 72/4
72/16 72/19 73/4 74/8
75/16 76/22 87/5
90/25 93/20 103/23
103/23 103/24 104/6
104/12 105/15 107/21
113/22 114/22 114/25
116/3 116/4 116/6
122/15 123/4 123/5
124/9 124/15 125/3
126/2 129/20 130/22
131/14 131/15 132/9
133/3 134/17 134/17
141/10 141/15 151/10
151/11 152/10 154/11
155/19 156/1 156/12
157/16 161/20 162/12
162/18 163/4 169/4
170/22 179/17 181/20
181/21 200/18 200/25
201/1 201/2 210/12
210/14 215/12 215/23
**theme [1]** 127/20
**themselves [3]** 33/13
123/7 180/18

**theoretically [2]** 63/9
114/19
**theories [4]** 7/6 34/13
207/18 212/24
**theory [84]** 9/6 9/6
16/20 17/7 17/22 18/7
18/10 18/12 19/9 22/6
25/7 26/21 26/24 28/8
28/10 28/16 28/22
29/15 29/15 29/18
29/18 30/1 31/12
36/25 37/3 37/3 37/25
37/25 38/1 41/5 53/8
53/19 116/8 190/13
196/3 199/3 199/6
205/14 205/19 206/4
206/12 206/13 206/15
206/16 206/17 206/24
207/1 207/3 207/16
208/13 209/16 209/25
210/6 210/7 210/11
210/11 210/15 210/16
210/21 211/3 211/11
211/14 211/17 211/22
212/5 212/16 212/17
212/20 212/22 213/1
213/8 213/14 214/4
215/11 215/17 216/8
216/9 216/21 216/23
216/24 217/8 217/9
217/12 217/12
**thereafter [1]** 119/6
**thereby [1]** 186/16
**therefore [8]** 119/24
142/14 145/17 148/18
149/24 156/6 158/1
196/6
**therewith [1]** 207/19
**these [104]** 8/1 8/23
9/17 15/17 27/15 37/2
40/10 40/12 40/19
42/21 42/22 53/7
53/23 54/20 58/16
63/21 67/11 69/4 69/5
69/12 70/24 71/3 72/7
75/12 75/14 77/12
80/13 80/17 84/9
84/20 85/10 87/3
87/25 90/10 90/11
90/22 91/7 92/3 93/19
93/25 94/3 95/2 97/25
100/15 103/20 104/22
105/8 105/22 106/7
106/8 106/9 106/10
106/13 106/16 110/12
110/17 113/18 113/21
116/15 118/16 118/17
119/24 119/25 122/9
122/11 122/12 123/1
124/21 127/21 130/5
131/5 131/10 131/13
131/22 133/13 134/16

(31) technique - these

Case 5:15-cv-01586-WDK-KK   Document 315   Filed 09/30/17   Page 253 of 257   Page ID
#:35482

{PLAINTIFF}
{DEFENDANT}

{WITNESSNAME}
{DATE}

**T**

**these... [28]** 136/15
138/18 140/6 145/15
145/17 145/19 154/5
156/10 164/10 165/17
166/25 170/9 176/5
176/13 176/14 178/3
178/5 179/8 179/16
180/10 182/13 190/2
190/18 197/19 204/11
210/18 214/22 215/13
**they'd [1]** 103/16
**they've [5]** 23/14
42/25 42/25 53/6
176/10
**thin [4]** 72/5 76/16
197/17 203/3
**thing [53]** 15/8 15/9
19/24 26/17 26/18
27/1 31/18 34/1 36/13
37/16 41/25 44/12
45/22 46/4 47/2 49/3
54/9 55/7 56/2 71/2
71/24 81/10 88/2
92/10 98/6 112/17
114/7 115/12 115/25
116/15 121/25 131/10
145/18 157/20 164/20
166/2 166/14 170/24
172/1 176/18 179/2
188/13 199/8 201/4
201/14 202/22 208/12
208/15 209/14 210/17
211/1 211/24 216/16
**things [31]** 9/9 10/10
11/2 15/5 15/12 18/25
19/17 20/20 23/4 23/9
37/2 53/7 80/21 81/3
87/25 107/22 109/5
110/12 115/24 121/17
133/22 135/23 146/25
162/21 172/5 179/16
179/22 182/5 188/7
188/19 214/8
**think [179]** 6/15 7/5
7/24 9/7 11/5 12/9
13/2 21/15 23/22 24/6
24/13 25/15 26/12
26/19 26/20 27/3 27/8
33/2 34/11 35/1 35/18
36/21 38/17 38/17
38/18 38/18 43/17
43/18 44/9 44/16
44/20 44/23 46/9
47/13 48/8 48/25 50/1
50/4 51/3 51/6 52/6
52/7 52/7 52/19 53/14
53/15 53/16 53/17
54/9 54/10 54/10
54/11 54/12 54/12
54/13 54/23 55/2 55/5

60/20 66/18 70/22
71/19 72/8 74/21
79/23 79/23 80/11
81/4 84/12 87/22
87/23 89/22 90/18
91/13 91/25 94/8
97/15 98/15 99/20
101/12 101/14 101/18
102/4 102/5 102/14
102/16 103/18 103/18
103/25 104/2 104/25
104/25 105/1 105/4
110/23 111/2 112/25
113/16 114/13 115/4
115/7 116/6 116/11
116/13 116/13 116/21
116/23 121/13 122/6
122/9 122/19 123/3
123/24 123/24 129/2
129/22 136/6 142/4
142/5 144/21 145/8
145/22 145/22 146/20
147/5 150/23 151/16
152/1 153/25 158/10
159/11 162/14 174/25
175/1 175/10 177/1
178/2 178/9 181/3
181/4 181/7 182/22
187/13 191/13 192/6
192/20 194/5 194/5
199/12 199/19 199/22
200/4 200/15 200/19
200/21 201/24 203/7
203/7 204/13 206/14
206/15 206/20 206/22
206/25 206/25 207/5
207/7 207/9 207/15
209/5 209/10 209/16
210/22 211/13 215/16
218/25 219/16 219/18
219/20
**think it's [1]** 206/25
**think's [1]** 115/7
**thinking [10]** 39/2
39/3 59/25 85/7
100/25 102/10 170/6
181/24 200/8 213/12
**third [3]** 163/21
163/22 176/23
**third-party [1]** 163/21
**this [478]**
**thorough [1]** 181/4
**those [80]** 33/17
56/12 62/4 63/25
68/12 70/13 74/7 78/6
89/14 92/1 96/2 96/12
96/14 98/21 109/4
109/5 109/18 109/24
112/2 120/16 129/24
130/6 132/8 132/18
132/20 135/25 136/1
136/3 136/23 137/6

137/9 138/20 138/22
139/6 139/22 140/18
141/4 141/18 146/22
147/11 150/15 150/18
150/19 150/23 152/4
152/5 153/22 153/23
154/10 154/25 155/1
155/9 155/17 155/17
155/18 156/2 156/6
157/8 160/21 162/13
164/15 168/24 172/21
175/7 180/2 180/12
180/15 182/25 188/19
196/5 204/3 205/24
207/4 207/14 209/14
211/2 212/14 214/11
214/21 220/18
**though [11]** 52/21
57/23 80/12 84/6
167/19 167/20 168/12
175/22 177/4 178/7
207/5
**thought [8]** 11/13
115/1 140/1 171/6
175/13 175/17 182/1
191/18
**thoughts [3]** 6/11
11/12 77/8
**thousand [1]** 145/12
**thousands [11]** 37/8
61/11 82/1 82/3 89/25
90/22 90/24 148/17
156/23 156/24 165/17
**three [37]** 6/20 6/21
11/14 25/15 45/5
71/21 71/22 76/4 79/4
99/8 99/12 120/25
124/9 129/3 155/9
163/2 163/5 169/3
176/17 180/5 184/21
184/23 185/2 185/4
185/11 185/14 186/4
186/5 189/6 189/24
189/25 192/11 192/14
192/18 193/21 207/9
207/10
**three-percent [5]**
99/12 184/23 185/4
185/11 189/6
**threshold [3]** 25/16
207/7 207/7
**throat [1]** 127/25
**through [69]** 6/25 7/3
9/3 19/23 21/16 27/15
28/9 28/17 30/2 47/23
48/13 48/19 48/20
49/1 67/6 68/5 73/4
73/5 89/13 96/21
96/22 96/22 102/11
102/24 105/3 114/10
114/11 116/19 118/6
125/25 126/7 126/12

129/17 131/21 133/24
140/13 140/14 140/23
141/13 142/8 142/16
148/9 148/17 148/22
149/5 149/14 149/25
159/14 164/10 165/11
166/25 168/6 168/13
171/24 172/14 172/21
173/10 177/19 184/4
186/1 190/12 191/9
199/7 200/14 201/18
202/7 202/24 218/1
218/25
**throughout [1]** 127/20
**throughs [5]** 133/23
140/20 140/21 141/7
142/14
**throwing [1]** 162/23
**thrown [1]** 177/1
**tie [1]** 59/24
**tier [1]** 127/4
**ties [1]** 69/12
**time [38]** 6/10 8/25
12/11 13/21 15/1
15/15 16/14 17/2
20/18 44/9 50/16
59/12 60/14 71/11
97/15 110/2 115/25
122/22 137/7 137/9
137/13 137/14 138/8
156/17 156/19 162/20
165/5 170/16 177/13
180/4 180/13 187/6
196/9 198/24 199/23
218/17 218/25 220/17
**times [8]** 22/13 50/22
134/1 143/1 156/1
180/3 186/5 188/5
**timing [1]** 200/8
**tired [1]** 208/9
**Title [1]** 221/4
**Title 18 [1]** 221/4
**today [23]** 6/4 6/16
8/5 22/18 25/3 26/4
26/11 108/16 165/6
165/8 167/3 173/19
173/21 177/11 177/16
179/19 180/3 181/4
182/4 196/13 200/23
207/2 220/15
**today's [1]** 35/1
**together [8]** 44/8
61/11 79/17 107/16
108/11 108/13 116/2
204/18
**token [2]** 34/19 34/19
**told [3]** 71/22 135/24
169/11
**tomorrow [7]** 199/25
201/5 216/17 217/14
219/16 219/17 220/12
**tones [1]** 65/20

**tonight [2]** 116/5
201/8
**too [12]** 11/7 24/18
44/19 49/20 58/6 85/6
88/20 104/24 115/6
123/15 151/16 201/5
**took [9]** 6/17 33/23
37/15 92/17 142/15
157/3 157/5 159/17
205/20
**tool [3]** 44/2 44/6
173/25
**top [14]** 22/16 65/25
68/10 70/5 88/24
89/14 94/23 138/3
138/12 152/18 163/15
176/1 176/1 187/15
**topic [4]** 36/3 103/18
159/23 163/9
**total [8]** 84/13 96/9
171/25 173/18 176/18
186/14 214/25 214/25
**totality [1]** 168/6
**totally [1]** 124/5
**toto [2]** 195/12 195/18
**touch [1]** 26/9
**touchy [1]** 122/6
**touchy-feely [1]** 122/6
**tough [5]** 34/5 39/10
43/9
**tout [1]** 130/12
**touted [4]** 127/22
128/18 130/3 130/3
**toward [4]** 15/8 27/1
43/21 89/2
**track [3]** 167/6 167/7
175/3
**tracked [2]** 167/20
175/6
**tracking [1]** 167/10
**trade [2]** 99/4 101/10
**trademark [43]** 59/15
60/10 61/16 80/14
80/15 80/16 80/18
80/21 81/1 81/24
84/23 99/1 101/1
101/3 101/10 106/8
106/8 106/9 106/10
106/11 107/24 107/25
108/5 108/7 109/1
109/6 109/6 109/10
109/11 109/12 109/12
109/22 109/23 110/4
110/25 113/25 119/17
119/18 184/12 191/8
191/10 196/25 203/5
**trademarks [3]** 59/19
99/2 108/7
**traditional [9]** 38/6
71/11 86/1 86/9 86/17
86/19 92/1 123/11
160/18

**T**

traditionally [4]  59/22
60/10 61/1 61/12
traffic [11]  141/13
142/2 142/12 164/11
164/15 164/19 164/23
165/1 175/23 176/15
219/5
Trail [2]  130/23
132/25
train [1]  91/24
training [1]  51/11
transactions [4]
214/17 214/20 214/22
215/6
transcript [7]  1/16
64/20 74/11 74/22
97/23 221/5 221/6
transition [1]  128/6
translate [5]  70/24
96/3 185/1 185/7
203/15
translated [1]  99/13
translates [1]  133/18
162/6 163/8
translating [2]  52/17
189/6
translation [3]  185/4
189/5 205/21
transpired [1]  88/7
treated [1]  18/5
tremendous [1]
110/12
trends [1]  159/20
trial [21]  6/18 6/20
8/22 8/24 33/9 40/13
47/6 79/6 95/2 115/13
115/14 115/18 115/21
135/1 135/12 135/13
182/6 198/21 211/7
212/16 213/10
tried [4]  7/10 32/9
75/16 177/25
trier [5]  10/16 36/21
51/21 52/4 97/9
tries [1]  40/10
triple [2]  174/18
174/19
trucked [1]  160/19
truly [1]  108/8
trust [4]  173/19
173/19 173/20 173/23
trusted [1]  163/6
try [18]  22/1 22/1
24/18 26/23 27/11
36/6 36/7 37/4 64/10
66/16 76/11 115/25
116/11 125/14 155/16
198/2 200/9 201/17
trying [42]  8/15 8/16
18/24 19/2 20/11

23/17 25/6 25/17
25/17 35/7 35/17
35/18 35/18 35/19
36/5 40/6 40/15 40/16
41/17 47/20 62/14
65/11 65/12 72/1
76/18 82/17 88/12
91/23 92/8 97/9 99/19
102/11 114/12 116/4
199/15 199/21 201/16
202/2 207/22 209/24
210/3 212/25
tune [4]  83/11 83/14
83/23 83/24
tuning [1]  83/13
turn [5]  22/3 66/20
70/19 75/3 97/19
Turning [1]  138/22
turns [1]  212/12
TV [1]  86/1
tweaking [1]  197/23
Twitter [4]  139/18
139/19 140/22 142/3
two [39]  23/9 25/15
25/25 35/21 36/13
47/4 56/13 60/23
62/22 77/18 80/25
88/5 97/22 99/23
109/4 109/13 114/13
116/20 118/8 129/2
131/10 135/18 148/11
158/18 165/16 170/17
178/18 192/20 204/13
205/5 205/16 205/25
207/9 207/9 209/15
211/2 216/25 218/14
219/8
type [4]  27/1 36/16
85/16 144/2
typically [4]  99/4
146/18 172/13 173/15

**U**

U.S.C [1]  11/1
uh [4]  41/13 140/16
146/10 146/24
Uh-huh [3]  140/16
146/10 146/24
ultimate [3]  159/10
161/12 185/16
ultimately [11]  34/9
63/1 133/16 149/14
156/15 157/23 161/13
161/24 162/6 163/7
172/18
umbrella [19]  33/20
33/22 55/1 55/9 55/9
55/11 59/2 75/8 75/25
76/5 81/25 82/10 83/4
105/9 109/11 110/7
126/17 131/18 155/20
umpteen [1]  121/1

unauthorized [1]
67/14
unavailable [1]
167/12
uncertainty [1]  197/14
unclear [1]  170/1
uncompensated [1]
161/23
under [42]  10/20
14/17 22/5 25/6 26/20
27/22 28/8 28/16
31/12 37/3 37/24
38/10 39/23 39/24
41/5 57/23 61/6 62/5
68/13 71/17 79/9
99/24 110/7 143/22
176/2 181/10 192/16
193/25 196/6 196/8
199/2 203/5 205/13
205/18 206/3 206/3
209/15 210/1 211/11
211/17 216/9 218/14
underground [1]
86/12
underlying [2]  119/1
124/8
undermine [2]  205/17
205/17
underperformed [1]
25/15
underscore [1]  32/4
understand [63]  7/23
7/23 9/20 10/9 12/21
14/18 15/23 18/6
18/13 19/5 23/11 28/4
38/7 38/22 39/21
43/17 49/17 49/18
51/22 52/4 57/25 58/1
82/17 82/21 82/21
83/13 84/8 84/11
84/17 88/18 96/11
102/2 104/25 105/1
113/3 113/5 113/16
113/17 119/9 119/9
121/5 122/6 129/4
129/5 140/7 150/24
151/6 157/9 157/19
157/21 162/21 167/14
170/11 170/24 178/9
178/19 179/3 182/14
204/15 208/17 211/16
217/10 218/4
understanding [24]
22/12 30/22 63/2
81/23 84/19 96/18
105/25 133/12 134/6
139/6 143/2 146/7
149/13 154/4 154/20
154/21 156/16 163/3
171/23 173/2 175/6
190/18 192/8 192/22
understatement [2]

8/18 95/14
understood [9]  18/21
30/7 82/19 94/11
126/22 178/17 182/1
187/7 220/11
unfairly [3]  196/9
198/11 212/11
Unfortunately [1]
193/23
uninformed [1]
208/11
unique [2]  139/4
139/6
UNITED [5]  1/1 1/23
35/4 221/4 221/8
unless [5]  105/14
113/15 122/9 122/11
167/3
unnecessary [2]  6/13
117/6
unseen [2]  149/23
157/16
until [6]  37/17 45/6
50/6 74/4 116/24
196/20
untrue [1]  189/22
unusual [2]  187/19
189/15
upcoming [1]  131/15
upon [20]  26/9 50/14
68/21 75/13 75/20
76/22 78/6 85/10
105/23 111/17 111/21
129/5 135/24 147/13
147/13 154/3 156/20
165/10 169/5 185/11
upper [1]  127/4
upper-tier [1]  127/4
us [23]  23/14 45/12
45/16 45/17 53/6
68/10 68/13 85/5
103/22 112/6 135/19
142/10 150/25 161/8
167/18 177/13 181/17
190/6 200/1 210/18
217/15 217/22 220/17
USA [1]  127/12
USA-grown [1]
127/12
use [55]  13/9 24/15
36/11 40/9 40/18
42/12 43/7 44/2 47/16
50/19 52/21 53/5
56/14 56/15 60/7
60/21 60/23 61/18
62/22 65/19 67/14
77/3 82/8 82/24 85/25
96/22 99/3 101/24
102/14 105/8 105/9
105/11 108/24 117/7
119/20 120/24 122/15
123/1 124/23 125/1

127/7 127/25 134/12
184/25 186/10 186/18
190/14 193/3 194/14
201/7 201/19 206/11
207/16 216/24 218/11
used [23]  16/13 33/17
42/4 47/6 59/7 60/11
60/23 64/19 75/19
76/7 86/13 100/14
100/14 105/21 120/22
127/7 134/14 169/6
183/5 183/5 184/11
203/14 216/24
user's [1]  213/18
users [7]  170/4 170/9
170/9 170/22 171/2
171/20 213/18
uses [5]  11/16 54/23
161/24 175/2 188/8
using [16]  10/5 10/22
49/20 60/19 60/19
62/18 71/12 85/1
122/7 122/7 188/2
188/4 188/10 190/13
201/20 204/11
utility [2]  202/21
202/23
utilized [1]  62/14
utmost [2]  81/14
81/17

**V**

V-Tech [1]  134/23
vacate [1]  116/25
vague [4]  144/2 144/4
177/9 177/22
vague-and-ambiguou
s-type [1]  144/2
validate [7]  60/23
60/24 60/25 62/22
183/6 202/25 216/25
validation [4]  63/6
185/16 217/5 218/1
Valmatrix [3]  107/25
109/14 109/15
valuable [1]  109/23
valuation [14]  59/9
59/14 59/18 60/17
61/10 62/9 62/24 94/4
100/15 113/22 135/17
183/5 184/8 191/10
value [85]  54/23 55/1
56/1 56/3 56/4 56/15
57/1 59/1 59/15 59/23
59/24 60/1 60/10
61/18 61/22 62/8
62/10 62/15 62/16
62/25 63/4 63/11
64/24 65/4 67/11 69/5
69/12 69/15 69/16
70/13 72/11 72/12
73/1 78/4 84/23 93/17

**V**

**value... [49]** 93/19
99/3 99/6 102/11
110/3 110/17 111/25
114/14 126/15 129/6
129/15 135/19 145/25
147/25 149/9 152/13
154/5 160/15 161/15
161/16 161/23 166/24
167/11 168/19 168/20
168/21 182/11 182/13
184/22 185/13 186/3
191/6 191/8 193/1
193/2 194/6 194/14
194/16 194/18 197/20
201/24 202/14 202/18
203/4 204/3 204/8
204/9 204/12 217/6
**valued [2]** 61/10
184/14
**values [2]** 70/16 194/6
**valuing [6]** 24/22 61/6
62/4 184/12 194/8
194/24
**vape [15]** 82/1 84/23
84/25 85/24 91/8 97/7
127/11 127/24 127/25
128/1 128/1 128/22
130/21 134/13 134/17
**vaped [1]** 128/9
**vapers [3]** 123/4 128/1
131/12
**vapes [6]** 91/7 130/25
133/1 133/2 136/9
139/2
**vaping [13]** 82/8 82/9
82/10 87/11 123/2
123/3 130/22 130/24
130/24 132/25 132/25
136/19 136/19
**vapor [5]** 123/1
130/23 130/23 132/24
132/24
**vaporous [3]** 176/24
177/8 177/21
**vapory [1]** 176/24
**varies [1]** 179/12
**various [18]** 26/2
27/15 28/9 28/17
28/17 36/23 39/20
77/9 98/2 105/4 105/8
109/19 120/7 129/24
140/15 156/21 159/8
170/5
**vegetable [1]** 127/8
**Ventures [4]** 5/4 5/8
5/18 5/22
**VENTURS [1]** 1/7
**venues [1]** 8/22
**verb [2]** 36/21 52/2
**verbally [1]** 122/22

**verbally/analytically
[1]** 122/22
**verbiage [2]** 31/22
120/24
**verdict [1]** 79/6
**veries [1]** 19/7
**verifiable [3]** 154/7
169/1 170/12
**verification [1]** 171/1
**verified [2]** 170/12
203/3
**verify [1]** 170/19
**veritable [2]** 19/4
43/15
**versa [2]** 14/11 57/22
**versed [1]** 52/3
**version [2]** 43/6 43/6
**versus [6]** 11/23 12/2
77/23 103/4 109/22
213/20
**very [34]** 9/20 11/7
19/6 19/6 22/11 24/23
31/15 31/16 32/11
35/4 37/10 39/4 49/16
50/23 59/19 82/2 87/9
93/12 99/2 101/16
120/11 131/2 131/2
132/13 148/12 158/10
158/10 180/4 183/20
198/5 202/8 204/14
210/19 215/5
**VG [2]** 127/9 128/1
**via [2]** 170/5 212/25
**vice [3]** 14/11 47/3
57/22
**vice-president [1]**
47/3
**video [1]** 136/17
**videos [6]** 128/17
131/15 131/22 136/23
137/2 137/3
**view [13]** 13/7 23/12
37/4 43/4 52/19 71/2
87/18 122/5 122/17
122/17 177/3 177/4
209/4
**viewers [1]** 136/6
**views [8]** 72/15
136/14 138/22 138/23
138/24 139/6 184/22
190/2
**violations [1]** 45/14
**vis [10]** 15/7 15/7
59/23 59/23 77/14
77/14 83/4 83/4 170/8
170/8
**vis-a-vis [5]** 15/7
59/23 77/14 83/4
170/8
**visit [1]** 172/16
**visualization [1]**
37/17

**visually [1]** 47/15
**voice [1]** 93/3
**volume [4]** 1/20 76/3
95/20 110/10

**W**

**W-e [1]** 55/19
**wait [7]** 39/3 66/23
69/25 111/19 111/19
115/2 199/5
**waiting [3]** 90/12
137/19 137/22
**waive [1]** 115/13
**waived [1]** 15/11
**walk [2]** 92/22 184/4
**walking [1]** 10/12
**wall [1]** 53/19
**want [151]** 6/14 8/19
8/19 10/25 12/13
12/14 12/14 13/18
15/6 15/14 16/2 18/15
18/16 18/17 19/1
19/17 19/20 20/6
21/15 21/22 21/23
21/25 22/10 23/16
23/18 23/18 27/1 27/8
27/20 27/21 28/12
28/18 28/18 28/20
28/23 28/23 30/2 31/1
32/9 34/13 34/18
36/23 38/1 38/18
39/19 40/3 40/7 40/12
41/6 41/9 41/16 42/6
42/20 42/21 42/21
43/19 43/20 43/24
44/15 46/4 46/10
46/12 46/14 47/2 47/9
47/16 48/8 48/10 49/9
49/22 50/3 50/4 50/16
56/20 57/18 63/11
64/24 66/18 71/6
71/25 72/2 72/6 72/7
72/7 72/25 73/13
73/18 73/19 78/24
80/3 80/5 80/7 83/21
84/10 88/12 93/5 93/8
94/25 97/6 97/24 98/6
105/17 109/14 113/15
113/16 115/22 115/24
118/5 121/10 124/15
124/23 125/3 125/11
125/11 125/12 125/13
125/14 125/20 125/21
125/25 129/6 131/25
132/11 143/1 143/5
143/7 143/17 144/7
144/11 151/6 170/15
176/8 180/19 183/1
183/7 183/7 199/7
200/3 200/10 201/5
201/19 202/22 203/23
203/24 207/20 208/22

211/7 212/3 213/3
215/25 216/12
**wanted [7]** 118/12
118/13 118/18 119/7
155/22 200/24 210/13
**wants [5]** 7/12 27/6
28/8 28/15 219/15
**warehouse [1]** 33/14
**warn [1]** 220/10
**warrant [1]** 14/17
**warranted [1]** 113/14
**was [180]** 6/18 10/9
17/5 17/23 23/20
24/24 24/25 25/21
33/16 35/7 37/12
37/13 37/15 39/4 46/1
47/3 47/4 47/5 47/7
48/14 54/13 55/9
55/10 58/16 58/18
58/25 61/4 62/19
62/22 62/23 62/25
63/8 64/15 65/5 65/7
65/10 65/25 68/2 68/7
68/11 69/3 74/9 74/25
75/9 76/1 76/1 77/22
77/23 78/2 79/3 79/4
79/5 81/18 84/4 89/2
94/9 94/11 95/9 95/15
100/6 101/2 103/8
103/9 103/9 108/11
108/17 108/23 110/6
110/14 110/15 118/12
118/13 118/19 120/11
121/24 127/23 128/22
128/22 129/14 130/17
131/6 132/13 132/16
132/16 134/23 135/2
135/11 135/18 136/13
136/20 137/7 137/9
137/9 137/13 137/14
137/14 138/8 138/12
138/13 138/15 139/1
140/17 142/1 142/2
142/7 142/8 145/8
145/14 149/9 149/9
152/4 154/3 155/2
156/17 156/17 156/19
157/7 157/9 159/6
161/14 161/15 162/9
162/10 164/3 165/6
166/21 166/23 167/1
167/4 168/16 168/19
168/20 169/5 169/9
169/10 170/20 170/23
171/7 171/22 171/22
171/24 173/5 173/6
177/13 182/21 182/23
182/23 183/19 183/24
184/5 185/19 185/21
191/2 191/13 192/12
194/23 196/20 197/17
197/23 198/6 198/6

**201/15 203/8 203/10**
203/11 203/11 207/13
207/24 210/9 210/10
211/21 211/21 211/22
213/7 215/12 218/13
218/15 219/13 220/3
220/16
**Washington [1]** 77/24
**waste [1]** 196/9
**watch [1]** 22/25
**water [3]** 43/7 45/7
218/7
**wattage [1]** 128/7
**wattages [3]** 128/2
128/10 128/11
**watts [2]** 128/8 162/23
**way [97]** 9/20 10/15
10/24 11/11 15/18
15/21 15/22 21/16
21/21 24/22 26/4
26/13 26/22 27/19
27/20 27/24 28/1 28/8
28/14 28/15 28/21
32/8 36/6 37/4 38/5
38/6 38/8 39/5 39/23
39/24 40/2 55/19
59/22 60/10 61/1
69/19 71/14 71/16
73/10 76/11 79/10
86/9 87/3 87/14 89/1
90/17 91/18 92/1 92/1
92/17 96/24 97/5
100/21 107/10 107/10
112/20 115/6 121/10
121/22 122/1 123/11
123/12 124/20 125/2
126/19 140/24 146/6
148/10 155/13 161/19
168/5 176/12 179/3
179/7 189/15 189/16
189/18 189/19 189/22
190/1 200/11 200/14
202/5 202/5 203/8
204/1 206/10 208/20
209/10 210/22 211/8
212/7 215/12 217/1
217/6 218/8 218/20
**ways [10]** 28/14 46/16
60/2 60/9 60/23 69/20
107/20 145/25 202/4
205/16
**WDK [2]** 1/9 5/4
**we [264]** 6/18
**we did [1]** 6/18
**we'd [2]** 103/21
172/20
**we'll [24]** 6/22 8/5 9/2
15/4 19/20 21/1 33/9
35/8 44/24 48/19
48/20 49/1 51/7
105/13 113/12 115/20
116/8 116/24 200/1

**W**

**we'll... [5]** 201/6 208/6
208/20 208/21 217/21
**we're [81]** 6/23 8/16
9/3 11/11 15/5 15/9
17/21 19/16 20/23
21/12 21/14 21/20
22/14 22/15 22/17
25/3 27/11 28/6 28/21
28/21 31/9 33/2 37/3
39/7 42/12 42/18 44/2
44/8 45/18 47/24 48/5
48/10 48/17 48/21
48/25 49/1 50/9 50/12
51/2 53/10 53/17
60/18 73/2 73/5 88/3
91/22 93/11 96/8
101/16 104/21 106/12
112/11 113/20 114/5
115/13 116/10 137/16
137/19 145/22 161/11
176/11 187/13 190/6
190/15 191/7 195/1
197/4 198/23 202/2
203/6 203/18 208/14
208/18 211/7 214/6
215/1 215/16 216/8
216/17 216/19 217/5
**we've [37]** 12/4 12/6
15/16 19/12 22/14
23/8 28/9 31/10 36/1
36/2 44/6 47/23 64/3
72/14 82/14 82/15
107/15 108/13 110/23
113/13 116/19 122/12
128/6 144/24 160/17
165/16 167/8 170/4
200/23 204/14 207/2
207/2 209/8 210/20
212/4 212/16 216/8
**weaker [1]** 7/13
**website [4]** 136/10
155/13 161/25 214/15
**websites [11]** 77/11
82/6 89/25 136/15
136/19 137/5 137/5
141/16 154/1 155/16
156/22
**weeks [2]** 45/5 138/13
**Wegner [48]** 3/3 3/3
3/7 3/11 3/15 4/6 4/7
4/8 4/9 5/25 6/2 6/3
12/9 12/19 24/2 24/8
26/18 29/9 33/5 37/1
37/2 46/14 49/4 49/21
55/14 55/19 55/19
55/22 56/21 92/24
92/24 110/20 112/6
115/23 118/5 118/5
122/10 125/25 129/8
131/4 158/14 169/25

**weigh [1]** 93/25
**weighing [2]** 121/14
121/14
**weighted [1]** 69/6
**weighting [2]** 68/13
92/25
**welcome [1]** 46/15
**well [105]** 6/21 8/9
8/11 9/10 10/18 12/2
14/19 15/20 19/2
20/20 21/5 22/21 23/2
24/23 25/24 26/14
28/12 37/11 38/9
38/13 38/18 43/10
43/13 46/19 47/11
48/9 48/11 50/22
50/24 52/3 52/22
52/25 53/4 58/23
59/19 64/3 64/4 64/13
69/20 70/18 76/11
82/5 83/8 87/14 88/7
89/15 93/12 93/23
94/24 96/17 97/24
100/2 100/13 100/19
102/6 102/10 102/11
102/16 103/1 103/4
104/16 106/15 107/7
109/14 110/14 113/7
113/13 113/20 113/23
114/4 116/21 118/9
119/17 119/21 121/21
123/9 125/2 126/14
137/16 140/17 141/19
142/13 142/25 144/1
145/5 159/18 159/19
167/2 173/15 174/22
178/11 178/13 191/12
191/15 193/19 195/1
197/19 198/14 200/16
202/4 205/10 211/5
215/7 218/13 220/4
**well-established [1]**
24/23
**well-versed [1]** 52/3
**went [13]** 33/14 48/13
77/20 79/6 104/4
104/10 131/21 131/22
135/12 140/13 162/12
173/10 184/19
**weren't [4]** 54/4 109/5
135/10 138/18
**West [1]** 2/7
**WESTERN [1]** 1/3
**Westlaw [1]** 213/21
**WESTON [2]** 4/11
57/11
**westside [1]** 219/12
**what [402]**
**What do [1]** 46/14
**what's [56]** 9/22 9/24

15/25 20/5 21/18
21/20 21/25 23/11
23/21 29/3 30/4 32/13
33/5 37/11 37/21
38/12 38/24 45/2 45/3
60/11 65/14 65/21
71/18 72/5 73/8 76/15
76/16 79/14 82/11
83/2 83/13 87/18 88/7
90/3 93/2 96/5 97/3
108/23 112/5 122/4
124/2 124/2 124/16
125/3 125/5 144/5
175/14 178/6 182/3
191/25 193/25 203/20
206/1 206/9 212/20
213/25
**where [70]** 10/22
15/13 20/1 22/20
23/15 24/9 24/9 25/22
26/2 26/11 26/15
31/14 31/17 32/4 32/5
32/14 32/24 35/1
36/18 39/7 40/24 43/2
43/21 47/18 47/23
47/24 67/25 68/20
68/22 71/1 75/8 75/21
76/6 76/7 77/17 83/12
83/15 84/23 86/23
88/3 89/16 91/14
100/20 105/11 116/13
119/17 120/13 120/18
123/6 127/21 132/7
132/8 132/21 138/7
144/23 150/15 162/22
163/5 165/23 171/1
177/9 185/4 193/5
193/17 197/18 200/22
201/11 202/20 213/17
214/4
**where's [1]** 170/25
**whereas [4]** 14/13
14/15 161/23 170/19
**whether [28]** 14/21
14/22 28/20 32/21
52/8 53/8 53/13 53/21
53/22 74/24 99/14
122/24 128/19 129/25
146/5 146/11 155/12
162/1 169/17 176/18
178/20 180/17 185/19
192/25 212/15 212/17
216/7 217/25
**which [78]** 9/16 9/23
10/5 15/17 15/20
17/21 18/10 22/14
26/6 26/24 27/12
33/17 40/9 42/13 46/6
49/7 51/1 51/2 64/15
64/17 69/19 73/1
75/17 78/4 79/18
79/18 81/7 81/25 84/9

93/15 93/25 94/9 95/9
95/17 95/18 98/20
99/1 110/6 110/15
114/18 118/18 118/20
120/21 122/2 122/2
127/9 128/3 128/4
129/5 130/5 133/17
138/23 142/6 148/6
148/21 159/5 159/6
162/6 162/24 175/16
186/23 186/24 187/9
187/12 191/15 196/23
197/10 202/7 202/19
203/12 204/14 205/23
206/2 208/7 214/13
214/14 215/10 218/10
**while [7]** 17/23 43/20
49/20 57/19 108/12
180/9 212/5
**whispering [1]** 115/1
**white [1]** 38/25
**who [35]** 7/17 8/11 20/4
35/5 47/3 47/5 49/5
51/9 53/18 65/12 78/3
85/16 87/1 87/1 91/5
97/1 97/1 97/1 104/4
123/1 130/6 130/11
146/25 147/2 148/21
155/4 155/12 155/24
160/3 160/4 161/20
170/4 171/2 171/20
171/20
**who's [6]** 6/3 7/13
89/19 102/6 107/19
114/11
**whole [9]** 19/24 71/14
80/16 88/25 98/6
167/7 173/20 177/7
212/12
**wholesale [12]** 148/10
150/9 150/20 150/20
156/22 158/4 159/5
159/17 159/22 188/4
214/15 214/18
**wholesaler [2]** 85/17
157/2
**wholesalers [13]**
147/24 148/2 148/20
149/17 152/20 153/7
153/15 154/22 155/25
156/11 157/14 157/24
159/14
**wholesome [1]** 115/7
**whose [1]** 37/13
**why [43]** 17/21 21/19
21/23 26/11 27/3
27/16 32/11 33/2 38/3
39/4 51/17 53/10
75/22 75/22 75/22
82/11 92/16 98/10
100/6 100/23 101/2
101/4 101/9 103/8

103/21 103/22 110/25
114/18 114/21 115/3
115/6 119/22 159/19
166/6 183/1 183/21
183/23 188/10 192/13
193/19 193/22 194/5
210/23
**widely [4]** 60/11 61/15
184/11 184/11
**WILLIAM [5]** 1/5 3/7
65/6 131/21 155/8
**willing [6]** 23/12 23/24
24/2 115/13 149/24
157/10
**wills [1]** 108/14
**win [3]** 208/6 208/20
208/21
**windfall [4]** 27/23
28/1 63/8 214/10
**winds [1]** 218/19
**wing [1]** 120/25
**winnow [1]** 43/9
**Winterland [2]** 31/23
32/11
**wise [1]** 23/13
**wish [1]** 97/4
**with what [1]** 190/16
**withdrawn [1]** 70/11
**within [8]** 119/1 119/2
127/7 127/24 166/18
168/2 175/5 212/6
**without [13]** 12/24
13/1 44/8 45/18 80/14
84/4 102/20 102/21
106/7 106/8 118/10
152/4 200/24
**witness [15]** 51/9 52/3
57/14 58/11 63/16
64/3 64/9 72/17 78/16
117/8 117/11 170/13
170/20 202/1 220/9
**witness's [1]** 170/7
**witnessed [1]** 88/7
**WITNESSES [1]** 4/3
**WL2749576 [1]**
213/21
**won't [8]** 22/15 50/6
86/11 92/14 102/3
104/16 123/4 179/2
**wonder [32]** 33/18
54/25 55/6 55/9 59/2
75/8 75/25 76/5 81/25
85/23 109/11 110/7
127/3 127/23 128/19
130/2 131/17 142/9
142/21 142/23 148/16
150/20 152/2 159/22
161/3 161/9 162/6
165/14 168/5 172/24
214/15 214/19
**wonderful [1]** 162/16
**Wonderland [1]**

**W**

**Wonderland... [1]**
179/20
**word [23]** 7/7 8/2 16/4
16/13 17/24 17/25
18/3 18/4 31/23 33/19
40/7 40/8 46/21 49/20
86/25 87/15 99/21
102/15 131/17 157/3
157/4 157/5 210/17
**wording [1]** 45/12
**words [15]** 40/10
59/24 74/6 86/18 93/8
93/10 101/20 112/15
133/19 143/15 155/25
160/19 166/2 174/18
186/1
**work [21]** 8/24 9/2
28/6 33/9 37/7 42/15
42/24 42/25 43/21
46/12 68/6 79/17
104/13 104/14 106/18
117/1 117/2 162/15
182/5 184/13 200/14
**worked [8]** 12/4 12/6
12/25 61/2 61/6 89/19
108/11 108/13
**working [2]** 27/15
107/2
**works [4]** 65/21 69/7
69/8 96/18
**world [10]** 19/5 21/22
47/4 72/11 73/6 87/5
91/16 123/7 123/7
208/7
**worse [1]** 7/14
**worth [1]** 63/8
**would [128]** 8/17
11/16 25/11 26/12
26/13 28/25 29/19
33/21 34/2 35/16 36/4
36/4 38/12 39/5 39/5
39/6 44/17 45/1 45/3
46/7 46/15 51/15 57/8
57/13 61/13 62/2 63/8
68/13 68/22 69/23
70/2 72/6 72/14 76/7
76/23 76/24 81/4 83/3
84/3 84/10 86/8 89/18
95/17 95/18 102/18
102/20 104/5 104/6
106/16 106/17 106/18
106/19 106/21 106/22
107/2 107/3 107/4
108/15 108/19 108/25
109/3 109/3 109/4
109/13 109/19 111/23
114/14 122/13 133/24
139/9 142/15 144/1
144/4 144/19 146/17
146/17 146/23 147/1

147/5 150/25 152/5
155/9 156/3 156/7
157/19 157/20 162/18
165/14 165/24 166/2
167/11 168/1 170/2
170/2 170/14 172/19
174/17 175/2 178/4
184/17 185/3 186/4
186/6 186/9 189/25
192/7 192/11 192/13
192/16 192/25 193/3
193/15 193/19 193/22
194/5 194/20 196/8
203/4 205/15 205/16
205/17 206/14 207/14
212/18 212/19 216/10
220/5 220/17
**wouldn't [7]** 14/15
51/2 51/2 54/13 117/5
156/3 181/9
**wrapped [1]** 98/25
**wrapping [1]** 216/19
**wrinkle [1]** 214/1
**wrinkles [1]** 214/2
**write [3]** 180/4 193/23
197/13
**writing [2]** 39/1
120/23
**writings [1]** 55/25
**written [3]** 6/11 200/9
216/4
**wrong [12]** 6/14 7/23
44/16 50/2 54/10
107/20 204/14 204/25
209/16 209/19 215/2
215/3
**wrong-doer [1]**
204/25
**wrongdoer [1]** 197/15
**wrote [2]** 164/9 176/5

**X**

**X-acto [3]** 36/9 36/9
36/11

**Y**

**yeah [16]** 10/11 20/14
26/17 44/23 48/15
54/7 64/2 94/2 94/8
113/7 132/10 144/2
187/5 191/4 202/15
218/21
**year [4]** 84/22 111/10
155/6 214/10
**years [13]** 8/20 12/15
35/4 47/3 61/3 79/4
81/19 85/2 91/2 91/20
128/6 134/15 135/18
**yeoman [1]** 6/9
**yesterday [5]** 10/20
11/14 19/23 118/17
119/8

**yet [11]** 22/17 40/24
52/15 74/17 80/7
105/12 118/4 167/21
168/14 178/11 203/19
**yields [1]** 205/22
**yoked [1]** 47/21
**yoking [1]** 47/22
**you'd [4]** 67/22 103/22
122/19 134/21
**you'll [5]** 20/15 34/4
38/19 76/2 197/6
**you've [40]** 8/13 13/24
15/11 19/4 19/19
21/22 22/6 40/20
42/16 42/16 42/17
43/12 43/13 43/14
43/17 51/3 79/8 83/20
87/18 88/4 92/18
101/21 101/22 110/23
115/24 116/12 118/7
118/7 124/3 126/16
137/25 139/13 143/4
183/3 183/4 190/11
190/13 197/20 198/22
216/1
**young [1]** 35/4
**yourself [8]** 24/13
34/16 34/22 85/21
116/15 125/6 137/1
220/10
**yourselves [1]** 57/9
**YouTube [10]** 130/20
130/25 136/10 136/11
136/14 136/16 136/18
138/23 138/24 176/13
**Yuanjun [1]** 3/11

**Z**

**zip [1]** 38/23
**Zophie [1]** 130/24
**Zophie's [3]** 133/1
136/9 139/2